**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Gilberte Jill Kelley,                )<br>and                )<br>Scott Kelley, M.D.                )<br>1005 Bayshore Blvd.                )<br>Tampa, Florida 33606                )<br>                )<br>                *Plaintiffs*,                )<br>                )<br>                v.                )<br>                )<br>The Federal Bureau of Investigation,                )<br>and Robert S. Mueller, III, in his official                )<br>          capacity as the Director of the Federal                )<br>          Bureau of Investigation,                )<br>935 Pennsylvania Avenue, N.W.                )<br>Washington, D.C., 20535-0001,                )<br>                )<br>United States Department of Defense                )<br>1400 Defense Pentagon                )<br>Washington, D.C., 20301,                )<br>                )<br>The United States of America                )<br>950 Pennsylvania Ave., NW                )<br>Washington DC, 20530,                )<br>                )<br>FBI John and Jane Does 1 through 10                )<br>          individually,                )<br>                )<br>DOD John and Jane Does 1 through 10                )<br>          individually, and                )<br>                )<br>USG John and Jane Does 1 through 10                )<br>          individually,                )<br>                )<br>                *Defendants*.                )<br>                ) | Civil Action No: _____ |

**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

1.        Plaintiffs Mrs. Gilberte Jill Kelley and Scott Kelley, M.D., bring this action to

vindicate their legal rights to privacy and dignity that were infringed by the government's improper disclosures of their personal, private, and confidential information.  While the facts ultimately leading to the resignation of Central Intelligence Agency ("CIA") Director David Petraeus ("Director Petraeus") and abrupt retirement of General John Allen are by now very well known, there was no legally acceptable reason for the government to disclose confidential information about the Kelleys and thereby make them part of the public scandal.

2.     Therefore, Mrs. Kelley and Dr. Kelley make this complaint against the Federal Bureau of Investigation, and Robert S. Mueller, III, in his official capacity as the Director of the Federal Bureau of Investigation, the U.S. Department of Defense, the United States of America, FBI John and Jane Does 1 through 10, DOD John and Jane Does 1 through 10, and USG John and Jane Does 1 through 10 ("John and Jane Doe Defendants") for money damages and injunctive relief for violations of Plaintiffs' Fourth and Fifth Amendment rights, for money damages for violations of Plaintiffs' privacy rights under the Privacy Act, 5 U.S.C. § 552a, and for declaratory relief under the Stored Communications Act, 18 U.S.C. § 2707(g).

3.     In the event the Defendants attempt to prove (and the Court were to agree) that the damaging leaks, cavalier sexual innuendo, old-fashioned "blame the victim" discrimination, and other privacy violations and slander of the Kelleys by government officials were not authorized conduct within the scope of those officials' employment, Plaintiffs also make this complaint for  violation of common law privacy rights and defamation by the John and Jane Doe Defendants.

**NATURE OF THE ACTION**

4.     This Complaint seeks to hold the Government and its agents accountable for their willful, malicious, and unlawful violation of Plaintiff's constitutional and statutory privacy

rights.   Dr. Scott and Mrs. Jill Kelley ("the Kelleys") are private citizens who sought the assistance of federal law enforcement by reporting evidence of possible criminal activity, including cyberstalking, involving threats to themselves and leaders in the US military and government, and foreign ambassadors.   The Kelleys were the victims of this criminal activity, and they sought to do the right thing by reporting the facts to agents of the Federal Bureau of Investigation ("FBI").   The federal government did not, however, do the right thing.   Rather than protect the Kelleys' privacy interests as the law and their duty required, Defendants instead willfully and maliciously thrust the Kelleys into the maw of public scrutiny concerning one of the most widely reported sex scandals to rock the United States government.   Defendants violated their legal duty to protect the Kelleys' privacy, dignity, reputation, and security, and instead started, engaged with, and fomented a malicious campaign of "blame the victim" that has taken a tremendous emotional and financial toll on the Kelleys and their three young daughters, and even threatened their physical safety.

5.     The injuries suffered by Plaintiffs are the direct product of Defendants' overreaching, including wrongful, unauthorized and overbroad search, collection, misuse, and dissemination of electronic data and other information with little to no regard for the standards required by law or common decency.

6.     In direct consequence of Defendants' misconduct, Jill Kelley was held out as an object of ridicule, moral opprobrium, scorn, and derision, causing her shame, public notoriety, egregious loss of privacy and security, and costing Mrs. Kelley positions of trust, responsibility, and diplomatic status, and costing the Kelleys public respect, lost income, and significant lost financial, business, and investment opportunities.   The Defendants unforgivably transformed Mrs. Kelley's reputation from that of a respected business and community leader and energetic

entrepreneur who volunteered to support our troops into a woman of dubious virtue and integrity – even though she is happily married, never engaged in an extramarital affair with anyone, and the emails that were so widely publicized by the Defendants came from an email account that she shared with her husband.

7.     In further direct consequence of Defendants' misconduct, Dr. Scott Kelley also suffered economic and other damages, which Plaintiffs are prepared to prove with detailed support to be offered after entry of a protective order.

8.     Defendants' investigatory and compulsory powers give them unparalleled access into the private lives of citizens.  The privacy rights Plaintiffs seek to vindicate in this suit are intended to check the potential for abuse inherent in these expansive and intrusive powers.  That potential for abuse is patent in the events underlying this suit.  If Defendants can wreak such emotional, reputational, and financial havoc on a couple as educated, intelligent, successful, and public-spirited as the Kelleys, they could certainly do so to anyone.  Accordingly, this suit seeks not only to vindicate Plaintiffs' legal rights, help restore their reputations, champion the truth, and otherwise attempt to make them whole, but also to deter Defendants from such egregious violations of privacy in the future.

9.     The Privacy Act expressly requires the federal government to protect individuals against disclosures "which could result in substantial harm, embarrassment, inconvenience, or unfairness" to them. The law is clear that victims and witnesses in government investigations are entitled to their privacy and to be protected from embarrassment willfully, directly, and proximately caused by the government.  Citizens like Mrs. Kelley and her husband do not deserve to be treated cavalierly or contemptuously simply because the government officials and agents involved did not take their dignity seriously.  Such callous disregard of personal privacy

and human dignity will sow increased mistrust of government, and impede the missions of our law enforcement, military, and national security agencies. It must not be condoned. The law of the United States simply does not permit the government and its agents to act in the manner in which they did.

## JURISDICTION

10. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a(g), the Stored Communications Act, 18 U.S.C. § 2707, the Fourth Amendment of the United States Constitution, the Fifth Amendment of the United States Constitution, and pursuant to 28 U.S.C. §§ 1331, 1343, 1346, 1361, and 1367.

## VENUE

11. Venue is proper in this District pursuant to the Privacy Act, 5 U.S.C. § 552a(g)(5), and pursuant to the United States Code of Judicial Procedure, 28 U.S.C. § 1391.

## PARTIES

12. Plaintiff Mrs. Gilberte Jill Kelley ("Jill Kelley" or "Mrs. Kelley") obtained an undergraduate degree from an institution now known as Arcadia University, where she was a pre-med student. While subsequently attending courses at Hahnemann University's medical program, she was a medical researcher for the Department of Anesthesia at the University of Pennsylvania in Philadelphia. She conducted and published research in critical care and pain medicine. She and Dr. Scott Kelley met at the University of Pennsylvania, they married, and Mrs. Kelley interrupted her medical program to relocate to Tampa with him when he received his fellowship at Moffitt Cancer Center. In 2002, the Kelleys were blessed with the birth of their first daughter, and Mrs. Kelley and her husband are now proud parents to three young children.

13.     In addition to raising their children, prior to the Defendants' egregious actions, Mrs. Kelley had been a successful real estate investor, community leader, liaison to the military community in Tampa, and appointed consular official accredited by the U.S. Department of State.  Mrs. Kelley has also continued her interests in medical research, has been working on a book regarding the diagnosis of and treatment for cancer, and drew on her background in medical studies to design an innovative medical device for which she filed a patent application regarding "methods and apparatus for surgical anastomosis" as the sole inventor/applicant.  Mrs. Kelley has also continued to develop further patent ideas.  Additionally, Mrs. Kelley has devoted considerable time to community service, both to the local homeless as well as to the large community of servicemen and women in the Tampa area.  Reflecting her contributions to the morale and well being of the military base in Tampa, she was named as the first "honorary ambassador" for the U.S. Central Command ("CENTCOM") Coalition in April 2012 while under the command of CENTCOM Commander General Mattis.  In August 2012, in further reflection of her abilities and reputation, the Government of the Republic of Korea appointed Mrs. Kelley as Honorary Consul under the Vienna Convention on Consular Affairs of 1963, Art. 10.

14.     Plaintiff Scott Kelley, M.D., is a general surgeon and surgical oncologist with an undergraduate degree from Dartmouth University and a medical degree from Columbia University.  He completed his residency at the University of Pennsylvania and his surgical oncology fellowship at Moffitt Cancer Center in Florida.  There, Dr. Kelley became the head of the esophageal gastric section.  After approximately five years, he left academics to enter private practice.  Dr. Kelley was a pioneer of laparoscopic surgery for esophageal cancer.  This procedure is significantly less invasive than traditional surgery, thereby reducing risk of patient morbidity.

15.     Defendant Federal Bureau of Investigation ("FBI") is a component of the United States Department of Justice, a Department of the Executive Branch of the United States Government.  Robert S. Mueller, III, is the Director of the FBI.  The FBI's principal place of business is in the District of Columbia.

16.     Defendant United States Department of Defense ("DOD") is a Department of the Executive Branch of the United States Government.  The DOD's principal place of business is in Virginia.

17.     Defendant United States of America is named in that the actions of the FBI and DOD complained of herein are the responsibility of the United States Government ("USG"), and such actions may have, upon information and belief, involved other Departments, Agencies, and/or Executive Offices.

18.     FBI Defendants John and Jane Does 1 through 10, DOD Defendants John and Jane Does 1 through 10, and other USG Defendants John and Jane Does 1 through 10 (collectively, the "John and Jane Doe Defendants") are individuals who acted jointly and in concert to conspire to and did commit, aid, and abet the acts complained of herein.  The John and Jane Doe Defendants' true names and capacities are presently unknown to Plaintiffs, but whose identities should become known during the course of discovery.  Each of the "Doe" Defendants is an agent or employee of the United States who, at least in part, exercises government authority, and is responsible in some manner for the acts and occurrences alleged in this complaint, and each of the "Doe" Defendants directly and proximately caused the damages alleged herein.

## FACTS

19.     Until November 2012, the Kelleys were active, dedicated, and productive members of the Tampa community that is home to MacDill Air Force Base and the United States Central Command, which has led U.S. combat operations in Iraq and Afghanistan.

20.     Scott and Jill Kelley live less than 10 miles from MacDill Air Force Base in Tampa.  They have great respect for our country's military, and volunteered many years in community outreach and support for their local military community.  One of the Kelleys' particularly successful community service initiatives involved the founding of the Coalition and Multi-National Forces Appreciation Reception in 2009, which included Senior National Representatives to CENTCOM from over 60 countries.  As the founder of the annual event, Mrs. Kelley hosted the attending foreign representatives and sought to promote goodwill, trust, camaraderie, and appreciation.

21.     In 2011, the Director of the Coalition and Multi-National Forces recognized Mrs. Kelley for her dedication and community-building efforts.  Mrs. Kelley also acted as a goodwill ambassador to the Commanders at CENTCOM.  This role came with no official duties or compensation, but, rather, recognized her continuing and dedicated commitment to contributing positively to the military community, including promoting the importance of cross-cultural and interfaith dialogue, and building relations with foreign ambassadors.

22.     Through all of their activities at MacDill, CENTCOM, Special Operations Command ("SOCOM"), and on behalf of the Coalition and Multi-National Forces, Mrs. Kelley and Dr. Kelley became acquainted with a number of military officials and their families, including Director David H. Petraeus, US Marine Corps General John R. Allen, Jr., US Marine Corps General James N. Mattis, United States Navy Admiral William H. McCraven, and US

Navy Vice Admiral Robert S. Harward, Jr. The Kelleys, individually and as a couple, interacted with these individuals and their spouses and families on a regular basis, and they all attended many of the same social and dignitary functions. Mrs. Kelley often corresponded with each these individuals and their spouses, sharing social news and personal reflections. She also corresponded with them about more substantive matters that would specifically relate to her community outreach and diplomatic efforts. As a result of these efforts, Mrs. Kelley was appointed Honorary Ambassador for the US CENTCOM Coalition.

23. The Kelleys were also active real estate developers and investors in the area, eventually acquiring an office building in Tampa.

24. Because of her established leadership and civic commitment, Mrs. Kelley was invited to attend the FBI's Citizens Academy, an honorary program for community leaders to learn about the practical, structural, operational and ethical aspects of the FBI. She completed that program in November 2011.

25. On or about January 2012, South Korean official Han Duk-soo, who is currently head of the Korean International Trade Association ("KITA") and was the South Korean Ambassador to the United States through approximately February 2012, requested that Mrs. Kelley be considered for a position as Honorary Consul, a position recognized and governed by the Vienna Convention on Consular Relations. In recommending Mrs. Kelley, he cited her active role in organizing events that helped bring about the free trade agreement between South Korea and the United States, including arranging meetings between the Ambassador and key individuals in the Tampa area. In August 2012, South Korea officially appointed Mrs. Kelley an

Honorary Consul accredited to the U.S. Department of State.[1]  Mrs. Kelley's goals as Honorary Consul were to build and strengthen US-Korea relations, in addition to helping Ambassador Han with interests related to the Korea-US Free Trade Agreement.  Her appointment to Honorary Consul carried a tax-free stipend and would be renewable after a five year term.  She was free to carry on other business while serving as Honorary Consul for the Republic of Korea, and Honorary Consuls typically engage in business deals and transactions arising out of their knowledge and contacts.  Mrs. Kelley was presented with opportunities to engage in such business and intended to do so during her service as Honorary Consul to the extent that such business would not conflict or interfere with her consular responsibilities.

### Receipt and Report of Threatening and Harassing Emails and Stalking

26.     On May 11, 2012, United States Marine Corps General John R. Allen emailed Mrs. Kelley alerting her that he had received a strange message.  The email, sent to General

---

[1] In contrast to statements made by some of the Defendants, the position of Honorary Consul is not a trifle.  This position is a compensated position of trust and responsibility, and it entails certain obligations of the U.S. Department of State to protect the dignity of her office.  Significantly, the position is "Honorary" in the sense that the individual encumbering the office serves by special designation of the sending country and is typically a citizen of the receiving country rather than a career member of the sending country's Foreign Service.  The State Department's guidance document on "Diplomatic and Consular Immunity" explains that "Honorary consuls are American citizens or permanent resident aliens who perform consular services on a part-time basis. Honorary consuls, unlike career consuls, are permitted to carry on another business."

Allen from the address kelleypatrol@gmail.com, disparaged Mrs. Kelley and made reference to an upcoming dinner they were having with several senior foreign intelligence, defense, and diplomatic officials.  General Allen was troubled by the email, in particular that somebody knew about the dinner, which had not been publicly announced, thereby presenting a potential security concern.

27.     The troubling email also frightened the Kelleys, as it indicated that Mrs. Kelley was being followed or stalked, and raised serious concerns about her own safety and wellbeing, particularly given the number of terrorist risks faced by CENTCOM leaders.

28.     Because of the alarming nature of the email and the specific, non-public knowledge it contained regarding General Allen, and after a number of senior commanders urged Mrs. Kelley to immediately report it to law enforcement, Mrs. Kelley contacted the MacDill Air Force Base FBI Counterintelligence Agent Fred Humphries.  Agent Humphries, a highly decorated veteran, asked Mrs. Kelley to think about who might be targeting her in such emails. Mrs. Kelley could not think of anyone who would have such animosity toward her, let alone someone who would be willing to threaten high government and military officials.  Agent Humphries advised her to remain vigilant.

29.     On June 3, 2012, Dr. Scott Kelley received an anonymous email disparaging Mrs. Kelley and containing threats.  The message also included a reference to Mrs. Kelley's recent trip to Washington, DC, and referenced "senior military and public officials and foreign Ambassadors" with whom she had dined in the past.  The email concluded with threats about "avert[ing]" "embarrassment for all, including spouses, such as info in national headlines," referring to CENTCOM and SOCOM officials and other senior government leaders mentioned elsewhere in the email.  The sender used the pseudonym and email handle "Tampa Angel."

30.    Dr. Kelley immediately informed Mrs. Kelley about the email.  Both Kelleys were extremely frightened by the email, which showed the sender had been tracking Mrs. Kelley and senior US and foreign officials, and in which the sender claimed to have taken pictures of Mrs. Kelley.   The email was all the more alarming when read in conjunction with the "kelleypatrol" email previously sent to General Allen.

31.    On June 5, 2012, the Dr. Kelley received another anonymous email message from "Tampa Angel."  This message made similar baseless allegations about Mrs. Kelley's behavior. Dr. Kelley knew these allegations and insinuations in the Tampa Angel email to be entirely false. Mrs. Kelley was not involved in any extramarital affair, and had no sexual relationship with any government or military official or anyone else.

32.    At that time, the Kelleys were made aware that anonymous emails were being sent to Director Petraeus, in addition to General Allen.  These emails also made apparent that the sender had tracked Mrs. Kelley's physical whereabouts.  The Kelleys were not only concerned for the security of their own and their daughters' welfare, but were also alarmed about the continuing threat to the senior military and public officials and foreign ambassadors whose movements were also clearly being tracked by someone with a hostile fixation.

### The Kelleys' Report of Threats and Harassment to the FBI

33.    In light of these anonymous, threatening emails targeting and tracking Mrs. Kelley, Mrs. Kelley contacted Agent Humphries again on June 3, 2012.  Mrs. Kelley was particularly concerned given the potential that the military leaders of CENTCOM and SOCOM, foreign ambassadors, and the Director of the CIA may have been under terrorist surveillance even while in the United States.  At this point, Agent Humphries asked Mrs. Kelley to come in to the Tampa FBI field office to provide additional information.  Although Agent Humphries was

not so close to the Kelleys as to create a conflict, he still felt it was more appropriate for someone with no social relationship with the Kelleys to take a formal report.  Therefore, on or about June 7, 2012, Agent Humphries introduced Mrs. Kelley to another agent, Agent Adam Malone, by email, and she reported the harassing email the Kelleys had received.

34.     Mrs. Kelley understood that the FBI had a legal duty to maintain the privacy and confidentiality of non-public investigative material, including the name and identity of a victim and witness, like herself, who reported a possible crime.  Agent Malone specifically promised Mrs. Kelley in their meetings throughout June 2012 that the FBI would respect the privacy and confidentiality of her name, and specifically stated that her name would not be disclosed.

35.     On or about the third week of June, 2012, Mrs. Kelley went to the Tampa FBI field office.  There, she met Agent Adam Malone in person, who was identified to her as the lead investigator concerning the cyberstalking matter.   Agent Malone attempted to determine the identity of the anonymous sender, but was unable to do so.  He thus determined that he needed to access the email in order to get more information.

36.     Because Agent Humphries was acquainted with Mrs. Kelley, he joined Agent Malone on a conference call to her around the third week of June, 2012, to ask whether Mrs. Kelley could provide the login and password to Dr. Kelley's email account for the specific and limited purpose of obtaining the anonymous sender's IP address.  Agents Humphries and Agent Malone explained that they would need to have access to the original "Tampa Angel" email in its "native" format to be able to discern the sender's IP address information.  They explained that they would do this by opening the original email Dr. Kelley received from Tampa Angel and clicking on the sender's information in the header of the email only; they assured Mrs. Kelley that they would not need to access the content of the email for any reason.  Mrs. Kelley declined

13

to provide unlimited access to the email account, but she did agree to provide the agents with the login and password information for the account for the specific and limited purpose of accessing the sender's IP information as it appeared in the first "Tampa Angel" email only.

37.     During a follow-up conversation, Agents Malone and Humphries specifically asked Mrs. Kelley if they could have authorization to access other emails in the account.  She specifically denied their request.  They also asked whether they could have authorization to access Mrs. Kelley's email accounts.  As such unlimited access was irrelevant to her report of the cyber stalker threats and harassment, Mrs. Kelley again denied such overbroad and unnecessary authorization.  Neither Mrs. Kelley nor Dr. Kelley authorized any access to their email accounts beyond the explicit and limited access to the first "Tampa Angel" email that arrived on June 3, 2012.

38.     Mrs. Kelley was troubled by the FBI's request to access additional emails and email accounts, and she specifically contacted Agent Malone again to reiterate that she gave permission to access only the sender's IP address from the original email, and that she had no intention of authorizing the FBI or anyone else to have unrestricted access to her and her husband's private emails.  Agent Malone committed to Mrs. Kelley that he would only need to access the header information of the email in question, and would not look at the contents of other emails or other email accounts, to determine the sender's IP address.

39.     Throughout the month, specifically on June 7, 11, 18, and 22, 2012, the Kelleys received additional threatening emails from "Tampa Angel," almost all of which spoke to either Mrs. Kelley's recent whereabouts or, sometimes in precise detail, her upcoming, personal dinner plans with high-level US leaders.

40.     In one of these emails, the sender specifically named yet another senior military commander and made clear from the content that the sender had tracked both Mrs. Kelley and the named high-level commander, whose name was never disclosed to the media.   The increasingly distressed Kelleys contacted Agents Humphries and Malone about each of them.

41.     Over the next several months, Mrs. Kelley continued to contact both agents to see if they had made any progress in the investigation, but until August 2012 received no specific information about developments in the case except that sometime around the second week of June, Agent Malone gave Mrs. Kelley the distressing news that the sender was highly sophisticated and "fingerprint-less," making her fear even more for her own safety.

42.     Sometime in August, after Mrs. Kelley contacted him, Agent Malone told Mrs. Kelley that the FBI thought it had identified the sender of the emails, but refused to give Mrs. Kelley any additional information.   Mrs. Kelley repeatedly inquired about obtaining security or protection, and Agent Malone replied that he would get back to her about it.   He never did. During that same conversation, Mrs. Kelley reiterated that she wanted very much to maintain her privacy in this matter, and Agent Malone told Mrs. Kelley that he would not access her emails.

43.     Upon information and belief, the FBI had been able to trace the IP address of the anonymous sender and, after additional investigation and surveillance, and perhaps as early as June 25, 2012, had determined that Mrs. Broadwell had stalked a senior military official and the Kelleys, and sent the Kelleys, Director Petraeus, and General Allen the threatening and defamatory emails about Mrs. Kelley.

44.     Unbeknownst to the Kelleys and upon information and belief based on the public statements of Director Petraeus, Director Petraeus was engaged in an extramarital affair with Paula Broadwell, his biographer.

45.     To their recollection, neither of the Kelleys have ever met with or spoken to Ms. Broadwell.

### *FBI Investigation of the Kelleys, Including Overbroad and Irrelevant Search and Seizure of the Kelleys' Personal Emails*

46.     Upon information and belief, the federal agents collected more than the one "Tampa Angel" email to which the Kelleys allowed them access.

47.     The Kelleys have not received any notice, delayed or contemporaneous, of any subpoena, order, writ or other process by which the United States would have lawful access to their electronic communications, such as is provided for at 18 U.S.C. § 2705.

48.     At no point did any government agents notify the Kelleys that they required additional access to emails in order to properly investigate the potential criminal behavior Mrs. Kelley had reported on or about June 5, 2012, and of which she and her husband were victims. At no point did any government agents notify the Kelleys that they were the subjects or targets of an investigation.   And there was no basis in law or fact for either of the Kelleys to be investigated as the subjects or targets of the FBI's criminal probe.

49.     Upon information and belief, the FBI Washington Cyber Division and FBI Deputy Director Sean Joyce directed agents in the Tampa Field Office Cyber Squad to treat the Kelleys' case differently than normal criminal investigations by, for example, not providing her with the security protections to which a victim is entitled, because they wanted to avoid attention before the upcoming presidential election cycle.  The Cyber Division and  Deputy Director Joyce preempted decisions made by the field office's Cyber Supervisor and directed the course of the investigation, including by directing the investigating agents not to proceed with a scheduled effort to interview the woman behind the threatening emails sent to the Kelleys once they had determined the identity of the stalker.

50.     In addition, the Kelleys' case was also treated differently, as confirmed by Agent Humphries, because they were not assigned a victims' assistance coordinator, nor were they provided with status updates regarding their case.  In fact, Agent Humphries confirmed to the Kelleys that in July 2012, he was instructed by his superiors not to give Mrs. Kelley any substantive information about the case, and his Assistant Special Agent in Charge ("ASAC"), Kevin Eaton, directed him to cut off all communication with Mrs. Kelley.

51.     The Kelleys understood, as confirmed to them by Agent Humphries, that FBI agents have a legal duty to protect the privacy and confidentiality of witness information, and other non-public material collected in a investigation, and that such confidential information should never be communicated to the media.  Such information includes the name and identity of a victim and witness, like Jill Kelley, that comes forward to report a potential crime or threat. The Kelleys also understood, as confirmed to them by Agent Humphries, that all FBI investigators must forward the names of victims to the FBI's Victim Witness Coordinator, and that confidentiality and witness protection are paramount objectives and standard practice.

52.     Upon information and belief, the FBI marginalized Mrs. Kelley, denied her standard rights and practices, and did not treat her case with the integrity and confidentiality it deserved, and that other victims and witnesses would routinely receive, based on inappropriate and unprofessional personal judgments made by certain agents.

53.     Upon information and belief, government agents accessed and collected a multitude of personal emails from multiple email addresses and accounts including, but not limited to, other Tampa Angel emails, and emails between the Kelleys and Director Petraeus, General Allen, and Agent Humphries, among others.  The additional emails the government agents searched, obtained, and reviewed were not pertinent or relevant to unearthing evidence

related to the case involving the Kelleys' cyber stalker or any other criminal investigation, nor could any reasonable person believe they could have been.  Rather, the government searched, obtained, and reviewed personal, irrelevant private emails belonging to the Kelleys.

54.    Upon information and belief, government agents then misused the emails obtained through brazen overreaching and overbroad search and seizure to conduct an unprofessional, frivolous and scurrilous investigation into Mrs. Kelley's private relationships and affiliations that had no bearing on any pending criminal investigation or other legitimate concern to the FBI.

55.    For example, Agent Humphries has told Mrs. Kelley that government agents confronted Agent Humphries with Mrs. Kelley's emails and inquired into the nature of the relationship between Mrs. Kelley and Agent Humphries, and accused him of having sexual relations with her.  The FBI engaged in this intrusive and irrelevant inquiry even though, at the point that Mr. Humphries was questioned about his relationship with Mrs. Kelley, the FBI and other government agents already knew that Mrs. Broadwell had sent the anonymous threats.  In fact, however, Agent Humphries' relationship with Mrs. Kelley was friendly, professional, and entirely platonic.

56.    As further example, on or about July 17, 2012, Mrs. Kelley was at her home with her three daughters when several FBI agents, including Agent Malone, arrived unannounced at her home.  They instructed Mrs. Kelley to get in what appeared to be a Suburban Sport Utility Vehicle ("SUV") in which they had arrived.  She refused, stating she was with her children and she was scheduled to take a flight out of Tampa in the next two hours.  The agents insisted she go with them and asked whether the children were alone in the house.  Mrs. Kelley replied that only she and the nanny were present, and the agents instructed her to leave the children with the

nanny and again ordered Mrs. Kelley to get in the vehicle.  Mrs. Kelley asked whether she could contact her attorney, and the FBI agents replied that she did not have time to do that, and demanded she leave her children, not contact an attorney or have an attorney present for questioning and get in the SUV immediately.  When Mrs. Kelley insisted that she could not leave her children, the agents threatened her, demanding that she not make them do something in front of her children that may terrify them.  Frightened and intimidated by the agents' threats and show of force, unable to consult her lawyer or husband, and concerned for the welfare of her three young daughters, Mrs. Kelley felt she had no choice but to go with the agents who were on her property.  They put her in the car and drove away.

57.    While in the vehicle, she again asked to call her attorney, and they again denied her, informing her she did not have time.  Instead, they then demanded she answer bewildering questions regarding her relationship with Director Petraeus and General Allen—including insinuations and accusations that she was engaged in adulterous activity—for approximately 30 minutes.  Comments made by Agent Malone made it further apparent to Mrs. Kelley that her status as victim was not a priority for the agents, being subsumed, if not entirely overcome, by other considerations such as career ambitions.

58.    After this harrowing experience, the agents deposited Mrs. Kelley alone, without her luggage, at the airport.  Mrs. Kelley immediately called her husband to inform him about the preceding events.

59.    After this incident, it was abundantly clear that Mrs. Kelley was not being treated as the victim of a crime, and was not being afforded the respect, rights, and information normally provided crime victims.  Instead she had somehow become the target of the FBI's zealous and sordid investigation into the agents' wild speculations and prurient interest in an extramarital sex

life they wrongly attributed to her.   At this point, even though she was not having any extramarital affairs and she was the victim who reported a crime, the FBI was investigating whether she was having affairs with two different Generals and/or an FBI Agent.

### *Perpetration of Inaccurate, Irrelevant Information*

60.     In addition to collecting vast amounts of irrelevant information and pursuing an intrusive and unnecessary investigation into the Kelleys' private affairs, the FBI intentionally or recklessly maintained or included inaccuracies in the information they maintained about the Kelleys.

61.     Agent Humphries has told the Kelleys that the FBI directed Agent Humphries to remove a statement in his sworn 302 declaration addressing, and flatly denying, the accusation that he had any sort of sexual contact or relationship with Mrs. Kelley.   Indeed, Agent Humphries had to insist on including the narrative of how he and Mrs. Kelley met several years before while he was conducting an investigation that involved Mrs. Kelley as a witness.

62.     Additionally, Agent Humphries has told the Kelleys that at a time after the FBI was aware that Mrs. Broadwell was the cyber stalker, it had a chart posted up on the wall and visible to anyone in its Tampa field office, showing Mrs. Kelley at the hub with spokes drawn out to several senior government and military officials.   There was no reason to have this chart unless the FBI had begun to treat Mrs. Kelley, the victim of the crime *she* reported to the FBI, as the target of its investigation.   Moreover, the chart, as the FBI had posted it, did not shield Mrs. Kelley's identity or safeguard her privacy in any way.   To the contrary, the chart and other conduct of the agents in question demonstrated a sexist and discriminatory fascination with Mrs. Kelley that caused these officials to violate their duties and the rights to which Mrs. Kelley was entitled.

63.     These side investigations, and the collection and maintenance of massive amounts of impertinent, irrelevant, unnecessary, inaccurate, and incomplete information regarding the Kelleys' personal relationships and other private and or protected First Amendment activities of association and speech were an egregious and unwarranted invasion of the Kelleys' rights.

64.     Based on information and belief, as confirmed by Agent Humphries, the FBI months ago issued a preservation notice to all individuals associated with this investigation to preserve all related documents and materials out of recognition that there could be possible litigation regarding the conduct of the FBI's investigation.

65.     By focusing resources on the lurid and pointless investigation of Mrs. Kelley's private life, the FBI neglected the investigation of actual potential crimes.

66.     At no point after the Kelleys first reported the threatening and harassing behavior of an unstable cyber stalker until sometime in August 2012 did the FBI inform the Kelleys of any progress in their case, that it had identified a suspect, or that it was continuing to investigate. Indeed, throughout this period, while the FBI was conducting their obsessive inquiries into Mrs. Kelley, no government agency provided the Kelleys with any information or update about the cyber stalker, or any victim's assistance or support, as the Kelleys continued to fear for their safety and well-being.

*Petraeus Affair Scandal and Leak of Victim Identity*

67.     On November 9, 2012, Director Petraeus resigned as the Director of Central Intelligence, the leader of the Central Intelligence Agency ("CIA").  The intense media coverage that followed reported that his affair had been uncovered through an investigation of anonymous, threatening emails sent to an individual who had filed a complaint with the FBI—although these

reports did not initially identify the recipient of the harassing emails.[2]  On that same day, before the name of the Kelleys was linked to this scandal, the Kelleys learned through news reports that no criminal charges were being pressed.  At no point before this decision was leaked to the media were the Kelleys asked whether they were interested in pressing charges.  After the leak disclosing that the FBI announced it would not file charges against Ms. Broadwell, Agent Malone called Mrs. Kelley asking for an interview with Dr. Kelley – that is the Bureau announced a decision not to press charges without having interviewed a victim, Dr. Scott Kelley.  When the FBI did interview Dr. Kelley, he demanded to know why he was being interviewed only after the judgment not to prosecute was made known.  Dr. Kelley also demanded to know

---

[2] *See*, *e.g.*, Tabassum Zakaria and Mark Hosenball, *FBI probe of Petraeus began with "suspicious emails,"* Reuters, Nov. 9, 2012, *available at* http://www.reuters.com/article/2012/11/10/us-usa-petraeus-idUSBRE8A81FP20121110 ("The FBI probe was triggered when Broadwell sent threatening emails to an unidentified woman close to the CIA director"); *FBI probe of Petraeus' emails purportedly led to discovery of extramarital affair*, FoxNews.com, Nov. 10, 2012, http://www.foxnews.com/politics/2012/11/10/fbi-probe-petraeus-emails-purportedly-led-to-discovery-extramarital-affair/ ("The FBI investigation began when someone reported suspicious emails allegedly sent from Broadwell."); *David Petraeus Affair: FBI Probe Into Inbox of Paula Broadwell Uncovers 'Human Drama'*, ABC News, Nov. 10, 2012, http://abcnews.go.com/Politics/OTUS/david-petraeus-affair-fbi-probe-uncovers-human-drama/story?id=17689348 ("The FBI stumbled across the affair after the unnamed woman, who received the troubling email several months ago, alerted authorities, who began a probe to track the source of the message.").

why their emails had been read despite the Kelleys' express refusal to consent to such activity, and why their names had been leaked to the press.

68.     By November 10, 2012, in utter disregard for her privacy and status as a victim, unnamed "law enforcement," "senior military," and other government officials were cited as having willfully leaked Mrs. Kelley's name to the media.[3]

69.     Indeed, Mrs. Kelley received a November 11, 2012 interview request from a national newspaper where the journalist stated that "[w]e have now seen some of the harassing e-mails she [Paula Broadwell] sent to you." *See* Ex. 1.

---

[3] *See, e.g.,* Sari Horwitz & Greg Miller, *FBI probe of Petraeus triggered by e-mail threats from biographer, officials say,* Wash. Post, Nov. 10, 2012, *available at* http://www.washingtonpost.com/world/national-security/fbi-probe-of-petraeus-triggered-by-e-mail-threats-from-biographer-officials-say/2012/11/10/d2fc52de-2b68-11e2-bab2-eda299503684_story.html ("The woman who received the emails [from Paula Broadwell] was Jill Kelley in Tampa, Fla., according to law enforcement officials. The nature of her relationship with Petraeus is unknown."); *Report: Emails triggered Petraeus probe*, Nov. 11, 2012, *available at* http://www.politico.com/news/stories/1112/83690.html#ixzz2UbQRzmpz ("A senior U.S. military official . . . says 37-year-old Jill Kelley in Tampa, Fla., received the emails from Petraeus biographer Paula Broadwell that triggered an FBI investigation."); Donna Leinwand Leger, *Jill Kelley ID'd as woman who sparked Petraeus inquiry*, USA Today, Nov. 12, 2012, *available at* http://www.usatoday.com/story/news/nation/2012/11/11/petraeus-jill-kelley-scandal/1698203/ ("A senior U.S. military official identified the woman who allegedly received the harassing e-mails from Paula Broadwell as Jill Kelley, 37, of Tampa.").

70.     By brazenly and cavalierly revealing Mrs. Kelley's identity as the victim of Mrs. Broadwell's threats, who by now had been identified as a person having a sexual relationship with Director Petraeus, by disclosing the contents of the Kelleys' emails, by either directly sharing contents of the emails or making statements suggesting that the content of the emails was lurid, government officials served Mrs. Kelley up on a platter to be devoured in a frenzy of salacious speculation regarding the nature of her relationship with Director Petraeus.

71.     Upon information and belief, by November 12, 2012, United States Government sources had fed the media absolutely egregious, spurious, and false "facts" that generated even more frenetic speculation about Mrs. Kelley's intimate and sexual life, which included publicly naming the Kelleys' minor children.[4]  According to one press account entitled "Petraeus Affair:

---

[4] *See, e.g.*, Henry Blodget & Kim Bhasin, *The 'Other Woman' In the Petraeus Scandal is Tampa Resident Jill Kelley*, Business Insider, Nov. 11, 2012, http://www.businessinsider.com/jill-kelley-petraeus-2012-11 (characterizing Mrs. Kelley as "the other woman" in the Petraeus scandal and citing an AP source of "an unnamed military official"); Michael Daly, *Exclusive: Paula Broadwell's Emails Revealed*, The Daily Beast, Nov. 12, 2012,

http://www.thedailybeast.com/articles/2012/11/12/exclusive-paula-broadwell-s-emails-revealed.html (citing an anonymous source from "the highest levels of the intelligence community" as describing the emails sent by Paula Broadwell to Jill Kelley as "kind of cat-fight stuff," and speculating that "Kelley likely assisted her 7-year-old daughter. . . in posting an online photo album that includes a picture of the girl and her two sisters with Petraeus"); Emma Brockes, *Petraeus scandal: Jill Kelley and the Tampa society set*, The Guardian, Nov. 16, 2012, *available at* http://www.guardian.co.uk/world/2012/nov/16/petraeus-scandal-jill-kelly-tampa-society.

Who is Jill Kelley?," published by ABC News on November 13, 2012, a government official disclosed that "[t]he FBI has now uncovered 'potentially inappropriate' emails between Gen. Allen and Kelley, according to a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta.  The department is reviewing between 20,000 and 30,000 documents connected to this matter, the official said."[5]

72.     On November 11, 2012, government officials further leaked information about Mrs. Kelley's personal correspondence with General Allen, further fanning the flames of the "vixen" storyline.  The media cited anonymous government sources for the proposition that Mrs. Kelley engaged in suggestive communications with General Allen, numbering in the tens of thousands, and that government officials were conducting an investigation into adultery between Mrs. Kelley and General Allen.  Indeed, government officials disclosed  damaging information from their records stemming from the Kelleys' personal email accounts, going so far as to characterize certain email communications as the "'equivalent of phone sex over email.'"[6]

---

[5] Christina Ng, Martha Raddatz & Luis Martinez, ABC News, Nov. 13, 2012,

http://news.yahoo.com/petraeus-affair-jill-kelley-154817861--abc-news-topstories.html .

[6] *See*, *e.g.*, *Gen. Allen's emails to friend of Petraeus family were like 'phone sex,' sources say*, FoxNews.com, Nov. 14, 2012, http://www.foxnews.com/politics/2012/11/13/top-us-commander-in-afghanistan-gen-john-allen-under-investigation-for-alleged/#ixzz2Ubsiijue ("[T]wo U.S. officials later told Fox News that Allen's contact with Kelley was more than just general flirting. One official described some of the emails as sexually explicit and the 'equivalent of phone sex over email.'"); Craig Whitlock & Rajiv Chandrasekaran, *Petraeus investigation ensnares commander of U.S., NATO troops in Afghanistan*, Wash. Post, Nov. 13, 2012, *available at* http://www.washingtonpost.com/world/national-security/scandal-probe-ensnares-commander-of-

73.     Once more, government leaks placed the Kelleys in the middle of rampant speculation about the nature of her private relationships with men who were not her husband, in this case General Allen, resulting in lurid headlines and political cartoons placing Mrs. Kelley at the "center" of a "sex scandal."[7]

74.     Upon information and belief according to media reports, General Allen's imminent promotion to Supreme Allied Commander of Europe for the North Atlantic Treaty

---

us-nato-troops-in-afghanistan/2012/11/13/a2a27232-2d7d-11e2-a99d-5c4203af7b7a_story.html?hpid=z1 ("According to a senior U.S. defense official, the FBI has uncovered between 20,000 and 30,000 pages of documents — most of them e-mails — that contain "potentially inappropriate" communication between Allen and Jill Kelley.").

[7] *See*, *e.g.*, Rachel Bletchly, *Sex and the CIA: The woman at the centre of the scandal with top US generals*, Mirror, Nov. 17, 2012, *available at* http://www.mirror.co.uk/news/world-news/jill-kelley-woman-at-the-centre-of-the-scandal-1440530; *The other ... other woman: Florida socialite emerges at center of Petraeus scandal*, FoxNews.com, Nov. 13, 2012, http://www.foxnews.com/politics/2012/11/13/florida-housewife-in-petraeus-scandal-reportedly-never-spared-anything-for/; Carl Hiaasen, *Jill Kelley, mystery vixen in Petraeus scandal*, Miami Herald, Dec. 1, 2012, *available at* http://www.miamiherald.com/2012/12/01/3121422/jill-kelley-mystery-vixen-in-petraeus.html; Phil Hands, *Four Star General Hospital*, Wisconsin State Journal, Nov. 18, 2012, *available at* http://host.madison.com/hands-cartoon-four-star-general-hospital/image_1f8b1b26-3000-11e2-a64d-001a4bcf887a.html (depicting Mrs. Kelley as being involved in a soap opera with Generals Petraeus and Allen); *In the Line of Booty*, N.Y. Daily News (cover story), Nov. 18, 2012, *available at* http://www.tampabay.com/resources/images/blogs/media/61982.jpg.

Organization ("NATO") was delayed pending the outcome of the investigation into the nature of his relationship with Mrs. Kelley.  On January 22, 2013, the investigators cleared General Allen of all wrongdoing, concluding he had not had an inappropriate relationship or inappropriate dealings with Mrs. Kelley.  Nevertheless, after the ensuing scandal purporting to smear him as having an affair with Mrs. Kelley, General Allen retired from the military on April 29, 2013.[8]

75.     Upon information and belief, these malicious leaks originated with government agents.  Because the Kelleys' case was a Sensitive Investigative Matter ("SIM"), access to their case file was – or should have been – restricted.  Upon information and belief, there is a list of approximately 70 government employees who had unlimited access to the case file, including individuals from the Tampa FBI office, FBI headquarters, and the Department of Justice.  The individuals on that list would be the only people with authorized access to information regarding the details of the investigation, the particulars of the Kelleys' personal emails, and the agents'

---

[8] *See*, *e.g.*, Benjamin Bell, *Retired General John Allen Recalls Toll of Petraeus-linked Investigation*, ABC News, May 26, 2013, available at http://abcnews.go.com/blogs/politics/2013/05/retired-general-john-allen-recalls-toll-of-petraeus-linked-investigation/ ("Gen. John Allen discussed the toll the Pentagon investigation into emails he exchanged with a Tampa socialite took on him and his wife, Kathy…. 'I didn't have any concerns about what was in the content of the e-mails…I was just interested in putting it behind me as quickly as we could,' he said.  Kathy Allen expressed surprise over the investigation into emails between her husband and Kelley, who she also was in communication with as well.  … 'When someone shares an e-mail with her husband, you know, I thought, 'Is somebody thinking this is a little odd that, you know, they're taking this so seriously?''").

use of those emails to conduct frivolous and sexually discriminatory inquiries into Mrs. Kelley's personal matters.

76.     Upon information and belief, information in or derived from the Kelleys' case file was disclosed to government officials beyond those on the authorized list, including officials outside of the FBI or DOJ, as well as improperly disclosed to members of the media.  Upon information and belief, access to this information has been investigated by the Inspector General of the Department of Defense.

### FBI's Willful Determination to Withhold Victim Services and Transform Mrs. Kelley from Victim to Subject of FBI Investigation

77.     At no point from when the Kelleys first reported the threatening and potentially criminal behavior of the mysterious stalker until after Mrs. Kelley's name was leaked and smeared to the media was Mrs. Kelley treated like the victim she is.  At no point did Defendants apprise her of the rights to which victims are entitled by law and FBI policy.  At no point did an FBI victims' representative officer contact her.

78.     In fact, Mrs. Kelley had asked FBI representatives repeatedly about victims' assistance or victims' rights, and each time she was told that they would get back to her.

79.     On or about November 7, 2012, in light of the fact that the Kelleys had not received any concrete information since they reported the potential crime in early June 2012 and were only told that the FBI had potentially identified the sender in August 2012, Mrs. Kelley contacted the FBI Victim Witness Assistance program coordinator office in Tampa seeking information about her case.  The websites for the United States Attorney's Office for the Middle District of Florida specifically includes information on victim witness assistance, stating "Services provided to crime victims and witnesses by the U.S. Attorney's Office include: notice of case events; information concerning their rights; information about case proceedings and the

criminal justice system in general; referrals to medical and/or social service providers; assistance with travel arrangements; and logistical information…."[9]  The Site provides contact information for the Victim Witness Assistance representative in each district.

80.     The FBI Victim Witness representative who answered the phone searched for her case file, which she could not initially locate.  After some difficulty, the FBI representative asked Mrs. Kelley if her case were related to the Director Petraeus and General Allen inquiry.  Once Mrs. Kelley acknowledged that her case was likely related, the representative told Mrs. Kelley her file had existed but had been removed from the victim representatives' list of cases, and that she had no further information.  Mrs. Kelley specifically communicated the desire for FBI protection due to the continued activity from the stalker, but the representative simply reiterated that the file had been taken off her desk and that she would tell Agent Malone to get in touch with Mrs. Kelley.

81.     Indeed, Mrs. Kelley was never offered, and never received, any of the rights she was entitled to pursuant to United States law and FBI policy.  The Crime Victims' Rights Act of 2004, codified at 18 U.S.C. § 3771, provides that the government must use its "best efforts to see that crime victims are notified of, and accorded, the[ir] rights," including "the right to be reasonably protected from the accused" and "the right to be treated with fairness and with respect for [the victim's] dignity and privacy."  The FBI is aware of this law, and notes on its website that victims should be afforded these rights and that "[t]he FBI's responsibility for assisting

---

[9] The United States Attorney's Office Middle District of Florida, Victim Witness Assistance, http://www.justice.gov/usao/flm/programs/vw/vwa.html.

victims is continuous until the investigation is closed or until it is turned over to a U.S. Attorney's Office for prosecution."[10]

### *Fallout and Aftermath*

82.     The reality of the Kelleys' lives stand in stark contrast to the absurd caricature the government has painted of them by wrongfully and improperly associating them with a national sex scandal.

83.     Echoing the comments and perspectives of the Tampa FBI agents, and other government officials, there are now multitudes of headlines and videos demonstrating the gleeful, unabashed ridicule and mockery heaped on the Kelleys after the government leaked their names, bad facts and false information, and sexist innuendoes to the press.  This leaked innuendo was drawn directly from confidential information provided by the Kelleys to help the FBI and to protect themselves from a stalker, and should not have been publicly associated by government officials with a national sex scandal that involved violations of law, adultery, and national security breaches committed by neither Dr. nor Mrs. Kelley.  Indeed, a Google search for "Jill Kelley and Petraeus scandal" on May 28, 2013 yields over 470,000 hits.

84.     No government official had any legal basis to release the name of either of the Kelleys to the media, or to publicly disclose, discuss and adversely characterize their private emails and other confidential information in the criminal investigation triggered by the Kelleys complaint to the FBI.

---

[10] FBI Victim Assistance, *Rights of Federal Crime Victims*, http://www.fbi.gov/stats-services/victim_assistance/victim_rights.

85.     The Kelleys have suffered enormously as a result of the Defendants' leak of their names, of their personal and private information, and of a host of bad facts, erroneous financial and other information, and rank gossip.

86.     Mrs. Kelley's reputation is indelibly tainted.  She is consistently referred to as the "center" of the "sex scandal" and is often portrayed as the woman who brought down two American generals.  As a result, she—the victim and a participant in none of the bad acts in the sex scandal—has shouldered the blame as the villain in the generals' downfall.[11]

87.     The vituperation directed toward the Kelleys forced them to invest in security measures they had never had to take before, to avoid public events they would otherwise attend, and to lose much of the value of living in their Tampa community.  It also prevented the Kelleys from attending their children's school functions, including school plays and family days, and a specific occasion where they were unable to see their children receive an award.

88.     In addition, to better understand their rights in the aftermath of the Defendants' disclosures, the Kelleys had to invest resources in hiring attorneys to try to help remediate the damage the government has caused them.

89.     The media circus has not limited itself only to hatching lies about the Kelley's relationships and affiliations – the Kelleys have also had to endure prying and false allegations about their finances and ethics.

---

[11] *See, e.g.,* Sage Stossel, *Petraeus scandal: History repeats itself*, Boston Globe, Nov. 24, 2012, *availableat* http://www.bostonglobe.com/opinion/2012/11/24/petraeus-scandal-history-repeats-itself/I6zGIU63qBEDIicrN0MZgN/story.html (cartoon depicting Mrs. Kelley as a modern-day Helen of Troy).

90.     Despite rank speculation in the public airwaves that all Mrs. Kelley wanted from this was public exposure and attention, the Kelleys maintained a private and discreet life. Neither had a Facebook, Twitter, or any other social media account.  Neither sought the national media spotlight.  There were few or no publicly available images or stories on file for either prior to the government's damaging leaks and violation of their privacy rights.  A Washington Post timeline archives search shows virtually no coverage, if any at all, of Jill Kelley prior to November 2012.  The private, non-public nature of the Kelleys was indirectly confirmed in a Saturday Night Live skit about Mrs. Kelley that aired on November 17, 2012, satirizing the gratuitous frenzy that erupted after the release of the Kelleys' names while only being able to show – repeatedly – the same video of her walking from a front door to a car.[12]  A large part of the attempted humor of the skit comes from the absolute dearth of public images of Mrs. Kelley available to the media, confirming Mrs. Kelley's private nature  - including by having Wolf Blitzer's impersonator ask "aren't there any other pictures of Mrs. Kelley out there?" – an individual with virtually no public persona from which the media could generate stories beyond the spurious insinuations stemming from the government naming her in connection to the Petraeus scandal.

91.     The public diminishment and objectification of Mrs. Kelley on the basis of sexual innuendo and worse is a direct result of the Defendants' wrongful treatment of her.  Such treatment was the product of sexual discrimination and stereotyping by Defendants.  It is a recrudescence of an older culture where ambitious, attractive, vivacious and intelligent women were shamefully reduced to mere sex objects and publicly humbled when they dared to lean in to leadership roles.

---

[12] http://www.nbc.com/saturday-night-live/video/the-situation-room-david-patraeus/n28990/

92.     In contrast to how quickly the unnamed officials commented on Mrs. Kelley's personal and social life, government sources were reluctant to make any statements regarding General Allen's involvement in the scandal.[13]   Even after some senior officials noted that General Allen and Mrs. Kelley exchanged "inappropriate" emails, other unnamed governmental officials leaped to defend General Allen, denying the existence of an affair that would damage *his* reputation but saying nothing of the media's character assassination of Mrs. Kelley.[14]

---

[13] Robert Burns, *Gen. John Allen, Top Afghanistan Commander, Investigated For Email Link To Petraeus Scandal*, Huffington Post, Nov. 13, 2012,

http://www.huffingtonpost.com/2012/11/13/john-allen-petraeus_n_2120609.html ("A senior defense official traveling with Panetta said Allen's communications were with Jill Kelley… He would not say whether they involved sexual matters or whether they are thought to include unauthorized disclosures of classified information."); David S. Cloud, Gen. *John Allen tied to Jill Kelley, Petraeus affair scandal*, LA Times, Nov. 13, 2012, *available at* http://articles.latimes.com/2012/nov/13/news/la-pn-john-allen-petraeus-jill-kelley-20121113 ("One official said that Allen, who is married, had denied having an inappropriate relationship with Kelley").

[14] *See Defense official fires back, denies Afghanistan commander exchanged 'inappropriate' emails*, NBCNews.com, Nov. 13, 2012,

http://usnews.nbcnews.com/_news/2012/11/13/15130151-defense-official-fires-back-denies-afghanistan-commander-exchanged-inappropriate-emails?lite ("'There was no affair,' said the official, who spoke on condition of anonymity.  The emails in question could be misconstrued, the official said, predicting that the investigation will prove *Allen's* innocence.") (emphasis added); Max Fisher, *Reports: Gen. John Allen did not send 30,000 e-mails to Jill Kelley*, Wash.

93.     Neither Dr. nor Mrs. Kelley have been accused of a crime, and to their knowledge, they have not been investigated for one.  Mrs. Kelley has not had an affair with anyone.  Mrs. Kelley has not had a sexual relationship of any kind with Director Petraeus, General Allen, Agent Humphries, any other federal official, or anyone else.  She and Dr. Kelley are happily married.  That Mrs. Kelley is in a position where she has to publicly address her sex life and declare that she has engaged in no extramarital affairs is but another example of the egregious invasion of privacy the Kelleys have endured.

94.     Mrs. Kelley's prior excellent reputation was a critical factor in obtaining her Honorary Consulship, and the reputational backlash she suffered as a result of the Defendants' actions directly and proximately caused her appointment as an Honorary Consul to be revoked. The revocation of her Honorary Consulship deprived her of significant social and financial networking, investment, and business fee finder opportunities, as well as the loss of the tax-free annual stipend for years.  Considering many Honorary Consuls serve for decades, this is a substantial loss of potential income.

95.     More significantly, an important facet of the Honorary Consul position is the ability to connect U.S. businesses with their business counterparts in the sending country, normally for a percentage of the consummated transaction.  Although separate from the official activities of an Honorary Consul, the prestige, connections, and reputation associated with that position could easily, and ethically, have resulted in millions of dollars in commission payments

---

Post, Nov. 13, 2012, *available at*

http://www.washingtonpost.com/blogs/worldviews/wp/2012/11/13/psa-gen-john-allen-did-not-send-30000-e-mails-to-jill-kelley/  ("He's [Gen. Allen] never been alone with her," the senior official said. "Did *he* have an affair? No.") (emphasis added).

over Mrs. Kelley's lifetime.  U.S. State Department guidance makes clear that Honorary Consuls servicing in the United States on behalf of other countries may engage in personal business activities.

96.     Prior to Defendants' misconduct, Mrs. Kelley had earned hundreds of thousands of dollars through her real estate investments, and her networking opportunities were beginning to present significant other business and philanthropic prospects.   In the aftermath of the government's actions and the ensuing smear of the Kelleys' personal and financial standings, Mrs. Kelley has lost a critical element for success in her real estate investments and business, and development and monetizing of patent ideas—credibility and financial standing.   Indeed, Mrs. Kelley has been made aware of opportunities that she may not participate in, because potential business partners and investors could not afford to associate or set their trust in someone who has been publicly associated with ostensible sexual peccadilloes of military men, bankruptcy, false dealings, and other morally questionable behavior.   Additionally, Mrs. Kelley's reputation was a critical element in her receipt of invitations to join boards for organizations that would further her success.   For example, in September of 2012, Mrs. Kelley was invited to join the Board of Trustees for the International Council of the Tampa Bay Region, which hosts distinguished international visitors, and whose members included executives from Fortune 500 companies, philanthropists, and other leaders.   In the aftermath of Defendant's actions, Mrs. Kelley was never contacted again by the Board for the International Council of the Tampa Bay Region.

97.     Moreover, Mrs. Kelley no longer receives prestigious invitations to the diplomatic and distinguished governmental functions at which she was a regular attendee now that she is associated with a scandal.[15]

98.     Her access to the MacDill Air Force Base was revoked notwithstanding the long years of voluntary service and resources she provided.

99.     Dr. Kelley also suffered dramatic financial losses because of the Defendants' misconduct.  Due to concerns regarding the property and privacy interests involved, and the potential for prejudice to the Kelleys from disclosure, those damages will be addressed in more detail under seal or pursuant to an appropriate protective order.

100.    The Defendants' disclosure of the Kelleys' private information resulted in potentially irretrievable reputational harm, significant financial expenses, and current and future financial losses and lost opportunities.

### Federal Protections of Privacy

101.    The Fourth Amendment of the U.S. Constitution recognizes the privacy interests in electronic communications.  Indeed, as the U.S. Court of Appeals wrote in *United States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010), "an email account … provides an account of its

---

[15] Indeed, Mrs. Kelley's frequent attendance at such social events was noted by the press.  *See, e.g.*, John Cook, *"Petraeus' Pal Jill Kelley Loaned $800,000 to Her 'Unstable' Twin Sister,"* Gawker.com, Nov. 13, 2012, http://gawker.com/5960211/petraeus-pal-jill-kelley-loaned-800000-to-her-unstable-twin-sister ("[S]he seems to have been a regular on the diplomatic circuit: Rep. Peter King (R-N.Y.) told CNN yesterday that he had met her once or twice at British embassy events.")

36

owner's life. By obtaining access to someone's email, government agents gain the ability to peer

deeply into his activities. …"  The Court thus went to hold that:

> If we accept that an email is analogous to a letter or a phone call, it
> is manifest that agents of the government cannot compel a
> commercial ISP to turn over the contents of an email without
> triggering the Fourth Amendment. An ISP is the intermediary that
> makes email communication possible. Emails must pass through
> an ISP's servers to reach their intended recipient. Thus, the ISP is
> the functional equivalent of a post office or a telephone company.
> As we have discussed above, the police may not storm the post
> office and intercept a letter, and they are likewise forbidden from
> using the phone system to make a clandestine recording of a
> telephone call—unless they get a warrant, that is.  See Jacobsen,
> 466 U.S. at 114; Katz, 389 U.S. at 353. It only stands to reason
> that, if government agents compel an ISP to surrender the contents
> of a subscriber's emails, those agents have thereby conducted a
> Fourth Amendment search, which necessitates compliance with the
> warrant requirement absent some exception.

102.    The Privacy Act, 5 U.S.C. § 552a, was enacted in 1974 following the revelation

of the illegal surveillance and investigation of individuals by federal agencies during the

Watergate scandal.  The Privacy Act seeks to protect individuals from unwarranted invasions of

privacy by federal agencies that maintain sensitive information about them.  In passing the Act,

Congress recognized that "the opportunities for an individual to secure employment, insurance,

and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems," and that "the right to privacy is a personal and fundamental right protected by the Constitution of the United States."  5 USC § 552a note (Congressional findings for the Privacy Act of 1974).

103.    Congress enacted the Electronic Communications Privacy Act, including the Stored Communications Act, 18 U.S.C. § 2701 et seq., in 1985 to protect individuals from the "technological advances in surveillance devices and techniques" that "ma[de] it possible for overzealous law enforcement agencies, industrial spies and private parties to intercept the personal or proprietary communications of others." S. Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557.  The Act sought to remedy what Justice Brandeis had correctly predicted decades before in his famous dissent in *Olmstead v. United States*, 277 U.S. 438 (1928), that "the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home," with no protection afforded to the individual's privacy.  *Id*. at 2, 3556.

104.    The FBI and other Defendants acted in this case in gross dereliction of their duties to respect these laws and violated these protections to the lasting detriment of the Kelleys.

## FIRST CAUSE OF ACTION

## AGAINST DEFENDANTS FBI DOD AND THE UNITED STATES

## PRIVACY ACT – UNAUTHORIZED DISCLOSURE

105.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 104 above, inclusive.

106.    Information regarding the Kelleys and their report to the FBI of threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of records

retrievable by use of the Kelleys' name or by some identifying number, symbol or other identifying particular assigned to Plaintiffs.

107.   Pursuant to 5 U.S.C. § 552a(b), the FBI may not "disclose any record which is contained in a system of records by any means of communication to any person, or to another agency" unless certain exceptions apply.

108.   At no time did Plaintiffs provide the government with either verbal or written consent to disclose information concerning themselves to third parties, and indeed received assurances that the FBI would preserve their privacy.

109.   Upon information and belief, on one or more occasions since the Kelleys first reported the threatening and criminal actions of the cyber stalker, the FBI shared records on the Kelleys with the DOD, and both shared these records with the media.  The FBI and DOD leaks by, for example, "law enforcement officials,"[16] a "senior U.S. military official,"[17] "an unnamed

---

[16] *See, e.g.,* Sari Horwitz & Greg Miller, *FBI probe of Petraeus triggered by e-mail threats from biographer, officials say,* Wash. Post, Nov. 10, 2012, available at http://www.washingtonpost.com/world/national-security/fbi-probe-of-petraeus-triggered-by-e-mail-threats-from-biographer-officials-say/2012/11/10/d2fc52de-2b68-11e2-bab2-eda299503684_story.html ("The woman who received the emails [from Paula Broadwell] was Jill Kelley in Tampa, Fla., according to law enforcement officials. The nature of her relationship with Petraeus is unknown.")

[17] *Report: Emails triggered Petraeus Probe*, Nov. 11, 2012, available at http://www.politico.com/news/stories/1112/83690.html#ixzz2UbQRzmpz ("A senior U.S. military official . . . says 37-year-old Jill Kelley in Tampa, Fla., received the emails from Petraeus biographer Paula Broadwell that triggered an FBI investigation."); see also Donna

military official,"[18] an anonymous source from "the highest levels of the intelligence community,"[19] and "a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta,"[20] were widely reported.

---

Leinwand Leger, *Jill Kelley ID'd as woman who sparked Petraeus inquiry*, USA Today, Nov. 12, 2012, available at http://www.usatoday.com/story/news/nation/2012/11/11/petraeus-jill-kelley-scandal/1698203/ ("A senior U.S. military official identified the woman who allegedly received the harassing e-mails from Paula Broadwell as Jill Kelley, 37, of Tampa.").

[18] *See, e.g.*, Henry Blodget and Kim Bhasin, *The 'Other Woman' In the Petraeus Scandal is Tampa Resident Jill Kelley*, Business Insider, Nov. 11, 2012, available at http://www.businessinsider.com/jill-kelley-petraeus-2012-11 (characterizing Mrs. Kelley as "the other woman" in the Petraeus scandal and citing an AP source of "an unnamed military official").

[19] Michael Daly, Exclusive: *Paula Broadwell's Emails Revealed*, The Daily Beast, Nov. 12, 2012, available at http://www.thedailybeast.com/articles/2012/11/12/exclusive-paula-broadwell-s-emails-revealed.html (citing an anonymous source from "the highest levels of the intelligence community" as describing the emails sent by Paula Broadwell to Jill Kelley as "kind of cat-fight stuff," and speculating that "Kelley likely assisted her 7-year-old daughter, Ca…, in posting an online photo album that includes a picture of the girl and her two sisters with Petraeus").

[20] Christina Ng, Martha Raddatz and Luis Martinez, ABC News, Nov. 13, 2012, available at http://news.yahoo.com/petraeus-affair-jill-kelley-154817861--abc-news-topstories.html ("The FBI has now uncovered "potentially inappropriate" emails between Gen. Allen and Kelley, according to a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta.

110.     Upon information and belief, the DOD did not have a need for the record in the performance of their duties, in part because they had already realized that Mrs. Broadwell was the source of the security compromise, and that no other lawful exception authorized the disclosure of records on the Kelleys to the DOD.

111.     Upon information and belief, in one or more occasions since the Kelleys first reported the threatening and criminal actions of the cyber stalker, the FBI, DOD, and the United States, through numerous employees, unlawfully and without regard to the foreseeable and certain consequences of association with the unfolding national scandal of Petraeus' extramarital affair, disseminated information, including that which was inaccurate, derogatory, and irrelevant, from within a protected system of records, to media members and other third parties who were not authorized to receive such information.

112.     No lawful exception authorized such damaging disclosures.

113.     This unlawful disclosure expanded the intrusion into the Kelleys' privacy and thrust them into the national spotlight to be associated with and held out to be the direct and proximate cause of, the criminal, adulterous, and potentially security-compromising actions of others, altering their lives forever.

114.     The unauthorized disclosures by the FBI and DOD violated 5 U.S.C. § 552a(b), with adverse effect to the Kelleys, and give rise to a claim pursuant to 5 U.S.C. §552a(g)(1)(D).

115.     Upon information and belief, the FBI, DOD and the United States, as well as their employees and officers, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.  Indeed, in the multitude of ensuing media coverage, none

---

The department is reviewing between 20,000 and 30,000 documents connected to this matter, the official said. The email exchanges between Kelley and Allen took place from 2010 to 2012.").

of the sources was identified by name, or appeared to have spoken to media only on condition of anonymity given the prohibited nature of leaking such protected and damaging information to the national press.

116.   Upon information and belief, the FBI, DOD and the United States acted intentionally and/or willfully in the violation of the Kelleys' privacy rights.

117.   As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

## SECOND CAUSE OF ACTION

### AGAINST DEFENDANTS FBI, DOD AND THE UNITED STATES

### PRIVACY ACT – FAILURE TO MAINTAIN IN RECORDS ONLY INFORMATION RELEVANT AND NECESSARY TO ACCOMPLISH A PURPOSE OF THE AGENCY

118.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 117 above, inclusive.

119.   Information regarding the Kelleys and their report to the FBI of threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of records retrievable by use of the Kelley's name or by some identifying number, symbol, or other identifying particular assigned to Plaintiffs.

120.   Pursuant to 5 U.S.C. § 552a(e)(1), the FBI, the DOD, and United States must "maintain in its records only such information about an individual as is relevant and necessary to

accomplish a purpose of the agency required to be accomplished by statute or by Executive order of the President."

121.    Upon information and belief, Private information about the Kelleys, including the Kelleys' personal relationships, financial dealings, and personal communications that are not relevant to their report of threatening and harassing cyberstalking, nor to the investigation of any other criminal activity, and that present no national security concern, are not relevant or necessary to the purposes of the FBI, the DOD and United States.

122.    Upon information and belief, Defendants the FBI, the DOD, and United States maintained and may still maintain information in their records that is irrelevant and unnecessary to the purposes of their agencies.

123.    Upon information and belief, the maintenance of irrelevant and unnecessary information in their records expanded the intrusion into the Kelleys' privacy without justification, painted the Kelleys in a damaging false light, created a larger set of information subject to compromise from government leaks and other misuse, and lead to significant emotional and financial injury to the Kelleys.

124.    Upon information and belief, the maintenance of irrelevant and unnecessary information violated 5 U.S.C. § 552a(e)(1), with adverse effect to the Kelleys, and gives rise to a claim pursuant to 5 U.S.C. §552a(g)(1)(D).

125.    Upon information and belief, the FBI, the DOD, the United States, and their employees and officers knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

126.    The FBI, the DOD, the United States, and their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

127.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

### THIRD CAUSE OF ACTION

### AGAINST DEFENDANTS FBI, DOD, AND THE UNITED STATES

### PRIVACY ACT – FAILURE TO MAINTAIN RECORDS WITH SUCH ACCURACY, RELEVANCE, TIMELINESS AND COMPLETENESS AS IS NECESSARY TO ASSURE FAIRNESS

128.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 127 above, inclusive.

129.    Information regarding the Kelleys and their report to the FBI of threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of records retrievable by use of the Kelleys' name or by some identifying number, symbol or other identifying particular assigned to Plaintiffs.

130.    Defendants FBI, DOD and the United States are required, under the Privacy Act at §552a(g)(1)(c), to "maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record…."

131.    Upon information and belief, records regarding the Kelleys were not maintained with a degree of accuracy, relevance and completeness as is necessary to ensure fairness, and

indeed FBI Defendants dissuaded an FBI agent from providing a complete and accurate record on Mrs. Kelley when Defendants asked that the agent eliminate information in the record accurately describing the nature of his relationship with Mrs. Kelley.

132.    Upon information and belief, these records were relied upon to proximately cause adverse determination to deny access to opportunities and benefits from victim assistance programs, and rather than be treated as the victims of a crime, make a determination to convert the Kelleys into the subject of an investigation.

133.    Upon information and belief, these inaccurate records expanded the intrusion into the Kelleys' privacy without justification, painted the Kelleys in a damaging false light, and created a larger set of information—including inaccurate information—subject to compromise from government leaks and/or other misuse.

134.    Upon information and belief, the FBI, DOD and the United States actions give rise to a claim pursuant to §552a(g)(1)(c) regardless of whether the information is maintained in a system of records.

135.    The FBI, DOD, and the United States, as well as their employees and officers knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

136.    The FBI, DOD and the United States, as well as their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

137.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment,  lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal

security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

## FOURTH CAUSE OF ACTION

### AGAINST DEFENDANTS FBI, DOD, AND THE UNITED STATES

### PRIVACY ACT – MAINTAINING RECORDS DESCRIBING EXERCISE OF RIGHTS GUARANTEED BY THE FIRST AMENDMENT

138.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 137 above, inclusive.

139.    Upon information and belief, information regarding the Kelleys and their report to the FBI of threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of records retrievable by use of the Kelleys' name or by some identifying number, symbol or other identifying particular assigned to Plaintiffs.

140.    Upon information and belief, Defendants FBI, DOD and the United States maintained records regarding the Kelleys' personal communications and friendships, activities protected under the First Amendment's guarantee of freedom of speech and rights of association, that were not pertinent to and outside of the scope of authorized law enforcement activity, nor expressly authorized to be maintained under any statute.

141.    As a result of the maintenance of records regarding the Kelleys' exercise of First Amendment rights, the Kelleys suffered adverse effects, including denial of access to victim assistant programs, and rather than be treated as the victims of a crime, were converted into the subject of an investigation.

142.    The maintenance of records regarding the Kelleys' exercise of First Amendment rights also had the adverse effects of expanding the intrusion into the Kelleys' privacy without

justification, painting the Kelleys in a damaging false light, and creating a larger set of information subject to compromise from government leaks and/or other misuse.

143.    The actions of the government violated § 552a(e)(7), with adverse effects to the Kelleys, which gives rise to claims pursuant to §552a(g)(1)(D).

144.    The FBI, DOD and the United States, as well as their employees and officers, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

145.    The FBI, DOD and the United States, as well as their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

146.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

## FIFTH CAUSE OF ACTION

## AGAINST DEFENDANTS FBI AND DOD AND THE UNITED STATES

## PRIVACY ACT – FAILURE TO MAKE REASONABLE EFFORTS TO ASSURE RECORDS ARE ACCURATE, COMPLETE AND RELEVANT FOR AGENCY PURPOSES PRIOR TO DISSEMINATION

147.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 146 above, inclusive.

148.    Information regarding the Kelleys and their report to the FBI regarding threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of

records retrievable by use of the Kelley's name or by some identifying number, symbol or other identifying particular assigned to Plaintiffs.

149.    The Privacy Act at § 552a(e)(6) requires that the FBI, DOD and the United States to "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" prior to disseminating such records to any person other than an agency.

150.    Upon information and belief, prior to disseminating privacy protected information, the FBI, DOD, and the United States, failed to take reasonable efforts to assure records regarding the Kelleys were accurate, complete, or relevant for agency purposes.

151.    Upon information, FBI Defendants dissuaded an FBI agent from providing a complete and accurate record on Mrs. Kelley when Defendants asked that the agent eliminate information in the record accurately describing the nature of his relationship with Mrs. Kelley.

152.    As a result of these inaccurate, incomplete, and irrelevant records, the Kelleys suffered adverse effects including denial of access to victim assistant programs, and rather than be treated as the victims of a crime, were converted into the subject of an investigation.

153.    These inaccurate, incomplete and irrelevant records also had the adverse effects of expanding the intrusion into the Kelleys' privacy without justification, painting the Kelleys in a damaging false light, and creating a larger set of information subject to compromise from government leaks and/or other misuse.

154.    The actions of the government violated § 552a(e)(6), with adverse effects to the Kelleys, which gives rise to claims pursuant to §§552a(g)(1)(D).

155. Upon information and belief, the FBI, DOD and the United States, as well as their employees and officers knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

156. Upon information and belief, the FBI, DOD, and the United States, as well as their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

157. As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

## SIXTH CAUSE OF ACTION

### AGAINST DEFENDANTS FBI, DOD AND THE UNITED STATES

### PRIVACY ACT – FAILURE TO ESTABLISH APPROPRIATE SAFEGUARDS TO ENSURE THE SECURITY AND CONFIDENTIALITY OF RECORDS WHICH RESULTED IN SUBSTANTIAL HARM AND EMBARRASSMENT

158. Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 157 above, inclusive.

159. Upon information and belief, information regarding the Kelleys and their report to the FBI of threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of records retrievable by use of the Kelley's name or by some identifying number, symbol or other identifying particular assigned to Plaintiffs.

160.    Upon information and belief, FBI, DOD and United States sources compromised the security and confidentiality of information held in records related to the Kelleys, their report of cyberstalking, and other information naming individuals in relation to an investigation into adulterous activity by a high profile national figure by providing the information in these reports to the media.

161.    Upon information and belief, the FBI, DOD and the United States failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records and to protect against anticipated threats or hazards to their security or integrity.

162.    The compromise of the security and confidentiality of records containing information related to the Kelleys' report of cyberstalking and resulting investigation, as well as information naming individuals in relation to an investigation into adulterous activity by a high profile national figure, reasonably foreseeably can result, and indeed did directly and proximately result, in substantial harm, embarrassment, inconvenience, and/or unfairness to the Kelleys.

163.     As a direct and proximate result of the Defendants' failure to establish safeguards to ensure the security and confidentiality of the records and protect against anticipated threats or hazards to their security or integrity, the Kelleys were denied access to victim assistance programs, and rather than be treated as the victims of a crime, were converted into the subject of an investigation.

164.    The Defendants' failure to establish safeguards to ensure the security and confidentiality of the records and protect against anticipated threats or hazards to their security or integrity inflicted such direct and proximate damage on the Kelleys as expanding the intrusion

into the Kelleys' privacy; painting the Kelleys in a damaging false light; making Mrs. Jill Kelley an object of ridicule, moral opprobrium, scorn, and derision, causing her, her husband, and her three young children shame, public notoriety, egregious loss of privacy, and security; costing Mrs. Kelley public respect, positions of trust and responsibility, and significant lost financial, business, and investment opportunities; and also costing Dr. Kelley extensive financial losses.

165.    The actions of FBI, DOD and the United States, as well as, and their employees and officers violated § 552a(e)(10), with adverse effects to the Kelleys, and gives rise to claims pursuant to §552a(g)(1)(D).

166.    Upon information and belief, the FBI, DOD and the United States, as well as their employees and officers knew or should have known that their actions were improper, unlawful, and/or in violation of the Privacy Act.

167.    Upon information and belief, the FBI, DOD and the United States, as well as their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

168.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

## SEVENTH CAUSE OF ACTION

## AGAINST DEFENDANTS FBI, DOD AND THE UNITED STATES

## STORED COMMUNICATION ACT – IMPROPER DISCLOSURES

169.   Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 168 above, inclusive.

170.   Upon information and belief, records held by FBI and the United States related to the Kelleys included information from the Kelleys' stored electronic communications obtained by the FBI and/or other officers, agents or employees of the United States through an investigative or law enforcement officer, or a governmental entity, pursuant to 18 U.S.C. § 2703, or from a device installed pursuant to 18 U.S.C. § 3123 or 18 U.S.C. § 3125 or by other legal authority or without legal authority.

171.   Anonymous leaks to the press of information in records protected by the Privacy Act are not disclosures made pursuant to the proper performance of governmental entity or officers official functions.

172.   Upon information and belief, the actions of the FBI and their employees and officers give rise to a violation of the Stored Communications act under 18 U.S.C. § 2707(g), which prohibits willful disclosure of a record obtained by an investigative or law enforcement officer where such disclosure is not made in the proper performance of the official functions of the officer or governmental entity making the disclosure.

173.   Upon information and belief, the FBI, and their employees and officers acted willfully in violation of the Kelleys' privacy rights.

174.   As a direct and proximate result of Defendants' violations of the Stored Communications Act, Plaintiffs have suffered grave injury, including but not limited to

emotional trauma, loss of reputation, revocation of a potentially lifelong consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

**EIGHTH CAUSE OF ACTION**

**AGAINST JOHN AND JANE DOE DEFENDANTS**

***BIVENS* CLAIM FOR VIOLATION OF FOURTH AMENDMENT RIGHTS
PROHIBITING UNREASONABLE SEARCHES**

175.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 174 above, inclusive.

176.    Upon information and belief, the United States accessed and searched the Kelleys' emails beyond the scope for which the government had probable cause or proper judicial approval to search.

177.    The Kelleys had a reasonable expectation of privacy in their personal emails that is protected by the U.S. Constitution's Fourth Amendment's guarantee of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches."

178.    Some of these searches concerned information that is not then collected and maintained as a record in a system of governmental records.

179.    John and Jane Doe Defendants' search of the Kelleys' emails beyond the scope of what the government had probable cause or proper judicial approval to search was not reasonable, and the Kelleys' right to be free of such unreasonable searches was sufficiently established that John and Jane Doe Defendants knew or should have known that such a search would violate the Kelleys' constitutional rights.   John and Jane Doe Defendants' conduct

"violated clearly established statutory or constitutional rights of which a reasonable person would have known."[21]

180.    John and Jane Doe Defendants' misconduct was undertaken under color of federal law.

181.    The John and Jane Doe Defendants acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

182.    John and Jane Doe Defendants' search of the Kelleys' emails beyond the scope for which the government had probable cause or judicial approval to search violated their Fourth Amendment rights, and gives rise to a claim under the U.S. Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), permitting plaintiffs to bring a civil rights suit against federal officials in their individual capacity for damages directly and proximately caused by constitutional torts under color of their authority.

183.    As a result of John and Jane Doe Defendants' violations of the Kelleys' Fourth Amendment rights against unreasonable searches, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, violations of their privacy, and attorneys' fees.

### NINTH CAUSE OF ACTION

### AGAINST JOHN AND JANE DOE DEFENDANTS

### *BIVENS* CLAIM FOR VIOLATION OF FIFTH AMENDMENT RIGHTS TO DUE PROCESS, INLUDING EQUAL PROTECTION UNDER THE LAW

184.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 183 above, inclusive.

---

[21] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

185.    John and Jane Doe Defendants treated Mrs. Kelley differently than male victims in investigating her reports of threatening and criminal actions of the cyberstalker by failing to provide her with victims' assistance service and engaging in a "blame the victim" strategy to turn her into the titillating subject of an investigation, rather than treating her as the innocent victim she is.

186.    As part of this "blame the victim" strategy, John and Jane Doe Defendants engaged in a malicious, intentional characterization of Mrs. Kelley as the sexualized "other woman," and failed to protect, and indeed violated, her privacy rights as they focused their investigation on her in search of salacious information.

187.    John and Jane Doe Defendants' misconduct was undertaken under color of federal law.

188.    John and Jane Doe Defendants acted with purpose and intent to discriminate against Mrs. Kelley on the basis of her gender.

189.    John and Jane Doe Defendants' actions to discriminate against Mrs. Kelley on the basis of sex were not reasonable, and Mrs. Kelley's right to be free of sex discrimination was sufficiently established that John and Jane Doe Defendants knew or should have known that their conduct would violate Mrs. Kelley's constitutional rights.   Their conduct "violated clearly established statutory or constitutional rights of which a reasonable person would have known."[22]

190.    The John and Jane Doe Defendants acted intentionally and/or willfully in violation of Mrs. Kelley's Fifth Amendment right to equal protection of the law.

---

[22] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

191.     John and Jane Doe Defendants discrimination against Mrs. Kelley on the basis of sex violated her Fifth Amendment rights to due process, which includes equal protection of the laws,[23] and gives rise to a claim under the U.S. Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), permitting plaintiffs to bring a civil rights suit against federal officials in their individual capacity for damages directly and proximately caused by constitutional torts under color of their authority.  *See also Davis v. Passman*, 442 U.S. 228 (1979) (extending *Bivens* suits for damages to the Fifth Amendment in the context of gender discrimination).

192.     As a result of John and Jane Doe Defendants' violations of Mrs. Kelley's Fifth Amendment rights, Mrs. Kelley as well as her husband, Dr. Kelley, have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to her personal security, and permanent association with a national sex scandal based on an affair in which she had no involvement.

## TENTH CAUSE OF ACTION, IN THE ALTERNATIVE

## AGAINST JOHN AND JANE DOE DEFENDANTS

## DEFAMATION

193.     Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 192 above, inclusive.

194.     Upon information and belief, John Doe Defendants made false and defamatory statements concerning the Kelleys, including statements that Jill Kelley was involved in extra-marital affairs, that Jill Kelley had engaged in tens of thousands of emails with General Allen,

---

[23] *Bolling v. Sharpe*, 347 U.S. 497 (1954).

and that the Kelleys were responsible for the downfall of numerous high ranking military officials.

195.    Upon information and belief, John and Jane Doe Defendants made such false and defamatory statements without privilege to a third party.

196.    As evidenced by their actions to preserve anonymity as they leaked the false and defamatory statements and upon information and belief, John and Jane Doe Defendants acted intentionally and/or willfully, but at least with negligence, in making such false and defamatory statements.

197.    Upon information and belief, to the extent that these false and defamatory leaks were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the actions of John and Jane Doe Defendants give rise to a claim for common law defamation.

198.    As a direct and proximate result of John and Jane Doe Defendants' making and causing to be published such false and defamatory statements, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a potentially lifelong consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

**ELEVENTH CAUSE OF ACTION, IN THE ALTERNATIVE**

**AGAINST JOHN AND JANE DOE DEFENDANTS**

**FALSE LIGHT**

199.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 198 above, inclusive.

200.    Upon information and belief, John Doe Defendants published, publicized or otherwise gave publicity to false statements, representations or imputations of or concerning the Kelleys by anonymously leaking such information to media members or other third parties.

201.    Plaintiffs did not consent to the publication of such false statements, representations or imputations about themselves.

202.    The publication of such false statements, representations or imputations placed the Kelleys in a false light that would be offensive to an ordinary, reasonable person.

203.    Upon information and belief, the John Doe Defendants acted intentionally and/or willfully to place the Kelleys in a false light.

204.    Upon information and belief, to the extent that such actions were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the actions of John and Jane Doe Defendants give rise to a claim for the common law tort of false light.

205.    As a direct and proximate result of John and Jane Doe Defendants' placing Plaintiffs in a false light, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a potentially lifelong consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees,

costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

**TWELFTH CAUSE OF ACTION, IN THE ALTERNATIVE**

**AGAINST JOHN AND JANE DOE DEFENDANTS**

**INTRUSION UPON SECLUSION**

206.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 205 above, inclusive.

207.    Upon information and belief, John Doe Defendants used some form of investigation or examination to physically intrude into the Kelley's private or secret concerns, including personal communications, financial, business and family affairs, and personal relationships that were not in any way relevant to the investigation of the Kelleys' report of threatening and criminal actions of the cyber stalker, or of any other appropriate or legally authorized investigation or examination.

208.    Plaintiffs did not consent to the investigation or examination and intrusion into their private or secret concerns unrelated to their report of threatening and criminal actions of the cyberstalker, nor consent to the investigation or examination of the contents of any personal communications other than those provided directly to law enforcement.

209.    The investigation or examination into the Kelleys' private or secret concerns would be highly offensive to an ordinary, reasonable person.

210.    Upon information and belief, the John Doe Defendants acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

211.    Upon information and belief, to the extent that such actions were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the

actions of John and Jane Doe Defendants give rise to a claim for the common law tort of intrusion upon seclusion.

212.    As a direct and proximate result of Defendant's violations of the Plaintiffs' privacy, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a potentially lifelong consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

**THIRTEENTH CAUSE OF ACTION, IN THE ALTERNATIVE**

**AGAINST JOHN AND JANE DOE DEFENDANTS**

**PUBLICATION OF PRIVATE FACTS**

213.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 212 above, inclusive.

214.    Upon information and belief, John Doe Defendants published, publicized or otherwise gave publicity to Plaintiff's private lives by anonymously leaking private facts such as Plaintiff's personal contact information, personal correspondence, personal relationships, personal financial concerns, family matters and confidential information about their victimization from a cyber stalker to media members or other third parties so that it would be substantially certain to become one of public knowledge.

215.    Plaintiffs did not consent to the publication of facts about their private lives.

216.    The publication of facts about the Kelley's private lives would be highly offensive to an ordinary, reasonable person.

217.    The publication of facts about the Kelleys' private lives that were not relevant to the investigation of criminal activity, nor of any relevance to a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley, are not of legitimate concern to the public.

218.    The John Doe Defendants acted intentionally and/or willfully in violation of the Kelley's privacy rights.

219.    Upon information and belief, to the extent that such actions were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the actions of John and Jane Doe Defendants give rise to a claim for the common law tort of publication of private facts.

220.    As a direct and proximate result of Defendant's violations of the Plaintiffs' privacy, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a potentially lifelong consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

## JURY DEMAND

Plaintiffs request trial by jury on all counts that may be heard by a jury.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

A.    order Defendants to issue a formal apology to Dr. and Mrs. Kelley for the violations of their privacy and dignity;

B.      award damages equal to actual and statutory damages sustained by the Kelleys

under the Privacy Act pursuant to § 552a(g)(4)(a);

C.      award Plaintiffs compensatory and consequential damages as proven at trial;

D.      award Plaintiffs punitive and exemplary damages as the Court may deem just and

proper to deter such future egregious conduct;

E.      order preliminary and permanent injunctive relief as appropriate to prevent further

violations of Plaintiffs' rights under the Fourth and Fifth Amendments to the U.S. Constitution;

F.      at the conclusion of this action, order that the FBI and DOD provide the Kelleys

with a specific accounting of all information gathered about them – whether or not stored in a

system of records – and the dissemination and use of each such piece of information within and

outside of the government, as well as a statement that any such information that was gathered

without legal authority or which is now no longer needed for a legitimate governmental purpose

be destroyed;

G.      direct that all officer, employees, and agents of the United States who have

violated the Privacy Act with respect to this matter be referred for appropriate military,

professional and/or administrative discipline;

H.      declare that Defendant FBI has violated 18 U.S.C. § 2707(g) of the Stored

Communications Act, and that the circumstances surrounding the violation raise serious

questions about whether or not an officer or employee of the United States acted willfully or

intentionally with respect to the violation, and order the Attorney General, the Director of the

FBI, and Secretary of Defense to promptly initiate a proceeding to determine whether

disciplinary action against the officer or employee is warranted pursuant to 18 U.S.C. § 2707(d);

I.      award Plaintiffs their costs and reasonable attorneys fees incurred in this action as

provided by 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412; and

J.      grant such other relief as the Court may deem just and proper, including relief for

the alternative claims of violations of their common law privacy rights and defamation.

Respectfully Submitted,

_____
Alan Charles Raul
(D.C. Bar No. 362605)

Edward R. McNicholas
(D.C. Bar No. 459136)

Colleen Theresa Brown
(D.C. Bar No. 984668)

Cara Viglucci Lopez
(D.C. Bar No. 994077)

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiffs*

Dated:  June 3, 2013

## VERIFICATION

I, Mrs. Gilberte Jill Kelley, declare as follows:

1.      I have personal knowledge of the facts set out in the forgoing Verified Complaint, except as to those matters stated upon the basis of information and belief, and if called on to testify, I would competently testify as to the matters stated herein.

2.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Complaint concerning myself, my activities and my experiences are true and correct.  28 U.S.C. § 1746.


Executed on June 3, 2013


Mrs. Gilberte Jill Kelley

## VERIFICATION

I, Scott Kelley, M.D., declare as follows:

1.      I have personal knowledge of the facts set out in the forgoing Verified Complaint, except as to those matters stated upon the basis of information and belief, and if called on to testify, I would competently testify as to the matters stated herein.

2.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Complaint regarding myself, my activities and my experiences are true and correct.  28 U.S.C. § 1746.

Executed on June ___3___, 2013

Scott Kelley, M.D.