## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Gilberte Jill Kelley, and<br>Scott Kelley, M.D.<br>1005 Bayshore Blvd.<br>Tampa, Florida 33606 | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | **Civil Action No: 13-cv-825 (ABJ)** |
| v. | ) ) | |
| The Federal Bureau of Investigation,<br>935 Pennsylvania Avenue, N.W.<br>Washington, D.C., 20535-0001, | ) ) ) ) | |
| United States Department of Defense<br>1400 Defense Pentagon<br>Washington, D.C., 20301, | ) ) ) ) | |
| United States Department of State<br>2201 C Street NW<br>Washington DC, 20520 | ) ) ) ) | |
| The United States of America<br>950 Pennsylvania Ave., NW<br>Washington DC, 20530, | ) ) ) ) | |
| Leon Edward Panetta | ) ) | |
| Sean M. Joyce | ) ) | |
| George E. Little | ) ) | |
| Steven E. Ibison | ) ) | |
| Adam R. Malone | ) ) | |
| John and Jane Does 1 through 10<br>        individually,<br>*Defendants*.[1] | ) ) ) ) | |

---

[1] By agreement with counsel for the FBI, DOD State Department and United States, home addresses for the individual defendants have been suppressed out of respect for the privacy and security of the current and former government officials named.

**VERIFIED FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

1.　　Plaintiffs Mrs. Gilberte Jill Kelley and Scott Kelley, M.D., bring this action to vindicate their legal rights to privacy and dignity that were infringed by the government's improper searches, maintenance, and disclosures of their personal, private, and confidential information.  While the government's investigation led to the resignation of Central Intelligence Agency ("CIA") Director David Petraeus ("Director Petraeus") and abrupt retirement of General John Allen, the government was not legally entitled to treat the Kelleys' like criminals, pry into and disclose their personal communications, violate their privacy, and disseminate confidential records as well as false information about them.

2.　　Therefore, Mrs. Kelley and Dr. Kelley make this complaint against the Federal Bureau of Investigation ("FBI"), the U.S. Department of Defense ("DOD"), and the U.S. Department of State ("State Department") for money damages for violations of Plaintiffs' privacy rights under the Privacy Act, 5 U.S.C. § 552a; against the United States of America for declaratory and injunctive relief under the Stored Communications Act, 18 U.S.C. § 2707(g); and against Former Secretary of Defense Leon Panetta, FBI Deputy Director Sean Joyce, Assistant to the Secretary of Defense for Public Affairs and Pentagon Press Secretary George Little, FBI Special Agent Steven E. Ibison, FBI Special Agent Adam R. Malone, and John and Jane Does 1 through 10 ("Doe Defendants") for money damages and injunctive relief for violations of Plaintiffs' constitutional rights and common law privacy rights and defamation.

3.　　There is no question that Mrs. Kelley and Dr. Scott Kelley were the victims of and witnesses to a potential cyberstalking crime.  There is no question that they reported the facts to the FBI out of concerns for their own physical safety and the safety of their friends who were among the nation's most senior intelligence and military leaders.

4. There is also no reasonable argument that in exchange for their coming forward as good citizens they became the target of an unreasonable and intrusive investigation, and a malicious smear campaign where their names, emails, and damaging (as well as false) information were leaked to the media. For example, on November 11th, 2012, Douglas Frantz, then a journalist with the Washington Post and currently serving as Assistant Secretary of State for Public Affairs, sent a fax to Mrs. Kelley stating "[w]e have now seen some of the harassing e-mails she [Paula Broadwell] sent to you."[2] On November 13th, the New York Times reported that then Defense Secretary Leon Panetta leaked Mrs. Kelley's name in relation to the scandal, writing that "Defense Secretary Leon E. Panetta and other officials traveling with him to Australia overnight on Monday [November 12, 2012] disclosed the inquiry into General Allen's e-mails with Jill Kelley, the woman in Tampa, Fla., who was seen by Paula Broadwell, Mr. Petraeus's lover, as a rival for his attentions," and that "the Pentagon" characterized the emails as "inappropriate communication[s]."[3] On November 14, 2012, a "US official" is quoted by Fox News as saying the communications were the "equivalent of phone sex over email."[4]

5. Former Defense Department General Counsel Jeh Johnson, and current nominee to be Secretary of Homeland Security, has acknowledged that he "pored over" several years' worth of Mrs. Kelley's emails provided to him by the FBI but which "were not germane to

---

[2] *See* Exhibit 1.
[3] Eric Schmitt and Elisabeth Bumiller, *Another General Is Tied to the Petreaus Inquiry*, N.Y. Times, Nov. 13, 2012, at A10.
[4] *See, e.g., Gen. Allen's Emails to Friend of Petraeus Family Were Like 'Phone Sex,' Sources Say*, FoxNews.com, Nov. 14, 2012, http://www.foxnews.com/politics/2012/11/13/top-us-commander-in-afghanistan-gen-john-allen-under-investigation-for-alleged/#ixzz2Ubsiijue ("[T]wo U.S. officials later told Fox News that Allen's contact with Kelley was more than just general flirting. One official described some of the emails as sexually explicit and the 'equivalent of phone sex over email.'").

Kelley's [cyberstalking] complaint."[5]   In this same article, he disclosed to the Tampa Tribune that he considered them to demonstrate "a potentially inappropriate relationship" to be investigated by the Office of Inspector General, "but no breach of national security."[6]   Indeed, former Defense General Counsel Johnson has candidly acknowledged that "undue investigation of these emails" which he admitted were not germane to the FBI's investigation nor demonstrating any breach of national security, "would be a fishing expedition and invasion of privacy for both of them," referring to Mrs. Kelley and Gen. Allen.[7]   That is, of course, precisely what happened, and what is complained of here.

6.     In addition to the barrage of damaging leaks, U.S. Department of State spokesperson Mark Toner willfully misinformed the public about Mrs. Kelley's diplomatic status.  He stated on November 13, and again on November 15, 2012 that Mrs. Kelley had "no formal affiliation with the State Department."[8]   This false information was damaging to Mrs. Kelley's reputation and livelihood because it mischaracterized her as a fake, rather than as a serious professional appointed by the Republic of Korea and accredited by the State Department to serve as Honorary Consul, and instructed by the State Department as well as the Republic of Korea in procedures for carrying out her consular responsibilities.   Indeed, Mrs. Kelley was

---

[5] Howard Altman, *Feds Won't Revisit Socialite Kelley's Emails*, Tampa Tribune, July 3, 2013, *available at* http://tbo.com/list/military-news/feds-wont-revisit-socialite-kelleys-emails-20130703/.

[6] *Id.  See also* Sari Horowitz and Greg Miller, *FBI Probe of Petraeus Triggered by E-mail Threats by Biographer, Officials Say,* Washington Post, Nov. 10, 2012*, available at* http://articles.washingtonpost.com/2012-11-10/world/35504278_1_petraeus-e-mail-threats-e-mails ("'This is a very personal matter, not a matter of intelligence,' the senior U.S. intelligence official said. 'There are protocols for this. I would imagine things have to cross a certain threshold before they are reportable.'")

[7] *Id.*

[8]  NBC News Staff, *In 911 calls, Kelley Tried to Invoke Diplomatic Immunity*, NBC News, Nov. 14, 2012, http://usnews.nbcnews.com/_news/2012/11/14/15162122-in-911-calls-kelley-tried-to-invoke-diplomatic-immunity?lite.

assigned a "United States Department of State Consular Identification Card."  Mr. Toner had the opportunity in the intervening two days between the damaging press briefings to gather the complete and accurate information necessary and indeed required by the law, prior to repeating the misleading information.   He did not.   Instead, the State Department's statements and omissions contributed to the government's destruction of Mrs. Kelley's professional reputation and the loss of her position as Honorary Consul to the Republic of Korea.

7.     Government officials, including law enforcement agents and even senior officials, are required to maintain the confidentiality of sensitive information about witness and victims by the Privacy Act, other laws and government policies.

8.     Courts have repeatedly recognized the damage that can be done by disclosing sensitive information from law enforcement files, including how "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation."[9]

---

[9] *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990); *see also Schiffer v. FBI*, 78 F.3d 1405, 1410 (9th Cir. 1996) (noting that persons named in FBI files "have a strong interest in 'not being associated unwarrantedly with alleged criminal activity,' and that disclosure could infringe upon this interest"); *Neely v. FBI*, 208 F.3d 461, 464-66 (4th Cir. 2000) (upholding the FBI's refusal to release the names of individuals contained in FBI files to protect their "substantial interest[s] in the nondisclosure of their identities and their connection[s] with particular investigations"); *Ruston v. DOJ*, No. 06-0224, 2007 WL 809698, at *5 (D.D.C. Mar. 15, 2007) (agreeing that release of names and references of third parties could subject those individuals "to unanticipated and unwanted injury to their reputations, and to derogatory publicity or interferences arising from their connection to law enforcement"); *Palacio v. DOJ*, No. 00-1564, 2002 U.S. Dist. LEXIS 2198, at *9 (D.D.C. Feb. 11, 2002) (finding that release of individual's name in connection with criminal investigation may carry stigma and subject him to unnecessary public attention or harassment), summary affirmance granted, No. 02-5247, 2003 WL 242751 (D.C. Cir. Jan. 31, 2003); *Anderson v. USPS*, 7 F. Supp. 2d 583, 586 (E.D. Pa. 1998) (disclosing identities of interviewees and witnesses may result in embarrassment and harassment), *aff'd*, 187 F.3d 625 (3d Cir. 1999) (unpublished table decision); *Cujas v. IRS*, No. 1:97-00741, 1998 U.S. Dist. LEXIS 6466, at *9-10 (M.D.N.C. Apr. 15, 1998) (finding that "third parties named in these law enforcement records have a very strong privacy interest in avoiding the stigma and

9.      Leaks of the names of victims and witnesses are damaging not only to the leak subjects, but to our faith in government and its ability to do its job, whether law enforcement or national security.

10.      President Obama himself has declared a "zero tolerance" policy against government leakers.[10]

11.      Former DOD General Counsel Jeh Johnson characterized the expansive intrusion into the Kelleys' personal correspondence as "not germane" to the FBI's investigation of the Kelley's cyberstalking complaint.[11]   The intrusion also contravened laws and policies that recognize the significant privacy harm that can result from over-searching and collecting documents.   For example, the DOJ's *Guidelines on Methods of Obtaining Documentary Materials Held by Third Parties*, issued to implement safeguards in the Privacy Protection Act, states that:

> A search for documentary materials necessarily involves intrusions into personal privacy. First, the privacy of a person's home or office may be breached. Second, the execution of such a search may require examination of private papers within the scope of the search warrant, but not themselves subject to seizure. In addition, where such a search involves intrusions into professional, confidential relationships, the privacy interests of other persons are also implicated.[12]

---

embarrassment resulting from their identification as a person that is or was under investigation"), summary affirmance granted, 162 F.3d 1154 (4th Cir. 1998) (unpublished table decision).

[10] Christi Parsons, *Obama: 'Zero Tolerance' for Leaking Classified Information*, LA Times, Jun. 8, 2012, *available at* http://articles.latimes.com/2012/jun/08/news/la-pn-obama-news-conference-leaks-20120608.

[10] US Department of Justice, *Attorney General Guidelines for Victim and Witness Assistance* (2011 ed., revised May 2012), *available at* http://www.justice.gov/olp/pdf/ag_guidelines2012.pdf.

[11] *See* Altman, *supra* n. 5.

[12] 28 C.F.R. § 59.1.

12. The treatment of Mrs. Kelley and Dr. Kelley violates not only the law, but also conflicts starkly with Attorney General Eric Holder's "Guidelines for Victim and Witness Assistance." Current Department of Justice policy, which implements the Victim and Witness Protection Act enacted by Congress, sets a proper, high standard for itself on how it treats those individuals who come forward with evidence of a crime:

> Our core mission is to pursue justice for criminal acts, and that pursuit includes justice for the victims of and witnesses to crime. Every day, Department personnel encounter individuals harmed by crime or who witnessed others being harmed by crime. How we treat those individuals has a huge impact on their confidence in the criminal justice system and their ability to heal and recover from crime. When the Department is successful in identifying and convicting offenders, our victim assistance efforts help victims navigate an unfamiliar system, foster accountability, and find affirmation for their suffering.[13]

13. The government's vast electronic overreach into the Kelleys' personal emails and the prurient leaks by a Cabinet member, numerous senior government officials and law enforcement agents could not present a starker conflict with the standards prescribed in the FBI's Domestic Investigations and Operations Guide ("DIOG"). That code of conduct obligates FBI officials and agents to "protect individual rights and to ensure that investigations are confined to matters of legitimate government interest" and to "[o]nly investigate for a proper purpose," using only the "least intrusive methods," "particularly if there is the potential to ... damage someone's reputation [or] intrude on privacy."[14]

---

[13] *Id.* at i.

[14] *See* FBI Domestic Investigations and Operations Guide, Oct. 15, 2011, § 4.1.1, *available at* http://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20% 28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2011-version. The DIOG procedures for monitoring real-time and obtaining stored electronic communications are also undoubtedly applicable to this case, but many of the provisions most likely to be relevant have been redacted in whole or in part. *See, e.g., id.* at §§ 18.6.1.8.1.1 (Consensual Monitoring of Computers); 18.6.8.4.2 (various provisions of ECPA – Compelled Disclosures); 18.6.8.4.3 (first

14.     The only real question is whether the government will be held accountable for cavalierly violating so many legal requirements, policies, and high ideals the public expects of its law enforcement, legal, military, intelligence and policy officials.  Through this Complaint, the Kelleys seek to compel the government to respect the privacy of innocent citizens.

## JURISDICTION

15.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a(g), the Stored Communications Act, 18 U.S.C. § 2707, the Fourth Amendment of the United States Constitution, the Fifth Amendment of the United States Constitution, and pursuant to 28 U.S.C. §§ 1331, 1343, 1346, 1361, and 1367.

## VENUE

16.     Venue is proper in this District pursuant to the Privacy Act, 5 U.S.C. § 552a(g)(5), and pursuant to the United States Code of Judicial Procedure, 28 U.S.C. § 1391.

## PARTIES

17.     Plaintiff Mrs. Gilberte Jill Kelley ("Jill Kelley" or "Mrs. Kelley") obtained an undergraduate degree from an institution now known as Arcadia University, and pursued additional post-baccalaureate medical studies at Drexel-Hahnemann University Hospital and published medical research at the University of Pennsylvania.  Prior to the Defendants' actions, Mrs. Kelley had been a real estate investor, and pursued her interests and expertise in medical research and medical device patent development.  She was also a community leader and liaison to the military community in Tampa, and devoted considerable time to community service, both to the local homeless as well as to the large community of servicemen and servicewomen in the

provision of ECPA – Voluntary Disclosure); 18.7.2.12 (Notice and Reporting Requirements – Title III).

Tampa area. Reflecting her contributions to the morale and well-being of the military base in Tampa, she was named as the first "honorary ambassador" for the U.S. Central Command ("CENTCOM") Coalition in 2012 while under the command of CENTCOM Commander General Mattis. As further testament to her abilities and reputation, in August 2012 the Government of the Republic of Korea appointed Mrs. Kelley as Honorary Consul under the Vienna Convention on Consular Affairs of 1963, Art. 10. In this capacity, Mrs. Kelley was officially accredited by the U.S. Department of State as a foreign consular official entitled to certain diplomatic privileges and immunities.

18. Plaintiff Scott Kelley, M.D., is a general surgeon and surgical oncologist with an undergraduate degree from Dartmouth College and a medical degree from Columbia University. He completed his residency at the University of Pennsylvania and his surgical oncology fellowship at Moffitt Cancer Center in Florida. There, Dr. Kelley became the head of the esophageal gastric section. After approximately five years, he left academics to enter private practice. Dr. Kelley was a pioneer of hand-assisted laparoscopic surgery for esophageal cancer.

19. Dr. and Mrs. Kelley met at the Hospital of the University of Pennsylvania, were married in 1999 and have three young daughters.

20. Defendant Federal Bureau of Investigation ("FBI") is a component of the United States Department of Justice, a Department of the Executive Branch of the United States Government. The FBI's principal place of business is in the District of Columbia.

21. Defendant United States Department of Defense ("DOD") is a Department of the Executive Branch of the U.S. Government with its principal place of business in Virginia.

22.     Defendant United States Department of State ("State Department") is a Department of the Executive Branch of the United States Government with its principal place of business in the District of Columbia.

23.     Defendant United States of America is named in the request for declaratory and injunctive relief under the Stored Communications Act.  The actions of the FBI, DOD and State Department complained of herein are the responsibility of the United States Government, and such actions may have involved other Departments, Agencies, and/or Executive Offices.

24.     Defendant Leon E. Panetta was the U.S. Secretary of Defense from July 1, 2011 through February 27, 2013.  He currently resides in California.

25.     Defendant Sean Joyce is the deputy director of the FBI and a resident of Virginia.

26.     Defendant George E. Little is the former Assistant Secretary of Defense for Public Affairs and Pentagon Press Secretary from July 19, 2011 to November 15, 2013.  He is a resident of the District of Columbia.

27.     Defendant Steve Ibison was a special agent in the FBI, now retired, and had supervisory authority in the Kelley's investigation.  He is a resident of Florida.

28.     Defendant Adam Malone is a FBI agent, and was assigned to investigate the Kelleys' complaints.  He is a resident of Florida.

29.     Defendants John and Jane Does 1 through 10 are individuals who acted jointly and in concert to conspire to and did commit, aid, and abet the acts complained of herein.  The Doe Defendants' true names and capacities are currently unknown to Plaintiffs, but their identities should become known during the course of discovery.  Each Doe Defendant is or was an agent or employee of the United States federal government who, at least in part, exercises or

exercised government authority, and is responsible in some manner for the acts and occurrences alleged in this complaint, and each directly and proximately caused the damages alleged herein.

## FACTS

30.     Until November 2012, the Kelleys were active, dedicated, and productive members of the diplomatic community and the Tampa community that is home to MacDill Air Force Base and the United States Central Command.   They volunteered many years in community outreach and support for the local military community.

31.     One of the Kelleys' particularly successful community service initiatives was founding the Coalition and Multi-National Forces Appreciation Reception in 2009, which included Senior National Representatives to CENTCOM from over 60 countries.  Mrs. Kelley also acted as a goodwill ambassador to the Commanders at CENTCOM.  In 2012, Mrs. Kelley's ongoing efforts for community service to the base were formally recognized through designation as Honorary Ambassador for the US CENTCOM Coalition.  These roles came with no official duties or compensation, but, rather, recognized her continuing and dedicated commitment to contributing positively to the military community, including promoting the importance of cross-cultural and interfaith dialogue, and building relations with foreign ambassadors under the support of the Commander at Central Command.

32.     Through their contributions to the military community, Mrs. Kelley and Dr. Kelley became acquainted with a number of military officials and their families, including Director David H. Petraeus and US Marine Corps General John R. Allen, Jr.  The Kelleys, individually and as a couple, interacted and corresponded with these individuals and their spouses and families on a regular basis, and they all attended many of the same social and dignitary functions.

33.     On or about December 2011, South Korean official Han Duk-soo, who is currently Chairman and CEO of the Korean International Trade Association ("KITA"), and who served as the South Korean Ambassador to the United States through approximately February 2012, proposed Mrs. Kelley to be named Honorary Consul, a position recognized and governed by the Vienna Convention on Consular Relations.

34.     In February 2012, South Korea nominated Mrs. Kelley for an Honorary Consulship, and in August 2012, she was accredited by the U.S. Department of State.

35.     Mrs. Kelley was free to carry on other business while serving as Honorary Consul for the Republic of Korea, and Honorary Consuls typically engage in business deals and transactions arising out of their knowledge and contacts.  Mrs. Kelley was presented with such opportunities and intended to do so during her service as Honorary Consul to the extent that such business would not conflict or interfere with her consular responsibilities.

36.     As Honorary Consul, Mrs. Kelley was required to submit to a State Department security clearance and approval process; was issued an identification card bearing State Department identification number 4019-7108-51; received a State Department approved Florida license plate noting her diplomatic status; and received instructions and other communications on State Department procedures applicable to her in the conduct of official duties.

37.     Honorary consular officers recognized by the U.S. Government are American citizens or permanent resident aliens who perform consular services on a part-time basis. The State Department maintains official records describing the status of Honorary Consuls, "Foreign Career Consular Offices and Honorary Consular Offices in the United States," and providing an official listing of such Honorary Consuls and the location of their consular offices.

***Receipt and Report of Threatening and Harassing Emails and Stalking***

12

38.     On May 11, 2012, United States Marine Corps General John R. Allen emailed Mrs. Kelley alerting her that he had received a strange message.  The email, sent to General Allen from the address kelleypatrol@gmail.com, disparaged Mrs. Kelley and made reference to an upcoming dinner they were having with several senior US and foreign intelligence, defense, and diplomatic officials.

39.     The email was troubling, as it indicated somebody knew about the private dinner, thereby presenting a potential security concern.  It also frightened the Kelleys, as it indicated that Mrs. Kelley was being followed or stalked, and raised serious concerns about her own safety and well-being, particularly given the  terrorism risks faced by CENTCOM leaders.

40.     Because of the alarming nature of the email and the specific, non-public knowledge it contained, Mrs. Kelley contacted the MacDill Air Force Base FBI Counterintelligence Agent Fred Humphries.  Agent Humphries, a highly decorated FBI veteran, asked Mrs. Kelley to think about who might be targeting her in such emails.  Mrs. Kelley could not think of anyone who would have such animosity toward her, let alone someone who would be willing to threaten high-ranking government and military officials.  Agent Humphries advised her to remain vigilant.

41.     On June 3, 2012, Dr. Kelley received an anonymous email disparaging Mrs. Kelley and containing threats.  The message was sent to Dr. Kelley's email account, which he primarily uses for work purposes, and advised him to "rein her in."  It also included a reference to Mrs. Kelley's recent trip to Washington, DC, and referenced "senior military and public officials and foreign Ambassadors" with whom she had repeated interactions with in the past. The email concluded with threats about "avert[ing]" "embarrassment for all, including spouses, such as info in national headlines," referring to CENTCOM and SOCOM officials and other

senior government leaders mentioned elsewhere in the email.  The sender used the pseudonym and email handle "Tampa Angel."

42.     Dr. Kelley immediately informed Mrs. Kelley about the email.  Both Kelleys were extremely frightened by the threatening tone in the email, which showed the sender had been tracking Mrs. Kelley and senior US and foreign officials, and in which the sender claimed to have taken pictures of Mrs. Kelley—admitting to her physical stalking.  It was even more alarming when read in conjunction with the email previously sent to General Allen.

43.     On June 5, 2012, Dr. Kelley received another anonymous email message from "Tampa Angel" making more references to Mrs. Kelley.

### The Kelleys' Report of Threats and Harassment to the FBI

44.     In light of these anonymous, threatening emails targeting and tracking Mrs. Kelley, and after a number of senior commanders urged Mrs. Kelley to report it to law enforcement while they themselves sought their own security measures, Mrs. Kelley contacted Agent Humphries again.  At this point, Agent Humphries asked Mrs. Kelley to come in to the Tampa FBI field office to provide additional information.  On or about June 7, 2012, Agent Humphries introduced Dr. and Mrs. Kelley to another agent, Agent Adam Malone, by email.  Agent Malone was in charge of taking a formal report from the Kelleys.  Mrs. Kelley thereafter contacted Agent Malone to report the harassing emails her husband had received.

45.     The Kelleys understood that the FBI had a legal duty to maintain the privacy and confidentiality of non-public investigative material, including the name and identity of victims and witnesses who reported a possible crime.  Agent Malone specifically promised Mrs. Kelley in their meetings throughout summer of 2012 that the FBI would respect her and Dr. Kelley's privacy, and specifically stated that their names would not be disclosed.

46.     Sometime around their email introduction, Mrs. Kelley went to the Tampa FBI field office to meet Agent Adam Malone in person.  Agent Malone attempted to determine the identity of the anonymous sender, including through the use of informal contacts to obtain the sender's subscriber information without legal process, but was unable to do so, noting that the sender was highly sophisticated and "fingerprintless."  He determined that he needed to access the one email in order to get more information.

47.     On or about June 8, 2012, the agents asked whether Mrs. Kelley could provide the login and password to Dr. Kelley's email account for the specific and limited purpose of obtaining the anonymous sender's IP address.  The agents explained that they would need to have access to the original "Tampa Angel" email in its "native" format to be able to discern the sender's IP address information by opening the original email Dr. Kelley received from Tampa Angel and click on the sender's information in the header of the one email only.

48.     The agents assured Mrs. Kelley that they would not need to access the contents of the email account for any reason.

49.     Mrs. Kelley declined to provide unlimited access to the email account, but she and Dr. Kelley did agree to provide the agents with the login and password information for the account for the specific and limited purpose of accessing the sender's IP information in the first "Tampa Angel" email.

50.     During a follow-up conversation, Agents Malone and Humphries specifically asked Mrs. Kelley for authorization to access other emails in the account.  She denied their request.  They also asked whether they could have authorization to access her own email accounts.  Mrs. Kelley again denied such overbroad and unnecessary authorization.

51.     Neither Mrs. Kelley nor Dr. Kelley authorized any access to their email accounts

beyond the explicit and limited access to the June 3, 2012 "Tampa Angel" email.

52.     In follow up communications, Mrs. Kelley received repeated reassurances that the FBI would respect their privacy.

53.     On June 7, 11, 18, and 22, 2012, the Kelleys received additional threatening emails from "Tampa Angel," often speaking to either Mrs. Kelley's recent whereabouts or, sometimes in precise detail, her upcoming, personal plans with high-level US leaders.   The increasingly distressed Kelleys contacted Agents Humphries and Malone about each of them.

54.     Around the second week of August, Agent Malone told Mrs. Kelley that the FBI had identified the sender of the emails, but refused to give Mrs. Kelley any additional information.  Mrs. Kelley repeatedly inquired about obtaining security or protection, and Agent Malone replied that he would get back to her about it.   He never did.   During that same conversation, Mrs. Kelley reiterated her desire to maintain her privacy, and received further reassurances from Agent Malone.

55.     Upon information and belief, the FBI had been able to trace the IP address of the anonymous sender and, after additional investigation and surveillance, and perhaps as early as June 25, 2012, had determined that Mrs. Paula Broadwell had stalked US leaders and senior military officials and the Kelleys, and sent the threatening and defamatory emails.

56.     Unbeknownst to the Kelleys, Director Petraeus was engaged in an extramarital affair with Mrs. Broadwell.

57.     The Kelleys never met or spoke to Mrs. Broadwell.

### FBI Investigation of the Kelleys, Including Overbroad and Irrelevant Search and Seizure of the Kelleys' Personal Emails

58.     Upon information and belief, the federal agents collected more than the one "Tampa Angel" email to which the Kelleys allowed them access.

59.     The Kelleys have not received any notice, delayed or contemporaneous, of any subpoena, order, writ or other process by which the United States would have lawful access to their electronic communications, such as is required by 18 U.S.C. §§ 2703, 2705.

60.     At no point did any government agents notify the Kelleys that they required additional access to emails or that the Kelleys were the subjects or targets of an investigation.

61.     At no point did the government have any basis in law or fact for either of the Kelleys to be investigated as the subjects or targets of any FBI's criminal probe.

62.     Upon information and belief, the FBI Washington Cyber Division and FBI Deputy Director Sean Joyce directed agents in the Tampa Field Office Cyber Squad to treat the Kelleys' case differently than other investigations.   The Cyber Division and Deputy Director Joyce preempted decisions made by the Field Office's Cyber Supervisor and directed the course of the investigation, including by directing the investigating agents not to proceed with a scheduled effort to interview Mrs. Broadwell once they had identified her as the stalker responsible for the threatening emails.

63.     The Kelleys' case was also treated differently because they were not assigned a victims' assistance coordinator or provided with status updates regarding their case.   In fact, in July 2012, Agent Humphries informed the Kelleys that he was instructed by Assistant Special Agent in Charge ("ASAC") Kevin Eaton to cease all communication with Mrs. Kelley.

64.     The FBI marginalized Mrs. Kelley, denied her standard rights and deviated from its standard practices, and did not treat her case with the integrity and confidentiality it deserved and that other victims and witnesses would routinely receive, based on inappropriate and unprofessional personal judgments made by certain agents.

65.     Upon information and belief, government agents accessed, collected, and

maintained records on a multitude of the Kelleys' personal emails including, but not limited to, other "Tampa Angel" emails, and emails between the Kelleys and Director Petraeus, General Allen, and Agent Humphries.

66.     Upon information and belief, the additional emails the government agents seized, searched, reviewed and maintained were not pertinent to unearthing evidence related to the case involving the Kelleys' cyber stalker or any other criminal investigation, nor could any reasonable person believe they could have been.  Rather, the government searched, obtained, and reviewed personal, irrelevant private emails belonging to the Kelleys.

67.     Upon information and belief, government agents misused the emails obtained through overbroad search and seizure to conduct a scurrilous investigation into Mrs. Kelley's private life that had no bearing on any legitimate concern to the FBI.

68.     For example, Agent Humphries has told Mrs. Kelley that his superiors confronted him with her emails and accusing him of having an extramarital affair with Mrs. Kelley.  They ordered Agent Humphries to compose an affidavit, and forced him to remove his statement denying an affair.  The FBI engaged in this intrusive and irrelevant inquiry even though, at the time of these accusations, the FBI and other government agents already knew that Mrs. Broadwell had sent the anonymous threats.  Agent Humphries' relationship with Mrs. Kelley was friendly, professional, and entirely platonic.

69.     As further example, on or about August 10, 2012, Mrs. Kelley was at her home with her three daughters when FBI agents, including Agent Malone, arrived unannounced at her home.  They instructed Mrs. Kelley to get in the SUV in which they had arrived.  She refused, stating she was with her children and was scheduled to take a flight out of Tampa in the next two hours.  The agents insisted she go with them, leaving the children with the nanny, and again

ordered Mrs. Kelley to get in the vehicle.  Mrs. Kelley asked whether she could contact her attorney, and the FBI agents replied that she did not have time to do that, and demanded she leave her children, not contact her attorney, and get in the SUV immediately.

70.     While in the vehicle, she again asked to call her attorney, and they again denied her, informing her she did not have time.  Instead, they then demanded she answer accusations regarding extramarital affairs with Director Petraeus.

71.     During this episode, Agent Malone informed Mrs. Kelley that the FBI had identified the stalker, but, despite Mrs. Kelley's repeated pleas for additional information, he refused to provide any information or answer questions about whether she was in danger.  Mrs. Kelley requested protection, and Agent Malone said he would get back to her, but never did.

72.     After this incident, it was abundantly clear that Mrs. Kelley was not being treated as the victim of a crime, and was not being afforded the respect, rights, and information normally provided to crime victims.  Instead, she had somehow become the target of the FBI's zealous investigation into the agents' speculations and prurient interests.

### Perpetration of Inaccurate, Irrelevant Information

73.     In addition to collecting vast amounts of irrelevant information and pursuing an intrusive and unnecessary investigation into the Kelleys' private affairs, the FBI intentionally or recklessly maintained inaccurate information in their records about the Kelleys.

74.     For example, Agent Humphries has told the Kelleys that Agent Ibison confronted him with allegations that Humphries was having an affair with Mrs. Kelley, presenting emails between Mrs. Kelley and Humphries, including an email with an attachment of a photo of Agent Humphries posing with target dummies taken at a firing range by other members of his SWAT

team.  Humphries had sent this photo in 2010 to many friends, including both Dr. and Mrs. Kelley, as a self-deprecating joke, and it was not suggestive or sexual.

75.     After confronting Agent Humphries about whether he had an inappropriate relationship with Mrs. Kelley, the FBI also directed Agent Humphries to remove a statement in his sworn 302 declaration addressing, and flatly denying, the accusation that he had a sexual relationship with Mrs. Kelley.

76.     Additionally, Agent Humphries has told the Kelleys that at a time after the FBI was aware that Mrs. Broadwell was the cyber stalker, it had a chart posted up on the wall, visible to anyone in its Tampa Field Office, showing Mrs. Kelley at the hub with spokes drawn out to several senior government and military officials.  In addition to demonstrating that Mrs. Kelley was the target of the investigation, the chart, as the FBI had posted it, did not shield Mrs. Kelley's identity or safeguard her privacy in any way.  To the contrary, the chart and other conduct of the agents demonstrated a discriminatory and sexist fascination with Mrs. Kelley.

### Petraeus Affair Scandal and Leak of Victim Identity

77.     On November 9, 2012, Director Petraeus resigned as Director of the Central Intelligence Agency.  The intense media coverage that followed reported that he had resigned because of an affair which had been uncovered through an investigation of anonymous, threatening emails sent to an individual who had filed a complaint with the FBI—although these reports did not initially identify the recipient of the harassing emails.[15]

---

[15] *See*, *e.g.*, Tabassum Zakaria and Mark Hosenball, *FBI Probe of Petraeus Began With "Suspicious Emails,"* Reuters, Nov. 10, 2012, *available at* http://www.reuters.com/article/2012/11/10/us-usa-petraeus-idUSBRE8A81FP20121110 ("[T]he FBI probe was triggered when Broadwell sent threatening emails to an unidentified woman close to the CIA director"); *FBI Probe of Petraeus' Emails Purportedly Led to Discovery of Extramarital Affair*, FoxNews.com, Nov. 10, 2012, http://www.foxnews.com/politics/2012/11/10/fbi-probe-petraeus-emails-purportedly-led-to-

78.     On information and belief,[16] Attorney General Eric Holder, FBI Director Robert Mueller, FBI Deputy Director Sean Joyce, Director of National Intelligence James Clapper Jr., and National Security Adviser Tom Donilon made decisions regarding the investigation and the decision on whether to inform the President, based on the timing of the presidential election.

79.     On November 9, the same day that Petraeus resigned and before the Kelleys' name was linked to this scandal, the Kelleys learned through news reports that no criminal charges were being pressed against Mrs. Broadwell.  Indeed, the FBI made this decision without ever interviewing Dr. Kelley, a key witness, victim and recipient of the threats, who was interviewed by the FBI only after the disclosure that the FBI would not file charges.

80.     In the days that followed, in utter disregard for the Kelleys' privacy and status as victims, unnamed "law enforcement," "senior military," and other government officials willfully

---

discovery-extramarital-affair/ ("The FBI investigation began when someone reported suspicious emails allegedly sent from Broadwell."); *David Petraeus Affair: FBI Probe Into Inbox of Paula Broadwell Uncovers 'Human Drama'*, ABC News, Nov. 10, 2012, http://abcnews.go.com/Politics/OTUS/david-petraeus-affair-fbi-probe-uncovers-human-drama/story?id=17689348 ("The FBI stumbled across the affair after the unnamed woman, who received the troubling email several months ago, alerted authorities, who began a probe to track the source of the message.").

[16] See Barton Gellman, *Spyfall: David Petraeus' Affair With his Biographer Ended His 37-year Career. But the Damage From This Episode Goes Much Farther.*, TIME Magazine, Nov. 15, 2012, *available at* http://swampland.time.com/2012/11/15/spyfall/print/ ("The decision by FBI Director Robert Mueller and Attorney General Eric Holder Jr. to withhold notice about the case until Election Day has turned congressional attention once again on *the* inner workings of the Obama Administration. . . . Thus far it is undisputed that word of the Petraeus affair first reached the White House on Wednesday, Nov. 7, the day after Obama's re-election, in a telephone call from Director of National Intelligence James Clapper Jr. to National Security Adviser Tom Donilon. Obama was celebrating with his family and staff in Chicago, and Donilon decided to hold the news until Thursday morning."); see also Mike Isikoff, *Agent Feared FBI Was Stalling Petraeus Investigation Until After 2012 Election*, NBC News, Nov. 7, 2013, http://investigations.nbcnews.com/_news/2013/11/07/21337699-agent-feared-fbi-was-stalling-petraeus-investigation-until-after-2012-election (interviewing Charles Mandigo, former Special Agent in Charge of the FBI's Seattle office, and former supervisor to FBI Special Agent Humphries, who said that Humphries "had been told, just sit back and wait. Once the election is over, this will be quietly handled and it will all be resolved." Mandigo also said that "Humphries attributed the comment to an unidentified senior official in the FBI's Tampa office.")

leaked Mrs. Kelley's name and damaging and false innuendo to the media.[17]

81.     On November 11, 2012, Mrs. Kelley received a fax from a national newspaper in which the journalist stated that "[w]e have now seen some of the harassing e-mails she [Paula Broadwell] sent to you." *See* Ex. 1.   The Kelleys now understood that not only had the government leaked Mrs. Kelley's name, but it was disseminating her emails to the press.   The journalist who sent that fax was Douglas Frantz of the Washington Post.   On September 3, 2013, Mr. Frantz was appointed Assistant Secretary for the Bureau of Public Affairs in the State Department.   He continues to serve as Assistant Secretary of State to the present time.

82.     As Mr. Johnson disclosed to the Tampa Tribune, three days after David Petraeus resigned as CIA Director, Mr. Johnson received a call about the emails from the FBI General Counsel, who said the emails were "not germane" to the FBI's investigation of the Kelleys' cyberstalking complaint.[18]   The article quotes Mr. Johnson saying, "[m]y strong recollection is that the emails that were handed over to me by the FBI were the product of a subpoena, therefore they would have picked up every single communication between Mrs. Kelley and Gen. Allen." Mr. Johnson described the emails as "very comprehensive and you could tell over a several year

---

[17] *See, e.g.,* Sari Horwitz and Greg Miller, *FBI Probe of Petraeus Triggered By E-mail Threats From Biographer, Officials Say,* Wash. Post, Nov. 10, 2012, *available at* http://www.washingtonpost.com/world/national-security/fbi-probe-of-petraeus-triggered-by-e-mail-threats-from-biographer-officials-say/2012/11/10/d2fc52de-2b68-11e2-bab2-eda299503684_story.html ("The woman who received the emails [from Paula Broadwell] was Jill Kelley in Tampa, Fla., according to law enforcement officials. The nature of her relationship with Petraeus is unknown."); *Report: Emails Triggered Petraeus Probe*, Nov. 11, 2012, *available at* http://www.politico.com/news/stories/1112/83690.html#ixzz2UbQRzmpz ("A senior U.S. military official . . . says 37-year-old Jill Kelley in Tampa, Fla., received the emails from Petraeus biographer Paula Broadwell that triggered an FBI investigation."); Donna Leinwand Leger, *Jill Kelley ID'd as Woman Who Sparked Petraeus Inquiry*, USA Today, Nov. 12, 2012, *available at* http://www.usatoday.com/story/news/nation/2012/11/11/petraeus-jill-kelley-scandal/1698203/ ("A senior U.S. military official identified the woman who allegedly received the harassing e-mails from Paula Broadwell as Jill Kelley, 37, of Tampa.").
[18] *See* Altman, *supra* n. 5.

period that nothing was missing. … There didn't seem to be any gaps in what we were looking at." Mr. Johnson also acknowledged that the emails did not demonstrate any "breach of national security,"[19] and that further investigation could be an invasion of privacy.

83.     Upon information and belief, by November 12, 2012, United States government sources had fed the media absolutely egregious, spurious, and false "facts" that generated even more frenetic speculation about Mrs. Kelley's life, which included publicly naming the Kelleys' minor children.[20]   According to one press account titled "Petraeus Affair: Who is Jill Kelley?," published by ABC News on November 13, 2012, a government official disclosed that "[t]he FBI has now uncovered 'potentially inappropriate' emails between Gen. Allen and Kelley, according to a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta.  The department is reviewing between 20,000 and 30,000 documents connected to this matter, the official said."[21]

84.     On November 11, 2012, government officials further leaked innuendo and

---

[19] *Id.  See also* Sari Horowitz and Greg Miller, *FBI Probe of Petraeus Triggered by E-mail Threats by Biographer, Officials Say,* Washington Post, Nov. 10, 2012, *available at* http://articles.washingtonpost.com/2012-11-10/world/35504278_1_petraeus-e-mail-threats-e-mails ("'This is a very personal matter, not a matter of intelligence,' the senior U.S. intelligence official said. 'There are protocols for this. I would imagine things have to cross a certain threshold before they are reportable.'")

[20] *See, e.g.*, Henry Blodget and Kim Bhasin, *The 'Other Woman' In the Petraeus Scandal is Tampa Resident Jill Kelley*, Business Insider, Nov. 11, 2012, http://www.businessinsider.com/jill-kelley-petraeus-2012-11 (characterizing Mrs. Kelley as "the other woman" in the Petraeus scandal and citing an AP source of "an unnamed senior military official"); Michael Daly, *Exclusive: Paula Broadwell's Emails Revealed*, The Daily Beast, Nov. 12, 2012, http://www.thedailybeast.com/articles/2012/11/12/exclusive-paula-broadwell-s-emails-revealed.html (citing an anonymous source from "the highest levels of the intelligence community" as describing the emails sent by Paula Broadwell to Jill Kelley as "kind of cat-fight stuff," and speculating that "Kelley likely assisted her 7-year-old daughter. . . in posting an online photo album that includes a picture of the girl and her two sisters with Petraeus"); Emma Brockes, *Petraeus Scandal: Jill Kelley and the Tampa Society Set*, The Guardian, Nov. 16, 2012, http://www.guardian.co.uk/world/2012/nov/16/petraeus-scandal-jill-kelly-tampa-society.

[21] Christina Ng, Martha Raddatz and Luis Martinez, ABC News, Nov. 13, 2012, http://news.yahoo.com/petraeus-affair-jill-kelley-154817861--abc-news-topstories.html.

misinformation about Mrs. Kelley's personal correspondence with General Allen. The media cited anonymous government sources for the proposition that Mrs. Kelley engaged in communications with General Allen numbering in the tens of thousands, and that government officials were conducting an investigation into inappropriate conduct between Mrs. Kelley and General Allen. One government official went so far as to characterize certain email communications as the "equivalent of phone sex over email."[22]

85. Once more, government leaks intentionally placed the Kelleys in the middle of rampant speculation about the nature of Mrs. Kelley's private relationships with men who were not her husband—in this case, General Allen—resulting in lurid headlines placing Mrs. Kelley at the "center" of a "sex scandal."[23]

86. The U.S. Department of State spokesperson Mark Toner answered questions

---

[22] *See*, *e.g.*, FoxNews.com, *supra* n. 3; Craig Whitlock and Rajiv Chandrasekaran, *Petraeus Investigation Ensnares Commander of U.S., NATO Troops in Afghanistan*, Wash. Post, Nov. 13, 2012, *available at* http://www.washingtonpost.com/world/national-security/scandal-probe-ensnares-commander-of-us-nato-troops-in-afghanistan/2012/11/13/a2a27232-2d7d-11e2-a99d-5c4203af7b7a_story.html?hpid=z1 ("According to a senior U.S. defense official, the FBI has uncovered between 20,000 and 30,000 pages of documents — most of them e-mails — that contain "potentially inappropriate" communication between Allen and Jill Kelley.").

[23] *See*, *e.g.*, Rachel Bletchly, *Sex and the CIA: The Woman at the Centre of the Scandal with Top US Generals*, Mirror, Nov. 17, 2012, *available at* http://www.mirror.co.uk/news/world-news/jill-kelley-woman-at-the-centre-of-the-scandal-1440530; *The Other ... Other Woman: Florida Socialite Emerges at Center of Petraeus Scandal*, FoxNews.com, Nov. 13, 2012, http://www.foxnews.com/politics/2012/11/13/florida-housewife-in-petraeus-scandal-reportedly-never-spared-anything-for/; Carl Hiaasen, *Jill Kelley, Mystery Vixen in Petraeus Scandal*, Miami Herald, Dec. 1, 2012, *available at* http://www.miamiherald.com/2012/12/01/3121422/jill-kelley-mystery-vixen-in-petraeus.html; Phil Hands, *Four Star General Hospital*, Wisconsin State Journal, Nov. 18, 2012, *available at* http://host.madison.com/hands-cartoon-four-star-general-hospital/image_1f8b1b26-3000-11e2-a64d-001a4bcf887a.html (depicting Mrs. Kelley as being involved in a soap opera with Generals Petraeus and Allen); *In the Line of Booty*, N.Y. Daily News (cover story), Nov. 18, 2012, *available at* http://www.tampabay.com/resources/images/blogs/media/61982.jpg.

about Mrs. Kelley's diplomatic status during press briefings on November 13, 2012[24] and again

on November 15, 2012.[25]  Mr. Toner disseminated inaccurate and incomplete information about

Mrs. Kelley's having "no formal affiliation with the State Department" on November 13th and

15th 2012, mischaracterizing Mrs. Kelley as a *poseur* or fake.  Mr. Toner's false information

from State Department records contributed to the ruin of her professional reputation.  He made

these statements despite the fact that Mrs. Kelley was an Honorary Consul vetted, registered and

recognized by the State Department, including being instructed by the State Department as to

appropriate procedures for her service as Honorary Consul for South Korea, and being issued a

State Department ID and State Department-approved diplomatic license plates.

    87.    Indeed, Mr. Toner had an opportunity to correct his damaging statements two

days after his first statement, but instead took the opportunity to reiterate that she had "no formal

affiliation with the State Department" and that the State Department had "no direct role."  He

specifically and repeatedly omitted critical information needed to ensure that what he

disseminated was accurate and complete.  What he did say on behalf of the State Department

was false, misleading and damaging. The correct and truthful information he failed to disclose

from State Department records was that Mrs. Kelley was officially recognized and credentialed

by the State Department, and that she was entitled to certain official privileges and immunities,

including "[p]rotection [of] the consular premises . . . [from] intrusion or damage . . . disturbance

of the peace . . . [and] impairment of its dignity"[26] which the United States was obligated to

respect under the Vienna Convention on Consular Relations as implemented by official U.S.

---

[24] See State Department transcript, Nov. 13, 2012, *available at* http://www.state.gov/r/pa/prs/dpb/2012/11/200477.htm.

[25] See State Department transcript, Nov. 15, 2012, *available at* http://www.state.gov/r/pa/prs/dpb/2012/11/200598.htm.

[26] Vienna Convention on Consular Relations art. 59, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

policy.  In fact, Mrs. Kelley's State Department Consular Identification Card states on the back that "[t]his person has been duly recognized by the Department of State….  The bearer shall be treated with due respect."

88.     When the FBI finally did interview Dr. Kelley on or about December 3, 2012, he demanded to know why he was being interviewed only after the government's judgment not to prosecute their stalker was publically announced.  Dr. Kelley also demanded to know why his and Mrs. Kelley's emails had been read despite their express refusal to consent to such activity, and why their names had been leaked to the press.  Malone refused to give him much information, but informed him that the leaks came from headquarters.

89.     On January 22, 2013, internal investigators cleared General Allen of all wrongdoing, concluding he had not had an inappropriate relationship or inappropriate dealings with Mrs. Kelley and that the allegations were unsubstantiated.  Nevertheless, after the media campaign to cast doubt about his fidelity with innuendo regarding Mrs. Kelley, General Allen retired from the military on April 29, 2013.

90.     Upon information and belief, these malicious leaks originated with government agents.  Because the Kelleys' case was a Sensitive Investigative Matter ("SIM"), access to their case file was – or should have been – restricted.  Upon information and belief, there is a list of approximately 70 government employees who had unlimited access to the case file, including individuals from the Tampa FBI office such as Agents Adam Malone, Kevin Eaton, and Steve Ibison, individuals from FBI headquarters, including Deputy Director Sean Joyce, and individuals from the Department of Justice.  The individuals on that list would be the only people with authorized access to the details of the investigation and the particulars of the Kelleys' personal emails, and the only people authorized to access those emails.

91.     Upon information and belief, Mrs. Kelley's emails and material from and about the government's investigation was provided by government officials directly to journalists, including Douglas Frantz of then of the Washington Post.  Mr. Frantz sent Mrs. Kelley a fax on November 11, 2012 representing that he had "seen some of the harassing emails [Mrs. Broadwell] sent to you."

### FBI's Willful Determination to Withhold Victim Services

92.     The Kelleys were not treated like the victims they were.  At no point did Defendants officially apprise them of the rights to which victims are entitled by law and FBI policy.  At no point did an FBI victims' representative officer contact them.

93.     In fact, Mrs. Kelley had asked FBI representatives repeatedly about victims' assistance or victims' rights, and each time she was told that they would get back to her.

94.     On or about November 7, 2012, in light of the fact that the FBI had not provided the Kelleys with any concrete information since they reported the potential crime in early June 2012, other than being told that the FBI had potentially identified the sender in August 2012, Mrs. Kelley contacted the FBI Victim Witness Assistance program coordinator office in Tampa seeking information about her case.  The websites for the United States Attorney's Office for the Middle District of Florida specifically includes information on victim witness assistance, stating "[s]ervices provided to crime victims and witnesses by the U.S. Attorney's Office include: notice of case events; information concerning their rights; information about case proceedings and the criminal justice system in general; referrals to medical and/or social service providers; assistance with travel arrangements; and logistical information…."[27]

---

[27] The United States Attorney's Office Middle District of Florida, Victim Witness Assistance, http://www.justice.gov/usao/flm/programs/vw/vwa.html.

95.     The FBI Victim Witness representative who answered the phone searched for her case file, which she could not initially locate.  After some difficulty, the FBI representative asked Mrs. Kelley if her case was related to the Petraeus inquiry.  Once Mrs. Kelley acknowledged that her case was likely related, the representative told Mrs. Kelley her file had existed but had been removed from the victim representatives' list of cases, and that she had no further information.

### Fallout and Aftermath

96.     Echoing the leaks of generally "unnamed" government officials, there are now multitudes of headlines, videos, false information, and sexist innuendoes harming the Kelleys.

97.     No government official had any legal basis to release the Kelleys' names, or to publicly disclose, discuss, and adversely characterize their emails and other information.

98.     The Kelleys have suffered enormously as a result of the Defendants' actions, including potentially irreversible reputational harm, significant financial expenses, and current and future financial losses and lost opportunities.

99.     On November 27, 2012, barely two weeks after the false and damaging government leaks began, Mrs. Kelley found out that her Honorary Consulship was being revoked through news reports.[28]  She received a letter formally informing her of the decision soon after.

100.     Neither Dr. nor Mrs. Kelley has been accused of a crime, and to their knowledge, they have not been investigated for one.  Mrs. Kelley has not had an affair with anyone.

101.     Mrs. Kelley's reputation is indelibly tainted.  She is consistently and falsely referred to as the "center" of the "sex scandal" and is wrongly portrayed as the woman who brought down two American generals.  As a result, she (the victim and a participant in none of

---

[28] *See, e.g.*, NBC News and News Services*, South Korea to Sack Tampa Socialite Jill Kelley as Honorary Consul*, Nov. 27, 2012, http://usnews.nbcnews.com/_news/2012/11/27/15484600-south-korea-to-sack-tampa-socialite-jill-kelley-as-honorary-consul.

the bad acts in the sex scandal) has unfairly shouldered the blame as the villain in the generals' downfall despite the fact that she was trying to protect them.[29]

102.    The vituperation directed toward the Kelleys forced them to increase their security, to avoid public events they would otherwise attend, and to lose much of the value of living in their Tampa community.  It also prevented the Kelleys from attending their children's school functions, including school plays, family days, and other special occasions.

103.    To understand their rights in the aftermath of the Defendants' disclosures, the Kelleys had to hire attorneys to help remediate the damage the government has caused them.

104.    The treatment of Mrs. Kelley in particular was also the product of sexual discrimination and stereotyping by Defendants.

105.    Mrs. Kelley's prior excellent reputation was a critical factor in her professional opportunities, including her Honorary Consulship, and the reputational backlash she suffered as a result of the Defendants' actions directly and proximately caused her appointment as an Honorary Consul to be revoked.  The revocation of her Honorary Consulship deprived her of her annual stipend and years of significant public service, social and financial opportunities.

106.    Prior to Defendants' misconduct, Mrs. Kelley's networking opportunities were beginning to present significant business and philanthropic prospects.  In the aftermath of the government's actions and the ensuing smear of the Kelleys' personal and financial standings, Mrs. Kelley has lost a critical element for success in these endeavors—credibility and financial standing.  Indeed, Mrs. Kelley has been made aware of opportunities that she may not participate

---

[29] *See, e.g.,* Sage Stossel, *Petraeus Scandal: History Repeats Itself*, Boston Globe, Nov. 24, 2012, *available at* http://www.bostonglobe.com/opinion/2012/11/24/petraeus-scandal-history-repeats-itself/I6zGIU63qBEDIicrN0MZgN/story.html (cartoon depicting Mrs. Kelley as a modern-day Helen of Troy).

in, given the scandal. Additionally, the DOD revoked Mrs. Kelley's access to the MacDill Air Force Base, notwithstanding many years of voluntary service.

107.    Dr. Kelley also suffered financial losses because of the Defendants' misconduct.[30]

### Federal Protections of Privacy

108.    The Fourth Amendment of the U.S. Constitution recognizes the privacy interests in electronic communications.  Indeed, as the U.S. Court of Appeals wrote in *United States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010), that "an email account … provides an account of its owner's life.  By obtaining access to someone's email, government agents gain the ability to peer deeply into his activities. . . ."

109.    The Privacy Act, 5 U.S.C. § 552a, was enacted in 1974 following the revelation of the illegal surveillance and investigation of individuals by federal agencies during the Watergate scandal.  The Privacy Act seeks to protect individuals from unwarranted invasions of privacy by federal agencies that maintain sensitive information about them.

110.    In passing the Act, Congress recognized that "the opportunities for an individual to secure employment, insurance, and credit, and his right to due process, and other legal protections are endangered by the misuse of certain information systems," and that "the right to privacy is a personal and fundamental right protected by the Constitution of the United States." 5 U.S.C. § 552a note (Congressional findings for the Privacy Act of 1974).

111.    Congress enacted the amended Electronic Communications Privacy Act, including the Stored Communications Act, 18 U.S.C. § 2701 et seq., in 1986 to protect individuals from the "technological advances in surveillance devices and techniques" that

---

[30] Due to concerns regarding the property and privacy interests involved, and the potential for prejudice to the Kelleys from disclosure, those damages will be addressed in more detail under seal or pursuant to an appropriate protective order.

"ma[de] it possible for overzealous law enforcement agencies, industrial spies and private parties to intercept the personal or proprietary communications of others." S. Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557.

112.    The FBI's DIOG establishes policies for the agency's conduct in investigations. It also defines the circumstances in which the FBI may disseminate investigative information.[31] The DIOG provides that, in addition to disclosures required by law, "[c]onsistent with the Privacy Act…," the FBI is permitted to share information with other agencies "if disclosure is compatible with the purpose for which the information was collected and [ ] is related to their responsibilities," or if the dissemination is otherwise permitted by the Privacy Act.[32]   This section accordingly requires use control and access limitations for disclosures to other agencies, such as the DOD, as well as respect for the Privacy Act, and does not contain any provision authorizing the FBI to share information with the media.  The DIOG also requires FBI agents to protect civil liberties and privacy throughout the investigative process, including specifications in section 4.1.1. to "protect individual rights and to ensure that investigations are confined to matters of legitimate government interest" and to "[o]nly investigate for a proper purpose."[33] This same section establishes that FBI agents should use the "least intrusive methods" to pursue the FBI's investigative goals, "particularly if there is the potential to ... damage someone's reputation, [or] intrude on privacy...)."[34]

**FIRST CAUSE OF ACTION**

**AGAINST DEFENDANTS FBI AND DOD**

**PRIVACY ACT – UNAUTHORIZED DISCLOSURE**

---

[31] *See* DIOG, *supra* n. 13 at § 14.3.
[32] *Id.* at § 14.3.1(B), (H).
[33] *See id.*, at § 4.1.1.
[34] *Id.*

113.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 112 above, inclusive.

114.   Information regarding the Kelleys and their report to the FBI of threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of records retrievable by use of the Kelleys' names or by some identifying number, symbol or other identifying particular assigned to Plaintiffs.

115.   Pursuant to 5 U.S.C. § 552a(b), the FBI and DOD may not "disclose any record which is contained in a system of records by any means of communication to any person, or to another agency" unless certain exceptions apply.

116.   At no time did Plaintiffs provide the government with either verbal or written consent to disclose information concerning themselves to third parties, and indeed, they received assurances that the FBI would preserve their privacy.

117.   Upon information and belief, on one or more occasions since the Kelleys first reported the threatening and criminal actions of the cyber stalker, the FBI shared records on the Kelleys with the DOD, and both shared these records and information contained therein with the media.  The FBI and DOD leaks by, for example, "law enforcement officials,"[35] a "senior U.S. military official,"[36] "an unnamed military official,"[37] an anonymous source from "the highest

---

[35] *See, e.g.*, Horwitz and Miller, *supra* n. 17 ("The woman who received the emails [from Paula Broadwell] was Jill Kelley in Tampa, Fla., according to law enforcement officials. The nature of her relationship with Petraeus is unknown.").

[36] Politico, *supra* n. 17 ("A senior U.S. military official . . . says 37-year-old Jill Kelley in Tampa, Fla., received the emails from Petraeus biographer Paula Broadwell that triggered an FBI investigation."); see also Leger, *supra* n. 17 ("A senior U.S. military official identified the woman who allegedly received the harassing e-mails from Paula Broadwell as Jill Kelley, 37, of Tampa.").

[37] *See, e.g.*,  Blodget and Bhasin, *supra* n. 20 (characterizing Mrs. Kelley as "the other woman" in the Petraeus scandal and citing an AP source of "an unnamed military official").

levels of the intelligence community,"[38] and "a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta,"[39] were widely reported.   The New York Times reported specifically that the leaker of Mrs. Kelley name and involvement was Secretary Panetta himself, as well as other officials travelling with the Secretary.[40]   CBS reported that a "Pentagon spokesman told reporters traveling with Defense Secretary Leon Panetta to Australia Monday that America's top commander in Afghanistan was also being investigated for 'potentially inappropriate' communications with Kelley."[41]   The next sentence in the same article reveals that "Pentagon press secretary George Little" explained that the FBI referred the matter to the DOD.

118.   Upon information and belief, the DOD did not have a need for the Kelleys' records in the performance of their duties, and no lawful exception authorized the disclosure of the Kelleys'' records to the DOD.

119.   Upon information and belief, on one or more occasions since the Kelleys first reported the threatening and criminal actions of the cyber stalker, numerous employees of the FBI and the DOD unlawfully and recklessly disseminated inaccurate, derogatory, and irrelevant information obtained from a protected system of records to media members and other third parties who were not authorized to receive such information.

---

[38] Daly, *supra* n. 20 (citing an anonymous source from "the highest levels of the intelligence community" as describing the emails sent by Paula Broadwell to Jill Kelley as "kind of cat-fight stuff," and speculating that "Kelley likely assisted her 7-year-old daughter, . . . , in posting an online photo album that includes a picture of the girl and her two sisters with Petraeus").

[39] Ng, Raddatz and Martinez, *supra* n. 21   ("The FBI has now uncovered 'potentially inappropriate' emails between Gen. Allen and Kelley, according to a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta. The department is reviewing between 20,000 and 30,000 documents connected to this matter, the official said. The email exchanges between Kelley and Allen took place from 2010 to 2012.").

[40] *See* Schmitt and Bumiller, *supra* n.2.

[41] *Details of Petraeus Affair Emerge as Scandal Engulfs Gen. John Allen*, CBS, Nov. 13, 2012, available at http://www.cbsnews.com/8301-505266_162-57548836/details-of-petraeus-affair-emerge-as-scandal-engulfs-gen-john-allen/.

120.    No lawful exception authorized such damaging media disclosures.

121.    The unauthorized disclosures by the FBI and DOD violated 5 U.S.C. § 552a(b), and directly and proximately caused adverse effect to the Kelleys, giving rise to a claim pursuant to 5 U.S.C. §552a(g)(1)(D).  Further, the law enforcement exceptions do not permit the FBI or DOD to shirk the prohibitions against disclosures.[42]

122.    Upon information and belief, the FBI and DOD, as well as their employees and officers, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.  Indeed, in the multitude of ensuing media coverage, few sources were identified by name; instead appearing to have spoken to media only on condition of anonymity given the prohibited nature of leaking such protected and damaging information to the national press.

123.    Upon information and belief, the FBI, the DOD, and their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

124.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury, including but not limited to emotional trauma, loss of reputation, revocation of a consular appointment, lost or jeopardized present and future financial opportunities, public relations and attorneys fees, costs associated with threats to their personal security, and permanent association with a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley.

**SECOND CAUSE OF ACTION**

**AGAINST DEFENDANTS FBI AND DOD**

**PRIVACY ACT – FAILURE TO MAINTAIN IN RECORDS ONLY INFORMATION RELEVANT AND NECESSARY TO ACCOMPLISH A PURPOSE OF THE AGENCY**

---

[42] *See Tijerina* v. *Walters*, 821 F.2d 789 (D.C. Cir. 1987).

125.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 124 above, inclusive.

126.    Pursuant to 5 U.S.C. § 552a(e)(1), the FBI and the DOD  must "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President."

127.    Upon information and belief, Defendants maintained private information about the Kelleys, including their personal relationships, financial dealings, and personal communications, that were not relevant to the Kelleys' cyberstalking report nor to the investigation of any other criminal activity, present or national security concern, or any other legitimate purpose of the FBI or the DOD.

128.    Upon information and belief, Defendants maintained and may still maintain information in their records that is irrelevant and unnecessary to the purposes of their agencies.

129.    Upon information and belief, the maintenance of irrelevant and unnecessary information in their records expanded the intrusion into the Kelleys' privacy without justification, painted the Kelleys in a damaging false light, created a larger set of information subject to compromise from government leaks and other misuse, and led to significant emotional and financial injury to the Kelleys.

130.    Upon information and belief, the maintenance of irrelevant and unnecessary information violated 5 U.S.C. § 552a(e)(1) and caused adverse effect to the Kelleys, and gives rise to a claim pursuant to 5 U.S.C. §552a(g)(1)(D).

131.    Upon information and belief, the FBI, the DOD, and their employees and officers knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

132.    The FBI, the DOD, and their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

133.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury.

### THIRD CAUSE OF ACTION

### AGAINST DEFENDANTS FBI AND DOD

### PRIVACY ACT – FAILURE TO MAINTAIN RECORDS WITH SUCH ACCURACY, RELEVANCE, TIMELINESS AND COMPLETENESS AS IS NECESSARY TO ASSURE FAIRNESS

134.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 133 above, inclusive.

135.    The Privacy Act, §552a(g)(1)(C), provides a cause of action against any agency that "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record…."

136.    Upon information and belief, Defendants did not maintain records regarding the Kelleys with a degree of accuracy, relevance and completeness as necessary to ensure fairness, including an overbroad and irrelevant collection of the Kelleys' emails, records regarding their personal lives and social connections, plainly inaccurate descriptions and summaries of Mrs. Kelley's communications with General Allen, and indeed, FBI Defendants dissuaded an FBI

agent from providing a complete and accurate record on Mrs. Kelley when Defendants asked that the agent eliminate information in the record accurately describing the nature of his relationship with Mrs. Kelley.

137.    Upon information and belief, these records were relied upon to proximately cause unfair and adverse determinations to revoke access to opportunities and benefits from victim assistance programs, withhold from the Kelleys critical information about their case, convert the Kelleys into the subjects of an aggressive, intimidating and intrusive investigation, revoke base privileges, and deny them the confidentiality typically given to victims' identities.

138.    The FBI and DOD actions give rise to a claim pursuant to §552a(g)(1)(c) regardless of whether the information is maintained in a system of records.

139.    The FBI and DOD, as well as their employees and officers knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

140.    The FBI, DOD, as well as their employees and officers acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

141.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury.

**FOURTH CAUSE OF ACTION**

**AGAINST DEFENDANTS FBI AND DOD**

**PRIVACY ACT – MAINTAINING RECORDS DESCRIBING EXERCISE OF RIGHTS GUARANTEED BY THE FIRST AMENDMENT**

142.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 141 above, inclusive.

143.    Upon information and belief, Defendants FBI and DOD maintained records regarding the Kelleys' personal communications, associations and friendships, which are

activities protected under the First Amendment's guarantee of freedom of speech and rights of association. These records were not pertinent to, and were outside of the scope of, authorized law enforcement activity, and no statute expressly authorized them to be maintained.

144.    As a result of the maintenance of records regarding the Kelleys' exercise of First Amendment rights, the Kelleys suffered adverse effects as detailed above

145.    The actions of the government violated § 552a(e)(7) and caused adverse effects to the Kelleys, which gives rise to claims pursuant to §552a(g)(1)(D).

146.    The FBI and DOD, as well as their employees and officers, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

147.    The FBI, DOD, as well as their employees and officers, acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

148.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury.

**FIFTH CAUSE OF ACTION**

**AGAINST DEFENDANTS FBI, DOD AND STATE DEPARTMENT**

**PRIVACY ACT – FAILURE TO MAKE REASONABLE EFFORTS TO ASSURE RECORDS ARE ACCURATE, COMPLETE AND RELEVANT FOR AGENCY PURPOSES PRIOR TO DISSEMINATION**

149.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 148 above, inclusive.

150.    The Privacy Act at § 552a(e)(6) requires that the FBI, DOD and State Department "make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes" prior to disseminating such records to any person other than an agency.

151.    Upon information and belief, prior to disseminating protected information, the

FBI, DOD and State Department failed to take reasonable efforts to assure records regarding the Kelleys were accurate, complete, and relevant for agency purposes.

152.    Upon information and belief, FBI Defendants dissuaded an FBI agent from providing a complete and accurate record on Mrs. Kelley when Defendants asked that the agent eliminate information in the record accurately describing the nature of his relationship with Mrs. Kelley.   They also collected and maintained a vast amount of personal information and communications on the Kelleys that was irrelevant to their investigation or any authorized purpose.

153.    Several of the government leaks attributed to law enforcement and defense department officials included gross speculation, misstatements and intentionally salacious hyperbole without regard to the truth or relevancy of the leaks.

154.    State Department spokesperson Mark Toner disseminated inaccurate and incomplete information about Mrs. Kelley's having no "formal affiliation with the State Department" on November 13, 2012 and again on November 15, 2012, repeatedly omitting critical information needed to ensure what he disseminated was accurate and complete, thereby intentionally misleading the press about the nature of Honorary Consuls and Mrs. Kelley's professional integrity.

155.    As a result of the failure to ensure accurate, complete, and relevant records prior to disclosure, the Kelleys suffered further adverse effects in addition to those that resulted from the improper leak of their identities.

156.    The actions of the government violated § 552a(e)(6) and caused adverse effects to the Kelleys, which gives rise to claims pursuant to §§552a(g)(1)(D).

157.    Upon information and belief, the FBI, DOD, and State Department as well as their employees and officers, knew or should have known that their actions were improper, unlawful and/or in violation of the Privacy Act.

158.    Upon information and belief, the FBI, DOD, and State Department, as well as their employees and officers, acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

159.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury.

## SIXTH CAUSE OF ACTION

## AGAINST DEFENDANTS FBI AND DOD

## PRIVACY ACT – FAILURE TO ESTABLISH APPROPRIATE SAFEGUARDS TO ENSURE THE SECURITY AND CONFIDENTIALITY OF RECORDS WHICH RESULTED IN SUBSTANTIAL HARM AND EMBARRASSMENT

160.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 159 above, inclusive.

161.    Upon information and belief, the FBI and DOD sources compromised the security and confidentiality of information held in records related to the Kelleys, their report of cyberstalking, and other information naming individuals in relation to an investigation into adulterous activity by a high-profile national figure by providing the information in these reports to the media.

162.    Upon information and belief, and as demonstrated by the multiple leaks from several government sources, the FBI and DOD failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records and to protect against anticipated threats or hazards to their security or integrity—and indeed failed to

prevent further leaks after the first leak.  This widespread permissive attitude aggravated the systematic failure to establish safeguards and ensure confidentiality.

163.    The compromise of the security and confidentiality of records containing information related to the Kelleys' report of cyberstalking and resulting investigation, as well as naming individuals in relation to investigations into adulterous activity by a high profile national figures, reasonably and foreseeably can result, and indeed did directly and proximately result, in substantial harm, embarrassment, inconvenience, and/or unfairness to the Kelleys.

164.    As a direct and proximate result of the Defendants' failure to establish the necessary safeguards, the Kelleys were denied access to victim assistance programs, had critical information about their case withheld from them, were targeted as the subject of an aggressive, intimidating and intrusive investigation, had base privileges revoked, had personal information and communications from their records disclosed to media members, and had to endure allegations from unnamed government officials about marital infidelity.

165.    The Defendants' failure to establish safeguards to ensure the security and confidentiality of the records and protect against anticipated threats or hazards to their security or integrity inflicted such direct and proximate damage on the Kelleys as expanding the intrusion into the Kelleys' privacy; painting the Kelleys in a damaging false light; making Mrs. Jill Kelley an object of ridicule, moral opprobrium, scorn, and derision, causing her, her husband, and her three young children shame, public notoriety, egregious loss of privacy, and security; costing Mrs. Kelley public respect, positions of trust and responsibility, and significant lost financial, business, and investment opportunities; and also costing Dr. Kelley extensive financial losses.

166.    The actions of the FBI and DOD, as well as their employees and officers, violated § 552a(e)(10), causing adverse effects to the Kelleys and giving rise to claims pursuant to §552a(g)(1)(D).

167.    Upon information and belief, the FBI and DOD, as well as their employees and officers knew or should have known that their actions were improper, unlawful, and/or in violation of the Privacy Act.

168.    Upon information and belief, the FBI and DOD, as well as their employees and officers, acted intentionally and/or willfully in violation of the Kelleys' privacy rights.

169.    As a direct and proximate result of Defendants' violations of the Privacy Act, Plaintiffs have suffered grave injury.

### SEVENTH CAUSE OF ACTION

### AGAINST DEFENDANT UNITED STATES

### STORED COMMUNICATIONS ACT – IMPROPER DISCLOSURES

170.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 169 above, inclusive.

171.    Upon information and belief, records held by federal law enforcement, intelligence and defense officials related to the Kelleys included information from the Kelleys' stored electronic communications obtained by the FBI and/or other officers, agents or employees of the United States through an investigative or law enforcement officer, or a governmental entity, pursuant to 18 U.S.C. § 2703, or from a device installed pursuant to 18 U.S.C. § 3123 or 18 U.S.C. § 3125 or by other legal authority or without legal authority.

172.    Leaks of personal correspondence to the press are not disclosures made pursuant to the proper performance of governmental entity or officers official functions.

173.    The actions of the United States and its employees and officers violate the Stored Communications Act under 18 U.S.C. § 2707(g), which prohibits willful disclosure of a record obtained by an investigative or law enforcement officer where such disclosure is not made in the proper performance of official functions.

174.    Upon information and belief, the United States and its employees and officers acted willfully in violation of the Kelleys' privacy rights.

175.    As a direct and proximate result of Defendants' violations of the Stored Communications Act, Plaintiffs have suffered grave, ongoing injury.

## EIGHTH CAUSE OF ACTION

## AGAINST DEFENDANT UNITED STATES

## STORED COMMUNICATIONS ACT – FAILURE OF NOTICE

176.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 175 above, inclusive.

177.    Under the Stored Communications Act, prior notice to the subscriber is required for any disclosures made pursuant to court order or subpoena, and the Stored Communications Act does not prohibit either prior notice or delayed notice to the customer or subscriber for disclosures obtained pursuant to search warrant.  *See* 18 U.S.C. § 2703.  Moreover, as reflected in 18 U.S.C. § 2518(8)(d), the government must ensure that notice of interception of electronic communications is provided to the parties whose communications were obtained.

178.    Dr. and Mrs. Kelley never received prior or delayed notice under the Stored Communications Act, even after specifically requesting such notice from counsel for Defendants on Wednesday, September 11, 2013 via email.   The actions of the United States and its

employees and officers gives rise to a violation of the Stored Communications Act under 18 U.S.C. § 2707(a).

179.    Upon information and belief, the United States and its employees and officers acted willfully in violation of the Kelleys' privacy rights.

180.    As a direct and proximate result of Defendants' violations of the Stored Communications Act, Plaintiffs have suffered grave, ongoing injury.

## NINTH CAUSE OF ACTION

### AGAINST DEFEENDANTS JOYCE, MALONE, IBISON AND DOE DEFENDANTS

### *BIVENS* CLAIM FOR VIOLATION OF FOURTH AMENDMENT RIGHTS PROHIBITING UNREASONABLE SEARCHES

181.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 180 above, inclusive.

182.    Upon information and belief, Defendants accessed, searched and seized the Kelleys' emails beyond the scope for which the government had probable cause or proper judicial approval to search.

183.    The Kelleys had a reasonable expectation of privacy in their personal emails that is protected by the U.S. Constitution's Fourth Amendment guarantee of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches."

184.    Defendants' search of the Kelleys' emails beyond the scope of what the government had probable cause or proper judicial approval to search was not reasonable, and the Kelleys' right to be free of such unreasonable searches was sufficiently established such that Defendants knew or should have known that such a search, that was admittedly "not germane to Kelley's complaint," would violate the Kelleys' constitutional rights.   Defendants' conduct

"violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."[43]

185.   Defendants' misconduct was undertaken under color of federal law.

186.   Defendants acted intentionally and/or willfully in violation of the Kelleys' rights.

187.   Defendants' search of the Kelleys' emails beyond the scope for which the government had probable cause or judicial approval to search violated their Fourth Amendment rights, and gives rise to a claim under the U.S. Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), permitting plaintiffs to bring a civil rights suit against federal officials in their individual capacities for damages directly and proximately caused by constitutional torts under color of their authority.

188.   As a result of Defendants' violations of the Kelleys' Fourth Amendment rights against unreasonable searches, Plaintiffs have suffered grave injury.

## TENTH CAUSE OF ACTION

## AGAINST DEFEENDANTS JOYCE, MALONE, IBISON AND DOE DEFENDANTS

## *BIVENS* CLAIM FOR VIOLATION OF FIFTH AMENDMENT RIGHTS TO DUE PROCESS, INLUDING EQUAL PROTECTION UNDER THE LAW

189.   Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 188 above, inclusive.

190.   Defendants treated Mrs. Kelley differently than male victims in investigating her reports of threatening and criminal actions of the cyberstalker by failing to provide her with victims' assistance service, withholding critical information about the case, and engaging in a "blame the victim" strategy to turn her into the subject of an aggressive, intimidating, and intrusive investigation.

---

[43] *Pearson*, 555 U.S. at 231 (quoting *Harlow*, 457 U.S. at 818).

191.     As part of this "blame the victim" strategy, Defendants maliciously and intentionally characterized Mrs. Kelley as the sexualized "other woman," and failed to protect, and indeed violated, her privacy rights as they focused their investigation on her in search of salacious information.   Further, although the government eventually publically cleared Gen. Allen of wrongdoing, and some government officials even defended him in the press, the government has never defended Mrs. Kelley, corrected its untrue sensationalist leaks, or apologized for its behavior.

192.     Defendants' misconduct was undertaken under color of federal law.

193.     Defendants acted with purpose and intent to discriminate against Mrs. Kelley on the basis of sex.

194.     Defendants' actions to discriminate against Mrs. Kelley on the basis of sex were not reasonable, and Mrs. Kelley's right to be free of sex discrimination was sufficiently established that Defendants knew or should have known that their conduct would violate Mrs. Kelley's constitutional rights.   Their conduct "violated clearly established statutory or constitutional rights of which a reasonable person would have known."[44]

195.     Defendants acted intentionally and/or willfully in violation of Mrs. Kelley's Fifth Amendment right to equal protection of the law.

196.     Defendants' discrimination against Mrs. Kelley on the basis of sex violated her Fifth Amendment rights to due process, which include equal protection of the laws,[45] and gives rise to a claim under the U.S. Constitution pursuant to *Bivens*, 403 U.S. 388, permitting plaintiffs to bring a civil rights suit against federal officials in their individual capacity for damages

---

[44] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).
[45] *Bolling v. Sharpe*, 347 U.S. 497 (1954).

directly and proximately caused by constitutional torts committed under color of their authority.[46]

197.    As a result of Defendants' violations of Mrs. Kelley's Fifth Amendment rights, Mrs. Kelley has suffered grave injury.

## ELEVENTH CAUSE OF ACTION

## AGAINST DEFEENDANTS PANETTA, LITTLE AND DOE DEFENDANTS

## DEFAMATION

198.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 197 above, inclusive.

199.    Defendants made false and defamatory statements concerning the Kelleys, including false statements to paint Mrs. Kelley as unfaithful in her marriage.

200.    Upon information and belief, such statements were made without privilege to a third party.

201.    As evidenced by their actions to preserve anonymity as they leaked the false and defamatory statements, and upon information and belief, Defendants acted intentionally and/or willfully, but at least with negligence, in making such false and defamatory statements.

202.    Upon information and belief, to the extent that these false and defamatory leaks were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the actions of Defendants give rise to a claim for common law defamation.

203.    As a direct and proximate result of Defendants' making and causing to be published such false and defamatory statements, Plaintiffs have suffered grave injury.

---

[46] *See also Davis v. Passman*, 442 U.S. 228 (1979) (extending *Bivens* suits for damages to the Fifth Amendment in the context of gender discrimination).

**TWELVTH CAUSE OF ACTION**

**AGAINST DEFEENDANTS PANETTA, LITTLE, AND DOE DEFENDANTS**

**FALSE LIGHT**

204.    Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 203 above, inclusive.

205.    Upon information and belief, Defendants published, publicized or otherwise gave publicity to false statements, representations or imputations of or concerning the Kelleys by anonymously leaking such information to media members or other third parties.

206.    Plaintiffs did not consent to the publication of such false statements, representations or imputations about themselves.

207.    The publication of such false statements, representations or imputations placed the Kelleys in a false light that would be offensive to an ordinary, reasonable person.

208.    Upon information and belief, Defendants intentionally and/or willfully placed the Kelleys in a false light.

209.    Upon information and belief, to the extent that such actions were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the actions of Defendants give rise to a claim for the common law tort of false light.

210.    As a direct and proximate result of Defendants' placing Plaintiffs in a false light, Plaintiffs have suffered grave injury.

**THIRTEENTH CAUSE OF ACTION**

**AGAINST DEFEENDANTS JOYCE, MALONE, IBISON AND DOE DEFENDANTS**

**INTRUSION UPON SECLUSION**

211.   Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 210 above, inclusive.

212.   Upon information and belief, Defendants used some form of investigation or examination to physically intrude into the Kelley's private or secret concerns, including personal communications, financial, business and family affairs, and personal relationships that were not in any way relevant to the investigation of the Kelleys' cyber stalker report, or of any other appropriate or legally authorized investigation or examination.

213.   Plaintiffs did not consent to this intrusion, indeed Dr. and Mrs. Kelley only authorized access to one email.

214.   The investigation or examination into the Kelleys' private or secret concerns would be highly offensive to an ordinary, reasonable person.

215.   Upon information and belief, Defendants intentionally and/or willfully violated the Kelleys' privacy rights.

216.   Upon information and belief, to the extent that such actions were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the actions of Defendants give rise to a claim for the common law tort of intrusion upon seclusion.

217.   As a direct and proximate result of Defendant's violations of the Plaintiffs' privacy, Plaintiffs have suffered grave injury.

## FOURTEENTH CAUSE OF ACTION, IN THE ALTERNATIVE

## AGAINST DEFEENDANTS PANETTA, LITTLE AND DOE DEFENDANTS

## PUBLICATION OF PRIVATE FACTS

218.   Plaintiffs repeat and reallege the allegations continued in paragraphs 1 through 217 above, inclusive.

219.    Defendants published, publicized or otherwise gave publicity to Plaintiffs' private lives by anonymously leaking private facts, such as Plaintiffs' personal contact information, personal correspondence, personal relationships, personal financial concerns, family matters and confidential information about their victimization by a cyberstalker to the media or other third parties so that they would be substantially certain to become public knowledge.

220.    Plaintiffs did not consent to the publication of these private facts.

221.    The publication of facts about the Kelleys' private lives would be highly offensive to an ordinary, reasonable person.

222.    The publication of facts about the Kelleys' private lives that were not relevant to the investigation of criminal activity, nor of any relevance to a national sex scandal based on an affair involving neither Dr. nor Mrs. Kelley, are not of legitimate concern to the public.

223.    Defendants intentionally and/or willfully violated the Kelleys' privacy rights.

224.    Upon information and belief, to the extent that such actions were not authorized by the agencies such that the Defendants were acting outside the scope of their authority, the actions of Defendants give rise to a claim for the common law tort of publication of private facts.

225.    As a direct and proximate result of Defendants' violations of the Plaintiffs' privacy, Plaintiffs have suffered grave injury.

## JURY DEMAND

Plaintiffs request trial by jury on all counts that may be heard by a jury.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

A.    order Defendants to issue a formal apology to Dr. and Mrs. Kelley for the violations of their privacy and dignity;

B.      award damages equal to actual and statutory damages sustained by the Kelleys under the Privacy Act pursuant to § 552a(g)(4)(a);

C.      award Plaintiffs compensatory and consequential damages as proven at trial;

D.      award Plaintiffs punitive and exemplary damages as the Court may deem just and proper to deter such future egregious conduct;

E.      order preliminary and permanent injunctive relief as appropriate to prevent further violations of Plaintiffs' rights under the Fourth and Fifth Amendments to the U.S. Constitution;

F.      at the conclusion of this action, order that Defendants provide the Kelleys with a specific accounting of all information gathered about them – whether or not stored in a system of records – and the dissemination and use of each such piece of information within and outside of the government, as well as a statement that any such information that was gathered without legal authority or which is now no longer needed for a legitimate governmental purpose be destroyed;

G.      direct that all officers, employees, and agents of government agencies or departments who have violated the Privacy Act with respect to this matter be referred for appropriate military, professional and/or administrative discipline;

H.      order injunctive, equitable and declaratory relief as may be appropriate, including a declaration of violations of the notice and disclosure prohibitions of the Stored Communications Act, and order the Attorney General, the Director of the FBI, and Secretary of Defense to promptly initiate a proceeding to determine whether disciplinary action against the officer or employee is warranted pursuant to 18 U.S.C. § 2707(d), and to provide Plaintiffs with all notice required by law under the Act;

I.      award Plaintiffs their costs and reasonable attorneys fees incurred in this action as provided by 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412; and

J.      grant such other relief as the Court may deem just and proper.

Respectfully Submitted,

Alan Charles Raul (D.C. Bar No. 362605)
Edward R. McNicholas (D.C. Bar No. 459136)
Colleen Theresa Brown (D.C. Bar No. 984668)
Cara Viglucci Lopez  (D.C. Bar No. 994077)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiffs*

Dated:  November 22, 2013

## VERIFICATION

I, Mrs. Gilberte Jill Kelley, declare as follows:

1.      I have personal knowledge of the facts set out in the foregoing Verified Complaint, except as to those matters stated upon the basis of information and belief, and if called on to testify, I would competently testify as to the matters stated herein.

2.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Complaint concerning myself, my activities and my experiences are true and correct.  28 U.S.C. § 1746.


Executed on November 22, 2013

Mrs. Gilberte Jill Kelley

## VERIFICATION

I, Scott Kelley, M.D., declare as follows:

1.     I have personal knowledge of the facts set out in the foregoing Verified Complaint, except as to those matters stated upon the basis of information and belief, and if called on to testify, I would competently testify as to the matters stated herein.

2.     I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Complaint regarding myself, my activities and my experiences are true and correct.  28 U.S.C. § 1746.

Executed on November 22, 2013

Scott Kelley, M.D.