**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GILBERTE JILL KELLEY** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE FEDERAL BUREAU OF** | ) |
| **INVESTIGATION** *et al.*, | )   **Civil Action No: 13-cv-825 (ABJ)** |
| | ) |
| **Defendants.** | ) |
| | ) |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND MEMORANDUM IN SUPPORT OF THE MOTION TO SET ASIDE THE
GOVERNMENT'S CERTIFICATION**

Plaintiffs respectfully submit this single brief in response (a) to the Defendants' Motions to Dismiss filed on February 28, 2014, in accordance with the Court's minute order of March 11, 2014; and (b) to the Government's Westfall Act Certification that individual Defendants acted within the scope of their employment, *see* ECF No. 34-1, in support of Plaintiffs' Motion to Set Aside the Certification, attached.

Alan Charles Raul (D.C. Bar No. 362605)
Edward R. McNicholas (D.C. Bar No. 459136)
Colleen Theresa Brown (D.C. Bar No. 984668)
Cara Viglucci Lopez  (D.C. Bar No. 994077)
Benjamin Beaton (D.C. Bar No. 1005477)

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

ARGUMENT .........................................................................................................................5

   I.   The Kelleys' Detailed and Verified Allegations Amply Describe the Factual Basis
       of their Privacy Act claims. ...........................................................................................5

     A.   The Privacy Act ....................................................................................................5

     B.   The Kelleys Plausibly Allege Facts to Support Six Distinct Privacy Act
         Violations .............................................................................................................5

        1.   Section 552a(b) - Unlawful Disclosure ....................................................7

        2.   Section 552a(e)(1) - Maintaining Irrelevant or Unnecessary Records ......11

        3.   Section 552a(g)(1)(C) - Inaccurate, Irrelevant, Untimely or Incomplete
           Records Used in Adverse Determinations .................................................15

        4.   552a(e)(7) - Records on First Amendment Activity .................................22

        5.   552a(e)(6) - Accurate, Complete and Relevant Records Prior to
           Dissemination .........................................................................................24

        6.   Section 552a(e)(10) - Appropriate Safeguards to Insure the Security and
           Confidentiality of Records .......................................................................25

  II.   This Court Has Jurisdiction to Grant Declaratory and Injunctive Relief for
       Defendants' Violations of the Stored Communications Act...........................................28

     A.   The Administrative Procedure Act Authorizes Judicial Review that Seeks
         Nonmonetary Relief. ..........................................................................................30

     B.   Equitable Relief Is the Only Means for the Kelleys to Obtain Judicial Review
         of Defendants' Ongoing Violation of the Stored Communications Act. ....................34

  III.   Westfall Certification Is Improper Because Defendants Acted Outside the Scope
       of Their Employment...................................................................................................35

     A.   Motion to Set Aside the Certification ...................................................................35

     B.   Florida Law Determines Whether the Defendants Exceeded the Scope of Their
         Employment ........................................................................................................36

     C.   Defendants Exceeded The Scope of Their Employment Under Florida Law ..............41

D.    Limited Jurisdictional Discovery and an Evidentiary Hearing Are Warranted ............48

IV.  The *Bivens* Counts State Claims on which Relief Can Be Granted .................................50

A.    Count Nine: Fourth Amendment Violation ...................................................52

1.    The SCA Does not Displace the *Bivens* Remedy for Fourth Amendment
Violations. ...........................................................................................................52

2.    Because the Right to Privacy in the Content of Personal Email
Communications Is Clearly Established, Qualified Immunity Does not Shield
Defendants from Liability. ........................................................................................55

3.    The Amended Verified Complaint Plausibly Claims that Defendants
Personally Violated the Kelleys' Fourth Amendment Rights. ..................................60

B.    Count Ten: Fifth Amendment Violation ........................................................63

1.    The *Bivens* Cause of Action for Sex Discrimination Is Well Established. ...............63

2.    Because the Prohibition on Sex-Based Discrimination Is Clearly Established,
Qualified Immunity is Unavailable. ..........................................................................65

3.    The Amended Verified Complaint Plausibly Claims that Defendants
Personally Violated Kelley's Fifth Amendment Rights............................................67

CONCLUSION..................................................................................................................72

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)........................................................................................32

*ACLU v. Clapper*,
   959 F. Supp. 2d 724 (S.D.N.Y. 2013)...........................................................32

*Al-Adahi v. Obama*,
   613 F.3d 1102 (D.C. Cir. 2010) .....................................................................69

*Al-Aulaqi v. Panetta*,
   No. 12-1192, 2014 WL 1352452 (D.D.C. Apr. 4, 2014).............................64

*Albright v. United States*,
   631 F.2d 915 (D.C. Cir. 1980) .......................................................................22

*Allmon v. Fed. Bureau of Prisons*,
   605 F. Supp. 2d 1 (D.D.C. 2009) ............................................................12, 13

*Alexander v. FBI*,
   971 F. Supp. 603 (D.D.C. 1997) ...............................................................48, 50

*Anderson v. Creighton*,
   483 U.S. 635 (1987)........................................................................................66

*Anderson v. Gates*,
   -- F. Supp. 2d --, 2013 WL 6355385 (D.D.C. Dec. 6, 2013) .....................61

*Anderson v. United States*,
   364 F. App'x 920 (5th Cir. 2010) ..................................................................47

*In re Application of the U.S. for an Order Pursuant to 18 U.S.C. §2703(d)*,
   830 F. Supp. 2d 114 (E.D. Va. 2011) ............................................................54

*Ashcroft v. al-Kidd*,
   131 S. Ct. 2074 (2011)....................................................................................59

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................52, 60, 61, 68, 69

*Atherton v. D.C. Office of Mayor*,
   567 F.3d 672 (D.C. Cir. 2009) .......................................................................56

* Authorities on which counsel chiefly relies.

iii

*Bard v. Seamans*,
  507 F.2d 765 (10th Cir.1974) ............................................................31

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................6

*\*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971)...................................................................51, 65

*Bloem v. Unknown Dep't of Interior Emps.*,
  920 F. Supp. 2d 154 (D.D.C. 2013) ...............................................53

*Bodin v. Vagshenian*,
  462 F.3d 481 (5th Cir. 2006) ..........................................................37

*Brown v. Fogle*,
  819 F. Supp. 2d 23 (D.D.C. 2011) .............................................60, 66

*Caprio v. Am. Airlines, Inc.*,
  848 F. Supp. 1528 (M.D. Fla. 1994) ...........................................41, 47

*Chambers v. U.S. Dep't of Interior*,
  568 F. 3d 998 (D.C. Cir. 2009) .........................................6, 12, 13, 26

*\*Ciralsky v. CIA*,
  689 F. Supp. 2d 141 (D.D.C. 2010) .................................................27

*City of Ontario v. Quon*,
  560 U.S. 746 (2010)........................................................................59

*Cong. News Syndicate v. U.S. Dep't of Justice*,
  438 F. Supp. 538 (D.D.C. 1977)........................................................2

*Conklin v. U.S. Bureau of Prisons*,
  514 F. Supp. 2d 1 (D.D.C. 2007) .................................................12, 13

*Connors v. Hallmark & Son Coal Co.*,
  935 F.2d 336 (D.C. Cir. 1991)..........................................................12

*Convertino v. U.S. Dep't of Justice*,
  684 F.3d 93 (D.C. Cir. 2012) ...........................................................13

*Corinthian Mortg. Corp. v. Choicepoint Precision Mktg., LLC*,
  543 F. Supp. 2d 497 (E.D. Va. 2008) ..............................................38

*Corley v. United States*,
  556 U.S. 303 (U.S. 2009).................................................................28

\* Authorities on which counsel chiefly relies.

*Council on Am. Islamic Relations v. Ballenger*,
  444 F.3d 659 (D.C. Cir. 2006) ...................................................................37, 48, 50

*Crawford–El v. Britton*,
  523 U.S. 574 (1998)...................................................................................................60

*Crispin v. Christian Audigier, Inc.*,
  717 F. Supp. 2d 965 (C.D. Cal. 2010) ......................................................................57

*Davis v. Passman*,
  442 U.S. 228 (1979)...............................................................................51, 63, 64, 65

*Davis v. United States*,
  430 F. Supp. 2d 67 (D. Conn. 2006).........................................................................54

*Deters v. U.S. Parole Comm'n*,
  85 F.3d 655 (D.C. Cir. 1996) ....................................................................................15

*Djenasevic v. Exec. U.S. Attorney's Office*,
  579 F. Supp. 2d 129 (D.D.C. 2008) ............................................................................6

*Doe v. Chao*,
  540 U.S. 614 (2004)...................................................................................................12

*Doe v. FBI*,
  936 F.2d 1346 (D.C. Cir. 1991) ................................................................................14

*Doe v. U.S. Dep't of Justice*,
  660 F. Supp. 2d 31 (D.D.C. 2009) ...............................................................6, 24, 26

*Doe v. U.S. Dep't of Treasury*,
  706 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................................13

*FDIC v. Meyer*,
  510 U.S. 471 (1994)...................................................................................................37

*Falwell v. Exec. Office of the President*,
  158 F. Supp. 2d 734 (W.D. Va. 2001) ......................................................................14

*Feldman v. CIA*,
  797 F. Supp. 2d 29 (D.D.C. 2011) ..........................................................8, 9, 10, 13, 14

*Fitzgibbons v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990) ....................................................................................2

*Flying Food Grp., Inc. v. NLRB*,
  471 F.3d 178 (D.C. Cir. 2006) ..................................................................................12

\* Authorities on which counsel chiefly relies.

*Gaines v. Dist. of Columbia,*
   961 F. Supp. 2d 218 (D.D.C. 2013) ...................................................................10

*Galbraith v. Cnty. of Santa Clara,*
   307 F.3d 1119 (9th Cir. 2002) ..........................................................................60

*Gerlich v. U.S. Dep't of Justice,*
   659 F. Supp. 2d 1 (D.D.C. 2009) .......................................................................19

*Gould Elecs. Inc. v. United States,*
   220 F.3d 169 (3d Cir. 2000)...............................................................................38

*Gritzke v. M.R.A. Holding, LLC,*
   No. 4:01CV495, 2002 WL 32107540 (N.D. Fla. Mar. 15, 2002)...................38, 40

*Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.,*
   485 F.3d 1233 (11th Cir. 2007) .........................................................................39

*Gutierrez de Martinez v. Lamagno,*
   515 U.S. 417 (1995).............................................................................35, 36, 49

*Halim v. Donovan,*
   951 F. Supp. 2d 201 (D.D.C. 2013) ...................................................................61

*Hamilton v. Weise,*
   No. 95-1161, 1997 U.S. Dist. LEXIS 18900 (M.D. Fla. Oct. 1, 1997) ...................2

*Harbury v. Hayden,*
   522 F.3d 413 (D.C. Cir. 2008)...........................................................................48

*Harris v. U.S. Dep't of Veterans Affairs,*
   126 F.3d 339 (D.C. Cir. 1997) ...........................................................................14

*Hartley v. Wilfert,*
   918 F. Supp. 2d 45 (D.D.C. 2013) .........................................................55, 56, 67

*Hope v. Pelzer,*
   536 U.S. 730 (2002).........................................................................................67

*Hui v. Castaneda,*
   559 U.S. 799 (2010).........................................................................................55

*Ingram v. Faruqye,*
   728 F.3d 1239 (10th Cir. 2013) ....................................................................54, 55

*Int'l Action Ctr. v. United States,*
   365 F.3d 20 (D.C. Cir. 2004).........................................................................62, 70

\* Authorities on which counsel chiefly relies.

*Iqbal v. Dep't of Justice,*
    No. 11-369, 2014 WL 169867 (M.D. Fla. Jan. 15, 2014)................................................53, 65

*Jackson v. Donovan,*
    844 F. Supp. 2d 74 (D.D.C. 2012), *aff'd*, 516 F. App'x 3 (D.C. Cir. 2013)..........................61

*Jamison v. Wiley,*
    14 F.3d 222 (4th Cir. 1994) ...........................................................................................47

*Jewel v. Nat'l Sec. Agency,*
    965 F. Supp. 2d 1090 (N.D. Cal. 2013) ..........................................................................32

*Jordan v. Medley,*
    711 F.2d 211 (D.C. Cir. 1983) (Scalia, J.).......................................................................43

*Kimbro v. Velten,*
    30 F.3d 1501 (D.C. Cir. 1994) ........................................................................................49

*Klayman v. Obama,*
    957 F. Supp. 2d 1 (D.D.C. 2013) ............................................................................31, 32

*KTVY-TV v. United States,*
    919 F.2d 1465 (10th Cir. 1990) .......................................................................................2

*Laningham v. U.S. Navy,*
    813 F.2d 1236 (D.C. Cir. 1987) ........................................................................................6

*Lawrence v. Dunbar,*
    919 F.2d 1525 (11th Cir. 1990) ......................................................................................41

*Lebron v. Rumsfeld,*
    670 F.3d 540 (4th Cir. 2012), *cert. denied*, 132 S. Ct. 2751 (2013).......................................64

*Lee v. Geren,*
    480 F. Supp. 2d 198 (D.D.C. 2007) ................................................................................19

*LeGrande v. United States,*
    687 F.3d 800 (7th Cir. 2012) ..........................................................................................40

*M.E.S., Inc. v. Snell,*
    712 F.3d 666 (2d Cir. 2013).............................................................................................55

*Majano v. United States,*
    469 F.3d 138 (D.C. Cir. 2006) ..................................................................................37, 43

*Manna v. U.S. Dep't of Justice,*
    51 F.3d 1158 (3d Cir. 1995).............................................................................................1

\* Authorities on which counsel chiefly relies.

*Mar-Jac Poultry, Inc. v. Katz*,
   773 F. Supp. 2d 103 (D.D.C. 2011) ................................................................39

*Markham v. White*,
   172 F.3d 486 (7th Cir. 1999) .........................................................................67

*Maron v. United States*,
   126 F.3d 317 (4th Cir. 1997) .........................................................................36

*Mastro v. Potomac Elec. Power Co.*,
   447 F.3d 843 (D.C. Cir. 2006) .......................................................................38

*Mellen v. Bunting*,
   327 F.3d 355 (4th Cir. 2003) .....................................................................56, 57

*Muldrow v. EMC Mortg. Corp.*,
   657 F. Supp. 2d 171 (D.D.C. 2009) ................................................................10

*\*Nadler v. Mann*,
   951 F.2d 301 (11th Cir. 1992) .................................................1, 42, 45, 46, 48

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) .......................................................................21

*New England Apple Council v. Donovan*,
   725 F.2d 139 (1st Cir. 1984) ...........................................................................2

*O'Ferrell v. United States*,
   968 F. Supp. 1519 (M.D. Ala. 1997), *aff'd*,
   253 F.3d 1257 (11th Cir. 2001) ......................................................................46

*Okoro v. Callaghan*,
   324 F.3d 488 (7th Cir. 2003) .........................................................................54

*Oveissi v. Islamic Rep. of Iran*,
   573 F.3d 835 (D.C. Cir. 2009) .......................................................................39

*Paige v. DEA,*
   665 F.3d 1355 (D.C. Cir. 2012) .....................................................................13

*Pearce v. E.F. Hutton Grp., Inc.*,
   664 F. Supp. 1490 (D.D.C. 1987) .........................................................38, 39, 40

*Peluso v. United States*,
   No. 10-80076-CIV, 2011 WL 902624 (S.D. Fla. Mar. 8, 2011) ...........................47

\* Authorities on which counsel chiefly relies.

*Perkins v. Marriott Int'l, Inc.*,
    945 F. Supp. 282 (D.D.C. 1996) ........................................................................39

*Phillips v. Mabus*,
    894 F. Supp. 2d 71 (D.D.C. 2012) ...............................................................41, 44

*Pilon v. U.S. Dep't of Justice*,
    796 F. Supp. 7 (D.D.C. 1992), *vacated on other grounds*,
    73 F.3d 1111 (D.C. Cir. 1996) ......................................................................7, 27

*Primeaux v. United States*,
    181 F.3d 876 (8th Cir. 1999) ............................................................................37

*R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*,
    894 F. Supp. 2d 1128 (D. Minn. 2012) .............................................................57

*Raflo v. United States*,
    157 F. Supp. 2d 1 (D.D.C. 2001) ...........................................................38, 39, 40

*Ranbaxy Labs., Inc. v. First Databank, Inc.*,
    No. 3:13-cv-859, 2014 WL 982742 (M.D. Fla. Mar. 12, 2014) .....................38, 40

*Rehberg v. Paulk*,
    611 F.3d 828 (11th Cir. 2010), *aff'd*,
    132 S. Ct. 1497 (2012) .................................................................................57, 58

*Reuber v. United States*,
    829 F.2d 133 (D.C. Cir. 1987) ..........................................................................10

*Richards v. United States*,
    369 U.S. 1 (1962) ........................................................................................37, 41

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008) ........................................................................61

*Russell v. Dupree*,
    844 F. Supp. 2d 46 (D.D.C. 2012) ................................................................37, 44

*S.J. & W. Ranch, Inc. v. Lehtinen*,
    913 F.2d 1538 (11th Cir. 1990), *amended on other grounds*,
    924 F.2d 1555 (11th Cir. 1991) ........................................................................42

*Sackett v. EPA*,
    132 S. Ct. 1367 (2012) ......................................................................................31

* Authorities on which counsel chiefly relies.

*Santiago v. Warminster Twp.,*
   629 F.3d 121 (3d Cir. 2010)............................................................................63, 70

*Santiago-Marrero v. United States,*
   61 F. App'x 718 (1st Cir. 2003).........................................................................64

*Schmidt v. United States DAV,*
   218 F.R.D. 619 (E.D. Wis. 2003) ......................................................................7

*Smith v. Maryland,*
   442 U.S. 735 (1979)...........................................................................................57

*St. Paul Guardian Ins. Co. v. United States,*
   117 F. Supp. 2d 1349 (S.D. Fla. 2000) .............................................................37

*Steele v. Meyer,*
   964 F. Supp. 2d 9 (D.D.C. 2013).................................................................38, 48

*\*Stokes v. Cross,*
   327 F.3d 1210 (D.C. Cir. 2003) ................................................................ passim

*Thompson v. Dep't of State,*
   400 F. Supp. 2d 1 (D.D.C. 2005), *aff'd,*
   210 F. App'x 5 (D.C. Cir. 2006)........................................................................6

*\*Toolasprashad v. Bureau of Prisons,*
   286 F.3d 576 (D.C. Cir. 2002)......................................................................6, 19

*United States v. Ali,*
   870 F. Supp. 2d 10 (D.D.C. 2012) ...............................................................33, 57

*United States v. Forrester,*
   512 F.3d 500 (9th Cir. 2007) .............................................................................57

*United States v. Perrine,*
   518 F.3d 1196 (10th Cir. 2008) .........................................................................58

*\*United States v. Warshak,*
   631 F.3d 266 (6th Cir. 2010) ....................................................33, 54, 57, 58, 59

*United States v. Zavala,*
   541 F.3d 562 (5th Cir. 2008) .............................................................................56

*\*Vymetalik v. FBI,*
   785 F.2d 1090 (D.C. Cir. 1986)....................................................................15, 23

\* Authorities on which counsel chiefly relies.

*Warshak v. United States*,
   532 F.3d 521 (6th Cir. 2008) ............................................................54

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) ....................................................38, 39

*Whitacre v. Davey*,
   890 F.2d 1168 (D.C. Cir. 1989) .......................................................64

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) .........................................................48

*Wilson v. Moreau*,
   440 F. Supp. 2d 81 (D.R.I. 2006), *aff'd*,
   492 F.3d 50 (1st Cir. 2007) ..............................................................57

*Woerner v. Brzeczek*,
   519 F. Supp. 517 (N.D. Ill. 1981) ....................................................66

*Wood v. United States*,
   995 F.2d 1122 (1st Cir. 1993), *abrogated on other grounds*,
   *Osborn v. Haley*, 549 U.S. 225 (2007) .............................................47

*Wuterich v. Murtha*,
   562 F.3d 375 (D.C. Cir. 2009) .........................................................48

## STATUTES

Patriot Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 ..........................33

5 U.S.C. § 552a ................................................................5, 8, 11, 24, 26

5 U.S.C. § 552a note ...........................................................................5

5 U.S.C. § 702 ............................................................................30, 31

18 U.S.C. § 2701 *et seq.* ...................................................................29

18 U.S.C. § 2703 ..............................................................................29

18 U.S.C. § 2707 .........................................................................29, 33

18 U.S.C. § 2708 .....................................................................33, 34, 54

18 U.S.C. § 2712 ...............................................................30, 31, 34, 54

18 U.S.C. § 3771 .........................................................................20, 65

\* Authorities on which counsel chiefly relies.

28 U.S.C. § 1346.......................................................................................................37

28 U.S.C. § 2679...........................................................................................36, 47, 54

28 U.S.C. § 2680.......................................................................................................49

42 U.S.C. § 10607.....................................................................................................65

42 U.S.C. § 2000aa-11................................................................................................2

50 U.S.C. § 1861.......................................................................................................32

**R**ULE

Fed. R. Civ. P. 8(a)(2).............................................................................................60

**L**EGISLATIVE **H**ISTORY

*Administration's Draft Anti-Terrorism Act of 2001: Hearing Before the H. Comm. on the Judiciary*, 107th Cong. (2001) ...............................................................34

S. Rep. No. 99-541 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555.........................29

147 Cong. Rec. S10,990 (daily ed. Oct. 25, 2001) ......................................33

**O**THER **A**UTHORITIES

*Restatement (Second) of Conflict of Laws (1971) ...............................................39, 40

FBI, *Domestic Investigations and Operations Guide* (2011) .........................................2

Office of Privacy & Civil Liberties, Dep't of Justice, *Overview of the Privacy Act of 1974* (2012), *available at* http://www.justice.gov/opcl/1974privacyact-overview.htm....................5

13D C. Wright et al., *Federal Practice and Procedure* (3d ed. 2008) .........................64

\* Authorities on which counsel chiefly relies.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The plaintiffs in this case are private citizens whom government officials subjected to damaging leaks from criminal investigative files, scandalous public disclosures, and unjustified overreach into their personal email accounts—all because they reported a crime to the FBI.  Defendants' response is surprising: it amounts to a denial of the government's legal obligation to maintain the confidentiality of sensitive law enforcement records, and to respect the dignity and privacy rights of crime victims and witnesses.  The Administration's well known and aggressive "zero tolerance" policy for leakers renders its defense of this misconduct even more surprising. Indeed, a federal law enforcement official "who leaks information to the press simply is not doing what his employment contemplated."  *Nadler v. Mann*, 951 F.2d 301, 306 (11th Cir. 1992) (internal quotation marks omitted).

If Defendants' view of the law here prevailed, the Privacy Act would tolerate such disclosures from law enforcement files.  Agencies could brazenly disregard congressional limits on their collection and disclosure of electronic data, investigatory material, and sensitive private information.  The privacy loopholes and exceptions contrived by Defendants would leave the public without meaningful rights or redress in court.   By arguing, for example, that *citizens* bear the burden to identify, before discovery, where the government housed a leaked record and whether the particular record system was exempt from the Privacy Act, Defendants would effectively immunize *all* of these systems from scrutiny under the Privacy Act.  Thankfully for American privacy rights, this is not the law.

Defendants cannot honestly disagree with the proposition that victims and witnesses in criminal investigations have a substantial privacy interest in the nondisclosure of their names.[1]

---

[1] *Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1166 (U.S.).

As courts have repeatedly recognized, withholding interviewees' names is "necessary to avoid harassment and embarrassment,"[2] "rumor and innuendo,"[3] "unwanted public attention,"[4] and "stigmatizing connotation"[5] in an "individual's private or professional life."[6]  Moreover, federal law clearly directs federal officers to use the "least intrusive" methods to collect evidence from persons, like the Kelleys, who are "not reasonably believed to be a suspect in [an] offense."[7] The Kelleys seek to enforce the safeguards Congress established in the Privacy Act and Stored Communications Act for the protection of all citizens – let alone victims and witnesses like the Kelleys.

Vindicating those rights would not impair the effectiveness of law enforcement efforts. Congress carefully balanced the government's need to gather information against the citizens' interest in privacy when it authorized the government—*within limits*—to collect, store, and disclose personal information. Disrespecting that balance by failing to protect (and indeed affirmatively disseminating) false and scandalous information has no bearing on the government's ability to collect that information in the first place—other than to discourage would-be victims and witnesses from reporting at all.  Certainly nothing about this case justified the government's massive collection, maintenance, and ultimate dissemination of sensitive information regarding the Kelleys.

---

[2] *KTVY-TV v. United States*, 919 F.2d 1465, 1469 (10th Cir. 1990) (per curiam).

[3] *Cong. News Syndicate v. Dep't of Justice*, 438 F. Supp. 538, 541 (D.D.C. 1977).

[4] *Hamilton v. Weise*, No. 95-1161, 1997 U.S. Dist. LEXIS 18900, at *22 (M.D. Fla., Oct. 1, 1997).

[5] *Fitzgibbons v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990).

[6] *New England Apple Council v. Donovan*, 725 F.2d 139, 144-45 (1st Cir. 1984).

[7] *See, e.g.*, 42 U.S.C. § 2000aa-11(a)(2) (federal officers must use "the least intrusive method or means" to collect documentary materials "in the private possession of a person when the person is not reasonably believed to be a suspect in such offense."); FBI, *Domestic Investigations and Operations Guide* § 4.1.1(E) (2011) ("Employ the least intrusive means that do not otherwise compromise FBI operations…. particularly [if] there is the potential to interfere with protected speech and association, damage someone's reputation, [or] intrude on privacy ….)"

Further, the Defendants' ongoing, willful violations of the Stored Communications Act demonstrate the need for equitable relief.  The government continues to refuse the Kelleys notice of the collection of the contents of their electronic communications, as required under the SCA. The equitable claim raised here is the only available remedy to enforce that provision and end the government's blatant violation.  In addition, declaring the government's conduct to be in violation of the SCA would trigger Congress' requirement that the agency in violation conduct an internal investigation and impose appropriate discipline.  This need is particularly acute given the Department of Justice's refusal to conduct its own investigation of the leaks.

The Kelleys also suffered common-law injuries—defamation and invasion of privacy—at the hands of the individual Defendants.  In response to these state-law claims, the government certified, under the Westfall Act, but without any explanation whatsoever, that the individual Defendants were acting within the scope of their employment, and were therefore immune under the Federal Tort Claims Act (FTCA).  The Kelleys respectfully disagree with that determination, and request that this Court set aside the Certification after limited jurisdictional discovery and an evidentiary hearing.

Finally, the harm suffered by the Kelleys implicated their constitutional rights.  The Kelleys, like the rest of us, have a reasonable expectation of privacy in the contents of their private emails—emails the Defendants hoovered up, pored over, and mischaracterized to the media despite the Kelleys' express denial of consent, and in violation of their Fourth Amendment rights.  The Kelleys respectfully urge the Court to reject Defendants' contention that there is no clearly established constitutional right to privacy of email messages.  As other courts have held, the Constitution does indeed protect the contents of stored emails, just as it protects the contents of postal letters.

The government also discriminated against Jill Kelley based on her sex—falsely telling Fox News, for example, that Kelley sent an older, powerful man (who was neither her husband nor the father of her three young children) messages that were the "equivalent of phone sex over email." This willful and salacious report was broadcast worldwide. Given the prurient and bizarre nature of the investigation, and the sexualized "other woman" narrative propounded by the leakers, it is not only conceivable but plausible (indeed, probable) that Jill Kelley's mistreatment was motivated by sexual discrimination. Accordingly, the Kelleys filed *Bivens* actions for damages to remedy and deter the violation of their rights of privacy and equal protection. Although *Bivens* remedies are properly rare, the Kelleys' claims arise in two contexts where the cause of action is well established. The Defendants' attempts to distort the rights and allegations at issue do not withstand scrutiny.

Try as they might to minimize citizens' rights and the government's obligations, Defendants do not and cannot deny that the Kelleys' mistreatment, if true, violated fundamental statutory protections and constitutional rights. And at this stage, the Kelleys' verified complaint *must* be accepted as true, with all reasonable inferences drawn in their favor. Certainly the allegations describe plausible claims, which is all that the Federal Rules require. The Kelleys have demonstrated their entitlement to discovery regarding their statutory and constitutional claims, and limited jurisdictional discovery regarding their common-law claims. They respectfully urge this Court to deny the Defendants' motions to dismiss, and to set aside the Westfall Act certification.

## ARGUMENT

I. **The Kelleys' Detailed and Verified Allegations Amply Describe the Factual Basis of their Privacy Act Claims.**

### A. The Privacy Act

In the wake of Watergate, COINTELPRO, and other disturbing abuses of power, Congress in 1974 enacted the Privacy Act, 5 U.S.C. § 552a, to make government more accountable and citizens more secure. Specifically, Congress sought to protect individuals from unwarranted invasions of privacy by federal agencies that maintain sensitive information about them.[8] The government's "misuse of certain information systems," Congress recognized, threatened "the opportunities for an individual to secure employment, insurance, and credit, and his right to due process." 5 U.S.C. § 552a note (Congressional findings). The concerns Congress voiced ring doubly true in today's wired world.

The Privacy Act protects against a wide range of government abuses related to the collection, maintenance, and disclosure of records about individuals. 5 U.S.C. § 552a. It also prescribes rules for the systems of records housing this information, including the limited situations in which Congress deemed it appropriate for agencies to exempt themselves from certain requirements. *Id.* To enforce these rights, deter future abuses, and restore public trust, Congress also provided a private cause of action so that victims could seek judicial redress for Privacy Act violations. *Id.* § 552a(g).

### B. The Kelleys Plausibly Allege Facts to Support Six Distinct Privacy Act violations.

Defendants repeatedly describe the Kelleys' verified allegations as implausible. *See, e.g,* Mot. to Dismiss at 20, 27-29. But the Kelleys' Amended Verified Complaint ("AVC") does not

---

[8] *See* Office of Privacy & Civil Liberties, Dep't of Justice, *Overview of the Privacy Act of 1974*, at 4 (2012), *available at* http://www.justice.gov/opcl/1974privacyact-overview.htm ("Privacy Act Overview").

suffer from the deficiencies Defendants ascribe to it.[9]   Defendants generally cite cases in which

Privacy Act claims were deemed implausible because legally required elements lacked *any* sup-

porting factual allegations.   That is manifestly not the case here.   The Kelleys became known to

national news audiences for the indisputable reason that their identities were leaked.   But factual

allegations certainly need not be unassailable to survive a motion to dismiss; they must merely

be plausible.   *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible

grounds…does not impose a probability requirement at the pleading stage…."). To that end, the

Kelleys allege that the government maintained records of sensitive protected information that

was in most cases irrelevant, unnecessary, inaccurate, untimely, incomplete, or related to the ex-

ercise of their First Amendment rights.   In violation of the Act, these records were not appropri-

ately safeguarded, were improperly maintained, and were wrongly disseminated without regard

to their accuracy.   AVC ¶¶ 128, 136, 143, 152.

The Kelleys have also pleaded that these numerous egregious violations were intentional

and/or willful, an element that may be met by showing that the agency "'flagrantly disregarded'

the rights guaranteed under the Privacy Act." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242

---

[9] The Motion to Dismiss cites several inapposite decisions.   *See, e.g.,* Mot. to Dismiss at 27.
*Compare Chambers v. U.S. Dep't of Interior*, 568 F. 3d 998, 1007 (D.C. Cir. 2009) (plaintiff
"did not even attempt to identify an adverse determination by a government agency that was
caused by Interior's alleged failure to accurately maintain her records"), *with* AVC ¶¶ 66-67, 72,
80, 90, 92, 106, 137 (identifying several adverse determinations)*; Doe v. U.S. Dep't of Justice*,
660 F. Supp. 2d 31, 43 (D.D.C. 2009) (plaintiffs did not allege any inaccuracy in information),
*with* AVC ¶¶ 66, 128, 136, 152 (agency *misinterpreted* information contained in the records);
*Djenasevic v. Exec. U.S. Attorney's Office*, 579 F. Supp. 2d 129 (D.D.C. 2008) (plaintiff failed to
allege inaccuracy, irrelevancy, untimeliness, or incompleteness), *with* AVC ¶¶ 65-68, 73-76,
136. *Cf. Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002) (refusing to
dismiss a Privacy Act claims where, as in the Kelleys' Amended Verified Complaint, "it is
enough that [plaintiff] challenges as false a specific assertion in the [record] that could, depend-
ing on the evidence, be easily ascertainable."); *Thompson v. Dep't of State*, 400 F. Supp. 2d 1, 11
(D.D.C. 2005) (deciding at *summary judgment* that discovery had revealed the inaccuracies in
Plaintiff's records were not the cause of the alleged adverse determination).

(D.C. Cir. 1987) (per curiam) (quoting *Albright v. United States,* 732 F.2d 181, 189 (D.C. Cir. 1984)). *Contra* Mot. to Dismiss at 39, 44-45. The Kelleys' indisputable mistreatment and public humiliation, as amply demonstrated in the Amended Verified Complaint,[10] reveals the intention-ality and willfulness required to recover damages. *See, e.g.*, *Pilon v. U.S. Dep't of Justice*, 796 F. Supp. 7, 12-13 (D.D.C. 1992), *vacated on other grounds*, 73 F.3d 1111 (D.C. Cir. 1996) (will-ful/intentional requirement satisfied by allegation that the "disclosures which are the subject of this lawsuit occurred after the Department became aware of several prior disclosures regarding this plaintiff and several requests for investigation and corrective action"); *Schmidt v. United States DAV*, 218 F.R.D. 619, 634 (E.D. Wis. 2003) ("reasonable to infer … safeguards were wholly insufficient" because officials knew safeguards would not prevent violations).

### 1. Section 552a(b) - Unlawful Disclosure

The Amended Verified Complaint sets forth detailed allegations that Defendants dis-closed records about the Kelleys to unauthorized individuals. The records—including the Kelleys' personal emails, information about their personal relationships, and reports related to the investigation of the Kelleys' complaint of cyberstalking—came from government files. Many of these allegations are drawn directly from authoritative press quotations of government sources. In short, if it is plausible that these well documented (and well pleaded) leaks occurred (which obviously they did), and the leaked information derived from government files regarding the Kelleys (which must be taken as true for present purposes), and the Defendants were respon-sible for these leaks (which, again, is both obviously true and well pleaded), then the Defendants' motion to dismiss this Count fails easily.

The Kelleys adequately allege all of the required elements to state a claim under

---

[10] *See, e.g.*, AVC ¶¶ 4-7, 66, 75-76, 80, 83-88, 90, 117, 123, 132, 136, 140, 147, 152-54, 158, 162, 168.

§ 552a(g)(1)(D) for unlawful disclosure in violation of § 552a(b).  A plaintiff must allege that (1) the disclosed information is a record contained within a system of records; (2) the record is re-trievable by the plaintiff's name or other identifying particular; (3) the agency improperly dis-closed the information; (4) the disclosure was willful or intentional; and (5) the disclosure ad-versely affected the plaintiff.  *See Feldman v. CIA*, 797 F. Supp. 2d 29, 38, 41 (D.D.C. 2011).

The facts underlying this count are largely uncontested.  Defendants do not dispute that the FBI and DOD obtained and disclosed records on the Kelleys to the media.  *See, e.g.*, AVC ¶¶ 80-81, 83-85, 117-19.  Nor do they dispute that these records were identifiable by name, that the Kelleys did not consent to disclosure, or that the disclosures adversely affected the Kelleys. *Id.* ¶¶ 114-24.  Defendants identify no permissible purpose under § 552a(b) that disclosure might have fulfilled.  And as noted above, the pattern of persistent and blatant press leaks, and the Kelleys' long-running mistreatment, demonstrates the defendants' willfulness.  *See supra* at 6-7.

Defendants' sole significant defense to Count 1 is that the Kelleys failed to allege "that defendants violated the retrieval rule," Mot. to Dismiss at 17.  This is simply false. Retrievability addresses the definition for a "system of records" under the Privacy Act, which is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particu-larly assigned to the individual."  5 U.S.C. § 552a(a)(5).  For purposes of § 552a(b), the Privacy Act prohibits disclosures of records from such systems, and this is precisely and amply the viola-tion which the Kelleys have pleaded.  In the absence of any other defense to this count, Defend-ants twist the Kelleys' allegations and disregard applicable pleading standards to advance a "retrievability" argument that does not withstand scrutiny.

The Privacy Act's "retrieval rule," as construed in this Circuit, is satisfied at the pleading

stage by a complaint alleging that a record was "maintained within one or more Privacy Act systems of records *retrievable* by use of [plaintiff]'s name or by some identifying number, symbol, or other identifying particular." *Feldman*, 797 F. Supp. 2d at 41 (emphasis added).  The Kelley's complaint plainly meets this standard.  *See* AVC ¶¶ 113-24.  Indeed, the Kelleys specifically state that "[i]nformation regarding the Kelleys and their report to the FBI … is maintained within one or more Privacy Act system of records *retrievable by use of the Kelleys' names or by some identifying number, symbol or other identifying particular assigned to Plaintiffs*."  *Id.* ¶ 114 (emphasis added).

The specific allegations, moreover, show that Defendants necessarily retrieved the records they disseminated to the media from their systems of records.  The emails and other documents at issue were government "records" covered by the Privacy Act, and those records were leaked to the media.  *See* AVC ¶¶ 80, 81, 84.  The government Defendants carried out the leaks. *See id.* ¶¶ 1, 117, 119; *see also id.* ¶ 90 (only a limited number of government officials had access to the restricted case file).  Therefore the Defendants plausibly—indeed, almost necessarily—retrieved the records from government systems.[11]

Defendants, however, parse the allegations and conclude the Amended Verified Complaint never adequately pleads retrievability.  This approach defies well-settled pleading standards.  Defendants argue that the Kelleys fail to satisfy the Privacy Act's pleading requirements

---

[11] *See* AVC ¶ 91 (noting "emails and materials *from and about the government's investigation* was *provided* by government officials directly to journalists") (emphases added), *id.* ¶ 97 (stating that "[n]o government official had any legal basis to release the Kelleys' names, or to publicly disclose, discuss, and adversely characterize their emails and other information"), *id.* ¶ 83 (noting how one government official disclosed information specific to the investigatory files, including that "the FBI has now uncovered" and that "the department is reviewing between 20,000 and 30,000 documents connected to this matter"), *id.* ¶¶ 86, 87 (describing how State Department spokesperson Mark Toner answered questions about Mrs. Kelley's diplomatic status and provided "*from* State Department records").

because they allege only "*retrievability*" of records about plaintiffs, rather than "an actual *re-trieval*." Mot. to Dismiss at 18-19 (emphases added). But notice pleading long ago did away with such "gotcha" defenses. As *Feldman* made clear, plausibly alleging "retrievability" is enough; neither the Federal Rules nor the Privacy Act contains the clear statement rule that Defendants would impose. 797 F. Supp. 2d at 41. It is well settled that allegations in a complaint are to be interpreted together, as a whole, in a light most favorable to the plaintiff. *See Gaines v. Dist. of Columbia*, 961 F. Supp. 2d 218, 221 (D.D.C. 2013). Defendants, however, read each paragraph in isolation, and argue they all fail to satisfy the retrieval rule. *See* Mot. to Dismiss at 19-20 (individually parsing AVC ¶¶ 114, 117 and 119). A "complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests." *See Muldrow v. EMC Mortg. Corp.*, 657 F. Supp. 2d 171, 174 (D.D.C. 2009) (citation omitted). Allegations that Defendants obtained, maintained, and disclosed records from Defendants' systems of records easily satisfy this standard. Defendants' arguments to the contrary, in fact, ignore multiple statements throughout the Amended Verified Complaint that put Defendants' on notice regarding retrieval: the records, the Kelleys allege, were "from" (AVC ¶¶ 9, 86, 87), "obtained from" (*id.* ¶ 119), "contained therein" (*id.* ¶ 117), and "retrievable" (*id.* ¶ 114) in accordance with the Privacy Act.

Defendants also argue that there are "no plausible allegations of a disclosure of any information about [Scott Kelley]." Mot. to Dismiss at 20 n.6. However, the Kelleys allege that FBI and DOD officials disseminated records regarding Scott Kelley, in particular Scott Kelley's emails, AVC ¶¶ 41-43 (noting that the harassing "Tampa Angel" emails were sent to Dr. Kelley's email account), *id.* ¶ 81 (quoting a fax from the Washington Post that stated "we have now seen some of the harassing e-mails she [Paula Broadwell] sent you"), and information about his

(and Mrs. Kelleys') complaint of cyberstalking, *id.* ¶¶ 117, 119.  These allegations indicate that excluding Dr. Kelley's claims on motion to dismiss, given his central role in the FBI's investigation and leaks, is unwarranted.

### 2.  Section 552a(e)(1) - Maintaining Irrelevant or Unnecessary Records

The Kelleys allege that Defendants maintained comprehensive records of several years of their email communications, as well as a trove of information on their personal lives, that was wholly irrelevant to any proper investigative purpose.  This private information was unrelated to the cyberstalking report or any other criminal activity or national security concern.  *See* AVC ¶¶ 127-28.  Its maintenance violated § 552a(e)(1) because Defendants failed to "'maintain in its records only such information about an individual as is relevant and necessary to accomplish' a legitimate agency purpose."  *Reuber v. United States*, 829 F.2d 133, 138 (D.C. Cir. 1987) (quoting § 552(e)(1)).  A plaintiff may obtain relief for violations that—like Defendants' here—adversely affected the individual.  5 U.S.C. § 552a(g)(1)(D); AVC ¶¶ 129-30, 133.

Defendants' main defense is that the records at issue *may* be within an exempt system of records.  This contention is premature on a motion to dismiss.

A system of records, under the Privacy Act, is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."  5 U.S.C. § 552a(a)(5).  The Privacy Act contains general and specific exemptions, which allow the head of an agency to promulgate rules to exempt a system of records from some provisions under the Privacy Act if the system of records satisfies certain requirements.  *Id.* § 552a(j), (k).  Significantly, however, the General Exemptions do not permit an agency to exempt itself from a number of provisions, including subsections 552a(b), (e)(6), (e)(7) and (e)(10) which are the subject of Plaintiffs' first, fifth, fourth and sixth causes of action, respectively.  *Id.* § 552a(j).  Here, De-

fendants' contention that the records at issue *may have been* maintained in an exempt system of records would be an affirmative defense, and not a pleading failure under § 552a(e)(1) or § 552a(g)(1)(C).[12] (In any event, Defendants' subjunctive argument relies on a factual proposition – the purported exemption of the relevant files – that is outside the complaint and is not properly before the Court on motion to dismiss.)

None of the cases cited by Defendants supports the proposition that the Kelleys must allege that the records at issue were contained in a "non-exempt location." *Chambers v. United States Dep't of Interior*, 568 F.3d 998 (D.C. Cir. 2009), explicitly lists all of the elements of a damages claim under the Privacy Act and makes no mention of non-exempt systems.[13]  *Doe v. Chao*, 540 U.S. 614, 616 (2004), stands for the proposition that a plaintiff must prove actual damages to qualify for the Privacy Act's minimum statutory award of $1,000; the case does not even discuss exempt systems.  Furthermore, Defendants misconstrue the holdings of two other cases they cite.  In both *Allmon v. Federal Bureau of Prisons*, 605 F. Supp. 2d 1, 3 (D.D.C. 2009), and *Conklin v. U.S. Bureau of Prisons*, 514 F. Supp. 2d 1, 3 (D.D.C. 2007), the court dismissed cases brought by inmates alleging inaccuracies in their Inmate Central Files.  Unlike the present case, the plaintiffs alleged that the inaccurate records were contained in their "inmate

---

[12] *See, e.g.*, *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006) ("[A] 'plaintiff is not required to negate an affirmative defense in his complaint.'") (quoting *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993)). In fact, attempting to "'avoid or defeat a potential affirmative defense'" is "'technically…improper pleading because these allegations are not an integral part of plaintiff's claim.'"  *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 344 n.12 (D.C. Cir. 1991) (quoting 5 Wright & Miller, *Federal Practice & Procedure* § 1276 (1990)).

[13] *See* 568 F.3d at 1007 (plaintiff must establish that "(1) he has been aggrieved by an adverse determination; (2) the [agency] failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination; (3) the [agency's] reliance on the inaccurate records was the proximate cause of the adverse determination; and (4) the [agency] acted intentionally or willfully in failing to maintain accurate records" to sustain a claim for damages under 552a(g)(1)(C)) (alterations in original).

files" that were stored exclusively in an exempted Bureau of Prisons' Inmate Central Records System; the records were, in fact, contained in an exempt system of records, leaving no issue of fact to be resolved in discovery.  Neither court characterized the location of the records as a "pleading requirement."[14]  Indeed, no court in the D.C. Circuit has ever held that a plaintiff must plead that records are located in a "non-exempt location" with respect to *any* Privacy Act claim.[15]

Further, there is no justification for allowing this affirmative defense to be raised in a motion to dismiss in this instance.  The relevant facts—where all of the records at issue were maintained—are not contained in the pleadings.  And this potential affirmative defense highlights several other potential factual disputes requiring discovery.  For example, at least some discovery would be needed to determine whether all of the records held by both the FBI and DOD relative to Dr. Scott and Mrs. Jill Kelley were indeed (1) maintained in systems of records that were exempt from the particular Privacy Act provisions requiring the records to be relevant and necessary to an agency purpose; and that (2) maintenance of such records relative to Dr. Scott and Mrs. Jill Kelley in the potentially exempt systems of records was proper given the nature of the records.  That information is necessary to determine (3) that the agencies properly exempted the system of records; and (4) that the claimed exemptions extend in scope to the records in question.  Indeed, it is the government that "bears the burden of demonstrating a law enforcement

---

[14] *See Allmon*, 605 F. Supp. 2d at 7; *Conklin*, 514 F. Supp. 2d at 6 ("[B]ecause regulations exempt the Inmate Central Records System from subsection (e)(5) of the Privacy Act, plaintiff effectively is barred from obtaining any remedy, including damages, under subsection (g)….") (citation omitted).

[15] Several decisions from this Circuit list the elements of various Privacy Act claims without mentioning the pleading requirement Defendants rely on.  *See, e.g., Convertino v. U.S. Dep't of Justice,* 684 F.3d 93, 99 (D.C. Cir. 2012); *Paige v. DEA,* 665 F.3d 1355, 1358-59 (D.C. Cir. 2012); *Chambers*, 568 F.3d at 1007 (failure to maintain); *Doe v. U.S. Dep't of Treasury*, 706 F. Supp. 2d 1, 6 (D.D.C. 2009) (unlawful disclosure); *Feldman*, 797 F. Supp. 2d at 38 (same).

purpose for each record as to which it has claimed exemption," *Doe v. FBI*, 936 F.2d 1346, 1353 (D.C. Cir. 1991), and this burden may involve a detailed factual inquiry based on the record.[16] This is not one of the rare cases in which an affirmative defense would be properly raised in a motion to dismiss.

Critically, Defendants never actually even contend that the records at issue are in fact located in an exempt system of records. Defendants state that "the FBI has exempted *several* of its systems of records." Mot. to Dismiss at 22 (emphasis added), and that similarly, the "DOD has exempted *some* of its systems of records," *id.* (emphasis added). Defendants aver that "it is *plausible* that the FBI and DOD maintained exempt law enforcement system of records relevant to those accusations." *Id.* at 23 (emphasis added). In effect, Defendants ask this Court, at this preliminary stage, to dismiss the Kelleys' second and third causes of action because Defendants *may* have an affirmative defense.

Instead of a motion to dismiss, Defendants may properly raise affirmative defenses in an answer, where they could plead that actual exemptions apply to the records in question, rather than simply alluding to exemptions that may or may not apply here. To do otherwise would convert this defense into an element of the cause of action that plaintiffs would have to plead, though the information at this time is known only to defendants. "Rule 8(c) means what it says: affirmative defenses must be raised in a responsive pleading, not a dispositive motion." *Harris v. U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 341 (D.C. Cir. 1997). As this Court stated in *Feldman*, 797 F. Supp. 2d at 41, "in the typical [Privacy Act] case, a plaintiff can hardly be expected to

---

[16] *See, e.g., Doe v. FBI*, 936 F.2d at 1353 ("CRS documents qualify for exemption only if they constitute law enforcement records within the meaning of the statute. Accordingly, the FBI bears the burden of demonstrating a law enforcement purpose for each record as to which it has claimed exemption in this case.") (citing *Vymetalik v. FBI*, 785 F.2d 1090, 1095 (D.C. Cir. 1986)); *Falwell v. Exec. Office of the President*, 158 F. Supp. 2d 734, 740 (W.D. Va. 2001) (examining whether the agency properly exempted a system of records).

know the full details behind an improper disclosure prior to discovery, since those details are most likely to be under the control of the defendant."

Acceptance of Defendants' affirmative defense based on an unproven—indeed not truly even claimed—factual basis would create a dangerous precedent. First, if the FBI's mere ability to invoke a "plausible" exemption were sufficient to dismiss a claim as a matter of law, it would essentially render the FBI categorically immune from the affirmative obligations of the Privacy Act under § 552a(e)(1). If Congress had wished to exempt the FBI from such affirmative obligations in the Privacy Act, it would have done so.[17]  Second, under Defendants' logic, no Privacy Act claim for a violation of 5 U.S.C. § 552a(e)(1) could ever stand *against any agency* where the agency was able to claim some exemption for some system of records that *may* be relevant to the claim. Such a result would be passing strange on a motion to dismiss.

### 3. Section 552a(g)(1)(C) - Inaccurate, Irrelevant, Untimely or Incomplete Records Used In Adverse Determinations

The Amended Verified Complaint sets forth how Defendants relied upon inaccurate, irrelevant and incomplete records to make several adverse determinations with respect to the Kelleys. AVC ¶¶ 65-68, 73-76, 136.[18]  These included determinations to turn the Kelleys into the targets of an aggressive, intimidating, and intrusive investigation; to revoke access to the victims assistance program; to withhold critical information about their case; to revoke base privi-

---

[17] For example, Congress chose to provide a general exemption, in section 552a(j)(1), for all records maintained by the CIA; there is no similar broad exemption for the FBI. *See Vymetalik v. FBI*, 785 F.2d 1090, 1095 (D.C. Cir. 1986) (noting that "had Congress wanted to exempt the entire filing system of the FBI, it certainly could have done so," and thus concluding that "the FBI must demonstrate something more than the mere nature of its functions" for its records to qualify under the (k)(2) exemption).

[18] The elements are that (1) plaintiffs have been aggrieved by an adverse determination, (2) the agencies in question failed to maintain records with the degree of accuracy necessary to assure fairness in the determination, (3) the agency's reliance on the inaccurate records was the proximate cause of the adverse determination (4) the agency acted intentionally or willfully in failing to maintain accurate records, and (5) plaintiffs suffered actual damages. *See Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996).

leges; and to deny typical victim confidentiality by repeatedly leaking their names, other personal information and communications, and spurious and derogatory information about them.  AVC ¶¶ 72, 80, 90, 92, 106, 137.[19]   The Kelleys have pleaded all necessary elements for a cause of action under 5 U.S.C. § 552a(g)(1)(C).[20]

Defendants inaccurately portray the Kelleys as asserting only three adverse determinations, *see* Mot. to Dismiss at 26, and mischaracterize the nature of one of those adverse determinations as merely "conversion of plaintiffs into the subjects of the investigation."   But the Kelleys have pleaded at least five actionable examples of adverse determinations made against them due to Defendants' failure to maintain records appropriately.   The determination to "revoke access to opportunities and benefits from victim assistance programs" to which they had initially been assigned, AVC ¶ 137, is separate and distinct from the determination to "withhold … critical information about their case," despite numerous requests to the officers on the case, as well as separate and distinct from the determination to "deny them the confidentiality typically given to victim's identities," by disclosing their identities and details of the investigation to the media, *id*.  Additionally, the Kelleys plead that Defendants converted them into the subjects of a unique "aggressive, intimidating and intrusive" investigation that sought out specific details of their

---

[19] The agencies' reliance on those inaccurate or otherwise improper records proximately caused the adverse determinations against the Kelleys. AVC ¶ 137 (alleging that "these records [which were described as inaccurate, irrelevant or incomplete in the prior paragraph] were relied upon to proximately cause unfair and adverse determinations."); *see also id.* ¶¶ 64, 66-72 (describing how the FBI's maintenance of irrelevant, private emails were used by the FBI to justify turning the Kelleys into the targets of an investigation), ¶ 76 (reiterating that the irrelevant and inaccurate records perpetuated the FBI's aggressive, intimating and intrusive investigation of the Kelleys). As noted above, the Kelleys adequately allege intentional and willful conduct, *id.* ¶ 140, as well as actual damages, *id.* ¶ 141.

[20] Contrary to Defendants' claims that a "complaint must contain six allegations," including that the records are "in a non-exempt location," exemption is an affirmative defense and not a pleading requirement, and no case that they cite supports their claim that it is a pleading element.  *See supra* at 11-15.

sexual lives and relationships bearing no relation to the commission of a cyberstalking offense reported by the Kelleys, or indeed any other criminal activity. *Id.* Finally, the Kelleys plead that DOD revoked Jill Kelley's privileged base access. *Id.* All five of the adverse determinations specifically pleaded by the Plaintiffs are decisions by the government that negatively affected Dr. and/or Mrs. Kelley. *Id.* ¶¶ 72, 80, 90, 92, 106.

In addition to ill-founded claims that the Kelleys' allegations fail to allege the affirmative defense of a non-exempt location or satisfy the retrieval rule, *see supra* at 11-15 and 8-10 respectively, Defendants' other challenges to the Kelleys' third cause of action also fail to acknowledge pleadings clearly set out in the Amended Verified Complaint, or present disagreement with the facts as plead, highlighting the need for discovery.[21]

For example, Defendants claim the Amended Verified Complaint fails to "plead facts plausibly showing that inaccurate or irrelevant information allegedly maintained by the FBI and DOD resulted in the alleged adverse determinations they complain about." Mot. to Dismiss at 27. The Kelleys more than adequately plead that the relevant records were inaccurate, incomplete, and contained an overbroad collection of irrelevant material. As stated in the Amended Verified Complaint, Jeh Johnson commented that the years of emails he pored over "were not

---

[21] For example, Defendants allege that the Kelleys fail to plead under the correct civil remedies provision. Mot. to Dismiss at 24. Defendants' argument is confused. Defendants first assert in a heading that "Subsection (e)(5) claims proceed under the civil remedy provision in subsection (g)(3), and not the catch-all provision in subsection (g)(4)." *Id.* However, subsection (g)(3) is not a general civil remedies provision; instead, it governs review for claims under § 552a(g)(1)(B), which the Kelleys never pleaded. Subsection (g)(4) provides that recoverable damages include actual damages and costs of the action including attorney fees. Perhaps the title heading was a typo and Defendants *intended* to assert that Plaintiffs must sue under subsection (g)(1)(C), and not (g)(1)(D), which would be consistent with the substance of the text underneath their heading. Mot. to Dismiss at 24. In any event, the Kelleys clearly *do* seek a remedy for count three under subsection (g)(1)(C). AVC ¶ 135 ("The Privacy Act, *§552a(g)(1)(C),* provides a cause of action against any agency that 'fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness….') (emphasis added). Accordingly, Defendants' argument here fails.

germane to [the Kelleys' cyberstalking] complaint" and that "undue investigation of these emails … would be a fishing expedition and invasion of privacy." AVC ¶ 5. This overbroad maintenance of irrelevant material included personal, private emails that the Kelleys never authorized the government to access, collect, maintain, or disclose. *Id.* ¶ 66. For example, the Kelleys allege that some of the personal emails the government maintained and reviewed included a personal email that Agent Humphries sent to Jill Kelley that contained a flippant joke. *Id.* ¶ 74. The FBI used this email to accuse Agent Humphries of having an inappropriate or sexual relationship with Jill Kelley. *Id.* Despite this sexual line of inquiry, the FBI directed Agent Humphries to remove a statement for the file that specifically denied the allegation. *Id.* ¶ 68. This is one of several examples the Kelleys plead in the complaint. Defendants' insistence on maintaining irrelevant, inaccurate, and incomplete records, and their refusal to correct them to show that Jill Kelley was *not* an active participant in any illegal or unethical conduct, caused the government to sexualize and vilify Jill Kelley and demean and disparage both Kelleys, and to rely on those records to make several adverse determinations against the Kelleys.[22]

---

[22] The FBI agents conducted an intrusive, aggressive and intimidating investigation into the Kelleys' private lives. It included collecting both the Kelleys' communications and other personal information about their personal relationships, coercing Jill Kelley into a government vehicle, denying her the opportunity to communicate with her attorney or her husband, and repeatedly questioning her about alleged sexual relationships, including with then CIA Director David Petraeus. AVC ¶¶ 69-70. The sexualization of Jill Kelley and trivialization of both Kelleys transformed them from cyberstalking victims to the objects of prurient interest and the targets of an intrusive investigation. *Id.* ¶ 137. The records that marginalized Jill Kelley as a sexual pawn were used to justify additional allegations about, and an investigation into, an inappropriate sexual relationship with General John Allen. *Id.* ¶ 117. These improper records were relied upon in the determination to, at some of the highest levels, disclose the allegations and "investigation" details, along with other information from the Kelleys' records, to the public, resulting in vast media coverage about Jill Kelley's supposedly lurid relationships although the allegations were found later to be unsubstantiated. *Id.* ¶ 89. Similarly, these improper records were relied upon in the determination to remove the Kelleys' case from the victim's services department, the determination to withhold critical information about the status of their case, and the determination that Jill Kelley should have her base privileges revoked.

Defendants' argument that the numerous adverse determinations that the Kelleys have pleaded must be dismissed *as a matter of law* is not supported by precedent; indeed, existing law shows that what constitutes an "adverse determination" is intentionally flexible.  The statute does not define the term, and case law provides only general guidelines that an adverse determination is essentially a government decision that negatively affects a plaintiff.  *See Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584 (D.C. Cir. 2002) ("The Act provides little guidance as to the intended breadth of the phrase 'determination … adverse to the individual.'") (quoting 5 U.S.C. § 552a(g)(1)(C)); *see also Lee v. Geren*, 480 F. Supp. 2d 198, 210 (D.D.C. 2007) ("An adverse action is one resulting in the denial of a right, benefit, entitlement, or employment by an agency which the individual could reasonably have been expected to have been given if the record had not been deficient.") (quoting OMB Guidelines, 40 Fed. Reg. 28,948, 28,969 (July 9, 1975)).  If Defendants seek to challenge that the adverse determinations were the product of reliance on the improper records, discovery would be necessary.[23]

Defendants also argue that because Congress did not authorize an independent cause of action, or create, enlarge or imply any duty or obligation based on the Crime Victims' Rights Act, that the determination to "revoke access to opportunities and benefits from victim assistance programs," or the determination to "withhold from the Kelleys critical information about their case," or the determination to "deny them the confidentiality typically given to victims' identities," AVC ¶ 137, do not qualify as an adverse determination under the Privacy Act.  Mot. to Dismiss at 26.  But the lack of a *separate* civil cause of action under the Crime Victims' Rights Act does not vitiate the express and independent cause of action under the Privacy Act.  The

---

[23] *See, e.g., Gerlich v. U.S. Dep't of Justice*, 659 F. Supp. 2d 1, 16 (D.D.C. 2009) (Allegations that irrelevant records undermined hiring process indicate, "at this stage of the proceeding plaintiffs have met their pleading burden with respect to their subsection (e)(5) [claim]….") (footnote omitted).

cause of action under the Privacy Act does not rely on, whatsoever, any expanded rights that may or may not have been afforded by the Crime Victims' Rights Act. Defendants' actions in revoking access to opportunities and benefits from the victim assistance programs, as well as their determinations to withhold case information and to deny confidentiality by leaking investigatory details and victim identities, are adverse determinations under the Privacy Act independent of the Crime Victims' Rights Act. Further, by Defendants' logic, no crime victim could ever suffer an adverse determination because the Crime Victim's Rights Act did not on its own authorize a private cause of action. Such an interpretation would result in a statute meant to protect crime victims' rights actually stripping crime victims of rights they would otherwise have. This is certainly not the intention or effect of the Crime Victims' Rights Act. *See* 18 U.S.C. § 3771(a) (listing various rights of crime victims, including "the right to be treated with fairness and with respect for the victim's dignity and privacy").

Defendants also assert that the revocation of Jill Kelley's privileged access to MacDill Air Force Base should not be considered an actionable adverse determination because the Kelleys fail to plausibly allege such determination "caused her to incur actual damages." Mot. to Dismiss at 30-31. However, the Amended Verified Complaint provides substantial detail about Jill Kelley's status prior to the government's illegal actions, which included her significant business, government, military and other community contacts that contributed to recognition for various community and professional leadership positions, including her diplomatic position as Honorary Consul for South Korea. AVC ¶¶ 17, 30-37. The multiple adverse determinations against Dr. and Mrs. Kelley, including the revocation of Jill Kelley's privileged access to MacDill Air Force Base, significantly limited, if not eliminated, her access to her previous contacts and eliminated privileges she had earned which helped established her success. *Id.* ¶¶ 98-99, 101, 105-

06, 141.  As detailed in the Amended Verified Complaint, Jill Kelley's Honorary Consulship was revoked in the wake of Defendants' actions, and she has missed out on other professional and lucrative opportunities.  *Id.* ¶¶ 105-06.  These reflect direct and substantial actual damages.

Defendants also argue that it is not proper, and would upset the balance of powers, to review the actions of a law enforcement investigation.  Mot. to Dismiss at 28.  But Congress surely accounted for this risk when it enacted the Privacy Act to constrain the use of private personal information by law enforcement—and chose *not* to categorically exempt law enforcement from the Act's requirements.  *See supra* at 15 n.17.  And a fundamental purpose of the judiciary is to provide a check and balance to the abuse of power of the other branches of government.  *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 612 (D.C. Cir. 1974) ("Under our system of law, the judiciary has a duty envisioned by the constitutional principle of checks and balances to keep both the Executive and Congress within their respective constitutional domains in order to prevent that concentration of power which the Founding Fathers so feared.") (footnote omitted).  It is proper for this Court to review the adverse determination to convert the Kelleys into the subjects of an aggressive, intimidating, and intrusive investigation based on the unique and disturbing circumstances, illegitimate motivations, and conduct in the investigation.  As detailed in the Amended Verified Complaint, *see* AVC ¶¶ 58-72, there is ample evidence that this investigation exceeded the bounds of a legitimate criminal investigatory process. The Kelleys are entitled to seek judicial review of adverse determinations based on detailed and well-pleaded violations of law (as well as agency procedures and policy) in circumstances that demonstrate willful intent to violate established rules and rights for improper, and indeed unconstitutional, purposes.  As demonstrated by the pleaded facts, this case involves far more than "a vague fear or suspicion that its officers will be unfaithful to their oaths or unequal to their responsibility."  Mot. to Dis-

21

miss at 28 (citing *Reporters Comm. for Freedom of Press v. AT&T Co.*, 593 F.2d 1030, 1065 (D.C. Cir. 1978)).

### 4. 552a(e)(7) - Records on First Amendment Activity

The Kelleys fully plead, and Defendants do not dispute, that the information at issue constitutes records of their exercise of First Amendment rights.  *See* AVC ¶¶ 58, 65-66, 143.  The Amended Verified Complaint adequately alleges that (1) the information at issue is a "record of the exercise of First Amendment rights, *id.* ¶¶ 58, 65-66, 143;  (2) the information is neither authorized to be maintained by statute nor "pertinent to and within the scope of an authorized law enforcement activity," *id.* ¶¶ 65-66, 68, 143; (3) the creation and maintenance of the record had an "adverse effect" on the Kelleys, *id.* ¶¶ 63, 67, 76, 85, 92, 144, 148; (4) the "agency acted in a manner which was intentional or willful," *see id.* ¶¶ 65-66, 146; and (5) the Kelleys suffered actual damages as a result, *see id.* ¶¶ 98, 102-05, 148.  *See Albright v. United States*, 631 F.2d 915, 921 (D.C. Cir. 1980).

Instead, Defendants argue that Plaintiffs are categorically precluded from obtaining relief under subsection (e)(7) because "*any* such records [maintained by Defendants] would be covered by the law enforcement exception."  Mot. to Dismiss at 31 (emphasis added).  Notwithstanding the plain allegations that the records at issue "were not pertinent to, and were outside of the scope of, authorized law enforcement activity, and no statute expressly authorized them to be maintained," AVC ¶ 143, Defendants insist that this was merely "formulaic" and "fail[s] the plausibility standard."  Mot. to Dismiss at 33.  But Defendants simply ignore the Kelleys' numerous factual allegations that the FBI and DOD maintained records that were outside the scope of an authorized law enforcement activity.[24]  Plainly, a central aspect of the Kelleys' allegations

---

[24] See AVC ¶ 143 ("FBI and DOD maintained records regarding the Kelleys' personal communications, associations and friendships, which are activities protected under the First Amend-

is that the government had no need or justification—law enforcement or otherwise—to obtain and maintain their private records.  Even the former DOD general counsel has admitted to news media that the communications between Mrs. Kelley and General Allen were "not germane" to the cyberstalking investigation.  See AVC ¶ 82.  Defendants nonetheless argue that this Court should simply assume that the FBI's and DOD's maintenance of significant and detailed records describing the exercise of First Amendment rights, including records of the Kelleys associations and sexual lives, were properly within the scope of law enforcement activity despite detailed allegations that the intrusive investigation was not proper "authorized law enforcement activity."

Further, under Defendants' logic, a section (e)(7) claim would never survive against an agency with a law enforcement mandate.  If Congress intended to exempt the FBI or the DOD from (e)(7)'s mandate, it could easily have done so. As stated in *Vymetalik v. FBI*, 785 F.2d 1090, 1095 (D.C. Cir. 1986),

> [H]ad Congress wanted to exempt the entire filing system of the FBI, it certainly could have done so.  In fact, an early draft of the Privacy Act did exempt the FBI from the mandates of the Act. The removal of the blanket exception from the final version of the Act suggests that the FBI must demonstrate something more than the mere nature of its functions. The agency's broad interpretation would bring through the back door a provision expressly omitted from the Act as approved by Congress and signed into law.

(citations omitted).  Further, the allegations that the investigation was beyond the scope of valid law enforcement purposes is not contradictory simply because the Kelleys' initial contact with law enforcement stemmed from their report of criminal cyberstalking.  As the Amended Verified

---

ment's guarantee of freedom of speech and rights of association" [which] "were not pertinent to, and were outside of the scope of, authorized law enforcement activity), *id.* ¶ 65 (government maintained records on "a multitude of the Kelleys' personal emails"), *id.* ¶ 66 (emails seized and maintained "not pertinent to" cyberstalking or any other criminal investigation"), *id.* ¶ 68 (discussing the "intrusive and irrelevant inquiry" into whether Mrs. Kelley was having an affair with Agent Humphries, even though "government agents already knew that Mrs. Broadwell had sent the anonymous threats").

Complaint makes clear, Defendants took this investigation well beyond investigation of the Kelleys' report of a crime into improper realms for improper purposes.

### 5. 552a(e)(6) - Accurate, Complete and Relevant Records Prior to Dissemination

The Kelleys have alleged that Defendants unreasonably failed to assure the information they disseminated to the press—whether in an official press briefing, announcements about the Kelleys in relation to the investigation into a sex scandal, or lurid leaks to the press—was accurate, complete and relevant.[25]   Defendants present five insufficient arguments as to why their conduct should be upheld as a matter of law.

In addition to their tortured retrievability argument, *supra* at 8-10, Defendants claim that the Kelleys do not allege dissemination of any record regarding Scott Kelley.  Mot. to Dismiss at 35.  However, the Kelleys have alleged DOD and FBI dissemination of records concerning *both* Dr. and Mrs. Kelley.  *See, e.g.*, *id.* ¶¶ 41-43 (noting that the harassing "Tampa Angel" emails were sent to Dr. Kelley's email account), *id.* ¶ 81 (quoting a fax from Douglas Frantz of the Washington Post that the media have seen the harassing emails, which had been sent to Dr. Kelley's email account), *id.* ¶ 117 (alleging that the FBI shared "records on the Kelleys" with the DOD, and that "both shared these records and information contained therein with the media").

Defendants dismiss the allegations of government dissemination as mere "generalized

---

[25] A plaintiff must allege that (1) an agency disseminated records about the plaintiff to a person other than an agency or FOIA requestor that were (2) retrievable from a system of records; (3) the agency failed to undertake reasonable efforts to assure that the record was accurate, complete, timely, and relevant for agency purposes prior to dissemination; (4) such failure was intentional or willful; (5) adversely affected the plaintiff; and (6) resulted in actual damages.  *See* 5 U.S.C. § 552a(e)(6); *Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d at 42-43 (considering the elements for an (e)(6) violation and a (g)(1)(D) claim)  As discussed above, the Kelleys adequately pleaded dissemination, *see supra* note 19; AVC ¶¶ 83, 153; failure to ensure accuracy and completeness prior to disseminating records concerning Mrs. Kelley,  AVC ¶¶ 6, 154; retrievability, *see supra* 8-10;  AVC ¶¶ 86, 114, 117, 119, willful and/or intentional behavior, *id.* ¶¶ 6, 86, 158; adverse affects, *id.* ¶¶ 85-86, 96-107, 155, 159; and actual damages, *id.* ¶¶ 102-03, 105-07, 159.

leaks." Mot. to Dismiss at 36.  But the Kelleys allege multiple, documented intentional leaks of specific investigatory information that only a limited number of government officials were permitted to access.  AVC ¶¶ 80-85, 90-91. Defendants also claim the Kelleys' allegations of the FBI's pressuring an FBI agent not to provide complete and accurate information on Mrs. Kelley did not include a direct allegation of "dissemination" of that relevant FD-302 report, and therefore argue that the allegations are insufficient to state a claim under § 552a(b).  Mot. to Dismiss at 35.  This argument fails because the Amended Verified Complaint is replete with allegations about numerous instances where Defendants disseminated inaccurate, incomplete, or irrelevant contents from records in a system of records about the Kelleys.  *See* AVC ¶¶ 4, 80-81, 83-87, 90-91.

Finally, Defendants' assertion that statements made by State Department spokesperson Mark Toner were not inaccurate, incomplete, or irrelevant highlights an unmistakable factual dispute.  To the extent they wish to dispute this alleged and well-supported allegation, discovery would be necessary to determine whether Mr. Toner's repeated statements that Mrs. Kelley had no formal affiliation with the State Department were inaccurate or incomplete in light of what is contained in the Department's files. The Kelleys have plainly sufficiently alleged a formal affiliation based on Jill Kelley's position as Honorary Consul, State Department ID, and other official State Department involvement.

### 6.   Section 552a(e)(10) - Appropriate Safeguards to Insure the Security and Confidentiality of Records

Agencies subject to the Privacy Act must establish "appropriate administrative, technical, and physical safeguards" to ensure the security and confidentiality of the "private" information under their charge.  5 U.S.C. § 552a(e)(10).  The Kelleys allege multiple leaks of protected information from agency records that were never stemmed, and possibly encouraged.  And, giving

any credence to the Defendants' Westfall Act argument, the campaign of leaking may even have been authorized, and possibly planned.   Mot. to Dismiss at 11-12.[26]

The FBI's and DOD's safeguards were not adequate to meet the required purpose, *see* AVC ¶ 162, and the Kelleys clearly pleaded as much, *see, e.g., id.* ¶¶ 160-69.   Defendants argue that the Kelleys were required to identify a rule or safeguard that Defendants should have had in place, citing *Chambers* and *Doe v. Department of Justice* for this proposition.   Mot. to Dismiss at 41.   However, *Doe* does not analyze this issue and merely cites the *Chambers* language.   In *Chambers*, the court found that the relevant count was one that should have been brought under (e)(5), not (e)(10) as the plaintiff there had done.   In making that determination, the court observed in a footnote that the plaintiff had not proposed a safeguard the defendants should implement.   *See Chambers*, 568 F.3d at 1007 n.7.   Thus, the court merely noted the absence of a suggested safeguard, among many other factors, to support its conclusion that the plaintiff's allegation was properly an (e)(5) claim.   *Id.*   At no point did the court create, or read into the law, a *requirement* that a proper (e)(10) claim *must* specify the missing safeguard.   *Id.*   Nor should it have, for the statute creates no such requirement.   *See* 5 U.S.C. § 552a(e)(10).   Accordingly, Defendants' argument provides no basis to dismiss the Kelleys' (e)(10) claim.

In any event, even if the law required plaintiffs to identify an omitted safeguard, the Kelleys did so.   They pleaded that the government established no safeguard to adequately "prevent further leaks after the first leak."   AVC ¶ 162.   This Court has previously held that when the "[p]laintiff has pleaded that the disclosures which are the subject of th[e] lawsuit occurred after

---

[26] Under subsection (e)(10), a plaintiff must allege that: (1) the agency should have established an "appropriate" rule or safeguard "to insure the security and confidentiality of records" but did not, *see* AVC ¶ 162; (2) the agency acted intentionally or willfully in failing to establish such a rule or safeguard, *id.* ¶¶ 167-68; (3) such failure adversely affected the plaintiff, *id.* ¶¶ 163-65; and (4) the plaintiff suffered actual damages as a result of this failure, *id.* ¶¶ 164-65.   *See* 5 U.S.C. 552a(e)(10); *Doe v. U.S. Dep't of Justice*, 660 F. Supp. 2d at 41, 43.

26

the [government] became aware of several prior disclosures regarding th[e] plaintiff," the plaintiff has satisfied the (e)(10) requirements, including the intentional and willful standard. *See Pilon v. U.S. Dep't of Justice*, 796 F. Supp. 7, 12-13 (D.D.C. 1992), *vacated on other grounds*, 73 F.3d 1111 (D.C. Cir. 1996). *See also Ciralsky v. CIA*, 689 F. Supp. 2d 141, 159 & n. 12 (D.D.C. 2010) ("'The CIA's improperly disclosing Ciralsky's records…constituted a violation of Section (e)(10) of the Privacy Act. Such improper disclosure is evidence that the CIA has negligently or intentionally failed to abide by that section's statutory requirement … to create and maintain "appropriate administrative, technical and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained.'"). Indeed, a review of the published safeguards the Defendants argue are public and judicially noticeable, *see* Mot. to Dismiss at 40, confirms that the FBI and DOD have articulated no safeguards to investigate or put a stop to initial or subsequent violations of Privacy Act restrictions once the agencies have notice that an initial violation has taken place. *See id.* at 40-44. The Kelleys' Amended Verified Complaint demonstrates the absence of safeguards requiring: internal checks to conform with published requirements; investigations of suspected or reported breaches; exception processes with which employees can comply when departing from the plain text of the guidance; and any and all other safeguards that would prevent the repeated, highly publicized violations of the Privacy Act. *See id.*; AVC ¶¶ 160-69

The Kelleys allege a repeated, egregious pattern of leaks from anonymous and named sources ranking at the very top of the Defendants' leadership structure, not just one accidental breach of discretion that internal rules failed to prevent. Yet Defendants disingenuously and

wrongly claim that the Kelleys' allegations would set forth a strict liability standard for viola-tions of subsection (e)(10) of the Privacy Act. *See* Mot. to Dismiss at 44.  But Defendants' read-ing of the statute would effectuate governmental immunity under the Act for concerted, inten-tional leaking.  Following the government's logic, as long as *some* rules are promulgated, no matter how inadequate or how systematically ignored, the government is insulated from judicial scrutiny under subsection (e)(10), and free to violate the Act with impunity.  But the government must be held to a higher standard than that.  The law demands more than just language parroting the provisions of the Act; it requires "appropriate … safeguards to insure the security and confi-dentiality of records…."  If the government could shirk its duties under the Act pursuant to the arguments it advances on its Motion to Dismiss, it would render meaningless the law's specific and intentional use of the term "appropriate," and of requiring safeguards that "insure" security and confidentiality.  Such a reading is impermissible.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("'A statute should be construed [to give effect] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).  Publishing language that merely restates the prohibition against illegal activity does not mean that the government has met its burden when all evidence suggests (and the Kelleys clearly allege) the safeguards were neither adequate nor enforced.  The government is required to establish and implement *appropriate* safeguards, and the Kelleys' complaint amply sets out that the government has failed to do so.

## II.     This Court Has Jurisdiction to Grant Declaratory and Injunctive Relief for Defend-ants' Violations of the Stored Communications Act.

The Stored Communications Act ("SCA") protects the content of stored electronic com-munications and specifies how law enforcement may request those contents.  18 U.S.C. § 2701 *et seq.*  Congress enacted the SCA to protect individuals from the "technological advances in sur-

veillance devices and techniques" that "ma[de] it possible for overzealous law enforcement agencies, industrial spies and private parties to intercept the personal or proprietary communications of others."  S. Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557. The SCA authorizes the government to obtain certain records through specific processes, but prohibits the government from disclosing those records.  *See* 18 U.S.C. § 2707(g); AVC ¶¶ 170-75 (Count 7).  The Act also requires prior notice to the customer or subscriber for any release of records made pursuant to a court order or subpoena, and does not prohibit notice to the customer or subscriber for disclosures obtained pursuant to search warrant.  18 U.S.C. § 2703.  The government must also provide notice of any interceptions of the Kelleys' electronic communications under § 2518(8)(d).  *See also* AVC ¶¶ 176-80.

Defendants do not deny that the Kelleys allege they disclosed the Kelleys' emails to the press in violation of the SCA's nondisclosure provision.  18 U.S.C. § 2707(g).  Nor do they deny that the Kelleys allege they failed to provide the Kelleys notice that the government obtained their stored electronic communications, in violation of the SCA's notice provision.  *Id.* § 2707(a).  Indeed, given the continued failure to provide notice upon the request of the Kelleys and their counsel, the violation of the SCA's notice provision remains ongoing.

Rather than confront these alleged violations directly, Defendants attempt to evade their consequences by invoking the SCA's presentment requirement for damages actions. §2712(b)(1).  This provision would require the Kelleys to pursue a separate administrative process in parallel with this civil action.  In moving to dismiss on this basis, Defendants disregard the nature of the Kelleys' SCA claim: the Kelleys seek to vindicate their SCA rights through *only* declaratory and injunctive relief (and not through money damages).  Such claims are not subject to the presentment requirement.  Given Defendants' repeated and cavalier mistreatment, the Jus-

tice Department's refusal to investigate, and the FBI's continued refusal to provide notice, the Kelleys pursued equitable relief in conjunction with their other damages claims. They have no other recourse to halt the ongoing violation of their rights under the SCA.

When a court finds an SCA violation, the Act directs federal agencies to determine whether disciplinary measures are necessary without regard to a finding of damages. 18 U.S.C. § 2712(c). This internal review is a powerful consequence. It is a matter of grave concern for the electronic privacy rights of all citizens that, under Defendants' theory, the government may avoid judicial review unless a person whose data was obtained in violation of the SCA can ascertain and quantify a claim in order to satisfy the presentment requirement – even if the citizen has no way of anticipating the breadth of the government's breach before the person has received any legally required notice of what was searched.

### A. The Administrative Procedure Act Authorizes Judicial Review that Seeks Non-monetary Relief.

The Kelleys request only equitable and declaratory relief: that the Government provide notice as required under § 2703(b), a declaration that Defendants violated § 2707(g) by improperly disclosing records obtained by an investigative or law enforcement officer, and a referral for investigation and disciplinary action under § 2707(d).

The Administrative Procedure Act, at 5 U.S.C. § 702, provides for a right of review and means for equitable relief to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." AVC ¶¶ 170-180. This provision waives sovereign immunity from suits seeking relief other than monetary damages unless another statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The APA establishes a presumption in favor of reviewability, which may be overcome only on a showing that Congress manifested in the statutory scheme an intent

to preclude judicial review. *See Sackett v. EPA*, 132 S. Ct. 1367, 1373 (2012). Though the Amended Verified Complaint pleaded jurisdiction under the SCA and 28 U.S.C. § 1331, not the APA, it is not necessary to expressly plead jurisdiction under the APA – the "[a]verment of a jurisdictional statute … is not required. It is sufficient that the operative facts pleaded bring the case within the court's jurisdiction." *Bard v. Seamans*, 507 F.2d 765, 767-68 (10th Cir. 1974).

The SCA contains two limited exclusivity provisions. Neither indicates Congress intended to preclude long-standing rights to judicial review and nonmonetary relief provided by the APA. The default rule of equitable judicial relief remains intact under the SCA.

The first provision, 18 U.S.C. § 2712, waives sovereign immunity for civil actions against the United States for money damages under the Federal Tort Claims Act. Further, § 2712(d) provides that actions pursuant to this provision "shall be the exclusive remedy against the United States for any claims *within the purview of this section*." (emphasis added). Section 2712's limited purview extends only to suits "against the United States to recover money damages." In other words, § 2712—with its attendant presentment requirement—is the only means by which plaintiffs may seek money damages from the federal government. It is plainly inapplicable where, as here, plaintiffs *do not* seek money damages, but only equitable relief. Otherwise, the reference to the Federal Torts Claims Act would be inapposite, because that statute exists exclusively to govern claims for monetary relief from the United States. § 2712(b).

In *Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013), this Court considered whether § 2712 precluded APA review of Stored Communications Act violations related to the Foreign Intelligence Surveillance Act (FISA). The Court recognized that, because § 2712's exclusivity provision is limited to "'claims within the purview of this section,'" "it might be argued that Section 2712's provision of a remedy should not be ready more broadly to have any preclusive im-

pact on violations of other provisions of FISA … not 'within the purview' of that section." *Id.* at

23 n.30 (quoting § 2712) (emphasis omitted). The court ultimately found the APA relief plain-

tiffs sought under § 2712 to be precluded when considered "in conjunction with FISA overall,

and in light of the secret nature of FISA proceedings designed to advance intelligence-gathering

for national security purposes." *Id*. The considerations that proved dispositive in *Klayman*,

however, are absent here. That suit sought to enjoin wholesale the government's collection and

analysis of phone record metadata. *Id.* at 7. The Kelleys' claims, of course, do not approach the

breadth or depth of those categorical intelligence-gathering concerns. Nor do they implicate the

"detailed scheme of judicial review," *id*. at 21, set forth under the FISA that indicated Congress'

intent to authorize only *limited* judicial review, *see* 50 U.S.C. § 1861, while precluding general-

ized APA review of FISA orders by third parties. 957 F. Supp. 2d. at 20-23 & n.30. It was *those*

FISA provisions—not any aspects of the SCA—that ultimately negated APA review in *Klayman*.

Indeed, the SCA's notice provisions demonstrate the intent of the statutory scheme to shine light

on, and provide accountability for, the government's collection of electronic communications

under the Act.[27]

The second limited exclusivity provision does not apply because it does not reach consti-

---

[27] *But see Jewel v. Nat'l Sec. Agency*, 965 F. Supp. 2d 1090, 1108 (N.D. Cal. 2013) (finding sec-
tion 2712(d) preclusive); *cf. ACLU v. Clapper*, 959 F. Supp. 2d 724, 739-40 (S.D.N.Y. 2013)
(citing *Jewel* and holding 50 U.S.C. § 1861 precluded APA review of FISA metadata order).).
The *Jewel* court relied almost solely on legislative history. When Congress created the civil
damages remedy against the federal government in § 2712, it excluded the United States from
the preexisting cause of action under § 2707 (discussed above), which authorized "'equitable or
declaratory relief.'"  According to the court, this revealed Congress' intent to preclude equitable
relief against the government. *See* 965 F. Supp. 2d at 1109. The court cited no legislative re-
ports, debates, or statements in support of this reading. A more reasonable inference, in fact, is
that removing the United States from § 2707 simply avoided overlap between the new § 2712
damages provision against the United States and § 2707's cause of action against all other par-
ties. Courts should not lightly presume that Congress signaled, *sub silentio*, through subtle infer-
ences drawn from legislative drafting, to countermand the longstanding presumption of judicial
review. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).

tutional violations of the sort pleaded by the Kelleys.  18 U.S.C. § 2707(a) authorizes a cause of action against persons or entities "other than the United States," which includes actual damages and equitable or declaratory relief.  18 U.S.C. § 2708 provides that "the remedies and sanctions described in this chapter are the only judicial remedies and sanctions for *nonconstitutional violations* of this chapter."  The search and seizure of the Kelleys' personal electronic communications, however, is a *constitutional* violation, as this Court has recognized.  *See United States v. Ali*, 870 F. Supp. 2d 10, 39 n.39 (D.D.C. 2012) ("'[I]ndividuals have a reasonable expectation of privacy in the content of emails stored, sent, or received through a commercial internet service provider'") (quoting *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010)).  Accordingly, the exclusivity provision of § 2708 for *nonconstitutional violations* is inapplicable.

The SCA's legislative history also indicates it should not bar equitable relief. The PATRIOT Act added § 2712 in 2001, Pub. L. No. 107-56, 115 Stat. 272, 294, to "create civil liability for violations, including unauthorized disclosures, by law enforcement authorities of the electronic surveillance procedures set forth in title 18, United States Code (e.g., unauthorized disclosure of pen trap, wiretap, stored communications), or FISA information" and "requires administrative discipline of officials who engage in such unauthorized disclosures." *See* 147 Cong. Rec. S10,990, S11,007 (daily ed. Oct. 25, 2001). The provision was not included in the Administration's original proposed bill; rather, it was added after members of Congress raised concerns about protecting individuals in the face of increased surveillance by law enforcement.  *See Administration's Draft Anti-Terrorism Act of 2001: Hearing Before the H. Comm. on the Judiciary*, 107th Cong. 17, 27 (2001) (Testimony of Rep. Barney Frank) ("Technology has changed, and … we are aware of our own fallibility. [W]e need to make sure the safeguards are there for those cases when we can make the mistakes.").  Barring individuals from obtaining equitable relief for

the government's violations of the SCA would thus contradict the core purpose of § 2712.

The Kelleys adequately plead violations of the SCA notice provisions, *see* AVC ¶¶ 58-60, 176-80, and violations of the improper disclosures provisions, *see id.* ¶¶ 4, 47-52, 58, 65, 74, 81-82, 170-75. The "relevant statute" for APA purposes, the SCA, does not explicitly or implicitly preclude the strong presumption for judicial review for equitable relief of legal wrongs; rather the exclusivity provision under 18 U.S.C. § 2712 is limited to claims "to recover monetary damages," 18 U.S.C. § 2712(a), and the exclusivity provision under 18 U.S.C. § 2708 is limited to "nonconstitutional violations." This Court therefore has jurisdiction to hear the Kelleys' claims for equitable relief under the SCA and APA.[28]

### B. Equitable Relief Is the Only Means for the Kelleys to Obtain Judicial Review of Defendants' Ongoing Violation of the Stored Communications Act.

Even had the Kelleys elected to pursue monetary damages, this retrospective relief would not address the continuing violation of the Kelleys' rights under the SCA. It is clear that the Defendants have the Kelleys' emails. Yet Defendants have failed to provide the Kelleys with notice, either prior or delayed, as required under the SCA. AVC ¶¶ 59, 178. And Defendants have made clear, through counsel, that they never intend to provide notice. *Id.* ¶ 178.

Presentment, as Defendants insist the Kelleys do, despite not claiming monetary damages under the SCA, would never require Defendants to cease their continued violation of the Kelleys' rights to notice under the Act, or to undertake the appropriate internal investigation to ensure that the gross misconduct is subject to discipline. Such internal processes are necessary to ensure that neither the Kelleys, nor anyone else, may be so violated. Only equitable relief, including a declaration of a violation of the SCA's clear prohibitions on disclosure and require-

---

[28] If the Court has any doubt as to the viability of equitable relief, Plaintiffs respectfully request limited discovery to understand the scope of stored electronic communications accessed and disclosed by the government, in order to quantify current damages for presentment.

ments of notice, and an order for the government to fulfill its obligations to provide notice under the SCA, will end Defendants' continuing violation of the Kelleys' notice rights under the SCA, and ensure disciplinary review of Defendants' misconduct.

**III.  Westfall Act Certification Is Improper Because Defendants Acted Outside the Scope of Their Employment.**

### A.  Motion to Set Aside the Certification

The Kelleys, seeking recourse for their economic and emotional injuries, filed tort claims against the individuals responsible for invading their privacy and tarnishing their reputations. The claims invoked four causes of action: defamation, false light, intrusion upon seclusion, and publication of private facts.  *See* AVC ¶¶ 198-225 (Claims 11-14).  The defendants are four former government officials, one current official, and as-yet unidentified Doe defendants.  *See id.* ¶¶ 24-28.  Given the egregious and personal nature of the actions alleged, and the lack of any legitimate connection to the business or interests of the U.S. government, the Kelleys filed these claims against the defendants in their individual capacities.

The Torts Branch of the Department of Justice, however, "certified" that these individuals were "acting within the scope of their employment as officers and employees of either the Department of Defense or the Federal Bureau of Investigation."  ECF No. 34-1.  Whether a federal employee, sued in tort, was acting within the scope of employment determines whether that employee is immune: If the defendant was acting beyond the scope of employment, he is subject to suit; if not, the Federal Tort Claims Act (FTCA) confers absolute immunity on the employee and calls for substitution of the United States as defendant.  *See* 28 U.S.C. § 2679(d)(1); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 423 (1995).  The government contends that its certification requires this Court to dismiss the individual defendants from this action.  Mot. to Dismiss at 13.

Dismissal is inappropriate because the individual defendants' actions, as set forth in the Kelleys' Amended Verified Complaint, fall outside the scope of their employment. The government's certification is not controlling, but subject to de novo review. *See Gutierrez de Martinez*, 515 U.S. at 420; *Maron v. United States*, 126 F.3d 317, 322-23 (4th Cir. 1997) (collecting cases applying de novo review). Such review is particularly necessary when the certification lacks any discussion of legal duties or principles that purportedly show the defendants' actions were even plausibly within the scope of their employment.

As described below, Florida law governs that determination under the FTCA's choice-of-law principles. The question for this Court's determination is whether the pattern of personal harassment and unlawful action visited upon the Kelleys by the individual defendants lies outside the scope of their employment. Under Florida law, this treatment was not a foreseeable aspect of the individual defendants' responsibilities. Under federal law, therefore, defendants are not absolutely immune.

Accordingly, the Kelleys respectfully move that this Court set aside the Government's certification. *See* ECF No. 34-1 (motion to set aside). In the alternative, the Kelleys request limited discovery and an evidentiary hearing to resolve disputed questions of fact that bear upon this Court's jurisdiction to adjudicate Claims 11-14.

### B. Florida Law Determines Whether the Defendants Exceeded the Scope of Their Employment.

Whether the defendants are immune from their torts depends on the respondeat superior law of the state where the tort occurred—here, Florida. The FTCA restricts absolute immunity for federal employees for conduct within the scope of their employment. Employees are subject to suit for nonconstitutional torts unless "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant

in accordance with *the law of the place where the act or omission occurred*."   28 U.S.C. § 1346(b) (emphasis added); *St. Paul Guardian Ins. Co. v. United States*, 117 F. Supp. 2d 1349, 1353-54 (S.D. Fla. 2000).

"[T]he law of the place" refers to the state law that would apply in a private tort suit.  *See FDIC v. Meyer*, 510 U.S. 471, 477-78 (1994); *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003).   And "the place where the act or omission occurred" generally refers to the state where the tort occurred.  28 U.S.C. § 1346(b); *Richards v. United States,* 369 U.S. 1, 11-13 (1962); *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (per curiam).[29]

---

[29] As this Court has recognized, the D.C. Circuit has, at times, articulated a somewhat different test.  "[T]o determine whether the employee was acting within the scope of his employment" under the FTCA, this Circuit's precedents have referred to "both the law of the state where the tort occurred and the law of the state where the employment relationship was based." *Russell v. Dupree*, 844 F. Supp. 2d 46, 50 n.5 (D.D.C. 2012) (comparing *Ballenger*, 444 F.3d at 663 ("*respondeat superior* law in the state in which the alleged tort occurred"), *with Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006) ("law of the place where the employment relationship exists").

Other circuits predominantly apply the law of the state of the tort.  *See, e.g.*, *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006) ("[W]hether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of the state in which the wrongful act occurred.") (citing *Williams v. United States,* 350 U.S. 857 (1955)); *Primeaux v. United States*, 181 F.3d 876, 878 & n.2 (8th Cir. 1999) (en banc) (acknowledging the "widely accepted principle that the law of the State where the alleged tort occurred governs the FTCA scope of employment issue"); 181 F. 3d. at 882 (Lay, J., dissenting) ("All of the circuits including this court have held that liability of the United States may be imposed under the [FTCA] if a private employer would be liable under state law *respondeat superior* where the wrongful conduct took place.") (collecting cases).

The "state-of-the-tort" standard appears to be the most often applied in this Circuit as well.  *See, e.g., Steele v. Meyer*, 964 F. Supp. 2d 9, 17 (D.D.C. 2013) ("When a plaintiff challenges the Westfall certification that the federal employee was acting within the scope of his or her employment, the courts apply the *respondeat superior* law of the state where the alleged tort occurred.") (citing *Jacobs v. Vrobel*, 724 F.3d 217, 221–22 (D.C. Cir. 2013); *Stokes*, 327 F.3d at 1214).  The D.C. Circuit appears not to have used the "employment relationship" standard before 2006, when *Majano* invoked the phrase. 469 F.3d at 141 (citing only *Kimbro*, 30 F.3d at 1506, which does not mention the "employment relationship" standard).  In any event, Florida's scope-of-employment law governs regardless of which standard the Court applies.  At least two de-

But where the relevant acts and omissions took place in more than one state, courts must first apply choice-of-law principles to determine *which* state's law applies. *Raflo v. United States*, 157 F. Supp. 2d 1, 7-9 (D.D.C. 2001). The applicable choice-of-law rule, like the substantive rule of liability, is supplied by the law of the state where the tortious "act or omission" occurred. *Id.* at 8 ("[I]n multistate FTCA actions, courts must apply the 'whole' law of the state where the negligent or wrongful acts occurred" and "the 'whole' law includes choice of law rules.") (citing *Richards*, 369 U.S. at 6-7).

In this case, the most relevant acts and omissions occurred in Florida and the District of Columbia. The question whether Florida or D.C. choice-of-law principles govern the case, however, is immaterial; both jurisdictions apply the Restatement (Second) of Conflict of Laws to defamation and invasion-of-privacy claims. *See, e.g., Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006) (defamation); *Weyrich v. New Republic, Inc.,* 235 F.3d 617, 626 (D.C. Cir. 2001) (defamation and false light); *Pearce v. E.F. Hutton Grp., Inc.*, 664 F. Supp. 1490, 1499 (D.D.C. 1987) (invasion of privacy); *Ranbaxy Labs., Inc. v. First Databank, Inc.*, No. 3:13-cv-859, 2014 WL 982742, at *5-6 (M.D. Fla. Mar. 12, 2014) (defamation); *Gritzke v. M.R.A. Holding, LLC*, No. 4:01-cv-495, 2002 WL 32107540, at *2 (N.D. Fla. Mar. 15, 2002) (invasion of privacy). Given this agreement between Florida and the District of Columbia, the Court may apply the Restatement directly, without ascribing it to one state or the other. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 180 (3d Cir. 2000); *Raflo*, 157 F. Supp. 2d at 8-9.[30]

---

fendants worked and lived in Florida, *see* AVC ¶¶ 27-28, much of the alleged activity was either carried out in or directed toward Florida, *see id*. ¶¶ 58, 62-72, 76, 90, and the harm was suffered chiefly in Florida, *see id.* ¶¶ 96-107.

[30] The Amended Verified Complaint also alleges certain actions that occurred in Virginia. And Virginia, unlike Florida and the District of Columbia, has not adopted the Restatement (Second) approach. *See Corinthian Mortg. Corp. v. Choicepoint Precision Mktg., LLC*, 543 F. Supp. 2d 497, 501 (E.D. Va. 2008) (Virginia applies the traditional *lex loci delicti* choice-of-law rule).

The Restatement (Second) directly resolves the question of whose law applies when defamation and privacy claims rest on events from more than one state. *See* Restatement (Second) of Conflict of Laws § 150 (1971) ("Multistate Defamation"); *id.* § 153 ("Multistate Invasion of Privacy"). In each situation, the answer is the state of the victim's domicile—here, Florida— where the bulk of the harm is felt. *See id.* § 150(2) ("[T]he state of most significant relationship will usually be the state where the person was domiciled at the time …."); *id.* § 153 ("[T]he state which … has the most significant relationship to the occurrence and the parties . . . . will usually be the state where the plaintiff was domiciled at the time ….").[31]

Courts applying District of Columbia and Florida choice-of-law principles have repeatedly applied the law of the domicile to supply the applicable substantive law in cases involving multistate defamation or privacy torts. *See Weyrich*, 235 F.3d at 626 (for defamation actions, the law to be applied is that of "'the place where the plaintiff suffered injury by reason of his loss of reputation'") (quoting *Dowd v. Calabrese,* 589 F. Supp. 1206, 1210 (D.D.C.1984)); *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 112 (D.D.C. 2011) (under either D.C. or Georgia choice-of-law rules, state of plaintiff's residence, operations, and injuries had most significant

---

But because the acts and omissions in Florida and the District of Columbia predominate over those in Virginia, it is (mercifully) unnecessary to resolve this conflict of conflict-of-law rules. *See Raflo*, 157 F. Supp. 2d at 9-10.

[31] While Florida courts directly apply the Restatement's "most significant relationship" test, *see* Restatement (Second) of Conflicts of Laws § 145, *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007), the District of Columbia follows a "blended" version of the "most significant relationship" test and the "governmental interests" analysis, *see Oveissi v. Islamic Rep. of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) (considering, in addition to the §145 significant-relationship factors, any competing "interests" that underlie the different state laws). At least in the context of defamation and privacy torts, however, the D.C. variant on the Restatement (Second) approach has not produced divergent outcomes. D.C. courts continue to apply the law of the state (here, Florida) where the victim suffered the loss of reputation or privacy. *See, e.g., Pearce*, 664 F. Supp. at 1495-96, 1498-1500 ("[T]he place of conduct is not a significant contact in the context of defamation and invasion of privacy actions."); *Perkins v. Marriott Int'l, Inc.*, 945 F. Supp. 282, 284 (D.D.C. 1996).

relationship to defamation claim); *Pearce*, 664 F. Supp. at 1499 (applying Restatement (Second) of Conflict of Laws § 153); *Ranbaxy Labs.*, 2014 WL 982742, at *5 ("most significant relationship" in multistate defamation cases generally "where the plaintiff corporation has its principal place of business"); *Gritzke*, 2002 WL 32107540, at *2-*3 (privacy claim usually has most significant relationship with state of plaintiff's domicile).

Nothing about the allegations in this case suggests the Court should deviate from this default rule. Florida plainly has the most substantial relationship to the most relevant acts. That state is where both plaintiffs are domiciled, where they suffered economic, reputational, and emotional injuries, where their private information was extracted, where leaked private information was publicized to greatest effect, where the "investigation" was centered, where rudimentary victim treatment should have been afforded, and where Jill Kelley was forcibly removed from her home for intimidating "questioning." *See* AVC ¶¶ 17-18, 44-55, 58, 62-72, 76, 83-85, 92-107; Restatement (Second) of Conflict of Laws § 150. Although certain acts are alleged to have occurred in the District of Columbia, *see* AVC ¶¶ 6, 86-87, 154 (State Department press conference), or abroad, *see id.* ¶¶ 4, 117 (Jill Kelley's name leaked by Panetta and aide during trip to Australia), the brunt of defendants' activity was clearly targeted at, and felt in, the Kelleys' lives in Florida. *Cf. Raflo*, 157 F. Supp. 2d at 10 (rejecting argument that the "relevant acts and omissions" occurred in the District of Columbia because the United States was the defendant).

This accords with the presumption, set forth in § 146 of the Restatement, "that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *See LeGrande v. United States*, 687 F.3d 800, 808 (7th Cir. 2012). Applying this same choice-of-law framework, Florida and District of Columbia courts would both conclude

that Florida law applies here.  And as noted above, under the Supreme Court's decision in *Rich-ards*, 369 U.S. 1, the FTCA court is bound to apply the whole law of Florida—not just its sub-stantive tort law, but also its choice-of-law and scope-of-employment law.  *See, e.g.*, *Phillips v. Mabus*, 894 F. Supp. 2d 71, 86 (D.D.C. 2012) ("[T]o determine whether a federal employee was acting within the scope of his employment, the Court must apply the law in the state in which the alleged tort occurred.").

### C.  Defendants Exceeded The Scope of Their Employment Under Florida Law.

The Kelleys' Amended Verified Complaint describes a bizarre pattern of personalized leaks and harassing behavior that reached well beyond the scope of any legitimate law-enforcement investigation.  The Defendants' alleged actions were extreme, injurious, and not a foreseeable part of their official duties.  Because the Defendants' conduct served no legitimate public purpose, but rather appears to have been motivated by personal aims and biases, it lies outside the scope of their employment.

Under Florida law, "'[a]n employee's conduct is within the scope of his employment only if it is the kind he is employed to perform, it occurs substantially within the time and space limits of the employment and it was activated at least in part by a purpose to serve the master.'"  *Law-rence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990) (per curiam) (quoting *Rabideau v. State*, 391 So. 2d 283 (Fla. Dist. Ct. App. 1980)).  All three elements must be proved for the scope-of-employment certification to be upheld.  *Cf. Phillips*, 894 F. Supp. 2d at 86-87 (applying standard disjunctively and authorizing discovery into whether defendants' actions were related to the work they were employed to perform).

The "'convenient test,'" in other words, "'is whether the employee was doing what his employment contemplated.'"  *Caprio v. Am. Airlines, Inc.*, 848 F. Supp. 1528, 1532 (M.D. Fla. 1994) (quoting *Morrison Motor Co. v. Manheim Servs. Corp.,* 346 So.2d 102, 104 (Fla. Dist. Ct.

App. 1977)).  In applying this test under the FTCA, courts review the Justice Department's certi-fication de novo.  *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1543 (11th Cir. 1990) ("highly discretionary" scope certification "does not warrant judicial deference" given lack of "particular expertise" regarding state law), *amended on other grounds*, 924 F.2d 1555 (11th Cir. 1991).

Defendants' acts, as alleged, reach beyond the scope of their employment.  They went far beyond any plausible interest of the federal government, and morphed into a strange and person-al smear campaign against Jill Kelley and, inextricably, her husband.  The disclosures, misinfor-mation, and mistreatment were unrelated—indeed, adverse—to the government's interest in in-vestigating witness reports, protecting victims, and pursuing wrongdoers.  The Kelleys' allega-tions that the individual Defendants acted "maliciously" and "contrary to their employer's inter-est" suffice to demonstrate, at the pleading stage, that such Defendants acted "outside the scope of their employment."  *Stokes*, 327 F.3d at 1216.

The Kelleys' Amended Verified Complaint includes numerous factual allegations that describe this mistreatment, and which tend to show—under analogous case law—that Defend-ants' conduct exceeded the scope of their employment:

- Defendants repeatedly, maliciously, and unlawfully leaked sensationalized information and outright falsehoods about Jill Kelley and her associations with prominent members of the local and military communities.  *See* AVC ¶¶ 4, 80-85, 90, 117.  The Kelleys were subjected to "a malicious smear campaign where their names, emails, and damaging (as well as false) information were leaked to the media."  *Id.* ¶ 4.  Under Florida law, unau-thorized government leaks of harmful personal information are beyond the scope of an official's employment.  *See Nadler v. Mann*, 951 F.2d 301, 305-06 (11th Cir. 1992) (dis-

cussed below).

- These leaks and other misstatements, *see, e.g.,* AVC ¶¶ 6, 86, 154 (State Department press conference), "maliciously and intentionally characterized Mrs. Kelley as the sexualized 'other woman' and … violated[] her privacy rights as they … search[ed] [for] salacious information," *id.* ¶ 191; *see also id.* ¶ 90.   Allegations that defendants "had maliciously acted contrary to their employer's interest" tend to show they acted "outside the scope of their employment." *Stokes*, 327 F.3d at 1216.

- The length of time the Defendants harassed and mistreated the Kelleys demonstrates this was not normal investigatory behavior, or even an isolated misstep during an otherwise valid investigation.  Rather, it was a pattern of antagonistic and harmful conduct that lasted from Jill's initial report of cyberstalking in May until (at least) the barrage of leaks and misinformation in November 2012.  AVC ¶¶ 38-44, 79-91, 94-95.  The Courts of Appeals have recognized that a pattern or repetition of intentional mistreatment can indicate a government official's conduct reaches beyond the scope of employment.  *See Stokes*, 327 F.3d at 1216 (pattern of intentional reputational and professional injuries by government investigators).  Acts that may *begin* as connected to employment activity may grow unrelated over time, and therefore fall outside the scope of employment.  *See Majano v. United States*, 469 F.3d 138, 141-42 (D.C. Cir. 2006) (even if initial physical confrontation was within the scope of employment, a subsequent confrontation was not).

- That Defendants allegedly committed *intentional* torts, *see, e.g.,* AVC ¶ 85, rather than mere negligence or recklessness, also tends to suggest Defendants went beyond their scope of employment.  An "intentional tort, which by its nature is willful … more readily suggests personal motivation." *Jordan v. Medley*, 711 F.2d 211, 215 (D.C. Cir. 1983)

43

(Scalia, J.).

- The Kelleys' treatment violated the Justice Department's Guidelines for Victim and Witness Assistance and Guidelines on Methods of Obtaining Documentary Evidence, as well as the FBI's Domestic Investigations and Operations Guide, which account for the potential of investigations to "damage someone's reputation [or] intrude on privacy."  AVC ¶¶ 11-13, 112 (quoting FBI's Domestic Investigations and Operations Guide).  The individual Defendants' violations of these policies do not by themselves prove the action went beyond the scope of employment, of course.  But they do suggest that the action was at cross purposes with Defendants' responsibilities and usual behavior.  *See Russell v. Dupree*, 844 F. Supp. 2d 46, 51 (D.D.C. 2012) (noting CIA chauffeur "was in violation of CIA internal regulations…when the accident occurred," and beyond the scope of his employment).

- These incidents were reported to the Justice Department and Defense Department Offices of Inspector General, but no investigation ever materialized.  AVC ¶ 5.  This unwillingness to investigate, combined with the repeated misconduct, represents another odd and unexplained allegation that illuminates the unanswered factual questions that undermine the Torts Division's certification.  *See Phillips*, 894 F. Supp. 2d at 87 (because facts alleged in opposition, taken as true, could rebut the Attorney General's certification, court allowed limited discovery on scope-of-employment issue).

- Finally, the strangeness of the government's behavior throughout the Kelleys' saga also increases the likelihood that the facts will show that the Defendants went beyond the scope of their employment.  Investigators charged with investigating a potential cyber-crime somehow trained their sights on the (nonexistent) romantic affairs of a married pri-

vate citizen—which plainly lie far beyond the remit of federal investigators.  *See* AVC ¶¶ 68-69.  The FBI insisted, without reason or explanation, that a witness omit a critical portion of his sworn declaration about the matter.  *Id.* ¶ 75.  Cooperating witnesses, Jill and Scott Kelley, were denied any information about the identity of their cyberstalker, as well as rudimentary victim services.  *Id.* ¶¶ 54, 64, 71-72.  And Jill Kelley—the *victim* of cyberstalking—was effectively kidnapped from her home, in front of her children, by a defendant and other FBI agents for questioning, without counsel, in an SUV.  *Id.* ¶¶ 69-72.  This pattern of intentional, harmful, and personalized mistreatment amounts to a more than plausible claim of malicious conduct beyond the scope of Defendants' employment.  *See Stokes*, 327 F.3d at 1216 (authorizing discovery in light of allegations of intentional injury to plaintiffs' professional reputation, filing of a false incident report, mishandling of evidence, impeding a promotion, and threats).

Florida law confirms that an official's injurious leaks and personalized mistreatment lie outside the scope of a federal law-enforcement official.  The Eleventh Circuit reached this conclusion in a case involving facts similar to—though *less* egregious than—those alleged by the Kelleys.  In *Nadler v. Mann*, a state-court judge sued an Assistant U.S. Attorney (AUSA) for slander.  951 F.2d at 302.  The AUSA allegedly leaked to the *Miami Herald* the story of a confidential FBI investigation: a tipster had reported to the AUSA that the judge accepted a bribe in connection with a case before him, and the AUSA referred the tipster to the Justice Department and the FBI.  When the story broke, the judge was competing in a run-off for re-election.  (The AUSA had run for the same seat, but failed to make the run-off.)  *Id.* at 303, 306.  In response to the judge's lawsuit, the government certified that the AUSA's alleged behavior occurred in the course of his employment.  The District Court dismissed the FTCA action.

The Eleventh Circuit disagreed.  Reviewing the certification de novo, the court applied Florida's scope-of-employment law.  *Id.* at 305.  The court considered whether the AUSA's action as alleged is "'of the kind he is employed to perform, [whether] it occurs substantially within the time and space limits of employment and [whether] it is activated at least in part by a purpose to serve the master.'"  *Id.* (quoting *Kane Furniture Corp. v. Miranda,* 506 So. 2d 1061, 1067 (Fla. Dist. Ct. App. 1987)).  It concluded that "[a]n AUSA who leaks information to the press simply is not 'doing what his employment contemplated.'"  *Id.* at 306 (quoting *Morrison*, 346 So. 2d at 104).[32]  The district court, therefore, had "erred in determining that [the official] acted within the scope of his employment insofar as its determination relates to [his] alleged leak to the *Miami Herald*."  *Id.* at 306.  Although the Eleventh Circuit affirmed the dismissal with respect to the AUSA's referral of the tip to the Justice Department, it remanded the case for further proceedings regarding the leak allegations.[33]

Under Florida law as applied by the Eleventh Circuit in *Nadler*, therefore, allegations of unauthorized leaks directed against a suspect are beyond the scope of the law-enforcement official's employment.  The Kelleys' case, of course, involves the same sort of personalized and harmful leaks.  Only here, the facts are *worse* because the leaks were directed not against a suspect, but against the victims and complaining witnesses.  And the Kelleys' allegations, of course, are not limited to alleged leaks.  They include a host of other harassing conduct, including effectively kidnapping the witness (plaintiff Jill Kelley) in front of her children, treating victims as

---

[32] "Indeed," the Court related, even the government lawyer agreed "that it is not part of an AUSA's job to leak information to the press." *Nadler*, 951 F. Supp. at 306 n.8.

[33] *See also O'Ferrell v. United States*, 968 F. Supp. 1519, 1528 (M.D. Ala. 1997) (Because "allegations of leaks made by FBI agents … are likely not within the [FBI] agents' scope of employment," court "probably lacks jurisdiction" under the FTCA "to consider [defamation] claim [] against the United States.") (citing *Nadler*, 951 F.2d at 306), *aff'd*, 253 F.3d 1257 (11th Cir. 2001).

suspects, violating the law and Departmental policies, refusing to inform the victims of their cyberstalker's identification, and misleading the press and public regarding the victims' occupation and associations. *See supra* at 42-45. The nature of these actions, and the Kelleys' allegations, indicate these actions were taken out of malice and personalized animus, not for any legitimate governmental purpose.[34]

This pattern of mistreatment is hard to attribute to reasons other than personal animus. *See Stokes*, 327 F.3d at 1216 (authorizing discovery of allegations that defendants "had maliciously acted contrary to their employer's interest"); *Caprio*, 848 F. Supp. at 1532 (whether defendants "acted for purely personal reasons" and therefore beyond the scope of their employment was a question for the jury); *Anderson v. United States*, 364 F. App'x 920, 923 (5th Cir. 2010) (per curiam) (reversing FTCA substitution in defamation action because defendant's statements "were not in furtherance of his specific duties … but made out of a personal vendetta to punish" the plaintiff). Certainly nothing in the record or Defendants' submissions thus far rebuts the Kelleys' allegations to that effect. And to the extent Defendants' behavior was driven, even in part, by political motivations—to suppress or punish a perceived "threat," or to confound and

---

[34] The Amended Verified Complaint's allegations of sexually discriminatory treatment also indicate that Defendants acted beyond the scope of their employment. *See, e.g., Peluso v. United States*, No. 10-80076-CIV, 2011 WL 902624, at *4 (S.D. Fla. Mar. 8, 2011); *Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir. 1994) (criticism of employee in retaliation for rejecting superior's sexual advances was outside scope of employment); *Wood v. United States,* 995 F.2d 1122, 1123 (1st Cir. 1993) (en banc) (Breyer, C.J.) (sexual harassment, including assault and battery, was "clearly outside the scope of employment"), *abrogated on other grounds*, *Osborn v. Haley*, 549 U.S. 225 (2007).

   The constitutional torts at issue here do not arise under the FTCA, *see* 28 U.S.C. § 2679(b)(2)(A), but the allegations of discriminatory treatment nevertheless illuminate the defendants' motivation behind the nonconstitutional torts committed against the Kelleys, which *are* cognizable under the FTCA. The discriminatory motive behind this pattern of mistreatment is relevant to determining whether the Defendants acted beyond the scope of their employment. *See, e.g., Stokes*, 327 F.3d at 1216 (allowing discovery into "malicious[]" actions "contrary to the[] employer's interest and, therefore, outside the scope of [the defendants'] employment").

delay investigations for electoral purposes—this too is beyond the scope of their employment.

*See Alexander v. FBI*, 691 F. Supp. 2d 182, 195 (D.D.C. 2010) (citing *Alexander v. FBI*, 971 F.

Supp. 603, 611 (D.D.C. 1997)) (noting that if defendants had in fact "gathered FBI files for par-

tisan political purposes," it would be outside "the scope of their employment").[35]

### D. Limited Jurisdictional Discovery and an Evidentiary Hearing Are Warranted

The Amended Verified Complaint plausibly describes "sufficient facts that, taken as true,

would establish that the Defendants' actions exceeded the scope of their employment." *Stokes*,

327 F.3d at 1215. Therefore the Kelleys are entitled to limited jurisdictional discovery and an

---

[35] To be sure, the analysis would differ under District of Columbia law. The District has taken a notably expansive view of the scope of employment, characterizing the test as "akin to asking whether the defendant merely was on duty or on the job when committing the alleged tort." *Harbury v. Hayden,* 522 F.3d 413, 422 n.4 (D.C. Cir. 2008). This has led District of Columbia courts to find such extreme acts as "sexual harassment, a shooting, armed assault, and rape" to fall within the scope of a defendant's employment. *Steele*, 964 F. Supp. 2d at 17 (quoting *Harbury*, 522 F.3d at 422 (collecting cases)). The D.C. Circuit, bound to follow these precedents of the D.C. courts, has treated as within scope allegations that government officials supplied information to the press. *See Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006); *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009); *Wilson v. Libby,* 535 F.3d 697 (D.C. Cir. 2008). These precedents squarely conflict, however, with the controlling authority under Florida scope-of-employment law, which applies in this case. *See Nadler*, 951 F.2d at 306.

The D.C. precedents are distinguishable in any event. In deeming press communications within the scope of employment, *Ballenger and Wuterich* focused on the specific nature of a Congressman's job. They expressly relied on the special "relationship with the public and in particular his constituents and colleagues in the Congress." *Wuterich*, 562 F.3d at 384 (quoting *Ballenger*, 444 F.3d at 665-66). This rendered communications with the press an essential aspect of the job of reaching and representing a Congressman's constituents. No legislative or representative role, however, is implicated in this case. And in *Wilson* (as well as *Wuturich*), a national public figure addressed important and high-profile issues of public policy when speaking to the press. *See Wuterich*, 562 F.3d. at 385 ("Congressman Murtha's discussion of grave public policy concerns relating to the war in Iraq"); *Wilson*, 535 F. 3d at 712 ("alleg[ations] that the defendants"— top Executive Branch officials—"spoke to the press in order to diffuse … criticism of the Executive's handling of pre-war intelligence"). Finally, each of these three cases involved discrete press communications. The Kelleys, by contrast, allege a pattern of discriminatory treatment that took many forms over the course of many months. *See supra* at 43. That a Congressman or White House official has been treated as within the scope of employment when giving press interviews on issues of public concern says little about whether FBI agents, and defense or intelligence officials, remain within the scope of their employment when engineering damaging leaks about purely personal affairs.

evidentiary hearing to decide the scope-of-employment question.  *Id.*; *Kimbro v. Velten*, 30 F.3d 1501, 1502 (D.C. Cir. 1994) ("remand[ing] for the district court to conduct an evidentiary hearing to ascertain whether [the defendant VA official] acted within the scope of her employment at the time of the alleged incident").

The hearing and discovery are necessary to give effect to the Supreme Court's holding that Justice Department certifications do not conclusively grant absolute immunity to individual defendants, but are subject to judicial review.  *See Gutierrez*, 515 U.S. at 434.  Indeed, judicial review is especially important in cases, such as this, that involve an exception to the FTCA's authorization of suit against the United States.  For in this situation, certification shields the individual defendant from liability *without* correspondingly exposing the government to suit.  *Id.* at 427-28.  Absent meaningful judicial review, the government could deprive the Kelleys of *any* remedy against *any* defendant for their defamation and false-light claims.  *See* 28 U.S.C. § 2680(h) (excluding the FTCA's waiver of sovereign immunity "[a]ny claim arising out of … libel, slander, [or] misrepresentation").[36]

The need for discovery is particularly acute in this case.  *First*, the Torts Division certification offered no justification or explanation for the defendants' alleged actions.  *See* ECF No. 34-1; *see also* Mot. to Dismiss at 13 (offering no explanation).  Indeed, the certification expressly acknowledged that it was based only on "the information now available."  ECF No. 34-1.  At

---

[36] *See* Mot. to Dismiss at 14-16 ("Because both defamation and false light claims … fall within the libel-slander-misrepresentation exception, sovereign immunity has not been waived, and plaintiffs cannot proceed as a matter of jurisdiction.") (citing § 2680(h)).  That the FTCA excludes defamation and false-light claims from its waiver of the *United States'* sovereign immunity, however, has no bearing on whether these claims may proceed against individual defendants who acted outside the scope of their employment.  And the Kelleys' claims for intrusion upon seclusion and publication of private facts are not barred by § 2680(h) *even if* the government is substituted for the individual defendants, as the Motion to Dismiss implicitly concedes.  Mot. to Dismiss at 14 (defamation and false-light claims, but not intrusion and publication torts, covered by § 2680(h)).

this stage, the Kelleys' allegations are uncontroverted and must be accepted as true. *See, e.g., Stokes*, 327 F.3d at 1211, 1215. *Second*, the need for discovery is heightened where, as here, the facts remain shrouded due in part to the Defendants' attempt to *anonymously* leak information and smear the Kelleys' reputation in the press. *See* AVC ¶¶ 80, 83-84, 117, 122. The Kelleys have alleged many facts based on information currently available to them, and have included allegations against as-yet unnamed John and Jane Doe Defendants, but the nature of the actions here strongly suggest that additional relevant information would be forthcoming. *Third*, because purpose is often important to the scope-of-employment determination, *see supra* at 41-43, 47-48, discovery is necessary to illuminate the mental state and motivation behind the bizarre steps taken against the Kelleys.

Given the information available to the Kelleys and the Court at this juncture, however, discovery is required. Because the facts as pleaded plausibly indicate that at least some of the individual Defendants operated outside the scope of their employment, the Kelleys respectfully request limited jurisdictional discovery and an evidentiary hearing. FTCA litigants in the D.C. federal courts have regularly conducted such tailored fact-finding in order to decide the scope-of-employment inquiry. *See, e.g., Ballenger*, 444 F.3d at 663; *Stokes*, 327 F.3d at 1211; *Alexander*, 971 F. Supp. at 611. Given the need for this Court to satisfy itself of its own jurisdiction, limited jurisdictional discovery is appropriate.

## IV.   The *Bivens* Counts State Claims on which Relief Can Be Granted.

Among the many rights violated by the individual Defendants, two rose to constitutional proportions. The contents of the Kelleys' private emails were searched and seized without a warrant in violation of the Fourth Amendment. *See* AVC ¶¶ 181-88 (Ninth Cause of Action). And Jill Kelley suffered humiliating and discriminatory mistreatment based on her sex in violation of the Fifth Amendment. *See id.* ¶¶ 189-97 (Tenth Cause of Action).

The three known leaders of the FBI "investigation"—Joyce, Ibison, and Malone—each participated directly and personally in these offenses against the Kelleys. Seeking to vindicate these constitutional rights, the Kelleys sued the three individuals pursuant to the constitutional cause of action recognized in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). As in *Bivens* itself, *id.* at 390 n.2, the Kelleys sued additional unnamed Doe Defendants, AVC ¶ 29.

The Defendants have moved to dismiss both of the constitutional claims on three grounds: 1) the nonexistence of a *Bivens* cause of action, 2) qualified immunity for violations of rights that were not "clearly established," and 3) the sufficiency of the allegations that the Defendants individually participated in the violations. Each argument, however, rings hollow: the Kelleys' constitutional rights and remedies under the Fourth and Fifth Amendments are well established, and the Kelleys' Amended Verified Complaint alleges facts that plausibly entitle them to relief.

*First*, the Defendants' resistance to the mere existence of *Bivens* actions in these contexts is puzzling. Seminal Supreme Court decisions make abundantly clear that a constitutional remedy exists to protect against search-and-seizure and Equal Protection violations. *See Bivens*, 403 U.S. at 392 (search and seizure); *Davis v. Passman*, 442 U.S. 228 (1979) (sex discrimination). Thus there is no need for this Court to weigh the constitutional right against any "special factors" that might counsel against a remedy; the Supreme Court has already conducted the balancing and recognized the remedy. The Defendants attempt to avoid these precedents by narrowing the asserted rights to the vanishing point, and by pointing to various statutory pronouncements that ostensibly supplant the *Bivens* cause of action. Neither maneuver, however, can circumvent the Supreme Court's longstanding recognition of redressable rights against warrantless searches and gender-based discrimination.

51

*Second*, in light of those well recognized rights and remedies, the Defendants are not protected by qualified immunity.  The constitutional violations alleged here—warrantless searches of messages over which a private citizen has a reasonable expectation of privacy, and discrimination against a woman on account of her sex—are familiar to any reasonable federal official.  Surely the limits came as no surprise to the Defendants here, given that the Kelleys expressly denied access to their private emails, and that Jill Kelley's sex was at the center of the investigation from the outset.  That existing precedents may not precisely mirror these facts is no barrier to recovery: Qualified immunity turns on the practical question whether an officer should have understood the constitutional rule—not the happenstance of whether a U.S. court previously adjudicated an identical case.

*Third*, the Kelleys have alleged specific facts that describe each Defendant's involvement in this scheme of unauthorized and unconstitutional mistreatment.  Agent Malone, for example, personally carried out many of the most egregious actions and decisions taken against the Kelleys.  Ex-Deputy Director Joyce personally directed the investigations from FBI Headquarters.  And Ibison aggressively pursued and circulated the (false) story that Kelley had engaged in an extramarital affair, even going so far as to demand alterations to a witness statement.  These allegations (and others set forth below) offer not just a conceivable account of each Defendant's individual role, but a plausible one.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Twombly*, 550 U.S. at 570).  Accordingly, the motion to dismiss Counts Nine and Ten should be denied.

### A.  Count Nine: Fourth Amendment Violation

#### 1.  The SCA Does not Displace the *Bivens* Remedy for Fourth Amendment Violations.

Note first what the Motion to Dismiss does not dispute: that the Amended Verified Com-

plaint alleges facts that, taken as true, adequately plead a Fourth Amendment violation. *See* AVC ¶¶ 183-84 (defendants violated Fourth Amendment through warrantless and unreasonable search of the contents of personal emails in which the Kelleys had a reasonable expectation of privacy). Nor do the Defendants resist the "well established" notion that a *Bivens* remedy exists, at least as a general matter, for such warrantless searches. *Bloem v. Unknown Dep't of Interior Emps.*, 920 F. Supp. 2d 154, 161 (D.D.C. 2013) ("Wisely, Defendants do not appear to dispute that a *Bivens* action may lie for Plaintiff's Fourth and Fifth Amendment claims."); *Iqbal v. Dep't of Justice*, No. 11-369, 2014 WL 169867, at *7 (M.D. Fla. Jan. 15, 2014) ("the objects of unlawful electronic surveillance are entitled to *Bivens* relief"). Defendants argue instead that Congress, by enacting the Stored Communications Act ("SCA"), precluded *Bivens* relief in the context of warrantless email searches. This interpretation of the SCA is entirely novel, and entirely incorrect. It overlooks the most relevant provision of the SCA, finds no support in any case law construing the SCA, and misconstrues precedents holding that other statutory schemes displaced the *Bivens* remedy.

The "plain text" of the SCA, Defendants assert, expressly indicates that its statutory remedies are the exclusive remedy for illegal searches of stored electronic communications. *See* Ibison Mot. to Dismiss at 16-17 (citing 28 U.S.C. § 2712(d)). This overreads § 2712, which speaks of the SCA's exclusivity only in terms of suits against the government: "Any action *against the United States* under this subsection shall be the exclusive remedy *against the United States* for any claims within the purview of this section." 28 U.S.C. § 2712(d) (emphases added). Plainly, this does not speak to the availability of a *Bivens* remedy *against an individual*.

The strongest textual indication of the scope of the SCA's remedies, meanwhile, is found in a provision the Defendants do not even mention. Section 2708, titled "Exclusivity of Reme-

dies," provides that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for *nonconstitutional* violations of this chapter."  18 U.S.C. § 2708 (emphasis added).  Congress' decision to expressly exclude constitutional violations from the exclusivity provision creates an overwhelming inference that the SCA does not displace *Bivens* actions.  Indeed, the FTCA's analogous savings clause has been uniformly interpreted to preserve *Bivens* actions against federal employees.  *See* 28 U.S.C. § 2679(b)(2)(A) (FTCA's exclusivity provision "does not extend or apply to a civil action against an employee of the Government … which is brought for a violation of the Constitution of the United States."); *Okoro v. Callaghan*, 324 F.3d 488, 491 (7th Cir. 2003); *Davis v. United States*, 430 F. Supp. 2d 67 (D. Conn. 2006).

Notably, Defendants cite no case law that addresses the interaction of the SCA and *Bivens*.  Much less do they cite precedent stating the SCA displaced the *Bivens* action in this context.  The few authorities to have considered the relationship contemplate that a *Bivens* action persists despite the SCA, though they do not resolve the question.  *See In re Application of the U.S. for an Order Pursuant to 18 U.S.C. §2703(d)*, 830 F. Supp. 2d 114, 141-42 (E.D. Va. 2011) ("[A]ctors who violate the Constitution under § 2703 are subject to civil or administrative action, or perhaps a *Bivens* action (though the Court expresses no opinion on that issue)."); *Warshak v. United States*, 532 F.3d 521, 531-32 (6th Cir. 2008) (en banc) (positing defendant could have obtained a ruling on lawfulness of email search through a *Bivens* action or suppression motion); *cf. Warshak*, 631 F.3d at 288 (SCA cannot trump Fourth Amendment protections for emails).

What precedent the Defendants *do* muster addresses a distinct situation: where Congress has *expressly* precluded civil actions against federal employees in favor of actions against the United States.  *See* Ibison Mot. to Dismiss at 16 (citing *Hui v. Castaneda*, 559 U.S. 799 (2010) (Public Health Service Act); *Ingram v. Faruqye*, 728 F.3d 1239, 1246 (10th Cir. 2013) (Veterans

Affairs Immunity Statute); *M.E.S., Inc. v. Snell*, 712 F.3d 666, 672 (2d Cir. 2013) (Contract Disputes Act)).   The three cited decisions do not stand for the proposition that the existence of a remedial scheme *against the United States* necessarily precludes the availability of a *Bivens* remedy *against individual defendants.*   Rather, each interprets particular statutory language, within a distinct statutory structure, that addresses—and expressly precludes—employee liability.[37]   The SCA, however, includes no such express textual instruction; in fact it says nothing at all about claims filed against federal employees.   Absent much stronger signals, courts should not presume that Congress has impliedly repealed a constitutional interpretation of the Supreme Court.   Thus the *Bivens* remedy for unconstitutional searches persists alongside the SCA.

### 2. Because the Right to Privacy in the Content of Personal Email Communications Is Clearly Established, Qualified Immunity Does Not Shield Defendants from Liability.

Defendants next contend that even if a *Bivens* remedy exists, they remain immune.  Again, the government does not dispute that the Amended Verified Complaint adequately pleads "that the individual defendant violated a constitutional right."   Ibison Mot. to Dismiss at 22 (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)).   Rather, Defendants focus solely on whether that constitutional right is clearly established—specifically, whether "the contours of the right [are] sufficiently clear," *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 56-57 (D.D.C. 2013), that "a reasonable official would understand that what he is doing violates that right," Motion to Dismiss at 22-23 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

---

[37] *See Hui*, 559 U.S. at 805 (FTCA "'shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee'") (emphasis omitted) (quoting 42 U.S.C. § 233(a)); *Ingram,* 728 F.3d at 1245 (FTCA remedy for damages "'arising from malpractice or negligence of a health care employee … shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the health care employee'") (quoting 38 U.S.C. § 7316(a)(1)); *Snell*, 712 F.3d at 672-73 ("'contracting officer's decision on a claim is final and conclusive and is not subject to review by any forum, tribunal, or Federal Government agency,' except as authorized by the CDA itself.")  (quoting 28 U.S.C. § 7103(g)).

If "the unlawfulness" of an officer's action is apparent "'in the light of pre-existing law,'" the officer is not shielded by qualified immunity. *Atherton v. D.C. Office of Mayor,* 567 F.3d 672, 689-90 (D.C. Cir. 2009) (quoting *Anderson,* 483 U.S. at 640). This does "'not require a case directly on point,'" though existing precedent must make the legal principle evident. *Hartley*, 918 F. Supp. 2d at 57 (quoting *al-Kidd*, 131 S. Ct. at 2083). Accordingly, "a principle of constitutional law may be 'clearly established,' even though the precise factual situation has never been presented to a court," and "'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Mellen v. Bunting*, 327 F.3d 355, 376 (4th Cir. 2003) (quoting *Hope*, 536 U.S. 730, 741 (2002)).

Defendants conclude a citizen's constitutionally protected expectation of privacy in the contents of his or her personal emails is not clearly established. Ibison Mot. to Dismiss at 23. This is wrong for at least three reasons.

*First*, ample caselaw indicates clearly that the Fourth Amendment does protect the contents of citizens' personal email messages. In addition to the Sixth Circuit, other courts have recognized the right as established. *See, e.g., United States v. Zavala,* 541 F.3d 562, 577 (5th Cir. 2008) (reasonable expectation of privacy regarding "private information, including emails" stored on mobile phone); *United States v. Forrester,* 512 F.3d 500, 511 (9th Cir. 2008) ("The privacy interests in these two forms of communication [email and traditional mail] are identical."); *Ali*, 870 F. Supp. 2d at 39 n.39 ("'[I]ndividuals have a reasonable expectation of privacy in the content of emails stored, sent, or received through a commercial internet service provider.'") (quoting *Warshak*, 631 F.3d at 288); *R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128, 1142 (D. Minn. 2012) (rejecting qualified immunity because "individuals maintain a reasonable expectation of privacy with respect to their private email accounts

and … such accounts are entitled to the same Fourth Amendment protections as conventional letters."); *Wilson v. Moreau*, 440 F. Supp. 2d 81, 108 (D.R.I. 2006) ("[T]he Court holds that [plaintiff] had a reasonable expectation of privacy in his personal Yahoo e-mail account."), *aff'd*, 492 F.3d 50 (1st Cir. 2007).  *Cf. Crispin v. Christian Audigier, Inc.,* 717 F. Supp. 2d 965, 991 (C.D. Cal. 2010) (construing SCA and holding that private Facebook messages are, like email, "inherently private" because such messages "are not readily accessible to the general public.").

These precedents more than suffice to put a reasonable law enforcement officer on notice of the Fourth Amendment limit.  Moreover, they do not represent a novel doctrinal development: by and large they adhere to the same "content/envelope" distinction that has long prevailed in postal mail and pen register cases.  *See, e.g., Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) (constitutionally distinguishing telephone call's (protected) contents from the (unprotected) phone numbers dialed); *Warshak*, 631 F.3d at 285-86 ("Given the fundamental similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection.").[38]  And even if the raft of email, telephone, and postal mail precedents are not squarely on point with the facts of this case, it does not follow that the right is not clearly established.  *See, e.g.*, *Mellen*, 327 F.3d at 376 (right may be clearly established "'even in novel factual circumstances'").

*Second*, Defendants perceive square disagreement between the Sixth and Eleventh Circuits regarding the applicability of the Fourth Amendment right to privacy in this context.  On that basis, they contend that "it is unfair to subject [government officials] to money damages for

---

[38] *Cf. Rehberg v. Paulk*, 611 F.3d 828, 843 (11th Cir. 2010) ("Several circuits have concluded that a person lacks legitimate privacy expectations in Internet subscriber information and in to/from addresses in emails sent via [third-party service providers]."), *aff'd*, 132 S. Ct. 1497 (2012); *United States v. Perrine*, 518 F.3d 1196, 1204-05 (10th Cir. 2008) (similar) (collecting cases), *aff'd*, 132 S. Ct., 497 (2012).

picking the losing side of the controversy" where "judges … disagree on a constitutional question."  Ibison Mot. to Dismiss at 23 (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999)).  But the premise of that argument is faulty: the Sixth and Eleventh Circuits have not disagreed on the existence of this constitutional right.  The Sixth Circuit held that the right existed.  *Warshak*, 631 F.3d at 288 (Because "a subscriber enjoys a reasonable expectation of privacy in the contents of emails," "government agents violated the Fourth Amendment when they obtained the contents of Warshak's emails" without "first obtaining a warrant based on probable cause.").  And the Sixth Circuit indicated that henceforth the right would be treated as clearly established.  *Id.* at 289 n.17 ("[A]fter today's decision, the good-faith calculus has changed, and a reasonable officer may no longer assume that the Constitution permits warrantless searches of private emails.").  The Eleventh Circuit, meanwhile, decided only that the right was not clearly established, without passing on whether it existed.  *See Rehberg v. Paulk*, 611 F.3d 828, 847 (11th Cir. 2010), *aff'd*, 132 S. Ct. 1497 (2012).[39]  Disagreement on whether a right is clearly established is not the same as disagreement on whether the right exists in the first place.  The Kelleys respectfully urge this Court to join with the courts finding there is a clearly established constitutional right to privacy in emails.

*Third*, Defendants acknowledge that an employee's awareness of the legal limits on his conduct is relevant to the qualified-immunity determination.  *See* Ibison Mot. to Dismiss at 22-23 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right.") (quoting *Anderson*, 483 U.S. at 640).  Qualified im-

---

[39] The Eleventh Circuit acknowledged that the "Supreme Court's decisions in *Katz* and *Smith* clearly established an objectively reasonable privacy right in telephone conversation content." Because "the modern Internet did not exist at the time of those decisions," however, the court questioned "whether the analytical framework, much less the rationale, of those decisions transfers to privacy rights in Internet email." *Rehberg*, 611 F.3d at 847.

munity is designed to provide "breathing room" for officials to make "reasonable but mistaken judgments." *Id.* at 23 (quoting *al-Kidd*, 131 S. Ct. at 2085). Where a mistake would necessarily be unreasonable, however, the justification for tolerating unconstitutional action attenuates.

On the undisputed facts of this case, it is beyond peradventure that the Defendants understood the limits on their authority to access the Kelleys' email. They had received specific and repeated instructions not to examine any more than the email Jill Kelley shared. *See* AVC ¶¶ 48-52, 54, 213. When the employees nevertheless ignored that limited consent, and perused thousands of personal emails that they would later share throughout the media and around the world, they were on notice that their authority did not come from consent or from a warrant. *See id.* ¶ 5 ("undue investigation" of non-germane emails "would be a fishing expedition and invasion of privacy," per then-DOD General Counsel Jeh Johnson). This is not a case, therefore, where qualified immunity protects discretionary judgments of the highest stakes necessarily made in an informational vacuum. *Cf. al-Kidd*, 131 S. Ct. at 2085. Rather, this was a considered decision to proceed in contravention of the law, the Kelleys' consent, and recognized privacy rights. Regardless of the risks courts might run in delineating the privacy expectations in other emerging technological contexts, *see City of Ontario v. Quon*, 560 U.S. 746, 759 (2010),[40] the principle advanced by the Kelleys is not pregnant with broad or unforeseen implications. The limits of the Kelleys' consent were precise and unambiguous: examine one email and go no further. No reasonable law-enforcement officer could possibly be surprised at the prospect of liability after proceeding in the face of a repeated, express, and unambiguous admonitions from a victim and wit-

---

[40] Contrary to Defendants' gloss on *Quon,* the Court's caution about the effect of technology was largely focused on specific attributes of the employment context, not technology generally—and certainly not to straightforward email messages that implicate Fourth Amendment concerns in largely the same ways as traditional postal mail or phone calls. *See Quon*, 560 U.S. at 759; *Warshak*, 631 F.3d at 285-86.

ness.  *See Brown v. Fogle*, 819 F. Supp. 2d 23, 28-29 (D.D.C. 2011) (no immunity where official "could be expected to know that certain conduct would violate statutory or constitutional rights") (internal quotation marks omitted).  The Fourth Amendment clearly establishes that going further required a warrant.

### 3. The Amended Verified Complaint Plausibly Claims that Defendants Personally Violated the Kelleys' Fourth Amendment Rights.

*Bivens* actions are not subject to a heightened pleading standard.  *See Crawford–El v. Britton,* 523 U.S. 574 (1998); *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1124-25 (9th Cir. 2002).  To survive a motion to dismiss, a complaint must simply satisfy Rule 8's standard of notice pleading: "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Amended Verified Complaint leaves little doubt regarding the constitutional violations alleged against the three individual Defendants: Joyce and Ibison directed an unconstitutional search of the Kelleys' personal email messages, *see* AVC ¶¶ 25, 27, 58-68, 181-88, and Malone executed the unlawful search after misrepresenting to Jill Kelley that agents would not access more than one of her emails, *see id.* ¶¶ 28, 44-52, 54-55, 181-88. The allegations put the Defendants on notice of their alleged violations and make out a plausible claim sufficient to warrant relief under the Fourth Amendment.  At this preliminary stage of the litigation, nothing more is required.  *See Iqbal*, 556 U.S. at 678 ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned,  the-defendant-unlawfully-harmed-me  accusation….") (quoting *Twombly*, 550 U.S. at 555).

To be sure, *Bivens* plaintiffs "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.* at 676.  The standard of individual liability requires that the defendant "participated personally in the alleged

wrongdoing." *Anderson v. Gates*, -- F. Supp. 2d --, 2013 WL 6355385, at *6 (D.D.C. Dec. 6, 2013).  In tallying the appearances of each individual Defendant's name, Defendants contend the Kelleys fall short of this pleading standard.  *See* Ibison Mot. to Dismiss at 8 (listing six mentions of Joyce, and "only four sets of allegations regarding Ibison").

The lengthy and detailed pleadings filed here, however, are a far cry from the sorts of complaints that courts have dismissed for failing to specify individual action, rather than simply acts by "the government" or "defendants."  *Compare* Ibison Mot. to Dismiss at 6-7 (noting Amended Verified Complaint refers, *in places*, to the defendants collectively as "government agents" or "the government"), *with, e.g., Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (dismissing based on complaint's consistent use of "the collective term 'Defendants'" and failure to distinguish between roles or acts of those defendants).  Likewise, the Amended Verified Complaint is more specific and plausible than the claims, cited by Defendants, that have been dismissed for failing to identify any role for a high-level defendant beyond generic "supervision."  *See, e.g, Anderson*, 2013 WL 6355385, at *7 (Secretary of Defense and Secretary of the Army "vested with … supervision"); *Halim v. Donovan*, 951 F. Supp. 2d 201, 208 (D.D.C. 2013) (complaint "nowhere even mentione[d]" defendant HUD Secretary); *Jackson v. Donovan*, 844 F. Supp. 2d 74, 78 (D.D.C. 2012) (alleging no involvement for HUD Secretary beyond status as "primary policy maker").

The "personal participation" requirement exists "[b]ecause vicarious liability is inapplicable to *Bivens*" suits.  *Iqbal*, 556 U.S. at 676.  The aforementioned allegations were dismissed because the complaints effectively ascribed liability to the department heads based only on their status within the organization, not any individual action related to the constitutional violation. The Kelleys' Amended Verified Complaint, however, poses no risk that any Defendant will be

subject to liability on a respondeat superior basis.

The individual allegations against Joyce and Ibison relate to their active participation in the direction of the Kelley "investigation":

> "FBI Deputy Director Sean Joyce directed agents in the Tampa Field Office Cyber Squad to treat the Kelleys' case differently than other investigations. The Cyber Division and Deputy Director Joyce preempted decisions made by the Field Office's Cyber Supervisor and directed the course of the investigation, including by directing the investigating agents not to proceed with a scheduled effort to interview Mrs. Broadwell once they had identified her as the stalker responsible for the threatening emails."

AVC ¶ 62. The Amended Verified Complaint, therefore, specifically alleges Joyce's leadership and direction, from FBI Headquarters in Washington, of the team that investigated and mistreated the Kelleys. *Id.* ¶ 25. He managed the field agents interacting with the Kelleys, including those who unconstitutionally searched and retrieved their emails. Likewise, it is reasonable to infer, based on the allegations, that Agent Ibison contributed to the strategy and execution of the "investigation." The Amended Verified Complaint makes clear that Ibison was the agent in charge of the investigation in Florida. *Id.* ¶ 27. The allegations indicate the likelihood that Joyce and Ibison either "directed others" to unreasonably seize the emails, or were the people "in charge" during the operation with "knowledge of and [who] acquiesced in" the unconstitutional search by subordinates. *See Santiago v. Warminster Twp.,* 629 F.3d 121, 129 (3d Cir. 2010).

Neither is subject to mere *respondeat superior* liability; rather each is subject to "supervisory liability" based specifically on a situation where the officials "'know about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see.'" *Int'l Action Ctr. v. United States,* 365 F.3d 20, 28 (D.C. Cir. 2004) (Roberts, J.) (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988)).

Malone's personal involvement is even more readily apparent on the face of the Amended Verified Complaint. This agent directly interfaced with Kelley at almost every critical junc-

ture of the "investigation" and harassment. Malone is the officer who took the Kelleys' formal report, AVC ¶ 44, promised to respect the Kelleys' privacy and anonymity, ¶ 45, tried and failed to trace the original stalker emails, ¶ 46, requested the Kelleys' email login and password information, ¶ 47, and requested unlimited access to the Kelleys' emails only to hear (and accept) their express instruction to limit access to a single message, ¶¶ 48-52. Given these repeated interactions surrounding the email account at issue, it is not just plausible but highly likely that Malone played a direct role in the unconstitutional email search.

### B. Count Ten: Fifth Amendment Violation

#### 1. The *Bivens* Cause of Action for Sex Discrimination Is Well Established.

As in Count Nine, defendants resist even the existence of a *Bivens* cause of action. They contend that a "*Bivens* remedy has not been previously created" in this context, and "should not be inferred here." Ibison Mot. to Dismiss at 17.

But, as with the Fourth Amendment claim discussed above, this Court need not weigh whether to "create" or "infer" a new cause of action, because such a claim is well established. Since 1979, the Supreme Court has recognized a *Bivens* remedy for sex discrimination in violation of the Fifth Amendment's equal-protection component. *See Davis v. Passman*, 442 U.S. 228 (1979). Defendants hardly mention *Passman*, and try to limit its scope to "claims of gender discrimination *in employment*." Motion to Dismiss at 17-18 (emphasis added). Yet the reach of *Passman* is not so constricted: that seminal case, though it *arose* in the context of workplace discrimination, was *decided* based on constitutional principles of equal protection that extend beyond the office. The *Passman* Court did address the employment context—but only to confirm that the statutory remedies of Title VII did not displace the constitutional remedy the Court recognized. 442 U.S. at 247.

Courts regularly invoke *Passman*, without mentioning the employment context, for the

general proposition that a *Bivens* action is available for sexual discrimination generally.[41]  Leading commentators are in accord.  *See, e.g.,* 13D C. Wright et al., *Federal Practice and Procedure* § 3573.2, at 596 n.64 (3d ed. 2008) ("right of action for damages can be implied from the equal protection component of the Due Process Clause of the Fifth Amendment").  To be sure, *Passman* is often described in terms of the workplace discrimination that gave rise to the case.  And it is unsurprising (and unfortunate) that sex discrimination claims typically involve the workplace.  But nothing about the *Passman* decision suggests these facts cabin the constitutional principle it announced.  In short, Jill Kelley's sex-discrimination claim is not a novel one: the Fifth Amendment *Bivens* remedy addresses sex discrimination by federal employees—not just the discrimination that happens to take place at work.

Defendants also contend that the Crime Victims' Protection Act (CVPA) and Victims' Rights and Restitution Act (VRRA) displace any *Bivens* claim that might otherwise exist.  Adjudicating the *Bivens* claim of a mistreated crime victim, Defendants assert, would "implicate[] a wide range of law enforcement concerns in areas in which Congress has previously legislated."  Ibison Mot. to Dismiss at 18-19.  The source of any tension between victim services and a damages remedy, however, is not apparent.  And Defendants do not say.

The CVPA and VRRA both disclaim any authorization of a *new* damages cause of action.  *See* 18 U.S.C. § 3771(d)(6); 42 U.S.C. § 10607(d).  But those provisions can hardly be read to

---

[41] *See, e.g., Iqbal*, 556 U.S. at 675 ("*Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment"); *Whitacre v. Davey*, 890 F.2d 1168, 1169 n.3 (D.C. Cir. 1989) (describing "*Bivens* actions for gender discrimination since sex is a quasi-suspect classification"); *Lebron v. Rumsfeld*, 670 F.3d 540, 554 (4th Cir. 2012) ("*Bivens* claim for gender discrimination"), *cert. denied*, 132 S. Ct. 2751 (2013); *Santiago-Marrero v. United States*, 61 F. App'x 718, 721 (1st Cir. 2003) (per curiam) ("plaintiff alleging gender discrimination may bring *Bivens* action"); *Al-Aulaqi v. Panetta*, No. 12-1192, 2014 WL 1352452, at *12 (D.D.C. Apr. 4, 2014) ("*Bivens* remedy for gender discrimination in violation of Fifth Amendment").

preclude any and all *existing* causes of action. *Cf. Passman*, 442 U.S. at 247 (exclusion of congressional employees from Title VII scheme did not preclude remedy available under *Bivens*). Passing strange would be the victims-rights bill that removed pre-existing remedies without replacing them. The *Bivens* Court itself contemplated that legislation might supplant the constitutional remedy by "remit[ing]" injured persons "to another remedy, equally effective in the view of Congress." 403 U.S. at 397. Defendants point to no such alternative here. Even so, these two statutes might yet "be significant if the Court were recognizing *for the first time* in this context a 'new and freestanding remedy in damages.'" *Iqbal*, 2014 WL 169867, at *7 n.13 (emphasis added) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). But the *Bivens* remedy for sex discrimination "is well-established," and the CVPA and VRRA offer no impetus for an exception. *See id.*

### 2.  Because the Prohibition on Sex-Based Discrimination Is Clearly Established, Qualified Immunity is Unavailable.

The constitutional right to be free of sex-based discrimination is "clearly established." "The equal protection component of the Due Process Clause thus confers on [plaintiff] a federal constitutional right to be free from gender discrimination…." *Passman,* 442 U.S. at 235 (footnote omitted).

Defendants, unable to deny this with a straight face, respond by contorting Jill Kelley's asserted constitutional violation beyond all recognition. By distinguishing "the right to victims' assistance" from the right to "gender-balanced media reporting," and ignoring the other sex-based discrimination suffered by Jill Kelley, *see, e.g.*, *supra* at 18, 43, Defendants narrow the Equal Protection claim to the vanishing point. Ibison Mot. to Dismiss at 25.

But Jill Kelley did not file two separate discrimination claims; she filed one, which complained of a long pattern of discriminatory treatment motivated by her sex. *See, e.g.*, AVC ¶ 190

(discussing the investigation, lack of victims services, withholding of information, failure to protect confidential information, and repeated public and private mischaracterization); *see also Woerner v. Brzeczek*, 519 F. Supp. 517, 518, 520 (N.D. Ill. 1981) ("long and pervasive course of conduct" constituted a cognizable claim for sex discrimination). Boiling down the long months of harassment and the permanent reputational harm to two issues—media coverage and victim services—is legally disingenuous and personally demeaning. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("The operation of [the qualified-immunity] standard … depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified.").

The gap is vast indeed between Defendants' whitewashed description of "gender equality in press coverage," Ibison Mot. to Dismiss at 26, and the cold reality of Jill Kelley's actual treatment. For example, *United States government officials* told Fox News, for national publication, that messages sent by Jill Kelley to an older, powerful man (who was neither her husband nor the father of her three young children) were the "equivalent of phone sex over email," AVC ¶ 4. And a source from "the highest levels of the intelligence community" underscored that sexist approach by telling *The Daily Beast* that emails sent by Paula Broadwell to Jill Kelley were "kind of cat-fight stuff." *Id.* ¶ 82, n.20. Perhaps it is possible, as a linguistic matter, to describe months of prurient government investigation and dissemination of Kelley's sex life and private communications as merely "gender discrimination for allegedly not receiving certain forms of victims' assistance." Ibison Mot. to Dismiss at 25. But it is less Orwellian, and more accurate, to describe it as simply sex discrimination by investigating officers. AVC ¶ 194.

When the right is phrased appropriately, the qualified-immunity defense is implausible. "[A]n official is not shielded [by qualified immunity] where he could be expected to know that certain conduct would violate statutory or constitutional rights." *Brown*, 819 F. Supp. 2d at 28-

29 (internal quotation marks omitted) (quoting *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998)).  As discussed above, therefore, *see supra at* 56, a precedent that represents a precise factual analog to this claim is not necessary.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The key is the officers' discriminatory treatment, not the particular program or context they were implementing.  And it would be obvious to any reasonable investigating officer that he (or she) cannot lawfully discriminate based on sex.

This court and others have rejected similar attempts by defendants to unduly narrow the rights at stake for immunity purposes.  *See, e.g., Markham v. White*, 172 F. 3d 486, 491-92 (7th Cir. 1999) ("[T]hat neither this court nor any other has ever dealt with a situation involving a short training seminar conducted for narcotics officers is of no moment. Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point.") (internal quotation marks omitted).  In response to a defendant's attempt to "define the legal rule here very specifically," Judge Boasberg recently responded that, for purposes of qualified immunity, the "constitutional right in question should be defined [from] an ordinary person's" perspective.  *Hartley*, 918 F. Supp. 2d at 57.  This Court should do likewise and reject Defendants' constricted view of equal protection.[42]

### 3.  The Amended Verified Complaint Plausibly Claims that Defendants Personally Violated Kelley's Fifth Amendment Rights.

Defendants once again challenge the Amended Verified Complaint for failing to sufficiently allege their personal involvement and motivation in the asserted constitutional claim.  As

---

[42] Defendants eventually and partially acknowledge the narrowness with which they define the constitutional right at stake.  *See* Ibison Mot. to Dismiss at 26 ("[E]ven at a higher level of generality – there is no clearly established Fifth Amendment right to be free from discriminatory investigations.")  This recalibrates the discussion only slightly, and continues to ignore Jill Kelley's clearly established Fifth Amendment right to be free from sex-based discrimination at the hands of the government, whether in an investigation, the delivery of victim services, or otherwise.

with Count Nine, *see supra* at 60-63, the complaint's lengthy and detailed allegations of individual discriminatory behavior and motivation more than plausibly state a claim for relief. The hyper-detailed allegations apparently sought by Defendants would only serve to add prolixity to already extensive pleadings. And they would unduly burden plaintiffs, such as Jill Kelley, seeking reasonable discovery of information wholly in the control of the defense.

Again, Defendants employ a "divide and conquer" approach to the Amended Verified Complaint. They try to tease out the allegations regarding victims assistance, which apply to both Jill and Scott Kelley, and use this overlap to show Jill Kelley was treated in the same manner as a male target. *See* Ibison Mot. to Dismiss at 13. As an initial matter, it is hard to fathom how a woman mistreated by the government on account of her sex could *lose* a sex discrimination claim based on the mistreatment of her husband as well. Certainly Defendants cite no authority for this disturbing proposition, and we are aware of none that would absolve sex-based discrimination because the official also harmed a loved one of the opposite sex. And the Amended Verified Complaint contains ample allegations that pertain just to Jill Kelley.[43]

But in any event, the denial of victim services specifically *to Jill Kelley* is important as still another example of her mistreatment at the hands of Defendants. AVC ¶ 190. Given the prurient and bizarre nature of the investigation, and the sexualized "other woman" narrative pursued in the leaks, *id.* ¶ 191, it is not only conceivable but plausible that Jill Kelley's mistreatment was motivated by sex. *See Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 570). The re-

---

[43] *See, e.g.*, AVC ¶ 67 (investigation into Jill Kelley's private life), ¶ 69 (kidnapping of Jill Kelley for questioning without counsel), ¶ 70 (questioning regarding alleged extramarital affair with Petraeus), ¶ 72 (prurient nature of the investigation), ¶ 75 (doctoring witness statements to *omit* information that would put Jill Kelley in a better and fairer light), ¶ 76 (Jill's photo on the wall of the FBI's Tampa Field Office, portrayed as the sexualized hub of a series of senior military officials), ¶¶ 80-87, 91 (her name leaked to media), ¶ 84 (reviewing her emails with Gen. Allen), ¶ 84 (describing her "phone sex over email"), ¶ 86 (disparaging her diplomatic status), ¶ 101 (describing Jill Kelley as at the center of sex scandal), ¶ 104 (gender stereotyping).

fusal to provide victim services is simply more evidence of how Defendants thought of her, and

that evidence—considered not in isolation but as a whole—suggests that one of the only plausi-

ble explanations for Kelley's treatment was invidious discrimination based on her sex.  *See gen-*

*erally Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) (fact-finders weigh all the evi-

dence holistically, even "if a particular fact does not itself prove the ultimate proposition").

As with Count Nine, the Amended Verified Complaint is *not* an attempt to use general-

ized allegations to effectively impose vicarious or *respondeat superior* liability on Defendants.

*See supra at* 63.  Rather, the allegations are sufficiently personalized to place each on notice of

how the official's individual actions violated the Constitution.  *See Iqbal*, 556 U.S. at 676.  The

allegations make clear the numerous ways in which Jill Kelley's status as a woman, and more

specifically as the "sexualized other woman" in this saga, AVC ¶ 191, affected the investigation

and the leaks.  *See supra* at 18 & n.22 (collecting allegations of gender-based mistreatment).

These many allegations show with plausibility how the three *Bivens* Defendants acted with the

invidious purpose of mistreating Kelley on account of her sex.

The individual allegations regarding Joyce and Ibison, with respect to Count Ten as with

Count Nine, relate to their active participation in the direction of the Kelley "investigation":

> "FBI Deputy Director Sean Joyce directed agents in the Tampa Field Office
> Cyber Squad to treat the Kelleys' case differently than other investigations.  The
> Cyber Division and Deputy Director Joyce preempted decisions made by the
> Field Office's Cyber Supervisor and directed the course of the investigation, in-
> cluding by directing the investigating agents not to proceed with a scheduled ef-
> fort to interview Mrs. Broadwell once they had identified her as the stalker re-
> sponsible for the threatening emails."

AVC ¶ 62.  The Kelleys specifically allege Joyce's leadership and direction from FBI Headquar-

ters in Washington of the team that investigated the Kelleys.  *Id.* ¶ 25.  He managed the field

agents interacting with Jill Kelley, including those who disparaged her within the FBI and to the

national media and blatantly mischaracterized her (nonexistent) role in the sordid sex scandal.

The allegations also make it reasonable to infer that Agent Ibison contributed to the strategy and execution of the "investigation" into Jill Kelley's sex life and the associated erroneous leaks. The Amended Verified Complaint makes clear that Ibison was the agent in charge of the investigation in Florida. *Id.* ¶ 27. He therefore had control over the display of Jill Kelley at the Tampa FBI field office, with obvious sexual overtones, as the center of a hub of senior officials. *Id.* ¶ 76. He confronted Agent Humphries regarding the removal of exculpatory material regarding Jill Kelley's alleged romantic affairs from a witness report. *Id.* ¶ 75. And he likely directed the unnecessary and invasive questioning of Jill Kelley and others regarding her alleged extramarital affairs. *Id.* ¶¶ 69-70, 75.

These allegations indicate the likelihood that Joyce and Ibison either "directed others" to unreasonably mistreat Jill Kelley on account of her sex, or were the people "in charge" during the operation with knowledge of and [who] acquiesced in" the unconstitutional search by subordinates. *See Santiago,* 629 F.3d at 129; *Int'l Action Ctr.*, 365 F.3d at 28 (Roberts, J.) (quoting *Jones*, 856 F.2d at 992).

And again, Malone's personal involvement is plainly apparent. This agent directly interfaced with Kelley at almost every critical juncture of the "investigation" and harassment. Malone took the Kelleys' formal report, AVC ¶ 44, violated Jill Kelley's limited to consent in order to search broadly through her private email messages, ¶¶ 48-52, forced her into an SUV for questioning without counsel regarding alleged extramarital affairs, ¶¶ 69-70, and facilitated the unlawful dissemination of those emails across the government and national media, ¶¶ 80-83. Given Malone's repeated interactions with Jill Kelley and the execution and structuring of the "investigation," it is not just plausible but highly likely that Malone directly participated, with

invidious intent to discriminate based on sex, in the unconstitutional treatment of Jill Kelley throughout the investigation and leaks.

If, contrary to these extensive allegations, the Court finds the pleadings deficient on any front, the Kelleys respectfully request leave to amend in order to remedy those shortcomings.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs respectfully requests that this Court deny Defendants Motion to Dismiss, and set aside the government's certification under the Westfall Act.

**Respectfully Submitted,**

\_\_\_/s/ **Alan Charles Raul**_____

Alan Charles Raul (D.C. Bar No. 362605)
Edward R. McNicholas (D.C. Bar No. 459136)
Colleen Theresa Brown (D.C. Bar No. 984668)
Cara Viglucci Lopez  (D.C. Bar No. 994077)
Benjamin Beaton (D.C. Bar No. 1005477)

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiffs*

Dated:  April 16, 2014

72