**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
GILBERTE JILL KELLEY, *et al.*,         )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )        Civil Action No. 13-0825 (ABJ)
                                        )
FEDERAL BUREAU OF                       )
INVESTIGATION, *et al.*,                )
                                        )
                Defendants.             )
_____)

**MEMORANDUM OPINION**

Plaintiffs Gilberte Jill Kelley and Scott Kelley filed this lawsuit against defendants the

Federal Bureau of Investigation, the United States Department of Defense, the United States

Department of State, the United States of America, Leon Edward Panetta, Sean M. Joyce,

George E. Little, Steven E. Ibison, Adam R. Malone, and John and Jane Does 1-10.[1]   The

amended complaint contains fourteen counts that assert a combination of claims based on alleged

violations of the Privacy Act, 5 U.S.C. § 552a (2012); the Stored Communications Act,

18 U.S.C. § 2701 *et seq.* (2012); the Fourth and Fifth Amendments to the United States

Constitution; and the law of four states.   Am. Compl. ¶¶ 113–225 [Dkt. # 19].

Defendants FBI, DOD, State Department, and United States have moved to dismiss

plaintiffs' Privacy Act, Stored Communications Act, and state law claims for lack of subject

---

1   Defendants Panetta, Joyce, Little, Ibison, Malone, and the Does are being sued in their
individual capacities.   At the time of the events in this case, defendant Panetta was the United
States Secretary of Defense; defendant Joyce was the deputy director of the FBI; defendant Little
was the Assistant Secretary of Defense for Public Affairs and Pentagon Press Secretary; and
defendant Ibison was a special agent in the FBI.   Am. Compl. ¶¶ 24–27 [Dkt. # 19].   Defendant
Malone was an FBI agent at the time of the events in this case, and he is still so employed.   *Id.*
¶ 28.

matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot. to Dismiss ("Defs.' Mot.")

[Dkt. # 34].  Defendants Joyce, Ibison, and Malone also filed a Rule 12(b)(6) motion to dismiss

the Fourth and Fifth Amendment *Bivens* claims asserted against them in their individual

capacities for failure to state a claim upon which relief can be granted.  Mot. to Dismiss by Defs.

Joyce, Ibison, & Malone ("Indiv. Defs.' Mot.") [Dkt. # 35].  Plaintiffs opposed both motions.

Pls.' Consolidated Opp. to Defs.' Mots. to Dismiss & Mem. in Supp. of the Mot. to Set Aside the

Gov't's Certification ("Pls.' Opp.") [Dkt. # 37].

This case arose out of plaintiffs' receipt of anonymous and troubling emails from a

woman who has since been identified as Paula Broadwell.  At the time, Ms. Broadwell was

involved in an extramarital affair with General David Petraeus, who was then the Director of the

Central Intelligence Agency ("CIA"), and who was also a friend of the Kelley family.  The

Kelleys reported the emails to an acquaintance in the FBI, and the investigation that is at the

heart of this lawsuit ensued.  The gravamen of the amended complaint is set out in its opening

paragraphs:

> There is no question that Mrs. Kelley and Dr. Scott Kelley were the
> victims of and witnesses to a potential cyberstalking crime. There is no
> question that they reported the facts to the FBI out of concerns for their
> own physical safety and the safety of their friends who were among the
> nation's most senior intelligence and military leaders.
>
> There is also no reasonable argument that in exchange for their coming
> forward as good citizens they became the target of an unreasonable and
> intrusive investigation, and a malicious smear campaign where their
> names, emails, and damaging (as well as false) information were leaked to
> the media.

Am. Compl. ¶¶ 3–4.  Plaintiffs seek declaratory and injunctive relief and money damages to

vindicate these alleged violations of their legal rights and intrusions upon their privacy.  *Id.* ¶ 2.

The amended complaint is a long, overwrought, and argumentative document, and its 225 paragraphs are full of indignation while being thin on facts. But the Court finds that plaintiffs have set forth sufficient factual allegations to withstand the motion to dismiss Count 1 to the extent that it asserts unlawful disclosure of information to the media because there are sufficient facts presented in the amended complaint to satisfy plaintiffs' burden to state a plausible Privacy Act claim.

With respect to the other claims, though, the Court finds that plaintiffs have failed to plead sufficient facts to support a plausible inference that the conduct underlying the Privacy Act claims in Counts 2 through 6 and the portion of the claim in Count 1 that is based on the FBI's disclosure of records to the DOD was intentional and willful, so those counts will be dismissed. The Court will also grant the motion to dismiss the Stored Communication Act claims in Counts 7 and 8 under Rule 12(b)(1) because plaintiffs did not first present those claims to the appropriate agency, and therefore, the Court lacks subject matter jurisdiction over them. Counts 9 and 10 will be dismissed on the grounds that it would be improper to imply a *Bivens* remedy for the constitutional violations that are alleged.

Further, because plaintiffs have failed to rebut the presumption that defendants Panetta, Little, Joyce, Ibison, and Malone were acting within the scope of their employment when they allegedly committed the state law torts in Counts 11, 13, and 14, the Court does not have subject matter jurisdiction over those claims, and they will therefore be dismissed as to those defendants.[2] The Court will also grant the motion to dismiss the false light claim against defendants Panetta and Joyce in Count 12 because neither Virginia nor Florida recognizes that cause of action.

---

2      As the Court explains below, Counts 11 through 14 will proceed against the Doe defendants.

Whether plaintiffs will be able to prove the remaining claims is a question for another day, but for now, the case will proceed, albeit on a considerably more streamlined basis.  The Kelleys may be rightfully aggrieved by the manner in which they were depicted in the media and by the impact of the stream of sensational articles on their reputations, but it remains to be seen if those harms can be laid at the feet of these defendants.

## BACKGROUND

### I.      Factual Background[3]

Plaintiffs Gilberte Jill Kelley and Scott Kelley are husband and wife, and they live in the state of Florida.  Am. Compl. ¶¶ 17–19.  According to the amended complaint, prior to the events giving rise to this case, Mrs. Kelley was "a community leader and liason to the military community in Tampa," which is comprised of servicemen and women assigned to MacDill Air Force Base and the United States Central Command.  *Id.* ¶¶ 17, 30–31.  The amended complaint also states that in early 2012, the Republic of Korea nominated Mrs. Kelley to serve in a position entitled "Honorary Consul" under the Vienna Convention on Consular Affairs of 1963, Art. 10, and that she was officially appointed as of August of that year.  *Id.* ¶¶ 17, 33, 36.  The State Department issued her an identification card bearing a State Department identification number as well as a State Department approved Florida license plate, noting her status.  *Id.*  Scott Kelley is a general surgeon and surgical oncologist who maintains a private practice in the Tampa area. *Id.* ¶ 18.

Through their involvement in the community, plaintiffs came to know both the former CIA Director David H. Petraeus, who had previously served as a General in the United States Army, and United States Marine Corps General John R. Allen.  *Id.* ¶ 32.  The Kelleys state that

---

3      The facts below are taken from plaintiffs' amended complaint, and they are assumed to be true for purposes of resolving the motions to dismiss.

4

as a couple and individually, they interacted and corresponded with General Petraeus and General Allen and their families on a regular basis.  *Id.*

The series of events outlined in the amended complaint began in May of 2012, when an anonymous individual sent an email to General Allen that "disparaged Mrs. Kelley and made reference to an upcoming dinner . . . with several senior US and foreign intelligence, defense, and diplomatic officials."  *Id.* ¶ 38.   In June, Dr. Kelley received a series of similar communications that revealed knowledge of Mrs. Kelley's activities.  *Id.* ¶¶ 41, 43, 53.  The plaintiffs were unnerved by the level of detail contained in the emails concerning Mrs. Kelley's personal activities, and Mrs. Kelley contacted FBI Counterintelligence Agent Fred Humphries twice to express her concerns.  *Id.* ¶¶ 39–40, 42, 44.  Around June 7, 2012, Agent Humphries introduced Mrs. Kelley to FBI Agent Adam Malone by email, and Mrs. Kelley learned that Agent Malone would be handling the investigation into what the amended complaint refers to as the "cyberstalking complaint:"  the anonymous emails Dr. Kelley had received.  *Id.* ¶ 44.  From that point on, Mrs. Kelley contacted Agent Malone to report any additional harassing emails her husband received.  *Id.*

After making an initial attempt to identify the anonymous email sender, FBI agents asked Mrs. Kelley for the login and password to Dr. Kelley's email account to obtain the sender's IP address.  *Id.* ¶ 47.  The amended complaint alleges that the agents assured Mrs. Kelley that they would not access the contents of plaintiffs' emails and that they would only access Dr. Kelley's account to obtain the anonymous sender's IP address by opening the original anonymous email Dr. Kelley received.  *Id.* ¶¶ 47–48.  The Kelleys aver that Mrs. Kelley agreed to give access for that limited purpose, and that she denied the agents' follow-up request that she authorize access to other emails in the account.  *Id.* ¶¶ 49–50.  They further maintain that Dr. Kelley did not

authorize the FBI to access his email account beyond the limited goal of obtaining the IP address, and that Agent Malone periodically assured plaintiffs that the FBI would respect their privacy and would not disclose their names.  *Id.* ¶¶ 45, 51, 54.

In about mid-August, Agent Malone informed Mrs. Kelley that the FBI had identified the anonymous email sender, but he did not provide her with any additional information, despite her requests about obtaining security or protection.  *Id.* ¶ 54.  It was later revealed that Paula Broadwell, the woman who was having an extramarital affair with General Petraeus, had sent the emails.  *See id.* ¶¶ 55–56.  Plaintiffs had never met or spoken to Mrs. Broadwell.  *Id.* ¶ 57.

The amended complaint sets forth a number of grievances that arose in connection with the above events:  plaintiffs complain that the FBI did not provide them with a victims' assistance coordinator or inform them about what was going on in the case.  *Id.* ¶¶ 63, 92–93. They state that the FBI never interviewed Mrs. Broadwell, but it decided not to bring charges against her.  *Id.* ¶¶ 62, 79.  They allege that defendant Sean Joyce – who was at that time the Deputy Director of the FBI overseeing the cyberstalking investigation from Washington – made the decision not to charge Mrs. Broadwell, and that he made the decision before the FBI had interviewed Dr. Kelley.  *Id.* ¶¶ 62, 79.  The amended complaint also notes that during the course of the investigation, the FBI accused Agent Humphries of having an improper relationship with Mrs. Kelley, and that when he attempted to include an affidavit in the case file denying an affair, he was told to remove it.  *Id.* ¶¶ 68, 74–75.

As plaintiffs put it, at some point, they began to feel like they were the subjects of an investigation, not the victims of a crime.  *See id.* ¶ 72.  On August 10, 2012, FBI agents allegedly required Mrs. Kelley to accompany them in an SUV despite her protests that she did not wish to go, denied her the opportunity to contact her attorney, and asked her questions about whether she

had an extramarital affair with General Petraeus.  *Id.* ¶¶ 69–70.  Mrs. Kelley was distressed to learn from Agent Humphries that the FBI had posted a chart on the wall of its Tampa office that depicted Mrs. Kelley at its hub, with spokes drawn out to several senior government and military officials, and that the chart could be seen by anyone in the office.  *Id.* ¶ 76.  And in November 2012, when Mrs. Kelley contacted the FBI's Victim Witness Assistance program to inquire about services, she was informed that a file had once existed, but it had been removed from the victim representative's list of cases for some unknown reason.  *Id.* ¶¶ 94–95.

Then, on November 9, 2012, General Petraeus resigned as Director of the CIA.  *Id.* ¶ 77.  Media outlets reported that General Petraeus resigned as a result of an affair that had been uncovered while the FBI was investigating a complaint lodged by an unnamed individual who had been receiving harassing emails.  *Id.*  But the individual did not remain unnamed for long.  A key allegation in plaintiffs' amended complaint is that it was government, law enforcement, and military officials who identified Mrs. Kelley to the media as the person whose complaint had led to the discovery of the Broadwell–Petraeus affair.  *See, e.g.*, *id.* ¶ 80.  On November 11, 2012, Mrs. Kelley received a fax from Douglas Frantz – who was a journalist for the Washington Post at that time – informing Mrs. Kelley that he had seen some of the harassing emails that Paula Broadwell sent her.  *Id.* ¶¶ 81, 91.  According to the amended complaint, Agent Malone informed Dr. Kelley that the media had received this information from FBI headquarters.  *Id.* ¶ 88.

Plaintiffs also allege that unspecified officials disseminated false information about Mrs. Kelley, including allegations that Mrs. Kelley was involved an affair with General Allen,[4] and

---

4       On January 22, 2013, an internal investigation determined that Mrs. Kelley and General Allen did not have an affair.  Am. Compl. ¶ 89.

they point to two separate occasions where State Department spokesperson Mark Toner denied that Mrs. Kelley had any formal affiliation with the State Department. *Id.* ¶¶ 80, 83–84, 86, 91.

The revelation of plaintiffs' identities resulted in significant media coverage about their personal lives. *Id.* ¶ 96. The Republic of Korea revoked Mrs. Kelley's Honorary Consulship, which deprived her of an annual stipend, *id.* ¶¶ 99, 105, and plaintiffs claim that they suffered other unspecified current and future financial losses. *Id.* ¶¶ 98, 107. The couple increased its security as a result of the media attention, and plaintiffs contend that they now avoid public events and their children's school functions. *Id.* ¶ 102. In the wake of the public disclosure and media speculation about Mrs. Kelley, Mrs. Kelley was no longer accorded privileged access to the MacDill Air Force base. *Id.* ¶ 106.

Based on all of these circumstances and the information reported by the media, plaintiffs believe that at some point, federal agents collected more than the one email that plaintiffs had authorized them to obtain. *Id.* ¶ 58. And since DOD undertook an investigation into whether General Allen had an affair with Mrs. Kelley, plaintiffs allege that the FBI shared those emails with DOD. *Id.* ¶ 82. The emails collected included communications between plaintiffs, General Petraeus, General Allen, and Agent Humphries, as well as other records about plaintiffs' personal lives, and plaintiffs believe that the emails were, and perhaps still are, maintained by the FBI and DOD. *Id.* ¶ 65. Yet plaintiffs state that they were never notified that the government planned to, or had, accessed their emails, and that they were never informed that they were the subjects of an investigation. *Id.* ¶¶ 59–60, 100.

## II.    Procedural History

Plaintiffs filed their original complaint in this case on June 3, 2013, Compl. [Dkt. # 1], and an amended complaint on November 22, 2013. Am. Compl. The amended complaint

advances fourteen counts against various government entities and multiple government officials

in their individual capacities.   Specifically, plaintiffs have lodged the following claims:

- In Count 1, plaintiffs allege that defendants FBI and DOD violated section 552a(b) of the Privacy Act, which prohibits disclosure of any item or information contained within a system of records maintained by the agency, unless disclosure is expressly authorized under the Act.  Am. Compl. ¶¶ 113–24.  Plaintiffs assert this claim, as well as the Privacy Act claims in Counts 2, 4, 5, and 6, through the civil cause of action created in section 552a(g)(1)(D).  *See, e.g.*, Am. Compl. ¶ 121.

- In Count 2, plaintiffs allege that defendants FBI and DOD violated section 552a(e)(1) of the Privacy Act, which requires an agency to "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." 5 U.S.C. § 552a(e)(1); Am. Compl. ¶¶ 125–33.

- In Count 3, plaintiffs bring a claim against defendants FBI and DOD under section 552a(g)(1)(C) of the Privacy Act, which establishes a civil cause of action against an agency that "fails to maintain any record concerning an individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record."  5 U.S.C. § 552a(g)(1)(C); *see also id.* § 552a(e)(5) (setting forth the obligation of an agency to conduct itself in a manner consistent with what is required by section 552a(g)(1)(C)); Am. Compl. ¶¶ 134–41.

- In Count 4, plaintiffs allege that defendants FBI and DOD violated section 552a(e)(7) of the Privacy Act, which provides that an agency must "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C. § 552a(e)(7); Am. Compl. ¶¶ 142–48.

- In Count 5, plaintiffs allege that defendants FBI, DOD, and the State Department violated section 552a(e)(6) of the Privacy Act, which requires that an agency, "prior to disseminating any record about an individual to any person other than an agency, . . . make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes."  5 U.S.C. § 552a(e)(6); Am. Compl. ¶¶ 149–59.

- In Count 6, plaintiffs allege that defendants FBI and DOD violated section 552a(e)(10) of the Privacy Act, which requires agencies to "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to

any individual on whom information is maintained."   5 U.S.C. § 552a(e)(10); Am. Compl. ¶¶ 160–69.

- In Count 7, plaintiffs assert a claim against the United States for violation of section 2707(g) of the Stored Communications Act, which prohibits disclosure of electronic communications that are obtained by the government through compulsion from a third-party service provider unless disclosure is "made in the proper performance of the official functions of the officer or government entity" or the information was previously lawfully disclosed to the public by a government entity or a plaintiff in a civil action, prior to the start of the civil case.  18 U.S.C. § 2707(g); Am. Compl. ¶¶ 170–75.

- In Count 8, plaintiffs assert a claim against the United States for violating the notice provision contained in section 2703(b) of the Stored Communications Act, which, in some circumstances, requires prior notice to a customer or subscriber that the government will intercept his or her electronic communications.  18 U.S.C. § 2703(b); Am. Compl. ¶¶ 176–80.

- In Count 9, plaintiffs assert a *Bivens* claim against defendants Joyce, Malone, and Ibison, as well as the Doe defendants, for a violation of plaintiffs' Fourth Amendment rights to be protected against unlawful searches and seizures.  Am. Compl. ¶¶ 181–88.

- In Count 10, plaintiffs assert a *Bivens* claim against defendants Joyce, Malone, and Ibison, as well as the Doe defendants, claiming that those defendants discriminated against Mrs. Kelley on the basis of her gender in violation of the Fifth Amendment Due Process Clause.  *Id.* ¶¶ 189–97.

- In Count 11, plaintiffs assert a defamation claim under state law against defendants Panetta, Little, and the Does.  *Id.* ¶¶ 198–203.

- In Count 12, plaintiffs assert the state law claim of false light against defendants Panetta, Little, and the Does.  *Id.* ¶¶ 204–10.

- In Count 13, plaintiffs assert a state law claim for intrusion upon seclusion against defendants Joyce, Malone, Ibison, and the Does.  *Id.* ¶¶ 211–17.

- In Count 14, plaintiffs bring a claim under state law for publication of private facts against defendants Panetta, Little, and the Does.  *Id.* ¶¶ 218–25.

Plaintiffs seek only damages for the alleged Privacy Act claims in Counts 1 through 6, *see id.* ¶ 2,[5] and they request only equitable relief with respect to their Stored Communications Act claims.  Pls.' Opp. at 29–30.

Defendants filed two motions to dismiss the amended complaint:  the government entity defendants sought dismissal of Counts 1 through 8 pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defs.' Mot., and individual defendants Joyce, Ibison, and Malone moved to dismiss Counts 9 and 10 on various grounds.  Indiv. Defs.' Mot.  Defendants also filed a Westfall Act certification that, if left unchallenged, would substitute the United States as the defendant in Counts 11 through 14 and require dismissal of the individually named defendants in those counts.  Westfall Act Certification, Ex. 1 to Defs.' Mot. [Dkt. # 34-1].  Plaintiffs opposed both motions.  Pls.' Opp.  They also filed a motion to set aside the Westfall Act certification.  Pls.' Mot. for Order to Set Aside Defs.' Westfall Act Certification [Dkt. # 38].[6]  The Court held oral argument on all of the pending motions on May 23, 2014.

## LEGAL FRAMEWORK

### I.    The Privacy Act

Congress enacted the Privacy Act in 1974 after it determined that, "in order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it [was]

---

5    At the motions hearing, plaintiffs' counsel stated that plaintiffs also seek equitable relief for the Privacy Act violations, such as the relief requested in paragraph F of the Prayer for Relief.  *See* Am. Compl., Prayer for Relief, ¶ F.  But this Circuit has made clear that equitable relief is only available for causes of action brought under 5 U.S.C. § 552a(g)(1)(A) or (B), *see Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988), and plaintiffs did not assert any Privacy Act claims under those provisions.  As a result, the Court will dismiss any request for equitable relief connected to the Privacy Act claims.

6    Because the points and authorities in support of the motion to set aside the Westfall Act certification are included within plaintiffs' opposition to the motions to dismiss, the Court will cite to plaintiffs' opposition when discussing the motion to set aside the Westfall Act certification.

necessary . . . to regulate the collection, maintenance, use, and dissemination of information by such agencies."  Privacy Act of 1974, § 2(a)(5), 88 Stat. 1896 (codified at 5 U.S.C. § 552a).  The Act sets forth detailed instructions on how agencies should manage their records, 5 U.S.C. § 552a(e), and when, if ever, information from those records may be disclosed.  *Id.* § 552a(b). The Privacy Act also provides "civil relief to individuals aggrieved by failures on the Government's part to comply with [those] requirements."  *Doe v. Chao*, 540 U.S. 614, 618 (2004).

The civil remedies available to individuals affected by the violation of one of the substantive provisions of the Privacy Act are governed by section 552a(g)(1).  As the Supreme Court has explained:

> The first two categories [of section 552a(g)(1)] cover deficient management of records:  subsection (g)(1)(A) provides for the correction of any inaccurate or other improper material in a record, and subsection (g)(1)(B) provides a right of access against any agency refusing to allow an individual to inspect a record kept on him. . . .  The two remaining categories deal with derelictions having consequences beyond the statutory violations *per se*.  Subsection (g)(1)(C) describes an agency's failure to maintain an adequate record on an individual, when the result is a determination "adverse" to that person.  Subsection (g)(1)(D) speaks of a violation when someone suffers an "adverse effect" from any other failure to hew to the terms of the Act.

*Chao*, 540 U.S. at 618–19; *see also* 5 U.S.C. § 552a(g)(1)(A)–(D).[7]

The type of relief that would be available to a successful Privacy Act claimant is governed by the subsection of 552a(g)(1)(A)–(D) that underlies the suit. Section 552a(g)(2)–(3) provides for equitable relief if a plaintiff succeeds on a claim brought under section 552a(g)(1)(A) or (B), and section 552a(g)(4) lists the remedies available for suits brought under section 552a(g)(1)(C) or (D). Section 552a(g)(4) provides:

> In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

---

[7]     Section 552a(g)(1) provides:

> Whenever an agency
>
> (A)   makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;
>
> (B)   refuses to comply with an individual request under subsection (d)(1) of this section;
>
> (C)   fails to maintain any record concerning an individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or
>
> (D)   fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,
>
> the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1)(A)–(D).

13

    (A)   Actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

    (B)   The costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4).

In light of these provisions, a Privacy Act plaintiff can only obtain equitable relief for a claim brought under section 552a(g)(1)(A) to correct inaccurate or improper material contained in a record, or under section 552a(g)(1)(B) to gain access to a record after the agency denies an inspection request. And claims brought under section 552a(g)(1)(C) and (D) will only result in monetary relief. *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs . . . .") (citation omitted); *Am. Fed'n of Gov't Emps. v. Hawley*, 543 F. Supp. 2d 44, 54 (D.D.C. 2008) (same).

Moreover, when a Privacy Act claim is asserted under section 552a(g)(1)(C) or (D) and is therefore brought to secure money damages against the United States under section 552a(g)(4), recovery is conditioned on the plaintiff's ability to prove that "the agency acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). Accordingly, intentional and willful misconduct is an element that must be pleaded and supported by sufficient facts to state a claim for relief under section 552a(g)(1)(C) or (D) of the Privacy Act. *See Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1006 (D.C. Cir. 2009); *Sussman*, 494 F.3d at 1122.

## II.    Stored Communications Act

The Stored Communications Act ("SCA") governs voluntary and compelled disclosure of wire and electronic communications and transactional records held by third-party electronic

communication service providers or providers of remote computing services.  18 U.S.C. § 2701 *et seq*.  Put differently, the SCA delineates when a third-party, such as an email service, may disclose the contents of its customers' electronic communications, such as emails, or other record information about those communications, such as the name of the person who owns the email account.  *Id.*

Section 2703 governs compelled disclosures of the contents of, or record information about, wire or electronic communications.  *Id.* § 2703.  If the government seeks to obtain the contents of an electronic communication that has been in electronic storage for 180 days or less, it must obtain a warrant in accordance with the Federal Rules of Criminal Procedure.  *Id.* § 2703(a).  But if the government wishes to obtain the contents of an electronic communication that has been in electronic storage for more than 180 days, the agency involved has two choices: (A) it can obtain a warrant that meets the requirements of the Federal Rules, in which case it does not need to provide prior notice to the customer or subscriber that it is accessing the contents of that individual's electronic communications, *id.* § 2703(b)(1)(A); or (B) it can provide notice to the subscriber or customer and then either issue an administrative subpoena or obtain a court order pursuant to section 2703(d).  *Id.* § 2703(b)(1)(B)(i)–(ii).

The SCA also provides for civil remedies in the event that the Act's provisions are violated.  Section 2707 provides for a civil cause of action where the violation of the Act's requirements was "engaged in with a knowing or intentional state of mind" and was committed by any "person or entity, other than the United States."  *Id.* § 2707(a).  The relief available under section 2707(a) includes:  "(1) such preliminary and other equitable or declaratory relief as may be appropriate; (2) damages under subsection (c); and (3) a reasonable attorney's fee and other litigation costs reasonably incurred."  *Id.* § 2707(b)(1)–(3).

Section 2712 provides that a civil cause of action "against the United States to recover money damages" may be brought by "any person who is aggrieved by any willful violation of the Act." *Id.* § 2712(a). But as a prerequisite to bringing an action under this section, the plaintiff must first present the claims "to the appropriate department or agency under the procedures of the Federal Tort Claims Act, as set forth in title 28, United States Code." *Id.* § 2712(b)(1). Once that requirement is satisfied, section 2712 authorizes a court to award a successful plaintiff damages in the form of "actual damages, but not less than $10,000, whichever amount is greater; and litigation costs, reasonably incurred." *Id.* Congress specified that this was to be an exclusive remedy for governmental violations of the SCA: "Any action against the United States under this subsection shall be the exclusive remedy against the United States for any claims within the purview of this section." *Id.* § 2712(d).

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Federal Rule of Civil Procedure 12(b)(1) or Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## I.      Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint."  *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm.*, *Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.      Failure to State a Claim

"To survive a [Rule 12(b)(6] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678.   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   *Id.*   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"   *Id.* at 679, quoting Fed. R. Civ. P. 8(a)(2).   A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.* at 678, quoting *Twombly*, 550 U.S. at 555, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."   *Id.*   In ruling upon a motion to dismiss, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."   *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

**I.**   **The Court will dismiss Counts 2 through 6 and part of Count 1 for failure to state a claim upon which relief can be granted.**

The first six counts of the amended complaint assert that defendants FBI and DOD violated various provisions of the Privacy Act:   Count 1 alleges that defendants disclosed information about plaintiffs contained in a system, or systems, of records maintained by the agencies in violation of section 552a(b), Am. Compl. ¶¶ 113–24; Count 2 complains that they maintained records about plaintiffs that were not relevant or necessary to accomplish their

statutory purposes in violation of section 552a(e)(1), *id.* ¶¶ 125–33; Count 3 states that defendants failed to maintain records about plaintiffs with the accuracy, relevance, timeliness, and completeness that was reasonably necessary to assure fairness to plaintiffs in any determination made in reliance on those records in violation of section 552a(e)(5) and section 552a(g)(1)(C), *id.* ¶¶ 134–41; Count 4 contends that defendants collected records about plaintiffs' exercises of their First Amendment rights in violation of section 552a(e)(7), *id.* ¶¶ 142–48; Count 5 posits that defendants failed, prior to disseminating information or records about plaintiffs, to ensure that the records were accurate, complete, timely, and relevant for agency purposes in violation of section 552a(e)(6), *id.* ¶¶ 149–59; and Count 6 claims that defendants failed to establish appropriate safeguards to insure the security and confidentiality of the records kept about plaintiffs in violation of section 552a(e)(10). *Id.* ¶¶ 160–69. Count 5, which concerns the accuracy of disseminated information, is asserted against defendant State Department as well. *Id.* ¶¶ 149–59.

Plaintiffs bring the six counts under section 552a(g)(1)(C)–(D), *see id.* ¶¶ 121, 130, 135, 138, 145, 156, 166, which permits civil suits against the United States for violations of the Privacy Act, and they seek monetary damages pursuant to section 552a(g)(4). *See id.* ¶ 2 (noting that their complaint against the FBI, DOD, and the State Department is "for money damages for violations of Plaintiffs' privacy rights under the Privacy Act"); *id.* ¶ B; *see also* 5 U.S.C. § 552a(g)(4).

Defendants moved to dismiss Counts 1 through 6 based on several pleading deficiencies as well as on the grounds that plaintiffs cannot obtain the relief they request in those counts.[8] Defs.' Mot. at 17–45.  Because the Court finds that plaintiffs have not adequately pleaded that the conduct underlying that portion of Count 1 that is predicated on the FBI's disclosure of records to DOD, or the conduct that gives rise to Counts 2 to 6, was intentional and willful, the Court will grant defendants' motion to dismiss those counts for failure to state a claim.

But the Court will deny defendants' motion to dismiss Count 1 to the extent that it claims that defendants FBI and DOD violated section 552a(b) when they allegedly disclosed information to the media.  Eventually, plaintiffs will need to come forward with specific information linking the alleged disclosures to defendants FBI and DOD, as opposed to "unnamed" government sources, but they have met their burden at this time to allege sufficient facts to support a plausible inference that the disclosures came from defendants and were intentional and willful, as well as sufficient facts to support an inference that whoever disclosed the information actually retrieved it from a protected Privacy Act system of records.

> **A.   Plaintiffs failed to allege sufficient facts to support an inference that defendants acted intentionally and willfully with respect to the Privacy Act violations alleged in part of Count 1 and the entirety of Counts 2 through 6.**

In order to state a Privacy Act claim that would entitle plaintiffs to monetary damages for the actions of the FBI, DOD, or the State Department, plaintiffs are required to establish that defendants "acted in a manner which was intentional or willful" when committing the alleged violations.  5 U.S.C. § 552a(g)(4); *see also White v. Office of Pers. Mgmt.*, 840 F.2d 85, 87 (D.C.

---

8     Because the Court finds that plaintiffs failed to plead sufficient facts in support of Count 1 (to the extent it asserts wrongful disclosure of records from the FBI to DOD) and Counts 2 through 6, the Court will not address many of defendants' arguments in support of their motion to dismiss.

Cir. 1988) ("[D]ismissal of a damages claim under the Privacy Act is proper where the complaint fails to allege" sufficiently "the willful or intentional manner of the agency action.").

Although in most cases there will be no question "that the agency acted 'intentionally' and 'willfully' in the generic sense of those words[,] . . . the words 'intentional' and 'willful' in § 552a(g)(4) do not have their vernacular meanings; instead, they are terms of art." *White*, 840 F.2d at 87. This Circuit has adopted a definition of "intentional" and "willful" for purposes of section 552a(g)(4) that requires an agency to have either committed an act "without grounds for believing it to be lawful" or in a manner that "flagrantly disregard[ed] others' rights under the Act." *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984). The Court of Appeals has elaborated on that test and explained that the plaintiff must plead sufficient facts to support a plausible inference that the defendant's conduct was "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful" in order to survive a motion to dismiss. *Toolasprashad v. BOP*, 286 F.3d 576, 584 (D.C. Cir. 2002) (internal quotation marks and citation omitted); *see also Feldman v. CIA*, 797 F. Supp. 2d 29, 42 (D.D.C. 2011); *Ciralsky v. CIA*, 689 F. Supp. 2d 141, 159 (D.D.C. 2010); *Peter B. v. CIA*, 620 F. Supp. 2d 58, 75 (D.D.C. 2009).

It is true that the talismanic words "willful" and "intentional" appear in the amended complaint, *see* Am. Compl. ¶¶ 6, 73, 80, 119, 123, 132, 140, 147, 158, but those allegations cannot satisfy plaintiffs' pleading burden because they are nothing more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678. And for the same reason, the summary allegations that defendants should have known that their conduct was improper cannot themselves create an inference of intentional and willful misconduct. *See* Am. Compl. ¶¶ 131, 139, 146, 157, 167.

Moreover, although the Court must accept plaintiffs' factual allegations as true for purposes of the motion to dismiss, it need not accept legal conclusions cast in the form of factual allegations. *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010), quoting *Iqbal*, 556 U.S. at 678 ("For legal conclusions, . . . 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable.'"). Thus, many of plaintiffs' allegations in support of their Privacy Act claims do not fill in the gap:

- "At no point did the government have any basis in law or fact for either of the Kelleys to be investigated as the subjects or targets of any FBI's criminal probe." Am. Compl. ¶ 61.

- "[G]overnment agents misused the emails obtained through overbroad search and seizure to conduct a scurrilous investigation into Mrs. Kelley's private life that had no bearing on any legitimate concern to the FBI." *Id.* ¶ 67; *see also id.* ¶ 66 (asserting that "the government searched, obtained, and reviewed personal, irrelevant private emails belonging to the Kelleys").

- "[T]he FBI intentionally or recklessly maintained inaccurate information in their records about the Kelleys." *Id.* ¶ 73.

- "No government official had any legal basis to release the Kelleys' names, or to publicly disclose, discuss, and adversely characterize their emails and other information." *Id.* ¶ 97.

- "[T]he DOD did not have a need for the Kelleys' records in the performance of their duties, and no lawful exception authorized the disclosure of the Kelleys'' [sic] records to the DOD." *Id.* ¶ 118.

- "[T]he FBI and DOD unlawfully and recklessly disseminated inaccurate, derogatory, and irrelevant information obtained from a protected system of records to media members and other third parties who were not authorized to receive such information." *Id.* ¶ 119.

- "No lawful exception authorized such damaging media disclosures." *Id.* ¶ 120.

When one distills the purely factual allegations from the amended complaint after the conclusory and legal ones have been stripped away and – reading them in the light most favorable to the plaintiffs – tests them against the definition of "intentional and willful" that applies in this Circuit, it becomes plain that plaintiffs have not alleged sufficient facts to support

more than one narrow Privacy Act claim.   The Court cannot conclude that the amended complaint gives rise to a plausible inference that the defendants intentionally and willfully violated section 552a(b) when defendant FBI made the alleged disclosures to defendant DOD, or that they intentionally or willfully violated sections 552a(e)(1), (e)(5), (g)(1)(C), (e)(6), (e)(7), and (e)(10).   But it does find that plaintiffs set forth sufficient facts about the alleged disclosure of information about plaintiffs to the media to overcome the low threshold at the motion to dismiss stage and create an inference of intentional and willful misconduct that allows that part of Count 1 to proceed.

       1.    <u>Plaintiffs' unlawful disclosure claim will be dismissed in part.</u>

Count 1 of the amended complaint asserts that defendant FBI violated the Privacy Act's disclosure provision, *see* 5 U.S.C. § 552a(b), when it "shared records on the Kelleys with DOD," and that both defendants FBI and DOD violated the same provision when they shared "records [about plaintiffs] and information contained therein with the media."   Am. Compl. ¶ 117.   The Court finds that there are no factual allegations to support an inference of intentional and willful misconduct with respect to the FBI's alleged disclosure of records about plaintiffs to defendant DOD, but that the allegations are sufficient to state a plausible claim arising out of disclosures to the press.

As part of its factual recitation, the amended complaint quotes a newspaper article that reports that former DOD General Counsel Jeh Johnson stated he received the email exchanges between Mrs. Kelley and General Allen from the FBI, and that the FBI believed the emails "might be of interest to the Department of Defense" because they suggested "'a potentially inappropriate relationship involving a military officer.'"   *See* Am. Compl. ¶¶ 5, 11, 82, citing Howard Altman, *Feds Won't Revisit Socialite Kelley's Emails*, Tampa Tribune, July 3, 2013

("Altman Article"), *available at* http://tbo.com/list/military-news/feds-wont-revisit-socialite-kelleys-emails-20130703/.  He noted that it is a violation of the Uniform Code of Military Justice "for a married service member to have an affair."[9]  *See* Altman Article, Tampa Tribune, *available at* http://tbo.com/list/military-news/feds-wont-revisit-socialite-kelleys-emails-20130703/.  As a result, Mr. Johnson went on to explain that after he reviewed the emails, "he concluded that they showed 'a potentially inappropriate relationship' between [Mrs.] Kelley and Allen," and that "he had no choice but to turn over the email exchange to the Defense Department's Office of Inspector General to investigate."  *Id.*

The Privacy Act contemplates that an agency may disclose records "to another agency . . . for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought."  5 U.S.C. § 552a(b)(7).  Whether or not the facts will ultimately demonstrate that the material was shared in the absence of a request, and that the Privacy Act was violated in this instance, the allegations in the amended complaint do not support the necessary additional element that the FBI intentionally and willfully violated the disclosure provision when it provided plaintiffs' emails to defendant DOD.   The interview that is incorporated into plaintiffs' own allegations sets out the lawful purpose underlying the disclosure to the Department of Defense, and the facts alleged, even when viewed in the light most favorable to the plaintiffs,  do not support a finding of a flagrant or egregious disregard of

---

9       Ordinarily when evaluating a Rule 12(b)(6) motion to dismiss, the Court may not look outside the complaint.  But where the complaint incorporates documents by reference, those documents "become a part of the incorporating document just as if it were set out in full.'" *United States v. Sci. Applications Int'l Corp.*, 502 F. Supp. 2d 75, 78 (D.D.C. 2007), quoting *Air Line Pilots Ass'n v. Delta Air Lines*, 863 F.2d 87, 94 (D.C. Cir. 1988).

plaintiffs' privacy rights.   As a result, the Court finds that the amended complaint does not support an inference that defendant FBI intentionally and willfully violated the Privacy Act's disclosure limitations by disclosing records about plaintiffs to defendant DOD, and it will dismiss Count 1 to the extent that it is premised on that disclosure.

But providing information to the media is not among the list of permissible disclosures listed in the Privacy Act.   *See* 5 U.S.C. § 552a(b).   While it may prove to be the case that the media sensationalized the facts and seasoned its coverage of these events with sexual innuendo on its own, plaintiffs do point to several press accounts that identify the sources as unnamed government or military officials.   *See, e.g.*, Am. Compl. ¶¶ 4, 83, 84, 117.   Plaintiffs claim that they specifically expressed concerns about their privacy to Agent Malone, and that Agent Malone repeatedly assured them that the FBI would not disclose their names.   *Id.* ¶¶ 45, 52, 54. The amended complaint further alleges that plaintiffs never consented to the disclosure of information from their files.   *Id.* ¶ 116.   Resolving any inferences arising out of these facts in favor of the plaintiffs, the Court finds that plaintiffs have alleged enough facts to support a plausible Privacy Act claim for disclosures to the media, and that the sufficiency of these allegations – several of which are based "upon information and belief" – will be more appropriately tested after more facts have been uncovered.[10]

2.      Plaintiffs' maintenance claims will be dismissed.

Counts 2 through 5 of the amended complaint are brought under separate provisions of the Privacy Act, but all allege that the defendants maintained inaccurate or irrelevant records about the plaintiffs.   *See* Am. Compl. ¶¶ 125–59 (alleging violations of 5 U.S.C. §552a(e)(1),

---

10      *See, e.g.*, Am. Compl. ¶ 83 ("Upon information and belief, by November 12, 2012, United States government sources had fed the media absolutely egregious, spurious, and false 'facts' that generated even more frenetic speculation about Mrs. Kelley's life . . . .").

(5), (6), and (7), and (g)(1)(C)).   To succeed on any of these counts, plaintiffs must allege sufficient facts to support a plausible inference of intentional and willful conduct, and the amended complaint falls short in this respect.

In support of their improper maintenance claims, plaintiffs primarily advance a series of legal conclusions that need not be considered for *Iqbal* purposes, but the allegations do include the following factual assertions:

- According to a newspaper article, former DOD General Counsel Jeh Johnson said in an interview that the emails that defendant DOD received from defendant FBI "were not germane to Kelley's [cyberstalking] complaint."  Am. Compl. ¶ 5 (alteration in original); *see also id.* ¶ 11.

- In the same article, Mr. Johnson was quoted as saying that plaintiffs' emails did not demonstrate "'any breach of national security,' and that further investigation could be an invasion of privacy." *Id.* ¶ 82.

- State Department spokesperson Mark Toner "stated on November 13, and again on November 15, 2012, that Mrs. Kelley had 'no formal affiliation with the State Department;'" Mrs. Kelley became Honorary Consul for the Republic of Korea in August 2012, which means she had to submit to a State Department security clearance and approval process and was issued an identification card as well as a license plate noting her status; and Mr. Toner did not mention that Mrs. Kelley went through that process or bore those identifiers.  *Id.* ¶¶ 6, 12, 36, 86–87.

- The FBI accused Agent Humphries of having an affair with Mrs. Kelley, ordered him to compose an affidavit, and then "forced [Agent Humphries] to remove his statement denying the affair."  *Id.* ¶ 68; *see also id.* ¶¶ 74–75, 136, 152.

- "Defendants maintained private information about [plaintiffs], including their personal relationships, financial dealings, and personal communications, that were not relevant to the Kelleys' cyberstalking report nor to the investigation of any other criminal activity, present or national security concern, or any other legitimate purpose of the FBI or the DOD." *Id.* ¶ 127.

- Defendants "may still maintain information in their records that is irrelevant and unnecessary to the purposes of their agencies." *Id.* ¶ 128.

- Defendants have records regarding plaintiffs' personal lives and social connections that include inaccurate descriptions and summaries of Mrs. Kelley's communications with General Allen.  *Id.* ¶ 136; *see also id.* ¶ 152 (noting that defendants collected and

maintained a vast amount of personal information about, and communications by, plaintiffs).

While these allegations might support an inference that the agencies cast their net too broadly or that the information they amassed was not entirely accurate, they do not rise to the level of the flagrant and obvious disregard needed to support a claim for damages under the Privacy Act. *Compare* Am. Compl., *with Feldman*, 797 F. Supp. 2d at 42 (finding an inference of intentional and willful misconduct because the "thrust of the plaintiff's Complaint [was] that his rivals within the CIA and NRO persecuted him by ginning up a misconduct investigation against him and then leaking details of that investigation in violation of the Privacy Act").

First, although the amended complaint alleges that the set of records collected about the plaintiffs' personal lives was more extensive than what plaintiffs posit was needed to pursue the investigation into the anonymous emails, it does not necessarily follow that the information was irrelevant to any lawful FBI or DOD purpose. Plaintiffs' conclusory statement that there was no legal basis for the FBI to investigate them does not constitute evidence that defendants intentionally and willfully violated the Privacy Act, and the Court need not accept that "sweeping and unwarranted averment[] of fact." *Ciralsky*, 689 F. Supp. 2d at 159. It was not obviously illegal to seek to understand the nature and scope of the relationships revealed by the Broadwell emails in order to ascertain whether those relationships presented any concerns.

Second, the very article that forms the basis for plaintiffs' amended complaint spells out the justification for the inquiry undertaken by the defendants, and it contradicts the notion that defendants intentionally and willfully violated the Privacy Act. The amended complaint quotes the portion of an interview in which the former DOD General Counsel expressed his view that it was not necessary to re-open an investigation into the relationship between Mrs. Kelley and General Allen and that doing so would be an invasion of privacy. Am. Compl. ¶ 5. But the key

word in that sentence is *re*-open; the Defense Department lawyer was simply opining that a *second* investigation would have been unnecessary given what was unearthed the first time. That statement plainly cannot be categorized as a factual allegation supporting the inference that the *original* investigation was obviously invalid. Moreover, plaintiffs ignore the portions of the article where Mr. Johnson explained that the emails showed "a potentially inappropriate relationship" and that an investigation ensued because it would have been a violation of the Uniform Code of Military Justice for a married service member to have had an affair. Altman Article, Tampa Tribune, *available at* http://tbo.com/list/military-news/feds-wont-revisit-socialite-kelleys-emails-20130703/.

Plaintiffs point to the statement in the article that explains that the review of the emails did not ultimately uncover any breach of national security. Am. Compl. ¶ 82. But again, that does not mean that it was obviously improper to conduct the investigation in the first place, or that defendants should have known that their conduct was illegal.[11]

Plaintiffs' allegation that the FBI directed Agent Humphries to remove his denial of an affair with Mrs. Kelley from his affidavit does not support an inference of an intentional and

---

[11] Plaintiffs devote a substantial part of the amended complaint to itemizing the various ways they believe they were mistreated during the course of the investigation. *See* Am. Compl. ¶¶ 54, 60, 62–64, 69–72, 76, 79, 92–93. But plaintiffs' generalized grievances about the course of the investigation into the anonymous emails – such as the complaints about the FBI's failure to keep them informed, the decision to question Mrs. Kelley in an SUV, or the agents' posting of a chart in their office that depicted the various relationships that were coming to light – do not supply the missing factual predicate for their claim that the FBI intentionally and willfully violated the provisions in the Privacy Act that prohibit the collection and maintenance of irrelevant or inaccurate records.

Plaintiffs also assert that the agents violated the FBI's Domestic Investigations and Operations Guide. *Id.* ¶¶ 13, 112. It is not clear that the agency's breach of its internal policies would give rise to a private right of action under the Privacy Act, but in any event, plaintiffs simply quote the broad directive that the agency should tailor investigations to avoid unnecessarily violating the rights of individuals, and they do not set forth specific factual allegations to support their conclusory claim that the Guide was violated. *See id.* ¶ 13.

willful violation of the Privacy Act either.  As the amended complaint reiterates several times, one of the requirements of the Privacy Act is that records about an individual must contain only relevant information.  Without any indication that such a denial would be relevant to the material maintained by defendants that concerned plaintiffs, the Court cannot conclude that defendants' conduct in asking Agent Humphries to remove that statement was so egregious and unlawful that anyone taking that step should have known it was unlawful.[12]

Accordingly, the Court finds that plaintiffs failed to plead sufficient facts to support a plausible inference that defendants willfully and intentionally violated the Privacy Act as set forth in Counts 2 through 5, and it will grant defendants' motion to dismiss those counts.

---

[12]    The dismissal of Counts 2 through 6 and a portion of Count 1 is predicated upon the failure to plead facts to support willful and intentional misconduct, but there are several other problems with plaintiffs' Privacy Act claims.  For example, Count 3 brings a claim under section 552a(g)(1)(C), complaining that defendants failed to maintain records about plaintiffs with the accuracy that would be necessary to assure fairness in any determination made in reliance on those records.  Plaintiffs point to several decisions, such as the FBI's denial of victims' assistance or the revocation of Mrs. Kelley's privileged access to MacDill Air Force Base, as adverse determinations that were issued in the wake of defendants' actions. Pls.' Opp. at 16–17.  But the Privacy Act is not implicated whenever an individual suffers an undesirable consequence; section 552a(g)(1)(C) only provides a remedy when inaccurate record keeping undermines the fairness of a determination "that may be made on the basis of such record."  5 U.S.C.  § 552a(g)(1)(C).   And there is no indication that either the FBI or the DOD investigative file was compiled for the purpose of making the sorts of decisions identified by plaintiffs.

Similarly, the Court questions the sufficiency of the showing in support of Count 4, which asserts that defendants violated the Privacy Act's proscription against maintaining records "describing how any individual exercises rights guaranteed by the First Amendment."  5 U.S.C. § 552a(e)(7).  Although plaintiffs argue that their emails necessarily involve speech and that they may shed light upon their associations, there are no factual allegations that indicate that the emails, which the amended complaint repeatedly insists were purely "personal," should be considered to be an exercise of plaintiffs' First Amendment rights.  Nor is there any indication that any defendant maintained or was involved in generating any record "describing how [plaintiffs] exercise" their rights.

3. Plaintiffs' claim that defendants failed to establish appropriate safeguards to protect the confidentiality of the information in their records will be dismissed.

Count 6 of the amended complaint sets forth plaintiffs' final Privacy Act claim. It contends that defendants willfully violated section 552a(e)(10) of the Privacy Act, which requires an agency to "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." 5 U.S.C. § 552a(e)(10). Plaintiffs support this claim by pointing to the alleged disclosures that make up Count 1, and they argue that the amended complaint establishes an inference of intentional and willful failure to create appropriate safeguards because those disclosures demonstrate a "repeated, egregious pattern of leaks from anonymous and unnamed sources ranking at the very top of the Defendants' leadership structure, not just one accidental breach of discretion that internal rules failed to prevent." Pls.' Opp. at 27. But the facts in the amended complaint do not rise to this level.

Plaintiffs rely on two cases to support their position that the amended complaint creates an inference of intentional and willful misconduct: *Pilon v. DOJ*, 796 F. Supp. 7 (D.D.C. 1992), and *Ciralsky v. CIA*, 689 F. Supp. 2d 141 (D.D.C. 2010). *See* Pls.' Opp. at 27. But both of those cases involved facts not present here that justified an inference that the failure to establish appropriate safeguards was intentional and willful. For example, in *Pilon*, the plaintiff "pleaded that the disclosures which [were] the subject of [the] lawsuit occurred after the Department became aware of several prior disclosures regarding [the] plaintiff and several requests for investigation and corrective action." 796 F. Supp. at 12–13. And in *Ciralsky*, the court found an inference of intentional and willful misconduct because the agency's "handling of [the

plaintiff's] records involved various breakdowns and misconduct" over time and that, if the safeguards had been properly established, those "failures would not have occurred."   689 F. Supp. 2d at 159.

Here, plaintiffs point to a series of media accounts that appeared in rapid succession over a period of two days, and there are no facts in the amended complaint from which the Court can infer that defendant FBI or defendant DOD knew that unlawful disclosures were being made and permitted them to continue.   Moreover, there is nothing in the amended complaint that would tend to show that the multiple media accounts were not all quoting the same source or handful of sources, or that the second wave of articles was based on sources at all rather than mere reiterations of information already reported elsewhere.   Accordingly, the Court finds that plaintiffs' citation of multiple articles does not suffice to create an inference of intentional and willful failure to establish safeguards, especially since the entities involved already had several published safeguards in place.   *See Hawley*, 543 F. Supp. 2d at 52 (finding an inference of intentional and willful misconduct because "Plaintiffs' allegations, if proven, would support a finding that defendants were warned of the deficiencies in their information security but failed to establish proper safeguards"); *Chambers v. U.S. Dep't of Interior*, 538 F. Supp. 2d 262, 268 (D.D.C. 2008) (dismissing the plaintiff's section 552a(e)(10) claim because the "complaint contain[ed] no specific allegations as to how the DOI" failed to meet its "procedural obligations"), *rev'd on other grounds*, 568 F.3d 998 (D.C. Cir. 2009); *see also* Defs.' Mot. at 41–44 (listing the published safeguards already in place).   Count 6 will therefore be dismissed.

**B.      Plaintiffs pleaded sufficient facts to support an inference that defendants actually retrieved information from a Privacy Act system of records that defendants then disclosed to the media in violation of section 552a(b).**

Since one Privacy Act count remains – the unlawful disclosure to the media set forth in Count 1 – the Court must go on to consider the other grounds advanced by defendants in support of their motion to dismiss.

To bring an unlawful disclosure claim under the Privacy Act, "a plaintiff 'must show that (1) the disclosed information is a 'record' contained within a 'system of records'; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff.'" *Cloonan v. Holder*, 768 F. Supp. 2d 154, 163 (D.D.C. 2011), quoting *Doe v. U.S. Dep't of Treasury*, 706 F. Supp. 2d 1, 6 (D.D.C. 2009). Defendants argue that plaintiffs failed to allege sufficient facts to show that the information defendants allegedly disclosed was actually retrieved from a system of records as that term is defined by the Privacy Act. Defs.' Mot. at 17–20. The Court will not dismiss the remaining portion of Count 1 on this basis.

Section 552a(b) of the Privacy Act makes it unlawful for an agency to disclose a record "which is contained in a system of records" except under certain circumstances. 5 U.S.C. § 552a(b). Thus, one of the essential elements of an unlawful disclosure claim is that the defendant actually retrieved the disclosed information from a system of records.[13] *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010). A system of records is defined by the Act as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5).

---

13      In limited circumstances, the D.C. Circuit has held that a plaintiff need not show actual retrieval of the records. *See Bartel v. FAA*, 725 F.2d 1403 (D.C. Cir. 1984).

Here, plaintiffs allege:  (1) "[i]nformation regarding the Kelleys and their report to the FBI of threatening and harassing cyberstalking is maintained within one or more Privacy Act systems of records retrievable by use of the Kelleys' names or by some identifying number, symbol or other identifying particular assigned to Plaintiffs," Am. Compl. ¶ 114; (2) "[u]pon information and belief, on one or more occasions . . . the FBI shared records on the Kelleys with the DOD, and both shared these records and information contained therein with the media," *id.* ¶ 117; and (3) "[u]pon information and belief, on one or more occasions . . . numerous employees of the FBI and the DOD . . . disseminated . . . information obtained from a protected system of records to media members and other third parties who were not authorized to receive such information." *Id.* ¶ 119.  The amended complaint also asserts that plaintiffs "received a fax from a national newspaper in which the journalist stated that '[w]e have now seen some of the harassing e-mails she [Paula Broadwell] sent you," *id.* ¶ 81, and it cites several newspaper articles that attribute private information about plaintiffs to government sources.  *Id.* ¶¶ 80, 84–85, 88, 91.

While this is all somewhat conclusory, if one considers the amended complaint as a whole and views the facts in the light most favorable to plaintiffs, the allegations give rise to a plausible inference of actual retrieval insofar as the amended complaint alleges that defendants FBI and DOD violated the Privacy Act by disclosing information to the media.  The pleading alleges that plaintiffs lodged a complaint with the FBI, that the FBI undertook a specific investigation at plaintiffs' behest, that there was an agent in charge of the matter, that DOD received records about plaintiffs from the FBI, and that officials within DOD reviewed them. *See, e.g.*, *id.* ¶¶ 44, 46–47, 82.  These circumstances support the notion that one or both agencies maintained a group of records assigned to plaintiffs in some identifiable way.  This inference is

reinforced by the specific accusation that a newspaper reporter claimed to plaintiffs that he was in possession of the emails that are or were likely contained in defendants' systems of records. *See Feldman*, 797 F. Supp. 2d at 41.

Defendants' argument that the disclosed information could have come from sources other than a system of records does not warrant a different conclusion.  While plaintiffs will need to amass sufficient evidence to meet their burden of proof as the case proceeds, they need not do so at the pleading stage.[14]  *See id.*, quoting *Twombly*, 550 U.S. at 570 ("To survive a motion to dismiss, a plaintiff need only plead 'enough facts to state a claim to relief that is plausible on its face' and to 'nudge[] [his] claims across the line from conceivable to plausible.'").  As a result, the Court will deny defendants' motion to dismiss Count 1 to the extent that it alleges that defendants FBI and DOD violated the Privacy Act by making unauthorized disclosures to the media.[15]

---

14     For this reason, the cases that defendants cite in support of their motion to dismiss Count 1 are distinguishable; they involved the application of the higher burden at the summary judgment stage.  *See* Defs.' Mot. at 17–20.

15     Defendants also argue that Scott Kelley cannot assert a claim for unlawful disclosure because plaintiffs do not allege that the information disclosed was about him.  Defs.' Mot. at 20 n.6.  But the amended complaint states that defendants provided the media with emails from Dr. Kelley's account, *see* Am. Compl. ¶¶ 41–43, 81, and it alleges that protected records about the Kelleys – not just Mrs. Kelley – were disclosed to the media.  *Id.* ¶ 117.

The Court is also not persuaded by defendants' argument that the claims fail because plaintiffs did not specifically plead that the disclosed records were maintained in a "nonexempt" system of records.  Defendants provided this Court with no authority that the unavailability of an exemption is an element that must be pleaded at the outset, and their position is at odds with the D.C. Circuit's holding in *Doe v. FBI*, 936 F.2d 1346 (D.C. Cir. 1991), which suggests that a record's exempt location is an affirmative defense to be raised by the defendant, not a pleading requirement.  This issue may prove to be important at the summary judgment stage, but it does not require the dismissal of Count 1 now.

**II.      The Court will dismiss Counts 7 and 8 for lack of subject matter jurisdiction.**

Counts 7 and 8 of the amended complaint allege that defendant United States violated the

Stored Communications Act ("SCA").   Am. Compl. ¶¶ 170–80.   Specifically, Count 8 alleges

that the government violated section 2703(b) of the SCA when it failed to provide plaintiffs with

notice that it accessed plaintiffs' stored communications, and Count 7 asserts that the

government violated section 2707(g) of that Act when various unnamed government sources

disclosed the content of those communications to the media.   *Id.*   Defendants moved to dismiss

these counts for lack of subject matter jurisdiction, arguing that plaintiffs have not presented

their claims to the appropriate department or agency as required by section 2712(b), and

therefore, sovereign immunity has not been waived.   Defs.' Mot. at 14–16; *see also* 18 U.S.C.

§ 2712(b) ("Any action against the United States under this section may be commenced only

after a claim is presented to the appropriate department or agency under the procedures of the

Federal Tort Claims Act, as set forth in title 28, United States Code.").

Subject matter jurisdiction is a necessary predicate to an exercise of this Court's Article

III power.   *See Kokkonen*, 511 U.S. at 377.   It is statutory in nature, and the party seeking federal

judicial review must establish that it has satisfied at least one of the statutory bases.   *See Lujan*,

504 U.S. at 561.   Additionally, in cases like this one where the defendant is the United States of

America, the plaintiff also bears the burden of establishing that the federal government has

waived its sovereign immunity.   *See Roum v. Bush*, 461 F. Supp. 2d 40, 46 (D.D.C. 2006).

Unless waiver can be established, the court lacks jurisdiction.

Here, the SCA contains a waiver of sovereign immunity in section 2712(a), but that

waiver is limited in two ways.   First, section 2712 creates a cause of action "against the United

States to recover money damages."   18 U.S.C. § 2712(a).   It therefore does not provide a cause

of action against the United States for equitable relief.  *See id.* § 2712(d).  And second, the waiver of sovereign immunity in section 2712 is only triggered after the plaintiff presents his or her claim "to the appropriate department or agency under the procedures of the Federal Tort Claims Act, as set forth in title 28, United States Code."  *Id.* § 2712(b).  As a result, failure to present a claim for violation of the SCA is fatal to a court's subject matter jurisdiction over that claim.

Plaintiffs do not dispute that they did not present their claims before bringing this lawsuit, and they instead argue that presentment is not required in their case because they are seeking injunctive and declaratory relief for defendant United States' violation of the SCA, not monetary damages.  *See* Pls.' Opp. at 29–30.  They contend that section 2712 governs only claims against the United States where monetary damages are sought, and that the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (2012), creates both the vehicle for them to seek equitable relief for the alleged SCA violations as well as the waiver of sovereign immunity needed for the Court to have jurisdiction.  *Id.* at 29–34.  The Court disagrees.

Although the APA often serves as the necessary waiver of sovereign immunity for claims brought by an individual who "suffer[ed a] legal wrong because of agency action, or [was] adversely affected or aggrieved by agency action," it cannot be invoked where another statute "expressly or impliedly forbids the relief which is sought."   5 U.S.C. § 702.   The Stored Communications Act does exactly that.

Congress amended the SCA when it passed the PATRIOT Act in 2001.  *See* Pub. L. No. 107-56 § 223, 115 Stat. 272 (2001).  And in doing so, it took several steps that support the conclusion that the APA cannot serve as a vehicle to bring SCA claims.  First, Congress enacted section 2712, which authorizes suits for monetary damages against the United States for

violations of the SCA.  *Id.*  At the same time, it amended section 2707(a) to specify that a civil action could not be brought against the United States under that section, which is the only section that provides for "other equitable or declaratory relief." *Id.* (amending the existing section 2707(a) to include the words "other than the United States").  Thus, the plain language of the statute reveals that as of 2001, Congress did not intend to permit individuals to pursue equitable remedies against the United States for violations of the SCA.  *See Jewel v. NSA*, 965 F. Supp. 2d 1090, 1109 (D.D.C. 2013).

Second, Congress declared in section 2712(d) that "[a]ny action against the United States under this subsection shall be the exclusive remedy against the United States for any claims within the purview of this section."  18 U.S.C. § 2712(d).  This means that a cause of action brought under section 2712(a) "shall be the exclusive remedy against the United States" for any claim that the United States violated one of the substantive provisions of the SCA.  This is another clear indication that Congress intended to preclude actions under the APA when it enacted section 2712.  This reading is not inconsistent with the legislative history that indicates that Congress sought to strengthen the protection offered to individuals to discourage violations of the SCA by law enforcement, *see* Pls.' Opp. at 33–34, citing *Administration's Draft Anti-Terrorism Act of 2001: Hearing Before the H. Comm. on the Judiciary*, 107th Cong. 17, 27 (2001) (Testimony of Rep. Barney Frank), *and* 147 Cong. Rec. S10,990, S11,007 (daily ed. Oct. 25, 2001); that is the purpose of the damages provision.[16]

---

16    Plaintiffs also point to section 2708 – another exclusivity provision in the SCA – and argue that it does not preclude APA review because it only limits the judicial remedies available for nonconstitutional violations of the SCA.  Pls.' Opp. at 32–33.  The Court finds that section 2712 alone precludes application of the APA here, so section 2708 is irrelevant, but it notes that the limitations in section 2708 would be of little moment anyway since plaintiffs' only SCA claims do not have constitutional underpinnings.  This argument mistakenly conflates the Fourth Amendment claim in Count 9 with the statutory notice and disclosure claims in Counts 7 and 8.

Moreover, plaintiffs argue that they must be able to bring an action for equitable relief to give the Court a basis upon which to order the government to conduct an internal investigation into a violation.  But the SCA already mandates the initiation of an investigation once a court has found a willful violation:

> If a court or appropriate department or agency determines that the United States or any of its departments or agencies has violated any provision of this chapter, and the court or appropriate department or agency finds the circumstances surrounding the violation raise serious questions about whether or not an officer or employee of the United States acted willfully or intentionally with respect to the violation, the department or agency shall, upon receipt of a true and correct copy of the decision and findings of the court or appropriate department or agency promptly initiate a proceeding to determine whether disciplinary action against the officer or employer is warranted.

18 U.S.C. § 2712(c).

In sum, the Court finds that, because plaintiffs may not seek equitable relief against the United States for violations of the SCA and they have not satisfied the presentment requirement for an action for money damages, the Court does not have subject matter jurisdiction over the SCA claims.  The Court will therefore grant defendants' motion to dismiss Counts 7 and 8.[17]

## III.   The Court will dismiss Counts 9 and 10.

Counts 9 and 10 of the amended complaint allege that individual defendants Joyce, Ibison, and Malone violated the Fourth Amendment and the Due Process clause of the Fifth Amendment, and they seek money damages against those individual defendants under *Bivens v.*

---

17    Plaintiffs have asked the Court to grant them limited discovery to determine the scope of the government's access to and disclosure of their emails so that they can quantify their damages for purposes of presentment.  Pls.' Opp. at 34 n.28.  But the Court cannot authorize the parties to embark on discovery on a claim over which it lacks subject matter jurisdiction.

*Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[18]   Am.

Compl. ¶¶ 181–97.   Specifically, Count 9 asserts that defendants Joyce, Ibison, and Malone

violated the Fourth Amendment by searching and seizing plaintiffs' emails without their consent

or judicial authorization.   *Id.* ¶¶ 181–88.   And Count 10 claims that those defendants violated the

Due Process Clause when they allegedly discriminated against Mrs. Kelley on the basis of her

gender.   Plaintiffs complain that this unconstitutional bias prompted the agents to withhold

information from plaintiffs about the status of their complaint, to fail to safeguard confidential

information, to disseminate and repeat mischaracterizations about Mrs. Kelley, to decline to

defend Mrs. Kelley's reputation in the media while publicly supporting General Allen, and to fail

to apologize.   *Id.* ¶¶ 189–97 ("Defendants treated Mrs. Kelley differently than male victims . . .

engaging in a 'blame the victim' strategy to turn her into the subject of an aggressive,

intimidating, and intrusive investigation. . . .   Defendants maliciously and intentionally

characterized Mrs. Kelley as the sexualized 'other woman,' and failed to protect, and indeed

violated, her privacy rights as they focused their investigation on her in search of salacious

information.").

The individual defendants responded to plaintiffs' allegations by filing a separate motion

to dismiss from the one filed by the government entities.   In their motion, the individual

defendants argue that the Court must dismiss Counts 9 and 10 for three reasons:  (1) the Court

should not imply a *Bivens* action for either the alleged Fourth or Fifth Amendment violations, (2)

if the Court does imply a *Bivens* action, defendants Joyce, Ibison, and Malone are entitled to

qualified immunity, and (3) plaintiffs failed to plead sufficient facts connecting the individual

---

18     The amended complaint also asserts these claims against ten John and Jane Doe
individuals.   *See* Am. Compl. ¶¶ 181–97.   For the reasons that follow, these claims will be
dismissed as to all defendants.

defendants personally to the conduct that allegedly violated the Constitution and therefore did not state a claim upon which relief can be granted. Indiv. Defs.' Mot. at 5–26. The Court agrees that it would be improper to imply a *Bivens* cause of action with respect to either the alleged Fourth Amendment or Fifth Amendment claims, and it will therefore dismiss Counts 9 and 10 for that reason.

In *Bivens*, the Supreme Court of the United States created a remedy that permits a plaintiff to bring a damages action against a federal employee in his or her individual capacity for violating the plaintiff's constitutional rights. The Supreme Court has recognized a *Bivens* action in three contexts: for violations of the Fourth Amendment search and seizure clause, *Bivens*, 403 U.S. at 388; for violations of the Fifth Amendment Due Process Clause resulting from sex discrimination in the workplace, *Davis v. Passman*, 442 U.S. 228 (1979); and for violations of the Eighth Amendment prohibition on cruel and usual punishment against a federal prison employee. *Carlson v. Green*, 446 U.S. 14 (1980). But outside of those contexts, the Court has been reluctant to imply a *Bivens* remedy. *Wilson v. Libby*, 535 F.3d 697, 705 (D.C. Cir. 2008), quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) ("[I]n most instances[, the Court has] found a *Bivens* remedy unjustified.").

Contrary to plaintiffs' suggestion in their opposition to defendants' motion, this Court cannot simply approve a *Bivens* action in this case because the Supreme Court has found it appropriate in other cases dealing with search and seizure or sex discrimination. Pls.' Opp. at 51 ("[T]here is no need for this court to weigh the constitutional right against any 'special factors' that might counsel against a remedy; the Supreme Court has already conducted the balancing and recognized the remedy."). The Supreme Court recently made clear in *Minneci v. Pollard* that prior recognition of a *Bivens* claim in one context does not automatically translate into the

availability of a *Bivens* remedy for an alleged violation of the same constitutional provision in a

"fundamentally different" context.   132 S. Ct. 617, 623 (2012), quoting *Corr. Servs. Corp. v.*

*Malesko*, 534 U.S. 61, 70 (2001); *see also Bloem v. Unknown Dep't of Interior Emps.*, 920 F.

Supp. 2d 154, 161, 163–64 (D.D.C. 2013) (recognizing that *Bivens* created a damages cause of

action for some violations of the Fourth Amendment search and seizure clause but conducting an

analysis as to whether the Small Claims Statute nonetheless precluded implication of a *Bivens*

action in that case).

In determining whether to imply a *Bivens* remedy, the Court must first consider

"'whether any alternative, existing process for protecting the [constitutionally recognized]

interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new

and freestanding remedy in damages.'"   *Minneci*, 132 S. Ct. at 621 (alteration in original),

quoting *Wilkie*, 551 U.S. at 550.   If the answer is yes, then the Court should refrain from

recognizing a *Bivens* action in that context.   *See Libby*, 535 F.3d at 708–09.   But even if the

answer is no, the Court must still consider whether there are "any special factors counselling

hesitation before authorizing a new kind of federal litigation."   *Id.* at 708, quoting *Wilkie*, 551

U.S. at 550 (internal quotation marks omitted).   This admonition reflects the understanding that

"a *Bivens* remedy is a subject of judgment," *id.* at 708, quoting *Wilkie*, 551 U.S. at 549, and that

such judicial discretion should be exercised carefully.   *See, e.g.*, *id.* at 704.

When conducting the first inquiry – whether there is an alternative, existing process to

protect the asserted constitutional interest that weighs against finding a *Bivens* action – the court

should focus on "the comprehensiveness of the statutory scheme involved, not the 'adequacy' of

specific remedies extended thereunder."   *Id.* at 706, quoting *Spagnola v. Mathis*, 859 F.2d 223,

227 (D.C. Cir. 1988).   The D.C. Circuit has instructed "that 'courts must withhold their power to

fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has not inadvertently omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies." *Id.*, quoting *Spagnola*, 859 F.2d at 228.

Moreover, it is not necessary for the alternative statutory scheme to provide the exact same remedies that would be available in a *Bivens* action: the Supreme Court has held that it is enough for the statutory scheme to "provide roughly similar incentives for potential defendants to comply with the [constitutional a]mendment while also providing roughly similar compensation to victims for violations." *Minneci*, 132 S. Ct. at 625. And the D.C. Circuit has gone one step further, finding that an alternative statutory process can counsel against implying a *Bivens* claim even if that alternative process affords no remedy. *Libby*, 535 F.3d at 706, citing *Wilkie*, 551 U.S. at 537 (noting that the Supreme Court held in *Wilkie* "that the creation of a *Bivens* remedy is not required solely because there is no alternative statutory remedy"); *id.* at 708–09 ("[A]n equally effective statutory remedy is a sufficient, but not an essential, reason for us to abstain from creating *Bivens* remedies. The presence of a comprehensive remedial scheme is also a sufficient reason for us to stay our hand."); *Spagnola*, 859 F.2d at 228, quoting *Schweiker v. Chilicky*, 487 U.S. 412, 429 (1988) (noting that where Congress has created a statutory scheme and chose not to include damage remedies for certain claimants, "it is not for the judiciary to question whether Congress' 'response [was] the best response, [because] Congress is the body charged with making the inevitable compromises required in the design of a massive and complex . . . program'"). Applying that framework here, the Court finds that it would not be appropriate to imply a *Bivens* remedy for either plaintiffs' Fourth Amendment or Fifth Amendment claim.

A. **The Fourth Amendment violation alleged in Count 9 cannot form the basis of a *Bivens* action because there is an alternative, existing process to protect the asserted constitutional interest.**

The SCA sets out procedures for how the government must go about procuring the contents of wire or electronic communications in electronic storage or in a remote computing service. 18 U.S.C. § 2703(a)–(b). This includes obtaining the contents of emails that are electronically stored in some capacity. And the SCA provides for a civil cause of action against the United States for monetary damages if the Act has been violated. *Id.* § 2712(a). It also establishes a cause of action for both damages and equitable relief against the individual federal employees involved in the violation. *See id.* § 2707(a)–(b). Thus, the SCA creates a cause of action against the United States and its officers for money damages for the same conduct that serves as the basis of plaintiffs' Fourth Amendment *Bivens* claim – that the individual defendants unlawfully searched and seized their emails. The Court therefore finds that the SCA provides a comprehensive remedial scheme that enables plaintiffs to redress the alleged violation of their Fourth Amendment rights, and that it would be improper to imply a *Bivens* remedy in this case.

That conclusion is further bolstered when this case is compared to *Bivens* itself. In *Bivens*, the Court identified four considerations that led to its decision to create a federal mechanism for the vindication of the plaintiff's Fourth Amendment rights instead of simply dispatching him to pursue state law tort claims. *See Bivens*, 403 U.S. at 390–97. First, the Court observed that certain actions might violate the Fourth Amendment but not state law, which gave rise to the risk that a plaintiff would be left without any avenue for redress unless the Court

created a constitutional remedy.[19]  *Id.* at 390–94.  Second, the Court expressed concern that the interests protected by the Fourth Amendment and state law tort claims might differ or even conflict with one another.  *Id.* at 394.  Third, there were no special factors counseling hesitation, such as federal fiscal concerns or, like in *Wheeldin v. Wheeler*, 373 U.S. 647 (1963), concerns about imposing liability upon a congressional employee for allegedly acting in excess of the authority delegated to him by Congress.  *Bivens*, 460 U.S. at 395–97.  And fourth, there was "no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress."  *Id.* at 397.

These considerations do not support implication of a *Bivens* remedy in the context of plaintiffs' Fourth Amendment claims in this case.  With respect to the first and second considerations, the SCA prescribes procedures that regulate government access to private parties' emails.  Any harms to the interests protected by the Fourth Amendment that would arise from the

---

19      The Court has backed away some from this reasoning in recent years.  In *Minneci*, the Supreme Court declined to imply a *Bivens* remedy in the context of an Eighth Amendment cruel and unusual punishment claim against a federal prison worker who was employed by a private company, noting that state tort claims could provide an adequate, alternative remedy because the employee was not protected by immunity.  132 S. Ct. at 626.  The Court then rejected the plaintiff's argument that state law would not cover all of the potential ways that the Eighth Amendment might be violated, stating that if those scenarios did in fact exist, it would reach the issue if and when a particular case arose.  *Id.*

government's unlawful search and seizure of emails would also be redressible under the SCA.[20] The policy interests underlying the constitutional amendment and the statutory provision are the same:  to protect an individual's right to privacy.  *See* Pls.' Opp. at 29, quoting S. Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C.A.A.N. 3555, 3557 (explaining that "Congress enacted the SCA to protect individuals from the 'technological advances in surveillance devices and techniques' that 'ma[de] it possible for overzealous law enforcement agencies, industrial spies and private parties to intercept the personal or proprietary communications of others.'").

Similarly, with respect to the third and fourth considerations, the availability of the SCA's separate, comprehensive remedial process to the address improper collection of emails is a factor counseling against finding a *Bivens* remedy here even in the absence of an "explicit congressional declaration" that a *Bivens* remedy should not be allowed.  *See Spagnola*, 859 F.3d at 229 n.10 ("The most that can be said for the legislative history of the CSRA is that Congress did not expressly intend to *eliminate* damages remedies.  Nevertheless, while this may be relevant under the 'explicit congressional declaration' exception to allow damages remedies, it has little relevance to the 'special factors' exception after *Chilicky*.").

---

20    Plaintiffs do not challenge the constitutionality of the SCA.  The Act specifically requires investigators to obtain a warrant for emails up to six months old, and for older emails, the government may, with notice to the subscriber or customer, seek a court order, which requires a "showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation," 18 U.S.C. § 2703(d), or issue an administrative subpoena.  *Id.* § 2703(a)–(b).  *But see United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (finding that individuals have a reasonable expectation of privacy in their emails and that, to the extent the SCA allows access to emails without a warrant, it is unconstitutional); *see also United States v. Davis*, 754 F.3d 1205, 1217 (11th Cir. 2014) (finding that "cell site location data information is within the subscriber's reasonable expectation of privacy," and therefore that the SCA is unconstitutional to the extent that it allows the government to obtain that information without a warrant).

Plaintiffs' reliance on section 2708 of the SCA does not warrant a contrary conclusion. That provision states that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."  18 U.S.C. § 2708.  Plaintiffs hone in on the word "nonconstitutional" and argue that the Court can infer from that word that Congress intended to preserve *Bivens* remedies after enactment of the SCA.

But the D.C. Circuit has explained that, where Congress creates a comprehensive system to protect public rights, such as the SCA, "'and has not *plainly* expressed an intention that the courts preserve *Bivens* remedies,' [the court] cannot create additional remedies."  *Libby*, 535 F.3d at 709–10 (emphasis added), quoting *Spagnola*, 859 F.2d at 228.  Section 2708 does not meet that standard.  Although there may be an inference from section 2708's language that Congress was willing to permit *Bivens* remedies to co-exist with the SCA, Congress did not expressly say so, and the binding precedent this Court must follow requires an explicit statement to justify implying a *Bivens* remedy where there is otherwise a comprehensive remedial scheme in place.[21]  *See id.* at 707.  As a result, the Court concludes that Count 9 must be dismissed

---

[21]    Plaintiffs' analogy to the FTCA is unpersuasive.  The exclusivity provision in that statute that other courts have held does not preclude a *Bivens* remedy speaks as clearly as Congress could of an intent to permit that remedy to continue without actually using the cause of action's name:  "Paragraph (1) does not extend or apply to a civil action against an employee of the Government – (A) which is brought for a violation of the Constitution of the United States."  28 U.S.C. § 2679.  The SCA does not.

because it is improper to imply a *Bivens* remedy in the context of plaintiffs' Fourth Amendment claim.[22]

---

22      Moreover, even if the Court were to imply a *Bivens* remedy in this case, there are serious questions about whether Count 9 would withstand the motion to dismiss on the grounds that defendants Joyce, Ibison, Malone, and the Does are entitled to qualified immunity.  A federal employee "is entitled to qualified immunity unless it is shown that the official violated a . . . constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard*, – U.S. – , 134 S. Ct. 2012, 2023 (2014) (citation omitted).  A right is not clearly established unless its "contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*  Put differently, to be clearly established, "existing precedent must have placed the . . . constitutional question confronted by the official beyond debate." *Id.* (citation and internal quotation marks omitted).

At the time of defendants' alleged actions in this case, there was no Supreme Court precedent or precedent in this Circuit that clearly established that individuals have a constitutionally protected expectation of privacy in their email communications.  And although the Sixth Circuit declared the existence of that right in 2010, *Warshak*, 631 F.3d at 288, the continued validity of the SCA and ever-developing law governing access to electronic communications around the country negates a conclusion that the Sixth Circuit's holding alone made an individual's expectation of privacy in his or her emails clearly established throughout the country as of 2012.  *See Rehberg v. Paulk*, 611 F.3d 828, 847 (11th Cir. 2010); *see also Plumhoff*, 134 S. Ct. at 2024 (holding that officials were entitled to qualified immunity where there was no "controlling case or a robust consensus of cases . . . that could be said to have clearly established the unconstitutionality" of the constitutional right at issue).

Moreover, plaintiffs' reliance on the pen register and postal mail cases does not alter that conclusion.  *See Plumhoff*, 134 S. Ct. at 2023 ("[W]e have repeatedly told courts . . . not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.").  The Court recognizes that individuals may in fact have a legitimate expectation of privacy in their email communications and that the postal and pen register cases provide support for that proposition.  But as defendant points out, the cases involving disclosure of information to a third party, as well as the number of user agreements that permit third-party providers to access the contents of emails, provide an argument on the other side.  Plaintiffs argue that the fact that they withheld their consent put defendants on notice that they had a constitutionally protected expectation of privacy in their emails.  But whether a right is clearly established at the time of the alleged violation focuses on the objectively reasonable officer, not the subjective beliefs of a particular person.  *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  The Court is not convinced that, as of 2012, it was clearly established that individuals have a constitutionally protected expectation of privacy in the contents of their email accounts.  *See id.* at 640 (noting that, in order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").

**B.     The Fifth Amendment violation alleged in Count 10 cannot form the basis of a *Bivens* action.**

Plaintiffs predicate Count 10 – the sex discrimination claim – on the allegation that certain conduct on the part of the agents was the product of discriminatory animus towards Mrs. Kelley:   (1) the failure to protect confidential information about the plaintiffs; (2) the dissemination of and failure to correct what plaintiffs refer to as repeated public and private mischaracterizations about Mrs. Kelley to the media, and (3) the withholding of information and services that should have been available to the plaintiffs as victims of a possible crime.  *See* Pls.' Opp. at 65–66, 68–71.  But none of that conduct permits the Court to imply a *Bivens* remedy in this case.[23]

For the reasons explained above, this case is not simply controlled by *Passman*, 442 U.S. at 248–49, which recognized a *Bivens* remedy in a case involving sex discrimination in the workplace.[24]  As the Supreme Court made clear in *Minneci*, 132 S. Ct. at 623–24, the Court must

---

23     Moreover, the Court has serious misgivings about whether plaintiffs have alleged sufficient facts to state a claim for sex discrimination, at least with respect to defendants Joyce, Ibison, and Malone.  Aside from the general allegations decrying the manner in which General Petraeus's resignation was sexualized and sensationalized by the media, the amended complaint lacks facts – as opposed to plaintiffs' conclusory statements – from which the Court can infer discriminatory animus on the part of the individual defendants.  To the extent that any inference of sexual animus can be drawn from the disclosures to the media ascribed to unnamed government sources, plaintiffs make no effort to attribute those comments to any of the named *Bivens* defendants.

24     Plaintiffs cite a number of cases in footnote 41 of their opposition brief as support for the notion that other courts have recognized a *Bivens* remedy in the context of sex discrimination claims, regardless of whether it arose in the employment context.  Pls.' Opp. at 64 n.41 (citing cases).  But a review of those cases shows that they did not actually involve sex discrimination claims and that any reference to *Passman* or sex discrimination in the opinions was simply an acknowledgment of that decision.  *See Iqbal*, 556 U.S. at 675; *Lebron v. Rumsfeld*, 670 F.3d 540, 554 (4th Cir. 2012); *Santiago-Marrero v. United States*, 61 F. App'x 718, 721 (1st Cir. 2003); *Whitacre v. Davey*, 890 F.2d 1168, 1169 n.3 (D.C. Cir. 1989); *Al-Aulaqi v. Panetta*, No. 12-1192, 2014 WL 1352452, at *12 (D.D.C. Apr. 4, 2014).

consider whether the particular context giving rise to plaintiffs' sex discrimination claims calls for the implication of a *Bivens* remedy.   It does not.

The first two categories of allegedly discriminatory conduct that plaintiffs identify involve the same acts that give rise to Count 1 in the amended complaint.   That count alleges a violation of the Privacy Act's disclosure limitations, and Count 10 adds only the allegation that the alleged improper disclosures were motivated by sex discrimination.   It is well-settled in this jurisdiction that the Privacy Act precludes the imposition of a *Bivens* remedy, *Chung v. DOJ*, 333 F.3d 273, 274–75 (D.C. Cir. 2003), and that prohibition extends to cases where the actions that are alleged to be unlawful under the Privacy Act underlie the plaintiff's constitutional claims as well.   *See Libby*, 535 F.3d at 92–93.   So the Court will not imply a *Bivens* remedy with respect to that conduct.[25]

It will also decline to imply a *Bivens* remedy with respect to plaintiffs' claim that the denial of victims' assistance, including the withholding of information about the status of the investigation, was the result of a discriminatory motive.   Courts may not imply *Bivens* remedies where Congress has intentionally withheld a remedy because "'that decision shows the considered judgment of Congress that certain remedies are not warranted.'"   *Davis v. Billington*, 681 F.3d 377, 383 (D.C. Cir. 2012), quoting *Libby*, 535 F.3d at 709.   And both the Crime Victim's Rights Act ("CVRA") and the Victims' Rights and Restitution Act ("VRRA"), which

---

25      Plaintiffs also cite to several allegations in their amended complaint as evidence of defendants' discriminatory intent towards Mrs. Kelley.   *See* Pls.' Opp. at 68 n.43.   It is not clear from the amended complaint or plaintiffs' opposition whether they assert that each alleged action is itself conduct on which they base their sex discrimination claim – as opposed to a series of events that support discriminatory animus – but even to the extent that they are, the conduct listed in that footnote cannot serve as the basis for a *Bivens* remedy based on sex discrimination because it fairly falls within the Privacy Act.   And to the extent that it does not, the Court finds that plaintiffs failed to plead sufficient facts to support an inference that the allegedly discriminatory conduct was in fact the product – in whole or in part – of sexually discriminatory animus.   *See supra* note 23.

delineate the victims' assistance rights that plaintiffs claim they were denied, do just that.[26]  18

U.S.C. § 3771(d)(6) (2012) ("Nothing in this chapter shall be construed to authorize a cause of

action for damages or to create, to enlarge, or to imply any duty or obligation to any victim or

other person for which the United States or any of its officers or employees could be held liable

in damages."); 42 U.S.C. § 10607(d) (2012) ("This section does not create a cause of action or

defense in favor of any person arising out of the failure of a responsible person to provide

information as required by subsection (b) or (c) of this section.").  The Court, therefore, cannot

imply a *Bivens* remedy for defendants' failure to provide plaintiffs with victims' assistance.[27]

Because none of the conduct underlying the constitutional claim in Count 10 will support

a *Bivens* remedy, the Court will dismiss that count.

### IV.    The Court will dismiss Counts 11 through 14.

Counts 11 through 14 of the amended complaint assert four tort claims under state law

against the individual defendants in this case.  Am. Compl. ¶¶ 198–225.  Counts 11, 12, and 14

---

26    Plaintiffs attempt to downplay the significance of these provisions by claiming that they "disclaim any authorization of a *new* damages cause of action" but cannot "be read to preclude any and all *existing* causes of action." Pls.' Opp. at 64–65, citing *Passman*, 442 U.S. at 247.  But a *Bivens* action *is* a new cause of action, and plaintiffs' suggestion that the remedy already exists due to *Passman* is not an accurate statement of law.  And the law is clear that the Court should not permit a *Bivens* remedy "where Congress has intentionally withheld a remedy . . . because it is in those situations that 'appropriate judicial deference' is especially due to the considered judgment of Congress that certain remedies are not warranted."  *Libby*, 535 F.3d at 709, citing *Chilicky*, 487 U.S. at 423.

The Court notes, however, that its reliance on the CVRA and VRRA in rejecting the proposed *Bivens* remedy should not be interpreted as any indication of its position on the question of how those statutes might affect plaintiffs' section 552a(g)(1)(C) Privacy Act claim. *See* Defs.' Mot. at 26–28.  The Court did not reach this issue because it dismissed that claim on other grounds.

27    Plaintiffs argue that these provisions should not be read to preclude a *Bivens* remedy in this case because doing so would essentially leave an individual without redress.  Pls.' Opp. at 65.  But the law is clear that "the creation of a *Bivens* remedy is not required solely because there is no alternative statutory remedy."  *Libby*, 535 F.3d at 706, citing *Wilkie*, 551 U.S. at 537.

allege claims of defamation, false light, and publication of private facts against defendants Panetta, Little, and the Does, *id.* ¶¶ 198–210, 218–225, and Count 13 alleges a claim for intrusion upon seclusion against defendants Joyce, Ibison, Malone, and the Does. *Id.* ¶¶ 211–17. In response to these counts and on behalf of the individual defendants, the United States filed a Westfall Act certification seeking to substitute the United States for the individual defendants, and it then moved to dismiss Counts 11 through 14 for lack of subject matter jurisdiction. Defs.' Mot. at 11–16; *see also* Defs.' Opp. to Pls.' Mot. for Order to Set Aside Westfall Act Certification ("Defs.' Opp.") [Dkt. # 42].  Plaintiffs' challenged the validity of the Westfall Act certification.  Pls.' Opp. at 35–50; *see also* Pls.' Reply in Supp. of Pls.' Mot. to Set Aside Westfall Act Certification ("Pls.' Reply") [Dkt. # 44].

The Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679 (2012), commonly referred to as the Westfall Act, "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007); *see also Majano v. United States*, 469 F.3d 138, 139 (D.C. Cir. 2006) (citation omitted) ("Under the terms of the Westfall Act, federal employees are immune from state tort lawsuits for money damages if their tortious conduct occurred while they were acting within the scope of their employment.").  The immunity is triggered if the Attorney General or his delegate certifies "that 'the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose.'"  *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013), quoting 28 U.S.C. § 2679(d)(1).  Upon certification, "the federal employee is dismissed from the case and the United States is substituted as the defendant in place of that employee.  Thereafter, the suit is governed by the Federal Tort Claims Act ("FTCA") and is subject to all of the FTCA's

51

exceptions for actions in which the Government has not waived sovereign immunity." *Wuterich v. Murtha*, 562 F.3d 375, 380 (D.C. Cir. 2009).  Should one of the exceptions to the FTCA apply, the Westfall Act certification "converts the tort suit into a FTCA action over which the federal court lacks subject matter jurisdiction and has the effect of altogether barring plaintiff's case." *Id.*; *see also Majano*, 469 F.3d at 139.

But a district court should not treat a Westfall Act certification as unimpeachable, and a plaintiff may challenge "the government's scope of employment determination." *Stokes v. Cross*, 327 F.3d 1210, 1213 (D.C. Cir. 2003), citing *Gutierrez de Martinez v. Lamango*, 515 U.S. 417, 420 (1995); *see also Wuterich*, 562 F.3d at 382.[28]  If a plaintiff mounts that challenge, "the certification 'constitute[s] *prima facie* evidence that the employee was acting within the scope of his employment,'" *Wuterich*, 562 F.3d at 381, quoting *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006) (per curiam), and the plaintiff must rebut that presumption by alleging "sufficient facts that, taken as true, would establish that the defendant['s] actions exceeded the scope of [his] employment." *Id.* (alterations in original), quoting *Stokes*, 327 F.3d at 1215.  The court should adhere to the teachings of *Iqbal* and *Twombly* in determining whether the plaintiff has met his or her burden to rebut the presumption. *Jacobs*, 724 F.3d at 221.  Only if plaintiff satisfies that burden, will he or she, "if necessary, be permitted to undertake 'limited jurisdictional discovery' to resolve any factual disputes over jurisdiction." *Id.*, quoting *Wuterich*, 562 F.3d at 381.

---

28      In *Gutierrez de Martinez v. Lamango*, the Supreme Court addressed the concerns that plaintiffs raise in this case about allowing the government to file a Westfall Act certification that immunizes the individual defendants and then precludes relief because the United States is also immune under the FTCA.  515 U.S. 417 (1995).  To alleviate that concern, the Court concluded that the Westfall Act certification must be subject to *de novo* judicial review.  515 U.S. at 427–30.

Here, plaintiffs challenge the government's certification that defendants Panetta, Little, Joyce, Ibison, and Malone were acting within the scope of their employment at the time of the conduct that underlies the torts alleged in Counts 11 through 14.  The Court must therefore conduct a *de novo* review of the Westfall Act certification and determine whether plaintiffs have pleaded sufficient facts to create an inference that defendants exceeded the scope of their employment in connection with Counts 11, 13, and 14.

The Court need not, however, conduct any analysis with respect to Count 12 because, regardless of whether the Westfall Act certification is valid with respect to that claim, the count must be dismissed as to defendants Panetta and Little for failure to state a claim upon which relief can be granted.  It is undisputed that, if the Westfall Act certification is valid, plaintiffs' false light claim cannot proceed against the United States because the United States has not waived sovereign immunity for that tort.  28 U.S.C. § 2680(h); *Peter B.*, 579 F. Supp. 2d at 83. Similarly, the claim cannot be maintained even if the Westfall Act certification is not upheld and the claim proceeds against the individual defendants under state law because neither Virginia nor Florida – the only states that the parties have suggested could provide the substantive law for this state law tort claim – recognizes a cause of action for false light.  *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1100 (Fla. 2008); *WJLA-TV v. Levin*, 564 S.E.2d 383, 394 n.5 (Va. 2002).  So the Court will dismiss Count 12 as to defendants Panetta and Little for failure to state a claim upon which relief can be granted.

## A.  Choice of law inquiry.

The parties agree that the scope of employment inquiry governing the claim asserted against defendants Ibison and Malone is governed by Florida law.  Defs.' Opp. at 10; Pls.' Reply at 2.  But before the Court may proceed to analyze whether plaintiffs successfully rebutted the

presumption that defendants Panetta, Little or Joyce were acting within the scope of their employment, it must first determine what law governs the inquiry for each of those individuals.

There is not an obvious answer to the choice of law question. Over the years, the D.C. Circuit has articulated two tests to determine which state law should apply to decide whether an employee acted in the scope of his or her employment under the Westfall Act, each of which it has applied on different occasions. *See Jacobs*, 724 F.3d at 221; *Wuterich*, 562 F.3d at 383; *Libby*, 535 F.3d at 711; *Majano*, 469 F.3d at 142. The first test provides that, "[t]o determine whether an employee was acting within the scope of his employment under the Westfall Act, courts apply the *respondeat superior* law of the state in which the alleged tort occurred." *Wuterich*, 562 F.3d at 383; *see also Libby*, 535 F.3d at 711. The second test directs the court to "consider the substantive law of the jurisdiction where the employment relationship exists." *Jacobs*, 724 F.3d at 221; *see also Majano*, 469 F.3d at 141.

Plaintiffs avoid this thicket and simply urge the Court to apply Florida law to all of the state tort claims in the amended complaint. Pls.' Opp. at 37–38. They focus on the language of the FTCA and discuss how courts have dealt with choice of law questions when FTCA claims involved acts and omissions occurring in multiple states. *See* Pls.' Opp. at 37–38 (discussing the language of 28 U.S.C. § 1346(b) and the court's analysis in *Raflo v. United States*, 157 F. Supp. 2d 1 (D.D.C. 2001)); Pls.' Reply at 3 (explaining their reliance on the FTCA and *Raflo*, and citing *Gould Electronics, Inc. v. United States*, 220 F.3d 169 (3d Cir. 2000), as additional support). But reliance on the FTCA assumes prematurely that the FTCA governs this action. Since plaintiffs have challenged the Westfall Act certification, the United States has not yet been substituted as a defendant and it has not yet been determined that the FTCA applies. So the

choice of law inquiry must be governed by either the test applied in *Jacobs* and *Majano* or the one applied in *Wuterich* and *Libby*.[29]

The Court concludes that the *Jacobs* and *Majano* test shall govern in this case for two reasons.  First, *Jacobs* is the D.C. Circuit's most recent articulation of how to conduct the choice of law inquiry in the context of a Westfall Act certification challenge, and it therefore serves as the most recent binding precedent.  And second, predicating the choice of law on the location where the employment relationship exists makes the most sense in this case because the record is unclear as to where defendants Panetta, Little, and Joyce's allegedly tortious conduct occurred.  *See* Pls.' Reply at 4.  As a result, the law of Virginia – the state where defendants Panetta and Little were employed at the time of their allegedly tortious conduct, Defs.' Opp. at 2 – will govern the scope of employment inquiry with respect to Counts 11 and 14, and District of Columbia law, *id.* at 2 – the place of defendant Joyce's employment at the time of his allegedly tortious conduct – will govern the scope of law inquiry with respect to defendant Joyce's immunity from suit in Count 13.  As noted above, Florida law will govern the scope of employment inquiry with respect to whether defendants Ibison and Malone are immune from liability under Count 13.

---

29    Plaintiffs also contend that Florida law should govern the scope of employment inquiry for all of the tort claims because it "remains the most sensible source of the applicable scope-of-employment rule," and "[c]onsiderations of judicial economy and the risk of inconsistent outcomes counsel in favor of applying a single state's law."  Pls.' Reply at 4.  But these are debatable propositions given the factual circumstances here.  Neither the "employment relationship" nor the "where the tort occurred" test would make Florida law the appropriate law to apply to the defamation and publication of private fact claims asserted against defendants Panetta and Little.  Nor would it be appropriate to apply Florida law to defendant Joyce:  there is no accusation that Joyce engaged in any conduct in Florida, and plaintiffs' statement in their Reply that he "sent orders to Florida calling for many of the tortious acts," Pls.' Reply at 4, does not fill in that gap in the amended complaint.  Furthermore, the burden on the Court is not so great as to make judicial economy a prominent factor here, and the Westfall Act contemplates that some individual defendants may face civil claims while others are immune.

**B.      Plaintiffs failed to plead sufficient facts to rebut the presumption of immunity created by the Westfall Act certification.**

Plaintiffs bear the burden to rebut the presumption created by the Westfall Act certification that the individual defendants acted within the scope of their employment when engaging in the conduct giving rise to Counts 11, 13, and 14.  *Jacobs*, 724 F.3d at 220.  Whether plaintiffs have met this burden depends on whether they pleaded sufficient facts – as opposed to conclusory statements – to support a plausible inference that defendants' conduct exceeded the scope of their employment.  *Id.* at 221.

Furthermore, only those facts that relate to the particular conduct that underlies the alleged tort may support an inference that defendants exceeded the scope of their employment.  *Id.* at 224 (refusing to rely on facts about other ways Vrobel allegedly mistreated Jacobs – such as giving her extra work – because they had nothing to do with whether the alleged defamatory statements were made within the scope of Vrobel's employment).  So much of the information that plaintiffs amass – such as the reiteration of the facts surrounding the Humphries affidavit, the interrogation in the SUV, or the denial of victims' services, *see* Pls.' Reply at 45 – has no bearing on the Westfall inquiry needed for the defamation, publication of private facts, or intrusion upon seclusion claims.

1.    Plaintiffs failed to plead sufficient facts that, taken as true, would establish that defendants Panetta and Little acted outside the scope of their employment under Virginia law when engaging in the conduct that underlies the defamation (Count 11) and publication of private facts (Count 14) claims.

Under Virginia law, the scope of employment question is governed by a two-prong inquiry.  First, it must be determined that the act "was expressly or impliedly directed by the employer, or is naturally incident to the business" of that employer.  *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987).  And second, the act must have been "performed, although

mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, and . . . not . . . wholly from some external, independent, and personal motive on the part of the [employee]." *Id.* The amended complaint itself makes it clear that any allegedly tortious acts committed by defendants Panetta and Little were incident to their Department of Defense employment, and there are no facts alleged that would tend to show that any of their acts were actuated wholly or even largely from any external, independent or personal motive.

Plaintiffs emphasize that they have accused defendants of committing intentional torts. *See* Pls.' Opp. at 43. But the Virginia Supreme Court has instructed that the fact that the alleged tort is an intentional one does not necessary mean that the individual exceeded the scope of his or her employment in committing it. *Gina Chin & Assocs. v. First Union Bank*, 537 S.E.2d 573, 577 (Va. 2000) ("In cases involving a willful and wrongful act of an employee, a narrow and literal reading of the language . . . , which would create a patent conflict within it, is not to be applied as a matter of law to the facts of a particular case."); *see also id.* at 542 (noting that "proper application of this definition . . . does not resolve into a simplistic determination that an employee's willful and wrongful act was not done with the intent to further the employer's interests or to benefit the employer in some way"); *Heckenlaible v. Va. Peninsula Reg'l Jail Auth.*, 491 F. Supp. 2d 544, 549 (E.D. Va. 2007). Similarly, the "motive of the employee in committing the act complained of is not determinative of whether it took place within the scope of the employment relationship." *Gina Chin*, 537 S.E.2d at 578. Instead, the scope of employment inquiry in the intentional tort context essentially boils down to "whether the service itself, in which the tortious act was done, was within the ordinary course of such business." *Davis v. Merrill*, 112 S.E. 628, 631 (Va. 1922); *see also Gina Chin*, 537 S.E.2d at 578; *Guiterrez*

*de Martinez v. DEA*, 111 F.3d 1148, 1156 (4th Cir. 1997) (explaining that, "[f]or the most part, Virginia courts take a fairly broad view of scope of employment, and hold that even intentional torts may be within the scope of employment").[30]

To apply that framework to Counts 11 and 14, the Court reviewed the amended complaint to see what plaintiffs alleged that these particular defendants did.  There is very little that is directly attributed to either Panetta or his press secretary, but the two Defense Department officials are individually named as defendants in the defamation and publication of private facts counts.  In the defamation claim, plaintiffs allege that "defendants made false and defamatory statements concerning the Kelleys, including false statements to paint Mrs. Kelley as unfaithful in her marriage."  Am. Compl. ¶ 199.  The publication of private facts claim complains:  "Upon information and belief, Defendants published, publicized, or otherwise gave publicity to Plaintiffs' private lives by anonymously leaking private facts, such as Plaintiffs' personal contact information, personal correspondence, personal relationships, personal financial concerns, family matters and confidential information about their victimization by a cyberstalker . . . .  The publication of facts about the Kelleys' private lives would be highly offensive to an ordinary, reasonable person."  *Id.* ¶¶ 219, 221.

The allegations that underlie these counts are as follows. With respect to Panetta, paragraph 4 alleges:  "On November 13th, the New York Times reported that then Defense Secretary Leon Panetta leaked Mrs. Kelley's name in relation to the scandal," and it points to Eric Schmitt and Elisabeth Bumiller, *Another General is Tied to the Petraeus Inquiry*, N.Y.

---

30      It is true, though, that evidence of intent and motive can be worthy of some consideration in the scope of employment inquiry.  *Gina Chin*, 537 S.E.2d at 578 ("We emphasize that the employee's improper motive is not irrelevant to the issue of whether the act was within the scope of employment.  Rather, it is merely a factor to be considered in making that determination . . . .").

Times, Nov. 13, 2012, at A10.  Am. Compl. ¶ 4; *see also id.* ¶ 117, citing Schmitt and Bumiller,

N.Y. Times, at A10 ("The New York Times reported specifically that the leaker of Mrs. Kelley

name and involvement was Secretary Panetta himself as well as other officials traveling with the

Secretary.")

Since the article is specifically referenced in the amended complaint, the Court need not

accept plaintiff's characterization of the document, but it may consider the document itself.  The

article does not actually report that it was defendant Panetta who leaked the name,[31] but, as

paragraph 4 alleges, it does state:   "Defense Secretary Leon E. Panetta and other officials

traveling with him to Australia overnight on Monday [November 12, 2012] *disclosed the inquiry*

into General Allen's emails with Jill Kelley, the woman in Tampa, Fla., who was seen by Paula

Broadwell, Mr. Petraus's lover, as a rival for his attentions."  *Id.*, quoting Schmitt and Bumiller,

N.Y. Times, at A10 (emphasis added).

*The New York Times* article referred to in paragraphs 4 and 117 of the amended

complaint also states:

> Conflicting portrayals of e-mails written by Gen. John R. Allen, the top
> American and NATO commander in Afghanistan, emerged Tuesday after
> it was disclosed that the general was under investigation for what the
> Pentagon called "inappropriate communication" with the woman whose
> complaint to the F.B.I. set off the scandal involving David H. Petraeus's
> extramarital affair.
>
> ***
>
> Mr. Panetta, along with Gen. Martin E. Dempsey, the chairman of the
> Joint Chiefs of Staff, referred the Allen matter to the Pentagon's inspector
> general, according to Mr. Panetta's aides, after a team of military and
> civilian lawyers reviewed what defense officials say are thousands of

---

31    Indeed, the amended complaint points to other news accounts that preceded this one that
identify Mrs. Kelley by name.  *See, e.g.*, Sari Horowitz and Greg Miller, *FBI Probe of Petraeus
Triggered by E-mail Threats by Biographer, Officials Say*, Wash. Post, Nov. 10, 2012, cited in
Am. Compl. ¶ 5 n.6.

pages of documents, including hundreds of e-mails between General Allen and Ms. Kelley, that the F.B.I. forwarded to the Pentagon.

Associates of General Allen said Tuesday that the e-mails were innocuous. Some of them used terms of endearment, but not in a flirtatious way, the associates said. "If you know Allen, he's just the kind of guy to respond dutifully to every e-mail he gets — 'you're the best,' 'you're a sweetheart,' that kind of thing," according to a senior American official who is familiar with the investigation.

Even so, other Pentagon officials briefed on the content of the e-mails said that some of the language did, on initial reading, seem "overly flirtatious" and warranted further inquiry.

*\*\**

A senior law enforcement official in Washington said Tuesday that F.B.I. investigators, looking into Ms. Kelley's complaint about anonymous e-mails she had received, examined all of her e-mails as a routine step. Officials familiar with the investigation said it covers 20,000 to 30,000 page of documents, but Pentagon officials cautioned against making too much of that number, since some might be from e-mail chains, or brief messages printed out on a whole page.

*\*\**

A senior official said Ms. Kelley was close to both General Allen and his wife. She would often send e-mails, hundreds over the course of any given year, to the couple about parties or people she had met or trips she was considering. General Allen was never alone with Ms. Kelley, the official said, and while he may have been "affectionate in a few e-mails with her, there's nothing he's embarrassed about or embarrassed to tell his wife about."

Schmitt and Bumiller, N.Y. Times, at A10.

Paragraph 83 of the amended complaint also refers to officials travelling with the Secretary of the Defense. It alleges "[u]pon information and belief, by November 12, 2012, United States government sources had fed the media absolutely egregious, spurious and false 'facts' that generated even more frenetic speculation about Mrs. Kelley's life," and it points to an ABC News piece, "Petraeus Affair: Who is Jill Kelley?" Am. Compl. ¶ 83. That press account

states that "[t]he FBI has now uncovered 'potentially inappropriate' emails between Gen. Allen and Kelley, according to a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta. The department is reviewing between 20,000 and 30,000 document connected to this matter, the official said." *Id.*

Finally, paragraph 117, which is set forth as part of the Privacy Act claim, decries alleged leaks from not only the FBI, but from a "senior U.S. military official," "an unnamed military official," and "a senior U.S. defense official who is traveling with Defense Secretary Leon Panetta." *Id.* ¶ 117.  It also states that "CBS reported that a 'Pentagon spokesman told reporters traveling with Defense Secretary Leon Panetta to Australia Monday that America's top commander in Afghanistan was also being investigated for 'potentially inappropriate' communications with Kelley.'" *Id.*, quoting *Details of Petraeus Affair Emerge as Scandal Engulfs Gen. John Allen*, CBS, Nov. 13, 2012, http://www.cbsnews.com/news/details-of-petraeus-affair-emerge-as-scandal-engulfs-gen-john-allen/; *see also* Am. Compl. ¶ 117 n.39, quoting Christina Ng, Martha Raddatz, & Luis Martinez, *Petraeus Affair: Who is Jill Kelley?*, ABC News, Nov. 13, 2012, http://news.yahoo.com/petraeus-affair-jill-kelley-154817861--abc-news-topstories.html ("The FBI has now uncovered 'potentially inappropriate' emails between Gen. Allen and Kelley, according to a senior U.S. Defense official who is traveling with Defense Secretary Leon Panetta.").

With respect to defendant Little, plaintiffs note in the amended complaint that "George E. Little is the former Assistant Secretary of Defense for Public Affairs and Pentagon Press Secretary from July 19, 2011 to November 15, 2013." Am. Compl. ¶ 26.  They point to the November 13 piece and allege that it "reveals that 'Pentagon press secretary George Little' explained that the FBI referred the [General Allen matter] to the DOD." *Id.* ¶ 117, quoting

*Details of Petraeus Affair Emerge as Scandal Engulfs Gen. John Allen*, CBS, Nov. 13, 2012, http://www.cbsnews.com/8301-505266_162-57548836/details-of-petraeus-affair-emerge-as-scandal-engulfs-gen-john-allen/.   They also note that the report quotes from an unnamed "Pentagon spokesman" who said the emails were "potentially inappropriate."   *Id.*

At the outset, the Court notes that this review of the allegations reveals that the amended complaint does little to suggest that these two defendants said anything false or defamatory at all. Even if one assumes that the Secretary of Defense and his press secretary were the DOD officials quoted, according to the plaintiffs, they confirmed to the media the fact that DOD was investigating General Allen's email correspondence with Mrs. Kelley, that Paula Broadwell "saw" Mrs. Kelley as a threat, and that a large volume of potentially inappropriate email traffic was involved.   The statements certainly did not "paint Mrs. Kelley as unfaithful in her marriage" as alleged in the defamation count, and they do not seem to include either the element of falsity needed for the defamation count or the element of "privacy" needed for the publication count.

But the scope of employment question does not turn on the sufficiency of the defamation allegations or other tort allegations.   The question is only whether these officials were acting within the scope of their employment when they said whatever they said to the press about the investigation into General Allen.

In resolving that question, the Court must start with the presumption that defendants Panetta and Little acted within the scope of their employment because the Westfall Act certification serves as *prima facie* evidence of that point.   And the presumption created by the certification is supported by the facts set forth in the amended complaint, which suggest that the activity in which the defendants were engaged when they allegedly committed the two torts – that is, speaking to the press about matters affecting the Department of Defense – fell squarely

within their ordinary business duties.  The amended complaint makes it clear that the defendants occupied "high-level positions in government, such as the offices of the Secretary of Defense [(Panetta)] and the Assistant to the Secretary of Defense for Public Affairs and Pentagon Press Secretary [(Little)]."  Defs.' Opp. at 12; *see also* Am. Compl. ¶¶ 24, 26.  And defendant Little's job title alone reflects that press relations was his primary function.

The amended complaint also shows that the statements were made in the defendants' official capacities while they "were on official governmental travel (and at no other times or locations), and such travel was in furtherance of their official duties."  Defs.' Opp. at 12; *see also* Am. Compl. ¶¶ 4, 83, 117 (accusing defendant Panetta and those traveling with him to Australia on November 12, 2012, of disclosing Mrs. Kelley's name to the press in connection with the General Petraeus scandal, and suggesting that it was "Pentagon press secretary George Little" who likely told the media that the DOD was investigating whether General Allen had an affair with Mrs. Kelley).  The question then becomes whether plaintiffs pleaded sufficient additional facts that would rebut that presumption.

Plaintiffs seek to resist the presumption provided by the certification with a general assertion that "defendants" in this case "leaked sensationalized information and outright falsehoods about Jill Kelley," Pls.' Opp. at 42–43, and that they "maliciously and intentionally characterized Mrs. Kelley as the sexualized 'other woman.'"  *Id.* at 43, quoting Am. Compl. ¶ 191.  Putting aside the absence of any facts to indicate that defendants Panetta and Little in particular were involved in this conduct, plaintiffs' conclusory, undifferentiated allegations cannot rebut the presumption created by the certification because they relate to whether defendants defamed or published private facts about Mrs. Kelley, not to whether they did so while acting in the scope of their employment.  *See Cloonan v. Holder*, 602 F. Supp. 2d 25, 34

(D.D.C. 2009) ("Cloonan's allegations in her opposition are not facts that rebut the certification but rather are conclusory assertions that Barnes' conduct must have been outside the scope of his employment because he both violated the Privacy Act and defamed her.  Cloonan's argument is both circular and entirely misplaced . . . .").  Under Virginia law, "the court's ultimate determination of the merits of [plaintiffs'] cause of action is unrelated to whether [defendants'] actions were in the scope of his employment." *Id.* (applying Virginia law).  Plaintiffs' constant repetition of the allegation that the defendants "leaked" information may support Count 1 – the claim that will proceed in this case – but it does nothing to answer the scope of employment question that determines whether the United States should be substituted for the individual defendants in Counts 11 and 14.

In their pleading on this issue, plaintiffs argue that defendants' actions were not within the scope of their employment because the dissemination of information about plaintiffs to the media was the product of a sexually discriminatory motive towards Mrs. Kelley.  Pls.' Opp. at 47 n.34.  They also point to the fact that defendants are accused of committing an intentional tort. *Id.*  But neither contention is sufficient to rebut the presumption created by the Westfall certification.[32]

---

[32]    Plaintiffs also contend that "defendants" acted contrary to the interest of their employers, Pls.' Opp. at 43, that they "violated the Justice Department's Guidelines for Victim and Witness Assistance," *id.* at 44, and that they behaved in a manner that is at odds with President Obama's policy toward government leaks.  Pls.' Reply at 7.   But these points do not rebut the presumption.  Plaintiffs' first point mistakes the posture of this case:  defendants are entitled to a presumption of immunity and need not prove that they acted in accord with the employer's interest, and plaintiffs' suggestion that they did not is pure argument.  Second, even if DOJ guidelines have some bearing on some aspect of this case, they do not provide the standard by which to measure the conduct of officials in the Department of Defense, who are not bound by DOJ policies.  Finally, the Administration's policies concerning leaks of classified information, as opposed to confidential information, have no bearing here.  *See* Am. Compl. ¶ 10, citing Christi Parson, *Obama: 'Zero Tolerance' for Leaking Classified Information*, L.A. Times, http://articles.latimes.com/2012/jun/08/news/la-pn-obama-news-conference-leaks-20120608.

First, there are no facts set forth in either the amended complaint or the motion to set aside the certification from which a factfinder could infer that defendants Panetta and Little were in fact motivated by a discriminatory animus toward Mrs. Kelley.   Plaintiffs' allegations regarding the alleged sex discrimination are contained in Count 10, the *Bivens* cause of action that is premised upon a set of acts or omissions on the part of the FBI.   It does not name either Panetta or Little as a defendant.   Am. Compl. ¶¶ 189–97.[33]

Second, even if plaintiffs did allege sufficient facts to support an inference that defendants Panetta and Little defamed plaintiffs or publicized private information about them, the legal inquiry at this stage requires plaintiffs to provide facts that would take that conduct outside the scope of defendants' employment.   As noted above, under Virginia law, simply noting that these counts purport to allege intentional torts does not meet that burden.   The Supreme Court of Virginia has adopted a broad view of *respondeat superior* liability that may include intentional torts.   *See, e.g.*, *Gina Chin*, 537 S.E.2d at 579.   Moreover, the allegations of intentional and willful conduct are quite thin.   *See, e.g.*, Count 11 – defamation, Am. Compl. ¶ 201 ("As evidenced by their actions to preserve anonymity as they leaked the false and

---

[33]     Plaintiffs cite an article that quotes a United States official as stating that the communications between General Allen and Mrs. Kelley "were the 'equivalent of phone sex over email.'"  Am. Compl. ¶ 4, quoting *Gen. Allen's Emails to Friend of Petraeus Family Were Like 'Phone Sex,' Sources Say*, FoxNews.com, Nov. 14, 2012, http://www.foxnews.com/politics/2012/11/13/top-uscommander-in-afghanistan-gen-john-allen-under-investigation-for-alleged/#ixzz2Ubsiijue. This is the most lurid comment quoted in the amended complaint.   But nothing in the article itself (or in plaintiffs' amended complaint) suggests that the "U.S. official" speaking was either Panetta or Little, or even that it was a person inside DOD as opposed to the FBI or elsewhere.

    Moreover, even if it could ultimately be shown that this unfortunate characterization emanated from one of those defendants, that proof would still not be enough to rebut the presumption that the Defense Department official was acting in the scope of his employment when he was talking to the press about an unusual ongoing investigation into a prominent Army General.   While such evidence might demonstrate that the speaker used poor judgment or insufficient maturity, care, or sensitivity when communicating with the press corps, he would have been using that poor judgment *while doing his job*.

defamatory statements, Defendants acted intentionally and/or willfully, but at least with negligence, in making such false and defamatory statements."); Count 14 – publication of private fact, *id.* ¶ 223 ("Defendants intentionally and/or willfully violated the Kelleys' privacy rights.")

Because plaintiffs included no additional facts in the amended complaint or in their challenge to the Westfall Act certification that would tend to show that defendants Panetta and Little exceeded the scope of their employment when they were engaged in speaking to the media about the DOD investigation into a General of the United States Army, the Court finds that plaintiffs did not meet their burden to rebut the presumption created by the certification. Plaintiffs' central concern that these defendants "leaked" private information will be addressed in Count 1.

2. <u>Plaintiffs failed to plead sufficient facts that, taken as true, would establish that defendants Joyce, Ibison, and Malone acted outside the scope of their employment when engaging in the conduct that underlies the tort asserted in Count 13</u>.

Count 13 of the amended complaint alleges that defendants Joyce, Ibison, and Malone committed the common law tort of "intrusion upon seclusion" when they "used some form of investigation or examination to physically intrude upon the Kelley's [sic] private or secret concerns, including personal communications, financial, business and family affairs, and personal relationships that were not in any way relevant to the investigation of the Kelleys' cyber stalker report" or any other authorized investigation. Am. Compl. ¶ 212. At that time, defendant Joyce was the Deputy Director of the FBI and allegedly directed the investigation into plaintiffs, *id.* ¶ 62, and defendants Ibison and Malone were FBI agents who participated directly in the investigation. *Id.* ¶¶ 27–28.

> *a.  Plaintiffs did not satisfy their burden to show that defendant Joyce exceeded the scope of his employment when he allegedly intruded upon their seclusion.*

Under D.C. law, the scope of employment analysis is conducted using the test established by the Second Restatement of Agency.  *Jacobs*, 724 F.3d at 221; *Libby*, 535 F.3d at 711.  The Second Restatement provides:

> (1)   Conduct of a servant is within the scope of employment if, but only if:
>
> > (a)   it is of the kind he is employed to perform;
> >
> > (b)   it occurs substantially within the authorized time and space limits; [and]
> >
> > (c)   it is actuated, at least in part, by a purpose to serve the master . . . .[34]
>
> (2)   Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Jacobs*, 724 F.3d at 221, quoting Restatement (Second) of Agency § 228 (1958).

The test is an objective one and is "based on all the facts and circumstances."  *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986).  It is also applied broadly.  *Jacobs*, 724 F.3d at 221, quoting *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008) ("Because of the broad scope-of-employment standard in many states and D.C., and because the FTCA and the Westfall Act incorporate the relevant state's test, tort claims against federal government employees often proceed against the Government itself under the FTCA rather than against the individual employees under state law.").  Although the scope of employment issue is often a jury question, it may be decided as a matter of law "if, viewing the evidence and all reasonable inferences in

---

34   The Restatement includes a fourth factor to be considered in the scope of employment analysis:  "if force is intentionally used by the servant against another, [whether] the use of force is not unexpected by the master."  *Majano*, 469 F.3d at 141, quoting Restatement § 228.  Plaintiffs do not allege a tort involving force, and therefore that factor is not relevant here.

the light most favorable to the [plaintiffs], a reasonable juror could only conclude" that the individual acted within the scope of his or her employment.  *Jordan v. Medley*, 711 F.2d 211, 215 (D.C. Cir. 1983).

Here, plaintiffs rely on a laundry list of allegations to establish that defendant Joyce acted outside the scope of his employment when he allegedly directed FBI agents to treat plaintiffs' case differently than other cases.  Pls.' Opp. at 43–47; Pls.' Reply at 8; *see also* Am. Compl. ¶ 62.  But these allegations, even taken as true, fail to satisfy plaintiffs' burden.

As an initial point, plaintiffs do not dispute that the second prong of the Restatement – that the conduct occur substantially within the authorized time and space limits – is met in this case, and their allegations instead address whether the first and third prongs are met.  Pls.' Opp. at 41–45; *see also* Pls.' Reply.  With respect to the first prong – that the conduct underlying the tort is the kind of conduct the defendant is employed to perform – plaintiffs point to their allegations that the FBI's investigation probed into Mrs. Kelley's private life in search of salacious information, Pls.' Opp. at 43; that defendants mistreated plaintiffs over a period of months, *id.*; that defendants' treatment of plaintiffs violated DOJ's Guide for Witness and Victim Assistance and Guidelines on Obtaining Documentary Evidence as well as the FBI's Domestic Investigations and Operations Guide, *id.* at 44; that the FBI's report to the DOD Office of Inspector General did not prompt an investigation there, *id.*; and that defendants were supposed to look into a cyberstalking complaint and not the private affairs of Mrs. Kelley based on suspicions of an affair as evidence that defendant Joyce was not engaged in conduct of the kind for which he was employed when he directed FBI to intrude upon plaintiffs' seclusion.  *Id.* at 45.

Even if these allegations could be characterized as factual, plaintiffs' reliance on those claims mistakes the nature of the inquiry under the D.C. scope of employment analysis:  "District

law requires that we focus on the type of act [the defendant] took that allegedly gave rise to the tort, not the wrongful character of that act." *Jacobs*, 724 F.3d at 221–22; *see also Ballenger*, 444 F.3d at 64 ("The appropriate question . . . is whether [the] telephone conversation – not the allegedly defamatory sentence – was the kind of conduct [the defendant] was employed to perform."). Applying that analysis to this case, the Court must look at the nature of defendant Joyce's conduct – directing an investigation – and not at the wrongs allegedly committed while carrying out that task, in order to determine whether his conduct was of the kind that he was employed to perform. Framing the question that way, the answer is yes; defendant Joyce was the Deputy Director of the FBI at that time, and it therefore follows that he was employed by the FBI to direct FBI investigations.

Similarly, plaintiffs' remaining allegations that attack the third prong of the Restatement test – which requires that the defendant's conduct "be actuated, at least in part, by a purpose to serve the master," Restatement § 228 – are also insufficient to demonstrate that defendant Joyce acted outside the scope of his employment. To satisfy that prong, "the employee must have had an 'intention to perform [the conduct in question] *as part of or incident to* a service on account of which he [was] employed." *Jacobs*, 724 F.3d at 222 (alteration and emphasis in original), quoting *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006). This means that the prong is satisfied so long as the employee acted with at least a "partial desire to serve the [employer]," *Ballenger*, 444 F.3d at 665, and that the "test 'is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Jacobs*, 724 F.3d at 222, quoting *Johnson*, 518 A.2d at 992. Like the inquiry used in evaluating the first prong of the Restatement, an analysis of whether the third prong of the Restatement is

satisfied "examine[s] 'the underlying dispute or controversy, not . . . the nature of the tort.'"  *Id.*

(second alteration in original), quoting *Johnson*, 518 A.2d at 992.

Applying those principles here, the Court concludes that defendant Joyce – in directing

an investigation – acted with at least a partial desire to serve the FBI, even if, according to the

plaintiffs, he did so in a manner that was insufficiently solicitous of their privacy or their rights

as complainants.  That conclusion is not disturbed by the fact that plaintiffs have alleged that

defendant Joyce committed an intentional tort, Pls.' Opp. at 43; *see also Johnson*, 518 A.2d at

992, or that his wrongdoing was allegedly motivated by discriminatory animus.[35]  Pls.' Opp. at

47 n.34; *see also* Am. Compl. ¶¶ 190–91, 193–94.  No reasonable juror could conclude from the

facts in the amended complaint that defendant Joyce deviated so far from a purpose of serving

the United States by directing investigations based on the information before him that he

---

[35]    Plaintiffs argue that there was no lawful basis for an investigation that would require the FBI to look at their personal emails.  But that is a legal conclusion, not a fact, and the Court need not accept it in resolving the motion to dismiss.  Moreover, even if the Court were to accept plaintiffs' conclusory statement that nothing about their cyberstalking complaint would have prompted an investigation into Mrs. Kelley's private affairs, they mistakenly suggest, then, that there could be no other reason for that conduct.  But it is axiomatic that the FBI is not precluded from following leads and, if warranted, opening a new investigation based on those leads when they uncover information in the course of a different investigation.

Additionally, unlike in the defamation and publication of private facts context where the disclosures contained overt statements that might support the conclusion that defendants acted with a discriminatory animus in making them, plaintiffs' evidence of sex discrimination in the context of the investigation and their intrusion upon seclusion claim is thin.  *See* Am. Compl. ¶ 76 (explaining that the FBI had a chart with "Mrs. Kelley at the hub with spokes drawn out to several senior government and military officials," which plaintiffs believe "demonstrated a discriminatory and sexist fascination with Mrs. Kelley").  And even taking those allegations as true does not support the conclusion that defendant Joyce's (or Ibison's or Malone's) predominant purpose in conducting an investigation into plaintiffs' private lives was discriminatory.

exceeded the scope of his employment.[36]  Thus, the Court finds that plaintiffs failed to plead

sufficient facts that would establish that defendant Joyce acted outside the scope of his

employment.[37]  *See District of Columbia v. Coron*, 515 A.2d 435, 437 (D.C. 1986) ("Although

the jury generally determines whether an employee's actions are 'within the scope of

employment' based upon the facts of the case, if there is insufficient evidence to permit a

reasonable juror to draw such a conclusion[,] it becomes a question of law for the court.").

---

[36]     The lack of extreme deviation from the task that defendant Joyce was employed to
perform distinguishes this case from *Majano*, where the D.C. Circuit found that the plaintiff
satisfied her burden to rebut the Westfall Act certification and therefore survived summary
judgment.  *See Majano*, 469 F.3d at 142.  In that case, the plaintiff sought damages against a
fellow employee for an assault perpetrated at work.  *Id.* at 139.  In determining that the scope of
employment question was a proper question for the jury, the court noted that, because the
"assault was violent and unprovoked and took place after" the defendant "had turned away from
her purpose to gain entry to the building," a reasonable jury could conclude that the defendant
"was acting '*solely* for the accomplishment of [her] independent purpose.'"  *Id.* at 142 (citation
omitted).  The same conclusion cannot be reached in this case.  *See Wuterich*, 562 F.3d at 384
(finding that Congressman Murtha was not acting outside the scope of his employment when he
allegedly defamed the plaintiff while speaking to the media because engaging in "interviews
with the media about the pressures on American troops in the ongoing Iraq war . . . is
unquestionably of the kind that Congressman Murtha was employed to perform as a Member of
Congress").

[37]     Plaintiffs rely heavily on *Stokes* to support their argument that the Westfall Act
certification should be set aside.  Pls.' Opp. at 42–45.  But that case is only relevant in the
context of defendant Joyce because it applies D.C. law, not Florida or Virginia law, and its facts
are distinguishable from the facts of this case.  In *Stokes*, the plaintiff filed a defamation action
against several of his co-workers, and he argued that the defendants had exceeded the scope of
their employment because they had destroyed documents and prepared and submitted false
affidavits.  327 F.3d at 1216.  The D.C. Circuit expressed skepticism that this would be enough
to show that the defendants acted outside the scope of their employment, but it concluded a
reasonable jury might find in favor of plaintiffs on that point and permitted plaintiff on remand to
engage in limited discovery on the scope of employment issue.  *Id.*  But here, the Court found
that a reasonable jury could not find that defendant Joyce exceeded the scope of his employment
when he allegedly intruded upon the seclusion of plaintiffs.  Looking into private matters often
falls squarely within the scope of an investigator's duties, and here, the Kelleys brought emails
to the FBI's attention that themselves made reference to the couple's personal associations.  The
only conclusion the Court can reach is that defendant Joyce was acting within the scope of his
employment and that the presumption raised by Westfall certification has not been rebutted.

*b.   Plaintiffs did not satisfy their burden to show that defendants Ibison and Malone exceeded the scope of their employment when they allegedly intruded upon the Kelleys' seclusion.*

Under Florida law, "[a]n employee's conduct is within the scope of his employment only if it is the kind he is employed to perform, it occurs substantially within the time and space limits of the employment and it was activated at least in part by a purpose to serve the master." *Rabideau v. State*, 391 So. 2d 283, 284 (Fla. Dist. Ct. App. 1980), *aff'd*, 409 So. 2d 1045 (Fla. 1982); *see also Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990); *Burleson v. Stark*, 357 So. 2d 1038, 1039–40 (Fla. Dist. Ct. App. 1978), quoting *Morrison Motor Co. v. Manheim Servs. Corp.*, 346 So. 2d 102, 104 (Fla. Dist. Ct. App. 1977).  The "convenient test is whether the employee was doing what his employment contemplated."  *Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992), quoting *Morrison Motor*, 346 So. 2d at 104; *see also Burleson*, 357 So. 2d at 1038–40.

Plaintiffs point to the same allegations in the amended complaint as they did with respect to defendant Joyce in an effort to satisfy their burden to provide facts that, if taken as true, would establish that defendants Ibison and Malone acted outside the scope of their employment.  Pls.' Opp. at 42–45.  But these allegations are insufficient to carry plaintiffs' burden as to defendants Ibision and Malone for the same reasons they were insufficient to carry the burden as to defendant Joyce.

Florida applies a *respondeat superior* law that is similar to the test applied in the District of Columbia, and as noted above, its primary focus is on whether the employee's conduct underlying the tort is the kind of conduct his employment contemplated.  Here, plaintiffs' claim for intrusion upon seclusion arises out of the allegation that defendants Ibison and Malone wrongfully steered the investigation prompted by the Kelleys' harassment complaint into an

excessively wide-ranging inquiry into their private affairs.  *See* Am. Compl. ¶ 212.  But both defendants were employed at that time as FBI agents, which means that their employment contemplated that they would be looking into people's private affairs, and that they could very well be called upon to probe and unravel a set of relationships connected to an initial complaint. Thus, they acted within the scope of their employment when they allegedly intruded upon the seclusion of plaintiffs.[38]

Plaintiffs' allegations that the tort alleged in Count 13 is an intentional tort and that defendants Ibision and Malone acted with a discriminatory animus towards Mrs. Kelley do not change that conclusion.  Florida law requires only that the conduct be "activated at least in part by a purpose to serve the master."  *Rabideau*, 391 So. 2d at 284.  And as with defendant Joyce, plaintiffs have not provided sufficient facts from which a reasonable juror could conclude that defendants Ibison and Malone acted predominantly for their own purpose, even when conducting that portion of the investigation that drew them into the private affairs of plaintiffs.  Accordingly, the Court finds that plaintiffs did not meet their burden to plead sufficient facts that, taken as

---

[38]    Although under Florida law "[t]he question whether a tort committed by an agent is within the scope of his employment is normally to be determined by the jury," *City of Green Cove Springs v. Donaldson*, 348 F.2d 197, 202 (5th Cir. 1965), no reasonable juror could conclude that defendants Ibison and Malone were acting outside the scope of their employment when they allegedly intruded upon the seclusion of plaintiffs.  This is not a case where there is a serious question as to whether the tortious conduct served the employer's interest, such as in an assault and battery case, nor does it involve a situation where the conduct occurred outside the normal hours of employment.  *See Burleson*, 357 So. 2d at 1040; *Forster v. Red Top Sedan Serv., Inc.*, 257 So. 2d 95, 97 (Fla. Dist. Ct. App. 1972).

true, would establish that defendants Ibison and Malone exceeded the scope of their employment.[39]

\* \* \*

Because plaintiffs were unable to rebut the presumption that defendants Panetta, Little, Joyce, Ibison, and Malone acted within the scope of their employment when engaging in the conduct underlying Counts 11, 13, and 14, the Westfall Act certification is valid, and the Court will deny plaintiffs' motion to set it aside.  The individual tort defendants will be dismissed, and the United States is automatically substituted in as a defendant in Counts 11, 13, and 14.  The substitution of the United States, in turn, deprives this Court of subject matter jurisdiction over the state law tort claims because the United States has not waived sovereign immunity with respect to claims for defamation, 28 U.S.C. § 2680(h), and plaintiffs have not satisfied the presentment requirement that serves as a prerequisite to the waiver of sovereign immunity for

---

39      Plaintiffs fault defendants for not addressing many of the cases that they cited in their opposition to the motion to dismiss and their motion to set aside the Westfall Act certification. *See* Pls.' Reply at 4.  But some of the cases need not be distinguished because they apply scope of employment law from states that do not furnish the applicable law for any of the causes of action in this case.  *See, e.g.*, *Anderson v. United States*, 364 F. App'x 920 (5th Cir. 2010) (applying Texas law).  And other cases, such as *Alexander v. FBI*, 691 F. Supp. 2d 182 (D.D.C. 2010), are inapposite.  *Alexander* reiterated that under D.C. law, political motivation might take an otherwise legitimate investigation out of the scope of employment. *Id.* at 195.  Since the case involves D.C. law, it is only relevant to the scope of employment inquiry for defendant Joyce, and there is no allegation in the amended complaint that defendant Joyce was motivated by partisan purposes.  In fact, the only allegation in the amended complaint that even mentions politics is plaintiffs' claim that government officials delayed notifying the President about General Petraeus's affair until after the November 2012 election, an averment that has nothing to do with any of the causes of action in the case.  Am. Compl. ¶ 78.

their other two claims.[40]  *Id.* §§ 2675(a), 2679(d).  Accordingly, the Court will dismiss Counts 11, 13, and 14 for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).[41]

---

[40]   Plaintiffs devote a number of pages in their briefs to discussing why this Court should permit limited jurisdictional discovery and an evidentiary hearing on the scope of employment issue in this case.  Pls.' Opp. at 48–50; Pls.' Reply at 9–10.  But the Court may not just order discovery and an evidentiary hearing; it must first determine that plaintiffs pleaded sufficient facts in their complaint or other filings that would establish that defendants' conduct exceeded the scope of their employment.  *See Wuterich*, 562 F.3d at 228, 233.  Because the Court concludes that plaintiffs failed to meet that burden, limited jurisdictional discovery and an evidentiary hearing on the scope of employment question is not available.

[41]   The Court's holdings with respect to Counts 11, 13, and 14 do not affect plaintiffs' ability to proceed against the Doe defendants.  No Westfall Act certification has been provided on their behalf because, as is apparent from the pseudonym, no Doe defendant has yet been identified.  Similarly, the Court's holding that the false light count must be dismissed does not apply to the Doe defendants because it is not clear at this time what state would provide the substantive law governing that claim and whether that state recognizes the tort of false light.

## CONCLUSION

For the reasons stated above, the Court will grant the motions to dismiss:

- Count 1, to the extent that it alleges a violation based on defendant FBI's disclosure of information to defendant DOD;

- Counts 2 through 10 in their entirety;

- Counts 11, 12, and 14 as to defendants Panetta and Little; and

- Count 13 as to defendants Joyce, Ibison, and Malone.

The Court will also deny plaintiffs' motion to set aside the Westfall Act certification.  But the

Court will deny the motion to dismiss:

- Count 1, to the extent that it states a claim for unlawful disclosure of information to the media by defendants FBI and DOD.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  September 15, 2014