# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
GILBERTE JILL KELLEY, *et al.*,           )
                                          )
              Plaintiffs,                 )
                                          )
       v.                                 )        Civil Action No. 13-0825 (ABJ)
                                          )
FEDERAL BUREAU OF                         )
INVESTIGATION, *et al.*,                  )
                                          )
              Defendants.                 )
_____ )

## <u>ORDER</u>

Pending before the Court is defendants' motion pursuant to Federal Rule of Civil Procedure 45(d)(3)(A) to quash plaintiffs' subpoena for the deposition of Jeh Johnson, the Secretary of the Department of Homeland Security.  Defs.' Mot. to Quash [Dkt. # 58] ("Defs.' Mot.").

The party moving to quash a subpoena bears the burden of demonstrating that the subpoena violates Rule 45.  *See, e.g.*, *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984), citing *Westinghouse Elec. Corp. v. City of Burlington*, 351 F.2d 762 (D.C. Cir. 1965).  "Where a movant asserting undue burden 'seeks to prevent a deposition entirely,'" as opposed to just limiting it, "his 'burden of proof is particularly great [.]'"  *Payne v. District of Columbia*, 859 F. Supp. 2d 125, 131 (D.D.C. 2012), quoting *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 263 F.R.D. 1, 8 (D.D.C. 2009).

But it is also true that in the D.C. Circuit, there is a presumption against deposing high-ranking government officials.  *See, e.g.*, *Peoples v. U.S. Dep't of Agric.*, 427 F.2d 561, 567 (D.C. Cir. 1970) ("[S]ubjecting a cabinet officer to oral deposition is not normally countenanced.").  Therefore, "high ranking government officials are generally not subject to depositions unless they

have *some* personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere." *Alexander v. FBI*, 186 F.R.D. 1, 4 (D.D.C. 1998) (collecting cases); *see also In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) ("The duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere."), citing *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985).

Defendants contend that the "subpoena should be quashed as contrary to the presumption that high-ranking federal officials such as Secretary Johnson should not be deposed absent extraordinary circumstances, which plaintiffs have not established in support of their subpoena." Defs.' Mem. in Supp. of Defs.' Mot. [Dkt. # 58] at 1.  But that heightened standard applies only where the official is being asked to testify about the deliberative process relevant to his official duties.  *See, e.g.*, *Simplex*, 766 F.2d at 586 ("[T]op executive department officials should not, absent extraordinary circumstances, be called to testify *regarding their reasons for taking official actions*.") (emphasis added), citing *United States v. Morgan*, 313 U.S. 409, 422 (1941) (finding that Secretary of Agriculture "should never have been subjected to [an] examination" regarding "the process by which he reached the conclusions" contained in an official order fixing maximum rates to be charged by market agencies at the Kansas City Stockyards).  Defendants appear to recognize as much when they acknowledge that "[c]ircumstances warranting depositions of high level officials have been found only occasionally, where a party has demonstrated that the deponent has 'unique personal knowledge' of relevant and necessary information that cannot be obtained through other means."  Defs.' Reply Mem. in Supp. of Defs.' Mot. [Dkt. # 62] at 2, quoting *Cmty. Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983).

Since there is no dispute that the sitting Secretary of the Department of Homeland Security is a high level official to whom the doctrine developed in this Circuit would apply, and since the plaintiffs are seeking to inquire into potential leaks to members of the press – not Secretary Johnson's decision making as a government official – the question to be decided is whether plaintiffs have shown that this witness has personal knowledge of relevant and necessary information that cannot be obtained elsewhere. *See Alexander*, 186 F.R.D. at 4. On those points, the record is extremely thin. While plaintiffs may have grounds to believe that this witness has the requisite personal knowledge, they have not yet established that they cannot obtain the information he may possess elsewhere. Therefore, defendants' motion to quash will be granted at this time.

The only remaining claim in this case is the portion of Count I that alleges a violation of the Privacy Act based upon the disclosure of personal information to the media. Order (Sept. 15, 2014) [Dkt. # 45]; Mem. Op. (Sept. 15, 2014) [Dkt. # 46]. The amended complaint alleges that plaintiffs received anonymous and harassing emails in June of 2012 and reported them to the FBI, and that they gave the FBI permission to access plaintiff Scott Kelley's email account for the sole purpose of determining the IP address of the sender. Am. Compl. [Dkt. # 19] ¶¶ 41, 43–44, 47, 49, 53. The sender turned out to be Paula Broadwell, a woman who was having an extramarital affair with the former CIA Director, General David Petraeus, with whom the Kelleys had an ongoing social relationship. *Id.* ¶¶ 32, 55–56. General Petraeus resigned on November 9, 2012, and it was soon reported that he resigned because the affair had been uncovered while the FBI was investigating a complaint filed by an unnamed individual. *Id.* ¶ 77. But the Kelleys did not remain unnamed, and the thrust of their complaint is that plaintiffs' identities and their communications with Broadwell, General Petraeus, and another general, John R. Allen, were revealed to the media

by a person or persons in law enforcement or the military without their permission.  *See, e.g.*, *id.* ¶¶ 80–81, 88, 91.[1]

In particular, the complaint points to a November 10, 2012 Washington Post article that identified Jill Kelley as the recipient of the Broadwell emails, and to other news accounts that published the same information shortly thereafter.  *Id.* ¶¶ 4, 80 n.17.  The complaint alleges that on November 11, 2012, plaintiff Jill Kelley received a fax from a Washington Post reporter claiming that he had seen some of the emails from Broadwell, and that by November 14, FoxNews.com was characterizing the emails between Mrs. Kelley and General Allen as sexually explicit.  *Id.* ¶¶ 4, 81.  While some of these articles attribute the information to "law enforcement officials," others refer to "a senior military official."  *Id.* ¶ 80 n.17.  The complaint also alleges that it was Secretary Johnson, then serving as the General Counsel of the Department of Defense, who was tasked with reviewing the Kelley emails on behalf of the Department of Defense, and that he discussed the nature of the emails in an interview with the Tampa Tribune in July of 2013, long after these events came to light and after it had been determined that the military would not be looking further into any wrongdoing by General Allen.  *Id.* ¶ 82.

In addition to these articles, plaintiffs rely upon a document received in discovery as the basis for their claim that Secretary Johnson has personal knowledge that would be relevant to this case.  Pls.' Mem. in Opp. to Defs.' Mot. [Dkt. # 61] ("Pls.' Opp.") at 2–3.  They assert that "Secretary Johnson received correspondence about the Kelleys from a reporter for the Daily Beast named Dan Klaidman, and that the two were evidently close enough that the reporter knew the Secretary's personal Gmail address and addressed the Secretary by his first name."  *Id.* at 3.  But

---

1       For a detailed summary of the facts alleged in the complaint, see *Kelley v. FBI*, 67 F. Supp. 3d 240, 247–50 (D.D.C. 2014).

this document, which has been reviewed by the Court, does not reveal Johnson to have been the initial source, since the email itself reflects that the Kelleys' identities had already been disclosed, and it does not go so far as to demonstrate that, as plaintiffs put it, Johnson "was evidently engaged in at least some outside-official-channels communication with the media." *Id.* at 4.  After all, Johnson was the recipient of the email, not the sender.  But it does raise questions about whether Johnson provided further information in response.

Plaintiffs also direct the Court's attention to a July 3, 2013 Tampa Tribune article, *id.* at 2, which reports that Johnson said he "pored over" the "comprehensive" collection of emails provided to him by the FBI, which appeared to him to include every single communication between Mrs. Kelley and General Allen, and that "he concluded that they showed a 'potentially inappropriate relationship' . . . but no breach of national security." Ex. 1 to Pls.' Opp. [Dkt. # 61-2] at 3.  He indicated that he then turned the material over to the Department's Office of Inspector General to investigate.  *Id.*  In the article, Johnson also stated that he received a call from the FBI about the emails three days after General Petraeus resigned, *id.* at 2, which would have been after Mrs. Kelley's name first appeared in the press, but close in time to some of the articles attributed to senior military officials.  *See* Am. Compl. ¶¶ 80 n.17, 84 n.22.  Finally, the article states that it was Johnson's "'strong recollection'" that the emails "'were the product of subpoena.'"  Ex. 1 to Pls.' Opp. at 3.

The mere fact that Johnson, who by that time was the former General Counsel of the Department, responded to questions on the record in connection with the Tampa Tribune article does not give rise to any reason to believe that he was the source of the previous unauthorized and unattributed leaks.  The interview with the Tribune reporter was conducted eight months after the disclosures this lawsuit is seeking to probe, and it was prompted by the fact that a member of the

House Armed Services Committee had publicly called for the investigation into General Allen to be re-opened.  Johnson simply informed the reporter that his review of the material indicated that such a step would be unnecessary, and he cast no needless aspersions on the Kelleys.  This single interview hardly supports plaintiffs' contention that Secretary Johnson "has a demonstrated propensity to speak with journalists about the Kelley records."  Pls.' Opp. at 4.

Plaintiffs do not point to any other facts that would suggest that the source who leaked Mrs. Kelley's identity was the General Counsel of the Department of Defense.  Basically, they just want to ask him.  *See id.* at 3–4 ("Secretary Johnson was a 'senior defense' or 'senior military' official who . . . could plausibly have leaked the information in question . . . .").  What could have happened seems to be a slender reed upon which to premise the interruption of a Cabinet Secretary's work.  The information in the article does confirm, though, that Johnson would have been one of the individuals in the Department with detailed knowledge of the content of the emails in the days in question in November of 2012, and there is evidence that he was in communication with at least one reporter who had access to his personal email address at that time.  So one can understand why plaintiffs to want to question him.  Even if he does not have any knowledge of or involvement in the disclosures to the media, he may have some relevant knowledge about the receipt and dissemination of the emails by the FBI.  Based on all of these circumstances, the record supports a finding that Secretary Johnson has some personal knowledge about the matter.

However, plaintiffs do not indicate that they have tried to ask any of the reporters who identified their source of the information about the Kelleys as a "senior military official" who that official might be, or even whether, when, and under what circumstances they received information directly from anyone at the Department of Defense.  They do not state that they have subpoenaed any records from those reporters or the news organizations involved, or what the records

6

subpoenaed from the government reveal.   Indeed, they devote very little attention in their opposition to establishing that the information they seek cannot be obtained through any other means.   They simply assert, "[p]rior cases demonstrate that journalists will not reveal their confidential . . . sources, even after protracted litigation." *Id.* at 7.  But there is nothing before the Court that would indicate that any information disclosed in this case was actually made under a promise of confidentiality or that the sources are unwilling to waive that protection.

Plaintiffs point to *Hatfill v. Gonzales*, 505 F. Supp. 2d 33 (D.D.C. 2007), but that case stands for the opposite proposition, because in it, the court actually ordered the non-party journalists to provide full responses to the plaintiff's questions.   *Id.* at 51.   The opinion is instructive, though, because in that case, before the court intervened, the reporters were all deposed, and they confirmed numerous leaks from FBI and DOJ sources, withholding only their names, so the court premised its ruling on a detailed recitation of the many means of obtaining that information that had previously been exhausted.  *Id.* at 42–43.

In the end, it may turn out that the information plaintiffs seek cannot be obtained through any other means, but that prong of the two part test has yet to be established.   After a review of the entire record, then, it is **ORDERED** that defendants' motion to quash is **GRANTED** at this time, but that ruling is without prejudice to plaintiffs' renewal of their request to take the deposition, based upon a more detailed factual submission, at a later point in the discovery period.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE:  July 16, 2015